MARC A. AGNIFILO (NY 2476182)
TENY R. GERAGOS (NY 5517693)
**BRAFMAN & ASSOCIATES, P.C.**
767 Third Avenue, Floor 26
New York, NY 10017-2023
Telephone: (212) 750-7800
Facsimile: (212) 750-3906
Email: marc@braflaw.com
     tgeragos@braflaw.com

WALTER F. BUGDEN, JR. (480)
**BUGDEN & ISAACSON, LLC**
445 E 200 S, Suite 150
Salt Lake City, UT 84111
Telephone: (801)467-1700
Facsimile: (801)746-8600
Email: wally@bilaw.net

Attorneys for Defendant

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH / CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>vs.<br><br>JACOB ORTELL KINGSTON,<br><br>    Defendant. | **REPLY IN RESPONSE TO MOTION FOR PRETRIAL RELEASE ON CONDITIONS**<br><br>Case No. 2:18-cr-00365-JNP-BW<br><br>District Judge Jill N. Parrish<br>Magistrate Judge Brook C. Wells |

Defendant, Jacob Kingston, respectfully submits this Memorandum in reply to the Government's Response to his motion for pre-trial release on conditions. Kingston filed his Motion for Pretrial Release on Conditions on January 4, 2019. (Dkt. 122.) On January 17, 2019, the Government returned and sealed the Second Superseding Indictment adding new charges

against the existing defendants and two new defendants—Kingston's wife and mother. On January 18, 2019, the Government filed a Response to Kingston's January 4, 2019 motion for release—citing the Second Superseding Indictment extensively. Five days later, on January 22, 2019, the Second Superseding Indictment was unsealed and made available to all counsel. (Dkt. 135.) In this Reply Memorandum, counsel will briefly reply to the points raised by the Government. Counsel asks that in addition to the information in this Memorandum, that he be permitted to provide additional information concerning these, and other, issues at the hearing scheduled for Thursday, January 31, 2019.

<u>First</u>, the Second Superseding Indictment, returned since the filing of Kingston's original motion for release, does not materially change the nature of the case against him nor the Court's calculus of risk of flight and danger to the community.

<u>Second</u>, the cases cited by the defense in the table on pages 6 and 7 of our original motion show that in similar tax matters with defendants facing similar sentencing exposure, the defendants were released on conditions.

<u>Third</u>, as confirmed by the Government, the witness allegedly discussing bribing and intimidating witnesses with Kingston was in fact a Government cooperator who was, by the Government's own admission, lying to Kingston about these matters. As a result, there is no danger presented by Kingston of witness intimidation or bribery because the actions amounted to a ruse ("catfishing" in the Government's parlance) conducted by a Government cooperator.

<u>Fourth</u>, the Government's recent change in position concerning the August 2018 family trip to Turkey, Malaysia and back to Utah corroborates our contention that in fact Kingston was not fleeing the jurisdiction.

Fifth, the Government has not come forward with any evidence that Kingston's investments in the Turkish businesses were illegal, improper or conducted through illicit means.

Sixth, aside from sheer speculation, the Government has failed to show how a U.S. citizen without a U.S. passport can leave the United States or enter Turkey, and that a U.S. citizen can remain in Turkey beyond a ninety-day period.

Seventh, the Government has still failed to explain the details of its theory of tax evasion and mail fraud, leading to the conclusion that the core of the Government's case is uncertain, weak and unprovable.

I. The New Indictment Does Not Change the Case or the Release Calculus

The Government is correct that the original bail motion was filed in regard to the Superseding Indictment and that since the filing of that motion, the Government has returned a Second Superseding Indictment, adding several charges against Kingston. However, while the recent indictment adds charges and years to the statutory maximum sentence, it does not change the guidelines whatsoever. According to the Government, Kingston was facing life in prison under a guidelines calculation with the previous two indictments and is still facing life in prison under a guidelines calculation with the recent indictment. Additionally, the new indictment does not enlarge the scope of the alleged tax fraud at the heart of this case.

While the new indictment does add money laundering and other counts, it does not alter the scope of the alleged fraud or, as noted, the sentencing exposure. Therefore, the new indictment should, respectfully, not change the Court's analysis as to whether release on conditions is appropriate.

