MARC A. AGNIFILO (NY 2476182)
TENY R. GERAGOS (NY 5517693)
**BRAFMAN & ASSOCIATES, P.C.**
767 Third Avenue, Floor 26
New York, NY 10017-2023
Telephone: (212) 750-7800
Facsimile: (212) 750-3906
Email: marc@braflaw.com
         tgeragos@braflaw.com

WALTER F. BUGDEN, JR. (480)
**BUGDEN & ISAACSON, LLC**
445 E 200 S, Suite 150
Salt Lake City, UT 84111
Telephone: (801) 467-1700
Facsimile: (801) 746-8600
Email: wally@bilaw.net

*Attorneys for Defendant*

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH / CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JACOB ORTELL KINGSTON,<br><br>Defendant. | **APPEAL FROM ORDER DENYING RELEASE PENDING TRIAL**<br><br>Case No. 18-cr-00365-JNP-BCW<br><br>District Judge Jill N. Parrish<br>Magistrate Judge Brook C. Wells |

By this Motion, Jacob Kingston moves this Court for a detention hearing on March 4, 2019, or at a time thereafter convenient to the Court and the parties. Kingston is appealing the denial of his Motion for Release on Conditions.[1] This motion is made pursuant to DUCrimR 57-16(a)(1).

---
[1] Dkt. 180.

In support of this motion we submit the instant memorandum of law as well as the memorandum submitted to Magistrate Judge Brook C. Wells, attached hereto as Exhibit A, and the reply memorandum, attached hereto as Exhibit C, which contains a full summary of many of the central issues pertaining to the instant application.

## I. Procedural History

On January 4, 2019, Kingston moved the Court for the first time, through counsel, for an Order releasing him on rigorous conditions that he could work with counsel to defend the extensive charges levied against him.[2] The Government, in direct response to the argument Kingston put forth in the Motion, waited to indict Jacob Kingston on a Second Superseding Indictment on January 17, 2019, then served its response on counsel on January 18, 2019.[3] The Government did not make a motion to unseal the indictment until five days later, on January 22, 2019, at which point, the indictment was unsealed and made available to all counsel.[4] Kingston replied to the Government's response on January 28, 2019.[5] Kingston's Motion and Reply are incorporated to this brief by reference, and attached herein.

On January 31, 2019, Magistrate Judge Wells held a detention hearing. Judge Wells took the arguments under submission,[6] and denied the Motion on February 8, 2019.[7]

## II. Introduction and Proposed Conditions of Release

Kingston is presumed innocent and "detention prior to trial or without trial is the carefully limited exception." United States v. Salerno, 481 U.S. 739, 755 (1987). When deciding an issue of pretrial release, federal courts in Utah express a strong preference for release pending trial.[8]

---

[2] See Dkt. 122 filed 1/4/19; attached hereto as Exhibit A with the original exhibits.
[3] See Gov't Response, attached hereto as Exhibit B.
[4] Dkt. 135.
[5] Dkt. 161, attached hereto as Exhibit C.
[6] See Dkt. 174.
[7] Dkt. 180, attached hereto as Exhibit D.
[8] United States v. Wright, 18 CR 336 (DN), 2018 LEXIS 121974 at *6 (D. Utah, July 20, 2018).

Indeed, the Bail Reform Act requires the Court impose ""the least restrictive...condition, or combination of conditions, that ... will reasonably assure the appearance of the person as required and the safety of the community."[9]

Kingston offers the following proposed conditions of release that, we submit, "will reasonably assure [his] appearance" and protect the community[10]:

(1) A $10M bond signed by Kingston;

(2) The bond will also be co-signed by 45 members of Kingston's family who exert powerful moral suasion over him, including all six of his adult children (the identities of whom will be provided in a non-public filing);

(3) The bond will be fully secured by equity in real property owned by members of Kingston's family who again exert powerful moral suasion over him (the addresses will be provided in a non-public filing);

(4) Kingston will be on full home incarceration at his home;

(5) Kingston will be electronically monitored with a GPS device that will be attached to his body and will record and transmit his every movement;

(6) Kingston's travel will be restricted to the District of Utah;

(7) Kingston will surrender of all travel documents, and will not secure new travel documents;[11]

(8) Kingston's children will surrender their travel documents and will agree to not secure new travel documents;[12]

(9) That Kingston shall not contact directly or indirectly any witness in this case (however, this does not limit the defense attorneys and their investigators from conducting appropriate defense investigation, consistent with the protective order signed by the Court); and

(10) Strict pre-trial services supervision.

