JOHN W. HUBER, United States Attorney (#7226)
ARTHUR J. EWENCZYK, Special Assistant United States Attorney (NY #5263785)
LESLIE A. GOEMAAT, Special Assistant United States Attorney (MA #676695)
RICHARD M. ROLWING, Special Assistant United States Attorney (OH #0062368)
JOHN E. SULLIVAN, Senior Litigation Counsel, Tax Division (WI #1018849)
Attorneys for the United States of America
111 South Main Street, #1800
Salt Lake City, Utah 84111
Telephone:  (801) 524-5682
Email:  arthur.j.ewenczyk@usdoj.gov
        leslie.a.goemaat@usdoj.gov
        richard.m.rolwing@usdoj.gov
        john.e.sullivan@usdoj.gov

_____

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

_____

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Case No. 2:18-CR-365-JNP-BCW |
| Plaintiff, | : | |
| v. | : | Government's Notice of Intent to Introduce Rule 404(b) Evidence |
| JACOB ORTELL KINGSTON, ISAIAH ELDEN KINGSTON, and | : | |
| LEV ASLAN DERMEN, a/k/a Levon Termendzhyan, RACHEL ANN KINGSTON | : | District Judge Jill N. Parrish Magistrate Judge Brooke C. Wells |
| SALLY LOUISE KINGSTON | : | |
| | : | |
| Defendants. | | |

_____

Now comes the United States of America, by and through its undersigned counsel, and

respectfully notifies the Court of its intent to introduce at trial the evidence described herein.

The government's notice encompasses evidence, which not only may be introduced in its case in

chief, but also evidence of knowledge and intent that might only be offered on cross-examination

or rebuttal, depending on the testimony and evidence adduced at trial.

1

## Table of Contents

I.    Applicable Law ......................................................................................................... 3

   A.    All Relevant Evidence is Admissible ................................................................ 3

   B.    Evidence of Other Acts of the Defendant May be Used to Prove Facts Other Than the
Defendant's Character ....................................................................................... 3

   C.    Rule 404(b) Does not Apply When Other Act Evidence and Evidence of the Crime
Charged are Inextricably Intertwined ............................................................... 4

   D.    Use of Rule 403 to Exclude Relevant Evidence is An Extraordinary Remedy and
Should be Used Sparingly ................................................................................. 5

II.   Conduct that is Inextricably Intertwined with Charged Conduct ........................... 6

   A.    Personal and Corporate Income Tax Filings .................................................... 6

      1.    Jacob and Sally Kingston's IRS Filing History, 2011-2015 ....................... 8

      2.    Isaiah  Kingston's IRS Filing History, 2011-2015 ..................................... 8

      3.    Lev Dermen's IRS Filing History, 2011-2015 ............................................ 9

      4.    Washakie Renewable Energy and United Fuel Supply's IRS Filing History ............. 9

   B.    Business and Family Practices of the Order ................................................... 10

   C.    Lev Dermen's Upblending of B99 into Gas Stations ...................................... 12

   D.    False Statements Under Oath .......................................................................... 13

III.  404(b) Evidence .................................................................................................. 14

   A.    Fraud with Gen-X ........................................................................................... 14

   B.    Lev Dermen's Efforts to obtain Belizean Passport to Transport Currency ................... 20

   C.    Isaiah Kingston's Use of a False Social Security Number at a Casino in Las Vegas .... 20

   D.    Lev Dermen's Use of a State of Washington Driver's License ..................... 21

   E.    Lev Dermen's use of the Yakima Indian Tribe to Evade Excise Taxes ........................ 21

IV.   Conclusion .......................................................................................................... 22

I.      **Applicable Law**

    A.      **All Relevant Evidence is Admissible**

Under the Federal Rules of Evidence, "[r]elevant evidence is admissible" unless the Constitution, a federal statute, the rules of evidence, or other Supreme Court rule provides otherwise. Fed. R. Evid. 402. "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. However, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

    B.      **Evidence of Other Acts of the Defendant May be Used to Prove Facts Other Than the Defendant's Character**

Although Rule 404 of the Federal Rules of Evidence limits the use of character evidence, Rule 404(b) provides that evidence of other crimes, wrongs, or acts may be used to prove facts of consequence to the litigation, such as "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."  The Tenth Circuit has adopted a four-part inquiry regarding the admission of evidence pursuant to Rule 404(b): "(1) whether the evidence is offered for a proper purpose, (2) its relevancy, (3) that the probative value of the evidence is not substantially outweighed by its prejudicial effect, and (4) a limiting instruction is given if the defendant so requests."  *United States v. Cardinas Garcia*, 596 F.3d 788, 797 (10th Cir. 2010) (cert. denied) (citations and quotations omitted); see also *United States v. Brooks*, 763 F.3d 921, 939 (10th Cir. 2013).  The Tenth Circuit further stated that "[t]o determine relevance under Rule 404(b), we must examine factors such as the similarity of the uncharged act to the charged

conduct and the temporal proximity of the two acts." *Id.* at 797-98.