II. Defendants in Cases With Similar Charges Facing Similar Sentenced Have Been Released on Reasonable Conditions

As stated in Kingston's Motion for Release (Dkt. 122 at 6-7), a review of similar large-scale biodiesel tax fraud cases around the country shows that release on conditions is typical in cases of this type. In the cases cited, the allegations focused on tax credit fraud and fraudulent RIN productions, specifically that: (i) defendants fraudulently filed for tax credits on fuel that was not produced; (ii) defendants generated false paperwork to create renewable identification numbers ("RINs"); and (iii) defendants laundered the proceeds of their fraudulent schemes. These defendants were ALL released on bail subject to varying conditions. We analyze the cases cited in pages 6-7 of the original memorandum below:

Brian Carmichael, Chad Ducey, Chris Ducey, Craig Ducey and others were charged with conspiracy to commit wire fraud, tax fraud, false statements to the Environmental Protection Agency. (United States v. Brian Carmichael, et al., 13 CR 194 (SEB) (S.D. Ind.) at Dkt. 3.) Carmichael, and the Duceys operated the company E-Biofuels, and the Government alleged that the defendants fraudulently filed tax credits for biodiesel that had not been produced, blended, and sold in compliance with IRS rules. The Government also alleged that E-Biofuels would fraudulently sell RIN-stripped B99 from companies and then resell that fuel to its customers by representing that it was B100 with assigned RINs, allowing its customers to claim a tax credit. All defendants were released on their own signatures. Carmichael was released on conditions preventing him from contacting co-defendants, victims, or witnesses, and his travel was restricted to the District of Oregon and the Southern District of Indiana. Chad Ducey was released on the same conditions, except his travel was restricted only to the Southern District of Indiana. Christopher Ducey was released on the same conditions, except his travel was restricted to the Southern and Northern Districts of Indiana.

Defendants <u>Andrew Bernard</u> and <u>Robert Fedyna</u> were charged with conspiracy to commit wire fraud and making false statements related to the Clean Air Act. (<u>United States v. Andrew Bernard</u>, 17 CR 61 (SPC) (M.D. Fla.) at Dkt. 2.) Like Kingston, both Bernard and Fedyna were charged in participating in a multi-state scheme to defraud biodiesel buyers and taxpayers by allegedly fraudulently selling biodiesel credits and fraudulently claiming tax credits. The Government also alleged that the defendants laundered the proceeds of the scheme through shell entities and established bank accounts in the names of those entities to perpetrate the scheme and conceal the proceeds. Lastly, the Government alleged that the defendants generated false paperwork to create RINs, which were in fact alleged to not be legitimate. The Government alleged that the coconspirators received at least $42 million from the sale of the RINs. Davanzo was released on $1 million bail secured by one property and was subject to home incarceration. Fedyna was released on $2 million bail secured by one property and was subject to home detention.

Defendant <u>Richard Estes</u> was charged with conspiracy to commit money laundering, where the Government alleged that he and co-conspirators laundered proceeds of schemes to falsely claim tax credits and file false claims for refunds of excise credits with the IRS. (<u>United States v. Richard Estes</u>, 15CR6048 (SMJ) (E.D. Wash.) at Dkt. 17.) The Government alleged that the fuel claimed was either not produced or was re-processed. The Government alleged that Estes laundered $39 million through his accounts or accounts he controlled. Estes was released and ordered to remain in the state of Washington while the case was pending.

Defendant <u>Nancy Bush Estes</u> was also charged with conspiracy to commit money laundering. (<u>United States v. Nancy Bush-Estes</u>, 15CR6047 (SMJ) (E.D. Wash.) at Dkt. 17.) Like Richard Estes, she was charged laundering proceeds of schemes to falsely claim the

5

production of RINs and file false tax refund claims with the IRS. Nancy Estes' only condition was that she remain in the United States while the case was pending.

Defendant Donald Holmes was charged with conspiracy to commit wire fraud and conspiracy to defraud the Government. (United States v. Donald Holmes, 15CR6044 (SMJ) (E.D. Wash.) at Dkt. 1.) The Government alleged that the defendant agreed with coconspirators to participate in a scheme to falsely generate RINs and to falsely claim tax refunds from the IRS. Holmes' travel was restricted to the United States.

Defendant Jeffrey Gunselman was charged with wire fraud, money laundering, and false statements in violation of the Clean Air Act. United States v. Jeffrey Gunselman, 12CR78 (N.D. Tex.) at Dkt. 1.) The Government alleged that Gunselman defrauded the EPA by falsely representing that he was in the business of producing bio-diesel, but instead falsely generated renewable fuel credits and sold them companies and brokers. Through this alleged scheme, the government alleged that purchasers wired $41,762,236 into his account. The Government also alleged that Gunselman laundered the criminal proceeds by engaging in nearly $12 million of monetary transactions to purchase, among other items" a Gulfstream airplane, a Military Tank, a Bentley, a Lexus, agricultural, business, and residential real estate. Gunselman's bail was $100,000 with two sureties, and his travel was restricted to the Northern District of Texas.