---

[9] 18 U.S.C. § 3142(c)(1)(B).
[10] Id.
[11] Kingston's passport is currently in the possession of counsel Walter F. Bugden, Esq.
[12] His minor children have surrendered their passports to pretrial services already, following the arrest of Sally Kingston. Sally Kingston's passport is currently in the possession of pretrial services.

3

**III.     Legal Standard**

In determining issues of pre-trial detention and release, 18 U.S.C. § 3142(g) directs courts to consider: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the person; (3) the nature and seriousness of the danger to any person or to the community that would be posed by the person's release; and (4) the history and characteristics of the person—including his family ties, employment record, community ties, history of drug or alcohol abuse, criminal history, and whether at the time of the offense or arrest he was on probation or parole.[13] Here, as explained below, the balance of factors weighs in favor of granting Kingston's release pending trial. Any doubts regarding the propriety of release should be resolved in favor of the defendant.

Although Kingston has not been before this Court for a Review of his Detention since the original August indictment, Kingston assumes the Court's familiarity with the following allegations that the Government has levied against all defendants with respect to risk of flight and danger to the community: (i) at the time of the February 2016 raids, "it became apparent that records had been removed and destroyed in anticipation of the warrants";[14] (ii) Kingston "wired over $130 million of the scheme proceeds to Turkey and used these proceeds to make significant business investments";[15] (iii) Kingston "schemed to pay an intermediary to hire an enforcer to intimidate an harm at least two suspected cooperating witnesses"[16]; and (iv) Kingston was a risk of flight because he "was arrested at the Sale [sic] Lake City, Utah airport *en route* to Turkey by

---

[13] 18 U.S.C. § 3142(g).
[14] Dkt. 9 at 6.
[15] Id.
[16] Id. at 8-9.

way of Amsterdam with his wife and some of his children."[17] In Kingston's original motion papers and again herein we explain the allegations are deeply flawed.

### IV. Kingston Does Not Pose a Danger

The Government's argument that Jacob Kingston is a danger is based largely on a series of written communications allegedly between Kingston and a government cooperator. The hearing before Magistrate Judge Wells established conclusively that the "intermediary" involved in these alleged communications with Kingston was a government cooperator at the time of these interactions. The hearing further established that the "intermediary" had invented a scenario and then sought to embroil Kingston in the made-up scenario the cooperator had invented. Specifically, the cooperator told Kingston that he (the cooperator) was bribing government officials and was getting a great deal of information about the current case. The cooperator further stated that if Kingston did not agree to work with the cooperator in the effort to bribe these make-believe government officials, that Kingston's wife, Sally, could be in danger. However, there were no government officials. Rather, the cooperator was getting information about the government's investigation not because he was bribing a government official, but because he was a cooperator.

In determining whether Kingston is a danger to the community or a danger to any particular witness or person, a few important facts must be known. <u>First</u>, the cooperator maintained repeatedly in the messages that if Jacob Kingston did not work with the cooperator, his wife would be in legal jeopardy. <u>Second</u>, the cooperator maintained that he had inside information about the investigation, providing Kingston with particular facts that were true about the pending investigation. In this regard, the cooperator coerced Kingston into having these conversations and dealings with him. Amazingly, the cooperator did so while he was actively cooperating with the

---

[17] <u>Id.</u> at 11.

5

government. While the Government will tell this Court that the text messages between the "intermediary" and Kingston began in 2014, it is *undisputed* that every single text message the Government attaches as an exhibit to establish that Kingston was a danger to the community occurred *after* this man became a Government cooperator.

Setting aside the egregious conduct of the cooperator and potentially of a government agency which fostered this conduct,[18] which will be a major issue at trial, the Court should look suspiciously at this material, and not give it any weight in terms of whether Kingston poses a danger to any person.