This list of "proper purposes is illustrative, not exhaustive, and Rule 404(b) is considered to be an inclusive rule, admitting all evidence of other crimes or acts except that which tends to prove *only* criminal disposition." *United States v. Tan*, 254 F.3d 1204, 1208 (10th Cir. 2001) (emphasis in original) (quotation and citation omitted). Further, although the text of Rule 404(b) indicates that other act evidence "may" be admissible for purposes other than to show criminal propensity, the legislative history makes it clear that Congress intended for all such evidence to be admitted:

> [T]he use of the discretionary word "may" with respect to the admissibility of evidence of crimes, wrongs, or acts is not intended to confer any arbitrary discretion on the trial judge. Rather, it is anticipated that with respect to permissible uses for such evidence, the trial judge may exclude it only on the basis of those considerations set forth in Rule 403, i.e. prejudice, confusion or waste of time.

*Tan*, 254 F.3d at 1208 (citing S. REP. NO. 93-1277 (1974), reprinted in 1974 U.S.C.C.A.N. 7051, 7071). "[I]f the other act evidence is relevant and tends to prove a material fact other than the defendant's criminal disposition, it is offered for a proper purpose under Rule 404(b) and may be excluded only under Rule 403." *United States v. Davis*, 636 F.3d 1281, 1298 (10th Cir. 2011) (quoting *United States v. Parker*, 553 F.3d 1309, 1314 (10th Cir. 2009).

## C. Rule 404(b) Does not Apply When Other Act Evidence and Evidence of the Crime Charged are Inextricably Intertwined

The Tenth Circuit has held that "[o]ther act evidence is intrinsic"—and thus not subject to Rule 404(b)—"when the evidence of the other act and the evidence of the crime charged are inextricably intertwined or both acts are part of a single criminal episode or the other acts were necessary preliminaries to the crime charged." *United States v. Lambert*, 995 F.2d 1006, 1007 (10th Cir. 1993) (quoting *United States v. Williams*, 900 F.2d 823, 825 (5th Cir. 1990)) (internal

quotation marks omitted). "It is well settled that Rule 404(b) does not apply to other act evidence that is intrinsic to the crime charged[.]" *United States v. O'Brien*, 131 F.3d 1428, 1432 (10th Cir. 1997); *see also United States v. Arney*, 248 F.3d 984, 992 (10th Cir. 2001) (discussing Rule 404(b) as not applying to intrinsic evidence).

Furthermore, the Tenth Circuit has held that, generally speaking, "'[i]ntrinsic evidence is directly connected to the factual circumstances of the crime and provides contextual or background information to the jury. Extrinsic evidence, on the other hand, is extraneous and is not intimately connected or blended with the factual circumstances of the charged offense.'" *Parker*, 553 F.3d at 1314 (citation omitted) (quoting Thomas M. DiBiagio, *Intrinsic and Extrinsic Evidence in Federal Criminal Trials: Is the Admission of Collateral Other-Crimes Evidence Disconnected to the Fundamental Right to a Fair Trial*, 47 Syracuse L. Rev. 1229, 1231 (1997)). "Because Rule 404(b) only limits evidence of 'other' crimes – those extrinsic to the charged crime – evidence of acts or events that are part of the crime itself, or evidence essential to the context of the crime, does not fall under the other crimes limitations of Rule 404(b)." *Parker*, 553 F.3d at 1314; *see also United States v. Green*, 175 F.3d 822, 831 (10th Cir. 1999); *United States v. Lambert*, 995 F.2d 1006, 1007-08 (10th Cir. 1993).