Defendant Rodney Hailey was charged with multiple counts of wire fraud, money laundering, and false statements in violation of the Clean Air Act. United States v. Rodney Hailey, 11CR540 (WDQ) (D. Md.) at Dkt. 19,) The Government alleged that the defendant falsely represented that he was in the business of producing bio-diesel fuel, when in fact the facility was not capable of producing fuel, then generated and sold over 35 million RINs to companies and brokers for at least $9 million. The Government alleged that the defendant used

the proceeds of the alleged scheme to fund vehicle purchases, real estate investments including his home, and jewelry. Hailey's travel was restricted to the United States.

Though it does not appear to counsel that any of the defendants were arrested off of a plane to another country, we continue to maintain that the arrest of Kingston was orchestrated by the Government, which secured an indictment, then waited <u>three weeks</u> to arrest Kingston while he was boarding a plane with his family, after having purchased round-trip air travel, so that the prosecution could then later argue that he was fleeing. In fact, the Government knew, as it had for over a year based on Kingston's Delta records it subpoenaed, that Kingston would take frequent trips to other countries. So, they waited until he was boarding a plane to Turkey with his wife, and two of his sons and their wives, to arrest him then claim he was about to flee. The idea that Kingston would leave his thirteen children and eleven grandchildren behind is contrary to Kingston's character and belied by the fact that he purchased round trip tickets and that he regularly travels to Turkey and Malaysia on business and for vacations.

III.  <u>The Witness Intimidation and Bribery Cited by the Government Never Existed And Was Instead a Ruse Perpetrated by the Government's Own Cooperator</u>

In a twist of irony befitting a modern-day soap opera, the Government asks the Court to continue to detain Kingston because one of the Government's own cooperating witnesses apparently falsely told Kingston that he (the cooperator) was bribing government officials and intimidating witnesses when in fact he was not, as part of a scheme to "catfish" Kingston and steal his money. That the Government would rely on this person, much less make this person a witness, shows the lengths the Government is willing to go to in order to bring these meritless charges and keep Kingston in jail. However, it is undisputed that in fact there was no witness being intimidated, that there was no government official being bribed, and that none of these things were actually happening because the Government cooperator made them all up. Worse yet

7

is that the cooperator made up this story to steal Kingston's money. Now that the Government has acknowledged that these were false, staged events, orchestrated by their own cooperator, these issues should not factor, most respectfully, in this Court's release calculus.

IV. The Government Cannot Seriously Dispute That the August 2018 Trip Previously Characterized as Kingston Fleeing Utah Was in Fact a Family Trip to a Turkish Resort Destination, to Malaysia and Back to Salt Lake City

The Government does not, and cannot, dispute the Travelocity and credit card records showing that the August 2018 trip was a family vacation to the resort town of Bodrum, Turkey with a continuation to Kuala Lampur, Malaysia, where Kingston has a palm oil facility, and back to Salt Lake City. In the face of such overwhelming evidence, the Government, apparently venturing into the travel agency business, questions why a family would vacation in Turkey.[1] The answer is that Bodrum is one of the most beautiful, historically-significant places in all the world. It was the site of the Mausoleum of Halicarnassus, one of the seven wonders of the ancient world, destroyed by earthquakes between the 12th and 15th centuries. It is also the site of Bodrum Castle built in 1402 by the Knights Hospitalar, who used the same volcanic stone of the Mausoleaum of Halicarnassus in its construction. When visitors tire of the historical sites, they can enjoy Bodrum's beautiful beaches. So, regardless of the Government's view of what is an acceptable family destination, the evidence is overwhelming that the August 2018 trip, so heavily relied upon by the Government as a reason to keep all three incarcerated defendants in jail, was a family vacation.

The Government then ventures that it is "unusual for a parent to accompany their child on a honeymoon, and it is even more unusual to book travel for an international honeymoon a mere three days before the trip." (Gov't Response at 22.) First, as we have maintained and as the

---

[1] Had the Government proposed family vacation destinations prior to the travel, perhaps the Kingstons could have benefited from the Government's approved list of honeymoon locations.

8

evidence shows, the Kingstons are a close-knit family. Second, in 2015, Kingston bought a trip for five of his family members for one of his son's honeymoons, less than a month before the trip. Indeed, the Government has seized the email accounts and is aware of this fact.