**V.     Kingston Is Not a Risk of Flight**

    A.  Circumstances of Arrest

The Government has repeatedly stated that Jacob Kingston is a flight risk because he was arrested *en route* to Turkey from Salt Lake City. Indeed, in response to this Court's question as to why it would file an indictment *in August* when their investigation was not close to complete, they have told this Court that they indicted him because he was a risk of flight.

> THE COURT: If you've always anticipated it and you've had the discovery, why are we doing this piecemeal? Why are we doing an indictment and a superseding indictment, and a second one? Why didn't you just do it?
>
> MR. EWENCZYK: Very simply, Your Honor, the government had an ongoing investigation and received evidence and information that the defendants were going to flee. In particular, Mr. Jacob Kingston was arrested at the Salt Lake City Airport about to board a plane going to Turkey. And given all the facts that Your Honor has heard about in the detention hearings and as Your Honor has ruled, these defendants are a risk of flight. So the government acted and arrested these defendants, particularly Mr. Jacob Kingston, who was about to flee the jurisdiction.[19]

---

[18] We have reason to believe that the cooperator was aligned with several different agencies. Accordingly, we have no reason to believe that this part of the investigation was conducted with the IRS. Until we receive sufficient discovery on this important, complex issue, it is impossible to know about the details of this cooperation.
[19] 12/18/18 Tr. at p. 44

This statement—which has been central to its argument that Jacob Kingston is a flight risk—is false. As stated in Kingston's Motion, the first Indictment was filed on August 1, 2018. It was sealed on that date.[20] Three weeks later, Jacob Kingston bought tickets to Turkey for himself, his wife, and several family members for his son's honeymoon. In fact, the Kingstons have celebrated another one of their son's honeymoon in Turkey before, last time in 2015.

The Government's response to this is that it is "unusual for a parent to accompany their child on a honeymoon, and it is even more unusual to book travel for an international honeymoon a mere three days before a trip."[21] Judge Wells "acknowledge[ed] it would be unusual for parents and siblings to accompany a couple on their honeymoon to a country considered dangerous by the State Department."[22] However, while this may be "unusual" to the Government and to Judge Wells, it was typical for the Kingston family, who often vacationed together in Turkey. And, as stated, the family had traveled together to Bodrum in 2015 for another one of their son's honeymoons.

Moreover, the Government's argument that they returned the indictment in August because "[m]ultiple witnesses have stated to investigators that Defendant Jacob Kingston made repeated statements affirming his intent to flee to Turkey if faced with prosecution."[23] The Government makes a litany of statements without attributing any witness, source, or even any indicia of reliability to them:

- A witness "heard that Defendant Jacob Kingston built a home in Turkey";[24]

- "Another witness told investigators that an employee of Washakie heard from Defendant Jacob Kingston's brother-in-law that Defendants Jacob Kingston and Isaiah Kingston had just returned from a two-week trip to Turkey where they purchased a home and that Jacob

---

[20] Dkt. 122 at 8.
[21] Gov't Response at 22.
[22] Dkt. 180 at 7-8.
[23] Gov't Response at 15.
[24] Id.

> Kingston and Isaiah Kingston had traveled to Turkey to purchase a home, to which they intended to flee, with their families, to avoid arrest.";[25]

- One witness heard from another person that "Jacob Kingston did not need a passport when he traveled to Turkey."[26]

These uncorroborated, unreliable hearsay statements are supposedly the evidence that to "clearly establish[]" that Kingston has "long planned to flee to Turkey to avoid prosecution."[27] Putting aside the fact that the Government's arguments are not corroborated whatsoever, the arguments cannot be credible on their face. First, knowing that the Government maintained the position that Kingston had a "house in Turkey," counsel *traveled* to Turkey before filing the Motion before Judge Wells so that he could come to this Court with *actual facts* rather than unreliable hearsay. Counsel observed an *office* on the Bosporus River for one of Kingston's businesses, Mega, that appears it could have previously been a private home. However, Kingston *does not* own a private home in Turkey.