**D.     Use of Rule 403 to Exclude Relevant Evidence is An Extraordinary Remedy and Should be Used Sparingly**

"[E]xclusion of evidence under Rule 403 that is otherwise admissible under the other rules 'is an extraordinary remedy and should be used sparingly.'" *Tan*, 254 F.3d at 1211 (quoting *United States v. Rodriguez*, 192 F.3d 946, 949 (10th Cir. 1999)). Evidence may be excluded under Rule 403 if "its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting

time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. The term "unfair prejudice" as used in Rule 403, "means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Fed. R. Evid. 403 Advisory Committee's note (1972). The Tenth Circuit in *Tan* identified some factors a court should consider in making a 403 determination. "First, we note that unfair prejudice does more than damage the Defendant's position at trial." *Tan,* 254 F.3d at 1211. Evidence is not precluded by Rule 403 unless "it makes a conviction more likely because it provokes an emotional response in the jury or otherwise tends to affect adversely the jury's attitude toward the defendant wholly apart from its judgment as to his guilt or innocence of the crime charged." *United States v. Davis*, 636 F.3d 1281, 1298 (10th Cir. 2011) (quotation and citation omitted). "Even if this type of prejudice is found, it must substantially outweigh the probative value of the evidence in order to be excluded under Rule 403." *Tan*, 254 F.3d at 1212.

## II.     Conduct that is Inextricably Intertwined with Charged Conduct

### A.     Personal and Corporate Income Tax Filings

Evidence of the defendants' personal and corporate income tax filings should be admitted as "inextricably intertwined" with the charges.

Many courts have held that a defendant's tax returns are "inextricably intertwined" with a conspiracy charge where omitted income shows the defendant's intent and consciousness of guilt. For example, in *United States v. Hogan*, the Seventh Circuit ruled that the omission of income from the defendant's tax return was inextricably intertwined with the money laundering conspiracy and thus admissible because it "suggest[ed] that he [the defendant] knew that the payments were unlawful." 886 F.2d 1497, 1507 (7th Cir. 1989). Similarly, in *United States v. Hatfield*, the Court held that the defendant's failure to include certain income on her tax returns

6

was "inextricably intertwined" with non-tax charges "because it showed consciousness of guilt." 685 F. Supp.2d 320, 324 (E.D.N.Y. 2010); *see also United States v. Black*, 2014 WL 5783067, at *5 (E.D.N.Y. Nov. 5, 2014).

Moreover, the Ninth Circuit has held that omissions from tax returns were "inextricably intertwined" because they showed that money in defendant's bank account came from his involvement in a money laundering conspiracy. *United States v. Jae Shik Cha*, 97 F.3d 1462, at *1 (9th Cir. 1996) ("Cha's tax returns, showing insufficient legitimate income to support the $4.5 million laundered through the Hong Kong account, were offered to show that the money came from drug transactions. All of the contested evidence was "inextricably intertwined" with the charged conspiracy, and therefore was *not* subject to Rule 404(b).") (emphasis added). The First Circuit has also recognized that a defendant's tax return is properly admissible as intrinsic evidence of intent to defraud in fraud prosecutions. *See United States v. Epstein*, 426 F.3d 431, 439 (1st Cir. 2005) (Further, the fact that [the defendant] did not include all of his income suggests that he had knowledge of the fraudulent scheme.").

Tax returns that omit fraud proceeds are also admissible under Rule 404(b) because they are proof of "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or lack of accident." Fed. R. Evid. 404(b)(2). In *United States v. Duong*, the Tenth Circuit held that the district court properly admitted the defendant's tax returns because "[t]he government did not offer the tax returns to show Mr. Duong's character. Instead, it properly offered the evidence of Mr. Duong's underreporting of his taxes to show his knowledge that the money he was receiving came from unlawful activity." 85 Fed. Appx. 99, 102 (10th Cir. 2003).

In the present case, as the following IRS filing histories show, the defendants omitted millions of dollars of fraud proceeds from their personal tax returns for the years 2011 through

2015. Incredibly, as shown below, both Jacob and Isaiah Kingston reported millions of dollars of flow-through *losses* from Washakie Renewable Energy ("WRE") for 2013 and 2014, despite the fact that WRE received more than $450 million in U.S. Treasury checks for fraudulent claims made for those same years. These flow-through losses stem from the false WRE partnership tax returns that are the subject of Counts 21 and 22.

### 1.    Jacob and Sally Kingston's IRS Filing History, 2011-2015

For tax years 2011 through 2014, Jacob and Sally Kingston filed delinquent joint income tax returns with the IRS reporting taxable income totaling a paltry $70,460. According to IRS records, the Kingstons have not filed a tax return for 2015. For the years they did file returns, Jacob reported the following income and loss amounts from his 50% ownership of WRE:

| Year | Description | Amount |
|------|-------------|--------|
| 2011 | Income | $20,310 |
| 2012 | Income | $12,177 |
| 2013 | Loss | ($100,538,452) |
| 2014 | Loss | ($54,444,713) |

For 2012, the Kingstons had a tax due and owing of $724.  For 2011, 2013, and 2014, the Kingstons claimed refunds totaling $79,505, including $30,997 of claimed refundable child tax credits.