In addition, by continuing to maintain that Kingston was fleeing with his family on Delta Airlines, the Government reveals a major inconsistency in its core theory of why it believes detention is appropriate. On numerous occasions and most recently in its Response, the Government maintains that Kingston is a flight risk because he will take a private plane allegedly owned by co-defendant Dermen. There are several problems with this theory. First, it is inconsistent with the Government's other core theory that Kingston was fleeing with five members of his family on a Delta flight in August 2018. Second, private aviation is highly regulated, especially so following the September 11, 2001 terror attacks, and there is no possibility of leaving the country on a private plane undetected or without a U.S. passport. Third, there is no evidence that Dermen owns a private plane. The Government's argument in this regard is merely layers of misinformation heaped on baseless speculation, amounting to nothing relevant.

We ask that the Court instead rely on the actual evidence deduced thus far, particularly the Travelocity records, Kingston's credit card records, and the fact that Kingston is paying for round-trip travel for himself and five others, returning to Salt Lake City.

V.  The Government Has Proffered No Evidence That Kingston's Investments in
    Turkish Business Interests Were Illegal or Improper

As pointed out in our initial motion, all transactions concerning the Turkish businesses were valid bank transactions in the names of the true people and entities involved. The Government has adduced no evidence to the contrary.

Moreover, the Government's unconfirmed statements that Kingston owns real estate in Turkey is not based on records or official information but instead on the purported representations of unidentified witnesses, the reliability of whom cannot be tested. While it is true that the Court may rely on proffers at detention hearings, these proffers are decidedly unreliable and should, most respectfully, be disregarded by the Court.

VI. The Government Has Adduced No Evidence as to How Kingston, a U.S. Citizen, Would Enter or Remain in Turkey Without a Passport or as a Fugitive

The Bail Reform Act discusses "serious" risks of flight, not fanciful ones. It is fanciful to suggest that perhaps the President of Turkey has taken such a liking to Jacob Kingston that he will permit Kingston to enter Turkey without a valid U.S. passport and to remain in Turkey as a non-citizen and as a fugitive from justice. The Government's so-called evidence for this fanciful tale is that Kingston appeared in a photograph with the Turkish President, who issued a press release discussing this U.S. investment in positive terms. However, this is evidence only of Turkey's apparent interest in having U.S. investment, an interest shared by almost every country. Kingston's investment in Turkish businesses and the fact that this investment was acknowledged by the Turkish President hardly means that Kingston is welcome as a non-citizen, U.S. fugitive in that country. As set forth in our initial motion, if Kingston had a valid U.S. passport, he could apply for a visa allowing him to enter and remain in Turkey for ninety days, after which he would be removed from Turkey as a visa-overstay. There is no evidence in this record to suggest that the rules applicable to every U.S. citizen do not apply to Jacob Kingston.

VII. The Government Has Failed To Explain The Tax Evasion And Mail Fraud Allegations That Are at the Heart of This Prosecution

The Government has indicted a hugely ambitious tax evasion and fraud case that it still, six months later, has failed to sufficiently explain to the Court or counsel. For instance, is the

Government saying that Kingston did not produce ANY biodiesel, or just that he didn't produce exactly what he claimed to produce? Also, is the Government's theory reliant on fuels and substances allegedly not produced by people and entities other than Kingston on which Kingston claimed some sort of credit? Because the prior detention hearings did not involve Kingston, the focus has never been on the Government's theory of fraud and evasion. Rather, the Government has focused on private planes, on arguments in restaurants, on text messages of its own cooperating witness "catfishing" Kingston, in investment in Turkey, etc. But the Government has not had to really explain its theory of prosecution.

      The prosecution has indicated that unlike the prior detention hearings in this case, it does not intend to call a witness. This omission speaks volumes. The defense contends that the Government is refusing to call an agent at Jacob Kingston's bail hearing because it is concerned the agent will be asked details about the alleged tax evasion and mail fraud that the Government is not prepared to answer. To date, the Government has never made its theory of prosecution clear, resorting instead to sweeping, generalized statements of a massive tax fraud. Now, with the opportunity for the first time to clearly explain its case to the Court and defense counsel, the Government for the first time in this case refuses to call an agent to the stand.

Jacob Kingston will remain in Utah to fight this case for the same reason the Government refuses to call an agent at this hearing, specifically because the Government's core case is not strong, because it is the sort of case that cries out for a vigorous defense, and because Jacob Kingston will so defend it.

Dated: January 29, 2019
New York, NY

Respectfully submitted,

**Brafman & Associates, P.C.**

By: /s/
Marc A. Agnifilo, Esq., Of Counsel
Teny R. Geragos, Esq.

**Bugden & Isaacson, LLC**

By: /s/
Walter Bugden, Esq.

cc: All Counsel (via ECF)