Second, the Government's argument that Kingston purchased a home in Turkey that he could flee to in order to avoid arrest, then traveled back to the United States, is curious to say the least. Kingston has known since *at least* February 10, 2016 that there was a widespread investigation into Kingston himself and his companies when "the United States executed simultaneous search warrants on three office locations of WRE and UFS, Jacob Kingston's residence, a back-up server for WRE and four locations related to the Order."[28] If he flew to Turkey to purchase a home to flee, why did he come back to the United States? If he was intending to flee, why would he not have *stayed* in Turkey, the place he was supposedly intending to flee? The

---

[25] Id.
[26] Id. at 16.
[27] Id. at 16.
[28] Dkt. 9 at 6.

Government does not have answers to these questions—instead they proffer double hearsay statements to the Court to try to establish a factual scenario that does not exist.

Third, the Government cites a witness who apparently asserts that Kingston does not need a passport to enter Turkey. Once again, this is provably false, as counsel has now traveled to Turkey and observed the customs process at the Istanbul airport. There is high security at customs and every single alien presents their passport and goes through a rigorous process in order to be let into the country, including yours truly.

Finally, Kingston has also put forward additional explanations of Kingston's travel, including his travel itineraries for the past several years and further proof that Kingston was not intending to flee to Turkey.[29] We incorporate these arguments herein to establish that Kingston was *not* fleeing to Turkey in August 2018 and refer the Court to the arguments in our original brief so as not to be repetitive.

   B.  Turkey Does Honor the Extradition Treaty

At the detention hearing in front of Judge Wells, the Government put forth the same argument that they have espoused since the inception of this case: if the Court releases the defendants, the defendants will flee to Turkey and the United States will never be able to seek justice because Turkey does not extradite United States Citizens. As this Court is aware, the Government has relied on this argument at the hearing for Isaiah Kingston[30] on September 12, 2018 and Lev Dermen on October 3, 2018[31] by admitting a January 2018 Reuters news article as

---

[29] See Dkt. 122 at 8-12.
[30] See 9/12/18 Tr. at 44 (Q: Now during your research and your consideration of this case, did you also learn that President Erdogan of Turkey has announced that he will not be extraditing until the United States extradites the cleric Gulen?"); Tr. at 44 (Q: In sum and substance, does it state that President Erdogan has stated that he will not be extraditing until the United States extradites the cleric Gulen?")
[31] See 10/3/18 Tr at 59 ("Turkey is not honoring extradition requests at this time."); Tr. at 211-212 ("at this point the president of Turkey, President Erdogan, has stated that until Mr. Gulen is extradited from the United States to Turkey, Turkey will not be honoring any requests from the United States to extradite fugitives.").

an exhibit. This article was the Government's basis for their claim that "Turkey will not extradite any suspects to the United States."[32] This Court has found this argument persuasive with respect to defendant Lev Dermen, writing that the Government established that "Turkey is not presently honoring its extradition agreement with the United States."[33] Further, the Court stated that "aside from defense counsel's representation that the notion of Turkey declining to extradite Mr. Dermen was 'laughable,' Mr. Dermen made no attempt to proffer evidence that undermines the government's evidence that the President of Turkey has publicly committed not to honor the United States' extradition requests."[34]

However, circumstances have changed, and Kingston can, in fact, proffer evidence that "undermines the government's evidence that the President of Turkey has publicly committed not to honor the United States' extradition requests."[35] *Less than one week after this Court's Order* denying Dermen's Motion for Release, Turkey and the United States did engage in diplomatic discussions and Turkey returned an American citizen. The Government's conveniently ignores this fact and *continues* to rely on the Reuters article they admit as evidence in every hearing. Their deliberate ignorance of the facts is disingenuous and misleading to the Court. The specific changes in United States and Turkish diplomacy since this Court's October 8, 2018 Order are laid out below:

- On October 11, 2018, news outlets reported that the "U.S. and Turkey are expected to begin mending a rupture in relations with the likely release on Friday of North Carolina pastor Andrew Brunson from detention and house arrest in Turkey, where he has faced terrorism charges."[36]