### 2.    Isaiah  Kingston's IRS Filing History, 2011-2015

Isaiah Kingston filed a timely joint income tax return for 2012 and filed delinquent returns for 2013 through 2014 reporting taxable income totaling $4,540. According to IRS records, he has not filed a tax return for 2015. For the years he did file returns, Isaiah reported the following income and loss amounts from his 50% ownership of WRE:

| Year | Description | Amount |
|------|-------------|--------|
| 2011 | Income | $9,3422 |
| 2012 | Income | $12,177 |

| Year | Description | Amount |
|------|-------------|--------|
| 2013 | Loss | ($100,538,452) |
| 2014 | Loss | ($54,444,713) |

For these four tax years, Isaiah claimed refunds of $21,472, including $17,476 of claimed refundable tax credits and $6,958 of claimed refundable earned income tax credits.

### 3.   Lev Dermen's IRS Filing History, 2011-2015

Lev Dermen filed timely individual income tax returns with the IRS for 2011 through 2015 under the names Levon Termendzhian (2011-13) and Levon Termendzhyan (2014-15). These tax returns can be summarized as follows:

| Description | 2011 | 2012 | 2013 | 2014 | 2015 |
|-------------|------|------|------|------|------|
| Wages | $104,000 | $104,000 | $106,000 | $104,000 | $106,000 |
| Partnership income (loss) | 177,855 | (7,345) | (2,452) | (9,298) | |
| SBK Holdings USA | | | | | 2,124,284 |
| Taxable income | 257,386 | 79,077 | 91,066 | 83,189 | 2,224,483 |
| Total tax | 68,053 | $11,829 | 18,794 | 16,650 | 952,609 |

Even assuming that the $2.1 million from SBK Holdings USA reported on Dermen's 2015 return represents fraud proceeds, that amount pales in comparison to the tens of millions he benefitted from the mail fraud scheme. *See* ECF 314-1 (Summary of Fraud Proceeds Benefitting Levon Termendzhyan) (showing that SBK Holdings USA received net fraud proceeds of $31,550,000 during 2015).

Based on the foregoing, the defendants' tax returns are intrinsic evidence of their intent and consciousness of guilt.  In the alternative, the returns are relevant prove that the defendants knew that the millions they were receiving from Washakie came from unlawful activity, and thus are also admissible pursuant to Rule 404(b)(2).

### 4.   Washakie Renewable Energy and United Fuel Supply's IRS Filing History

Delinquent partnership tax returns for WRE for 2013 and 2014 were filed in 2017. Isaiah

Kingston signed these returns, which are the subject of Counts 21 and 22. According to IRS records, a partnership tax return for 2015 has not been filed for WRE. Similarly, partnership tax returns have not been filed for United Fuel Supply ("UFS") for 2014 and 2015.

Jacob and Isaiah Kingston each owned 50% of WRE.  They also controlled UFS and its bank accounts, through which they laundered millions of dollars of fraud proceeds during 2013 through 2015.  *See, e.g.,* Government's *James* Proffer (ECF 336-347), GX 31-1 (Flow of Funds – Purchase of 2072 East Creek Road) and GX 33-1 (Flow of Funds – Purchase of 2010 Bugatti Veyron).  In January 2016, a $322,900,000 claim for refundable fuel tax credits was filed on behalf of WRE for biodiesel mixtures allegedly produced during 2015. *See* Government's *James* Proffer (ECF 336-347), GX 1-1 (Claim #38).  In February 2016, a $321,573,260 claim for refundable fuel tax credits was filed on behalf of UFS for biodiesel mixtures allegedly produced during 2015.  *Id*. (Claim #39).  The fact that corporate income tax returns were not filed for these entities is inextricable intertwined with the alleged money laundering transactions and the false claims filed on behalf of WRE and UFS for calendar year 2015.  This evidence is also admissible pursuant to Rule 404(b) to show intent, knowledge, and absence of mistake.

### B.      Business and Family Practices of the Order

The government's evidence will establish that Davis County Cooperative Society, a/k/a, the Order, operates as a cooperative communal economic group, and generally requires its members to use an internal, unauthorized banking system.  The members of the society pool their funds with those who control the group.  As a cooperative society, the group also engages in practices in which any personal possession (asset owned, or income earned) is not personally owned, but rather given to the group for the benefit of the Order.

The main office for the Order's banking system is located at the Century Office building.