---

[32] J. Kingston Detention Hearing, Government Exhibit O: Reuters Staff, Turkey to end extraditions to U.S. unless cleric is turned over, Erdogan says, Reuters (January 11, 2018, 7:32 AM) https://www.reuters.com/article/us-usa-turkey/turkey-to-end-extraditions-to-u-s-unless-cleric-is-turned-over-erdogan-says-idUSKBN1F01XV.
[33] Dkt. 91 at 4.
[34] Id.
[35] Id. at 5.
[36] Alan Cullison and Peter Nicholas, Turkey Is Expected to Release American Pastor on Friday, The Wall Street Journal (Oct. 11, 2018) https://www.wsj.com/articles/turkey-is-expected-to-release-american-pastor-on-friday-

- On October 12, 2018, as reported, Turkey freed Pastor Andrew Brunson, a move that "eas[ed] tensions with U.S." and signaled "a truce of sorts in a heated diplomatic dispute between Turkey and the United States."[37] In order to release Pastor Bronson, President Trump explained "We went through a system and we got him out," indicating that relations between the two countries to exchange citizens does, in fact, work.[38]

- On October 17, 2018, Secretary of State Michael Pompeo travelled to Turkey to meet with President Erdogan and Sec. Pompeo's spokesperson released the following statement: "Secretary Michael R. Pompeo met today with Turkish President Recep Tayyip Erdoğan in Ankara. They discussed a range of issues of bilateral importance including Syria. The Secretary welcomed the decision to return Pastor Andrew Brunson. The Secretary also expressed the United States' concern over Jamal Khashoggi's disappearance and reiterated the United States' willingness to assist Turkey in its investigation."[39]

- On January 31, 2019, President Trump and President Erdogan met at the UN general assembly and "Mr. Erdogan made no reference to the fate of the pastor in his address…."[40]

In short, while the United States has *not* returned Cleric Gulan to Turkey upon Turkey's request, *Turkey has returned* Pastor Bronson *upon the United States Government's request*. These significant change in circumstances between the relations of the two countries cannot be ignored by the Government. Moreover, the Government has expressed concern that, if released, Jacob Kingston will leave his wife, children, and grandchildren (all of whom he maintains a close relationship with) to become a citizen of Turkey. This is also not possible. According to new Turkish regulations, foreigners can become citizens if they own property worth $250,000 for three years, down from a previous value set at $1 million, or if they hold $500,000 of Turkish debt for three years, down from a previous $3 million.[41]

---

1539287944?emailToken=c6eabb318fd3e1bea52a9058b027212f0jRuzx6iB+BXo/lu/3p/WZMQNd6q7lw4Vs41Uzr bPNg9dUeSmh/Z3+WTJKS3/O0avdR24smdKflTrINX53oViCA4bsZhh3Yh/yqnsDtuljBP17nHsIdnIMh5YfI9VlSI &reflink=article_email_share.

[37] Carlotta Gal, Turkey Frees Pastor Andrew Brunson, Easting Tensions With U.S., New York Times (Oct. 12, 2018) https://www.nytimes.com/2018/10/12/world/europe/turkey-us-pastor-andrew-brunson.html.
[38] Id.
[39] https://www.state.gov/r/pa/prs/ps/2018/10/286697.htm.
[40] Katrina Manson, Trump and Erdogan Have First Meeting Since Detained Pastor Row, Financial Times (Sept. 25, 2018), https://app.ft.com/content/dfde7a3c-c0df-11e8-8d55-54197280d3f7.
[41] Ceyda Caglayan, Turkey cuts investment levels for citizenship, property sales seen boosted, Reuters (Sept. 19, 2018), https://www.reuters.com/article/us-turkey-currency-citizenship/turkey-cuts-investment-levels-for-citizenship-property-sales-seen-boosted-idUSKCN1LZ https://www.reuters.com/article/us-turkey-currency-citizenship/turkey-cuts-investment-levels-for-citizenship-property-sales-seen-boosted-idUSKCN1LZ1SR 1SR.

Therefore, not only is it impossible for Jacob Kingston to flee to Turkey (his passport will be in the custody of the Court), but if he were to somehow flee, it would be impossible for him to stay in Turkey because he could not become a citizen. Finally, due to the improving relations between Turkey and the United States—where Turkey has actually returned an American citizen to the United States—the fear that the Government as propagated since the inception of this case no longer exits.