Income and assets are given to the Order in a variety of ways.  Members of the Order who earn income from an Order entity receive a "slip" indicating a credit to their personal account within the Order's banking system. However, the Order banking system does not store currency. Rather, the funds are maintained in bank accounts at traditional banks in the name of Order entities, such as the Davis County Cooperative Society, Fidelity Funding, or Equitable Funding. Members who wish to withdraw money from their personal account within the Order's banking system need to obtain authorization from specific Order members, depending on the size of the withdrawal. They can then show up at the Century building and receive cash or checks drawn from the bank accounts of Order entities. Stated differently, the Order keeps members' funds in bank accounts they do not control and require the members to go through an internal Order banking system to retrieve their money. Members who leave the Order are often unable to retrieve their money from the Order's internal banking system.

Upon reaching the age of 15 or 16, Order members are expected to reimburse their parents for the cost of their upbringing, including food and rent, usually $50,000. In addition, the Order engages in the practice of arranged marriages and plural marriages. Young women are often married to family members. While the first wife and her husband are legally married, marriage to subsequent wives are "spiritual marriages."

The Order also promotes a practice of "bleeding the beast," wherein Order members are encouraged to obtain as much money as possible from local, state, and federal government agencies for the benefit of the Order, because of the fear that the government will seek to punish them for their way of life. In so doing, Order members often resort to unlawful means, such as food stamp fraud, tax fraud, and student loan fraud.

Some of these family and business practices of the Order are inextricably intertwined

with the charged crimes. First, evidence regarding the Order's commingling of funds in and donation of income to the Order's internal banking system is necessary to explain many of the transactions, which went to and through the accounts of Order-related entities, which are charged as part of Counts 25 and 34 through 38. Further, the Order's internal banking practices are essential to understanding the obstruction of justice conspiracy charged in Count 44, which includes the destruction of records, documents, computers, and objects at the Century Office building, which is the main office for the Order's banking system. Second, evidence of the Order's internal banking practices are necessary to provide context about the basis for witnesses' knowledge about certain financial transactions alleged in these counts. Third, the Order's practice of "bleeding the beast" is part and parcel of Washakie's efforts to defraud the government of over a billion dollars. Fourth, the plural marriages and other family practices of the Order are necessary to provide context to the testimony of certain witnesses–how they know these defendants, how they are related to them, and why they were once part of the Order but have decided to leave.  Furthermore, the evidence will show that Jacob Kingston did not conceal the fact that he was part of this society or family, but rather explained to others that he had over a hundred siblings, and came from a family in which the men had multiple wives.

In addition, even if these family and business practices were not inextricably intertwined, they would be admissible under Rule 404(b) to prove motive, opportunity, and intent.

### C.     Lev Dermen's Upblending of B99 into Gas Stations

The United States intends to offer evidence that Dermen was "up-blending" B99 into his Los Angeles area gas stations, well in excess of levels permitted by the State of California (allowing sellers of diesel to blend up to 20% of biodiesel in their diesel). Multiple witnesses will testify that Dermen was up-blending as much as 50% B99 at his gas stations. Additionally, the

United States may offer evidence that covert samples taken at Dermen's gas stations revealed that the fuel at one such station was more than 57% biodiesel. This evidence is inextricably intertwined with the crimes charged, as the evidence will show that the conspirators planned to ship the B99 purchased from third parties by Washakie and others on its behalf and "re-certified" through WRE by the Kingston defendants to Los Angeles for Dermen, at dramatically below-market sales prices, to blend into his gas stations, including the third-party B99 the Kingstons simply bought and rotated to and from Panama and India.

This evidence is also admissible pursuant to Rule 404(b) as it is directly relevant to Dermen's motive and intent in participating in the conspiracy with Jacob Kingston and co-conspirators to obtain B99 from third parties, "recertify" that B99 through WRE so that WRE could fraudulently claim government credits, and to sell the B99 to Dermen at dramatically below market prices. Dermen's "upblending" of the below-market B99 into his gas stationsresulted in substantial profits as he purchased the B99 for significantly less than the gas stations charged for the sale of fuel. This large margin of profit was made possible through the repeated and fraudulent claiming of tax credits by WRE on material that was not eligible for tax credits. This evidence is admissible to prove absence of mistake, lack of accident, and to rebut a defense by Dermen that he was a mere businessman of WRE's and was not aware of the criminal actions taken by its principals.