    C. <u>Kingston's Business Interests in Turkey</u>

As detailed in and incorporated in Kingston's original Motion, Kingston has significant business interests in Turkey. His frequent travel to this country was prompted, in part, because Turkey has been a popular country for foreign investments in the past decade. Kingston details his several business interests in his Motion, incorporated herein, at pages 12-15.[42]

    D. <u>A Review of Similar Cases Shows That Typically Defendants Are Released for Similar Alleged Tax Frauds</u>

With the proposed conditions set forth above, there is no realistic probability, nor is there any actual way that Kingston will flee or pose a danger. The Government has not been able to articulate *how* Kingston will be able to flee when he (i) will not have a passport; (ii) will have an ankle bracelet on; (iii) will resides at home with his wife, who is also a defendant, and his minor children who do not have a passport; and (iv) does not own a private plane.

Indeed, in other cases where defendants have been charged in multimillion dollar frauds, Courts around the United States have released defendants on conditions[43]:

---

[42] Dkt. 122 at 12-15.

[43] In support of his motion for pretrial release, Kingston cited several cases involving the same alleged conduct as this case from around the country. Judge Wells was not swayed by these cases, stating:

> However, upon the court's request for citations, the court received bond release orders void of any facts or legal analysis. Thus, there is no evidence in the record that any of the underlying cases

As stated in Kingston's Motion for Release,[44] a review of similar largescale biodiesel tax fraud cases around the country shows that release on conditions is typical in tax cases. In the cases cited, the allegations focused on tax credit fraud and fraudulent RIN productions, specifically that: (i) defendants fraudulently filed for tax credits on fuel that was not produced; (ii) defendants generated false paperwork to create renewable identification numbers ("RINs"); and (iii) defendants laundered the proceeds of their fraudulent schemes.

These defendants were ALL released subject to varying conditions. We analyze the cases cited in pages 6-7 of the original memorandum below:

Brian Carmichael, Chad Ducey, Chris Ducey, Craig Ducey and others were charged with conspiracy to commit wire fraud, tax fraud, false statements to the Environmental Protection Agency.[45] Carmichael, and the Duceys operated the company E-Biofuels, and the Government alleged that the defendants fraudulently filed tax credits for biodiesel that had not been produced, blended, and sold in compliance with IRS rules. The Government also alleged that E-Biofuels would fraudulently sell RIN-stripped B99 from companies and then resell that fuel to its customers by representing that it was B100 with assigned RINs, allowing its customers to claim a tax credit. All defendants were released on their own signatures. Carmichael was released on conditions preventing him from contacting co-defendants, victims, or witnesses, and his travel was restricted to the District of Oregon and the Southern District of Indiana. Chad Ducey was released on the

---

involved matters with multi- defendants, multimillion-dollar fraud, flight risk or danger to the community. Thus, none of these cases have precedential value. (Dkt. 180 at 6-7.)

The analysis of facts of all cases were cited in Kingston's Reply in Response (Dkt. 161) and is once again reiterated in this motion. While the cases of course do not have precedential value, Kingston attempted to list the cases from the United States with similar alleged frauds. Kingston has not found similar bio-fuel alleged frauds from the District of Utah to cite for the Court.

[44] Dkt. 122 at 6-7.
[45] United States v. Brian Carmichael, et al., 13 CR 194 (SEB) (S.D. Ind.) at Dkt. 3.

same conditions, except his travel was restricted only to the Southern District of Indiana. Christopher Ducey was released on the same conditions, except his travel was restricted to the Southern and Northern Districts of Indiana.

Defendants Andrew Bernard and Robert Fedyna were charged with conspiracy to commit wire fraud and making false statements related to the Clean Air Act.[46] Like Kingston, both Bernard and Fedyna were charged in participating in a multi-state scheme to defraud biodiesel buyers and taxpayers by allegedly fraudulently selling biodiesel credits and fraudulently claiming tax credits. The Government also alleged that the defendants laundered the proceeds of the scheme through shell entities and established bank accounts in the names of those entities to perpetrate the scheme and conceal the proceeds. Lastly, the Government alleged that the defendants generated false paperwork to create RINs, which were in fact alleged to not be legitimate. The Government alleged that the coconspirators received at least $42 million from the sale of the RINs. Davanzo was released on $1 million bail secured by one property and was subject to home incarceration. Fedyna was released on $2 million bail secured by one property and was subject to home detention.