### D.    False Statements Under Oath

Jacob Kingston, Isaiah Kingston, and Rachel Kingston made false statements under oath in affidavits and declarations filed with the district court as well as in sworn depositions during the Lifetree litigation in the Southern District of New York. In these affidavits and declarations, Jacob, Isaiah, and Rachel made false statements regarding assets of WRE, banking, and

information relating to WRE. These perjurious statements are inextricably intertwined with the crimes charged. First, the false statements, which will be proven false through other testimony and documentary exhibits, are highly probative of Jacob, Isaiah, and Rachel's knowledge and intent regarding the wire transfers to Turkey charged as money laundering, and constitute a continuation of the conspiracy charged. The false statements to the Southern District of New York were intended to continue to conceal the proceeds of their fraud, which they had secreted away in the Republic of Turkey. Further, false statements in depositions were intended to both obscure the proceeds of their fraud and otherwise obscure the truth about Washakie's ability to produce biodiesel, a critical component of the co-conspirators' scheme.  These false statements were submitted during the time period that the defendants were continuing to attempt to bribe law enforcement officers ("Commissioner Gordon") and bribe enforcers ("Beto") and were another attempt to obstruct discovery of their fraud.

These statements are also admissible pursuant to Rule 404(b) as relevant to and highly probative of motive and intent. Quite simply, people do not commit perjury for money that they don't have an interest in. Further, the defendants' willingness to provide false testimony is powerful evidence of their knowledge of the criminal nature of the transactions.

### III.    404(b) Evidence

#### A.    Fraud with Gen-X

From October 2012 through December 2012, Jacob Kingston, Isaiah Kingston, Rachel Kingston and others executed a fraudulent renewable fuel fraud, nicknamed "Project Seagull," with uncharged co-conspirator Scott Johnson. Johnson, CEO of Gen-X in Pasco, Washington, will testify to this fraud at trial. Johnson pleaded guilty to a large RIN fraud/tax fraud scheme and is currently incarcerated.

Johnson will testify that Jacob Kingston, aware of Johnson's financial problems, proposed a "way out." They devised a scheme to have Kingston provide feedstock to Gen-X, which would be processed into "G-Force" by Gen-X, and then sold to WRE. Once received by WRE, the paperwork could change to indicate that it was not "G-Force" fuel, but once against feedstock, where it would be trucked right back to Gen-X to be processed again. The Order-owned company, CCP Trucking, would provide transportation services and Scott Johnson and Gen-X would file for the fraudulent tax credits and RINs. According to Scott Johnson, Isaiah Kingston was present for the discussions of "Project Seagull."

Jacob Kingston became concerned that the fraud appeared too illegitimate, on its face, with only their companies involved, and so Kingston and Johnson recruited Jacob Cha into the fraud. Jacob Cha has also pleaded guilty to renewable fuel fraud and is currently incarcerated. The government expects Cha to testify at trial as well. Cha's company became the straw buyer of the "G-Force," while Jacob Kingston continued to provide the feedstock on paper. Later, at Jacob Kingston's direction, Cha's company Pynnacle became the straw feedstock provider, and the "G-Force" was sold to UFS, because it was more plausible to have UFS purchasing fuel, rather than selling feedstock. The actual product was cycled between Gen-X and nearby frack tanks in Washington. Despite the false paperwork, claiming this product was transported to Utah, it never left the state of Washington, no product was sold to real customers, and no new feedstock was purchased.

This project started with approximately 30,000 to 60,000 gallons of feedstock, which was used to generate RINs and tax credits for 4,476,000 supposed gallons of "G-Force" fuel. This fraud resulted in millions of dollars of fraudulent tax credits and RINs, which were shared among Jacob Kingston, Johnson, and Cha.

Scott Johnson pleaded guilty and cooperated with the government. As part of his cooperation, Johnson participated in a recorded meeting with Jacob Kingston in August of 2015. At that meeting, Jacob and Johnson explicitly referenced the criminal nature of Project Seagull:

**JACOB:** It was '12, right?

**SCOTT:** '12. That was Project Seagull.

**JACOB:** They're going to dig that up, aren't they?

**SCOTT:** If they're any good. I don't know.

**JACOB:** I wonder what the statute is on something like that.

**SCOTT:** I thought it was seven years.

**JACOB:** How's your Spanish?

**SCOTT:** Zero. Well, I can count to ten, say hi and goodbye.

**JACOB:** Should we go to Mexico for three years?

**SCOTT:** Yeah, sounds like a plan.

Later in the undercover recording, Jacob admitted that his plant was not producing biodiesel and Johnson and Jacob discussed the (false) paperwork from Project Seagull, with Jacob Kingston admitting that he hid the paperwork and that it was his mother and co-defendant Rachel Kingston who prepared the paperwork:

**JACOB:** Yeah. And stuff that they -- there's nothing there, because we haven't produced in years.

**SCOTT:** Yeah.

**JACOB:** And the stuff we did produce is solid as a rock.

**SCOTT:** What about all of our paperwork from, like, '12? Think we're okay?

**JACOB:** (Indiscernible.)

16

**SCOTT:** Huh?

**JACOB:** I don't know where that went.

**SCOTT:** You don't have it?

**JACOB:** Somewhere. I honestly don't know where it is. I told them, "I don't want to see this in your house, my house, office, anywhere."