Defendant Richard Estes was charged with conspiracy to commit money laundering, where the Government alleged that he and co-conspirators laundered proceeds of schemes to falsely claim tax credits and file false claims for refunds of excise credits with the IRS.[47] The Government alleged that the fuel claimed was either not produced or was re-processed. The Government alleged that Estes laundered $39 million through his accounts or accounts he controlled. Estes was released and ordered to remain in the state of Washington while the case was pending.

---

[46] United States v. Andrew Bernard, 17 CR 61 (SPC) (M.D. Fla.) at Dkt. 2.
[47] United States v. Richard Estes, 15CR6048 (SMJ) (E.D. Wash.) at Dkt. 17.

Defendant Nancy Bush Estes was also charged with conspiracy to commit money laundering.[48] Like Richard Estes, she was charged laundering proceeds of schemes to falsely claim the production of RINs and file false tax refund claims with the IRS. Nancy Estes' only condition was that she remain in the United States while the case was pending.

Defendant Donald Holmes was charged with conspiracy to commit wire fraud and conspiracy to defraud the Government.[49] The Government alleged that the defendant agreed with coconspirators to participate in a scheme to falsely generate RINs and to falsely claim tax refunds from the IRS. Holmes' travel was restricted to the United States.

Defendant Jeffrey Gunselman was charged with wire fraud, money laundering, and false statements in violation of the Clean Air Act.[50] The Government alleged that Gunselman defrauded the EPA by falsely representing that he was in the business of producing bio-diesel, but instead falsely generated renewable fuel credits and sold them companies and brokers. Through this alleged scheme, the government alleged that purchasers wired $41,762,236 into his account. The Government also alleged that Gunselman laundered the criminal proceeds by engaging in nearly $12 million of monetary transactions to purchase, among other items" a Gulfstream airplane, a Military Tank, a Bentley, a Lexus, agricultural, business, and residential real estate. Gunselman's release conditions were $100,000 with two sureties, and his travel was restricted to the Northern District of Texas.

Defendant Rodney Hailey was charged with multiple counts of wire fraud, money laundering, and false statements in violation of the Clean Air Act.[51] The Government alleged that

---

[48] United States v. Nancy Bush-Estes, 15CR6047 (SMJ) (E.D. Wash.) at Dkt. 17.
[49] United States v. Donald Holmes, 15CR6044 (SMJ) (E.D. Wash.) at Dkt. 1.
[50] United States v. Jeffrey Gunselman, 12CR78 (N.D. Tex.) at Dkt. 1.
[51] United States v. Rodney Hailey, 11CR540 (WDQ) (D. Md.) at Dkt. 19.

the defendant falsely represented that he was in the business of producing bio-diesel fuel, when in fact the facility was not capable of producing fuel, then generated and sold over 35 million RINs to companies and brokers for at least $9 million. The Government alleged that the defendant used the proceeds of the alleged scheme to fund vehicle purchases, real estate investments including his home, and jewelry. Hailey's travel was restricted to the United States.

Notably, all these defendants were released on conditions less substantial than the conditions offered by Kingston.

### VI. CONCLUSION

For the reasons set forth above, and the reasons set forth in Kingston's original motion, we move this Court to release Kingston under the proposed conditions.

Dated: February 25, 2019
Salt Lake City, UT

Respectfully submitted,

**Brafman & Associates, P.C.**

By: /s/
Marc A. Agnifilo, Esq., Of Counsel
Teny R. Geragos, Esq.

**Bugden & Isaacson, LLC**

By: /s/
Walter Bugden, Esq.

cc: All Counsel (via ECF)

**Certificate of Service**

I certify that on the 25th day of February 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF electronic filing system, which will send notice of electronic filing to counsel of record in this case.

*/s/ Teny Rose Geragos*
TENY R. GERAGOS