     Later in the undercover recording, Jacob admitted that Rachel Kingston and Isaiah Kingston knew about the fraud, and could not recall whether Sally Kingston knew about the fraud.[1]

**SCOTT:** Does your mom still do all the paperwork for you guys, because you're so big now. You've got too many. Was she able to retire or what is she doing?

**JACOB:** She does this kind of stuff. She does our audits and -- she puts paperwork for the audits together and... And she does know a little history, which I don't know if that's a good thing.

**SCOTT:** Does she know? She doesn't know, does she?

**JACOB:** Oh, yeah.

**SCOTT:** Oh, she knew.

**JACOB:** Yeah.

**SCOTT:** Okay. I thought just you and Isaiah knew.

**JACOB:** No, she put the paperworks together. I probably added to her wrinkles and her gray hair.

**SCOTT:** If she knew, yeah, you really added some years to her life. Does Sally know?

---

[1] Co-defendant Sally Kingston periodically left the WRE office, typically after having given birth to a child, or for other reasons. Accordingly, there were periods of time when she was absent from Washakie, and later returned to it. This exchange is telling, as Jacob Kingston's response to Scott Johnson is not a categorical rejection of Sally Kingston's knowledge, but an inability to recall whether Sally Kingston was involved in *this particular fraud project*.

**JACOB:** I don't think so. I mean, that was so long ago she wouldn't remember.

The Tenth Circuit has routinely found that evidence of similar fraud is admissible for various purposes under Rule 404(b). *See, e.g., United States v. Grissom*, 44 F.3d 1507, 1509, 1513 (10th Cir.1995) (cert. denied) (in prosecution for false statements to a bank, district court did not abuse its discretion by admitting evidence of the defendant's unrelated falsification of union payroll records to show defendant's intent, knowledge, and lack of mistake); *United States v. Bolt*, 776 F.2d 1463, 1464, 1470–71 (10th Cir.1985) (in prosecution for material false statements to a bank and mail fraud, district court did not abuse its discretion by admitting evidence of the general fraudulent nature of defendant's business as relevant to defendant's identity, existence of a scheme to defraud, intent, and absence of mistake); *United States v. Bonnett*, 877 F.2d 1450, 1452, 1460–61 (10th Cir.1989) (in bank fraud prosecution involving one bank, district court did not abuse its discretion by admitting evidence of defendant's accounts with insufficient funds at a different bank, which tended to show intent, motive, and knowledge with respect to defendant's fraudulent scheme); *United States v. Parnell*, 581 F.2d 1374, 1378 (10th Cir.1978) (in prosecution related to scheme involving forged cashier's checks, district court did not abuse its discretion in admitting evidence of defendant's previous check scheme, which tended to show defendant's knowledge and absence of mistake).

In *Parnell*, the Tenth Circuit rejected the defendant's appeal of the district court's admission of evidence of a prior check scheme during a check scheme prosecution, explaining that:

> To the contrary, however, the San Antonio check scheme was the direct precursor to the scheme for which appellants were brought to trial. The conspiracy charged in the indictment grew out of and was a refinement upon the earlier operation.

> Thus Culver's testimony concerning the San Antonio scheme was admissible as proof of motive, intent and the continuation of a common plan. Federal Rules of Evidence, Rule 404(b). As the evidence established that Parnell was deeply involved in both operations, the testimony concerning the San Antonio plan also tended to show knowledge or an absence of mistake on Parnell's part as to the true nature of the cashier's checks. The evidence was properly admitted. *See United States v. Nolan*, 551 F.2d 266, 271-2 (10th Cir. 1977), Cert. denied, 434 U.S. 904, 98 S.Ct. 302, 54 L.Ed.2d 191.

581 F.2d 1374, 1384 (10th Cir. 1978). Here, as in *Parnell*, the Project Seagull fraud was a direct outgrowth and continuation of the other simultaneous frauds being committed by the defendants. It involved the exact same type of fraud – cycling product in a circle in order to claim production of qualifying fuel and fraudulently claim credits – as the charged conduct, occurred within the same time span, and required the same knowledge regarding renewable fuel benefits. Indeed, the only distinction from the charge fraud is that in Project Seagull the false government credits were claimed through Gen-X, and WRE/UFS served as the straw feedstock provider and later straw fuel purchaser.

Further, there is inextricable cross-over between Gen-X and the charged 2011 conduct, as seized emails prove that Jacob and Rachel Kingston reveal the Skinny Crow Music co-conspirator was directed to create false feedstock invoices saying SCM sold feedstock to Gen-X in 2011, simultaneously while also creating false feedstock invoices saying SCM sold feedstock to WRE. The evidence will show that this product referenced in these fake and false invoices that SCM "sold" to WRE in 2011 was B99 biodiesel produced and blended by others, and that SCM did *not* sell feedstock to either WRE or Gen-X.  As in *Parnell*, this evidence tends to show the defendants knowledge of the scheme and absence of mistake. It further establishes proof of motive, intent, and the continuation of a common plan.

**B.     Lev Dermen's Efforts to obtain Belizean Passport to Transport Currency**

At some point between 2012 and 2016, Lev Dermen reached out to a Belizean government minister in an effort to be credentialed as a Belizean diplomat to the United States. Dermen undertook these efforts in order to be able to enter or exit the United States with over $10,000 in currency without reporting it to U.S. Customs and Border Protection. Dermen had previously been stopped with $30,000 while exiting the country. This evidence is properly admissible under Rule 404(b) to establish Dermen's intent, knowledge, and absence of mistake, particularly with regard to Counts 24, 26 through 30, and 32, which charge him with conspiracy to commit international, concealment, and expenditure money laundering offenses, in violation of 18 U.S.C. § 1956(h) and concealment money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i). This evidence is relevant because it occurred close in time to the charged money laundering offenses and involves Dermen's efforts to transfer funds while avoiding detection by the authorities. The probative evidence of this conduct is not substantially outweighed by its potential for unfair prejudice. This evidence represents part of Dermen's ongoing efforts to transfer funds while avoiding detection from the government.

**C.     Isaiah Kingston's Use of a False Social Security Number at a Casino in Las Vegas**

During the period June 2017 through March 2018, Isaiah Kingston travelled to Las Vegas, Nevada. According to business records maintained by a casino in Las Vegas, Isaiah Kingston bought at least $18,300 in gambling chips and took a cash advance of $2,800. Other business records show that Isaiah Kingston provided the casino with a false social security number in connection with a Form 4789, Currency Transaction Report that was filed with the IRS. This evidence is relevant to prove motive, intent, knowledge of the criminal nature of the

false claims scheme, as well as how a portion of the fraud proceeds were used by Isaiah Kingston. This evidence could also be used to impeach Isaiah Kingston's credibility should he elect to testify at trial.

### D.     Lev Dermen's Use of a State of Washington Driver's License

In September 2011, Lev Dermen, then-named Levon Termendzhyan, obtained a driver's license from the State of Washington. The driver's license expired in August 2016. The license lists a Yakima, Washington, address despite the fact that Dermen was a resident of California during 2011 through 2016, and owned and operated numerous businesses in the Los Angeles area during this same time period. This evidence could be used to impeach Lev Dermen's credibility should he elect to testify at trial.

### E.     Lev Dermen's use of the Yakima Indian Tribe to Evade Excise Taxes

According to witnesses, Dermen is a member of the Yakima Indian Tribe, and purchases large volumes of diesel fuel, which he purports to sell to the Yakima Indian Tribe, but which he in fact sells out of his Los Angeles gas stations and to Los Angeles area gas stations, thereby avoiding the payment of excise taxes. This evidence is relevant and admissible pursuant to Rule 404(b), in rebuttal, to rebut a defense by Dermen that he is an honest businessman who was swindled by the Kingstons. Such a claim would be belied by this evidence, proving, in conjunction with his participation in procuring and helping WRE re-certifying third-party B99, that Dermen was willing to commit crimes in order to procure below-market product to sell. This evidence is admissible pursuant to Rule 404(b), in rebuttal, to prove knowledge, intent, and lack of mistake.

**IV.**     <u>**Conclusion**</u>

The Government hereby provides notice of its intent to admit the evidence described hereto as inextricably intertwined with the crimes charged and pursuant to Rule 404(b). The Government reserves the right to supplement this Rule 404(b) Notice as necessary.

Respectfully submitted this 17th June, 2019.

JOHN W. HUBER
United States Attorney

*/s/ Leslie A. Goemaat*
LESLIE A. GOEMAAT
Special Assistant United States Attorney

Certificate of Service

I certify that on the 17th day of June 2019, I caused a copy of the foregoing to be filed through the CM/ECF electronic filing system, thereby providing notice to all parties of record in this case.


/s/ Leslie A. Goemaat
Leslie A. Goemaat
Special Assistant United States Attorney