ANDREA MARTINEZ, United States Attorney (#9313)
RICHARD M. ROLWING, Special Assistant United States Attorney (OH #62368)
JOHN E. SULLIVAN, Senior Litigation Counsel, Tax Division (WI #1018849)
CY H. CASTLE, Assistant United States Attorney (#4808)
DARRIN L. McCULLOUGH, Senior Policy Advisor, Money Laundering and Asset Recovery
Section (GA #487011)
Attorneys for the United States of America
111 South Main Street, #1800 | Salt Lake City, Utah 84111
Telephone: (801) 524-5682
Email: richard.m.rolwing@usdoj.gov| john.e.sullivan@usdoj.gov| cy.castle@usdoj.gov|
        darrin.mccullough@usdoj.gov

---

## IN THE UNITED STATES DISTRICT COURT

### DISTRICT OF UTAH, CENTRAL DIVISION

---

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Case No. 2:18-CR-365-JNP |
| Plaintiff, | : | MOTION OF UNITED STATES FOR INTERLOCUTORY SALE ORDER OF |
| v. | : | SEIZED PROPERTY AND MEMORANDUM IN SUPPORT |
| JACOB ORTELL KINGSTON, et al., | : | |
| Defendant. | : | Judge Jill N. Parrish |
| | | Magistrate Judge Dustin B. Pead |

---

The United States of America, through its attorneys, moves this Court pursuant to Fed. R.

Crim. P. 32.2(b)(7) and 21 U.S.C. § 853(e), for an order authorizing the immediate interlocutory

sale of the property described in Exhibit A and all property contained thereon and therein

(hereinafter referred to as "the $64 Million Biodiesel Plant"). In support of its motion and

memorandum, the United States submits the following:

/

/

/

## BACKGROUND

A.      <u>Criminal Case</u>

1.      On January 17, 2019, a grand jury returned a Second Superseding Indictment

charging the defendants with multiple crimes including a conspiracy to commit mail fraud that

involved fraudulently obtaining over $500 million of fuel tax credits from the Internal Revenue

Service.  ECF No. 135.

2.      Count 25 of the Second Superseding Indictment charged Jacob and Isaiah

Kingston with one of three money laundering conspiracies in which they transferred the proceeds

of the mail fraud conspiracy in Count 1 in conceal and disguise money laundering transactions,

and expenditure transactions in excess of $10,000.  Count 25 further alleged the defendants

"transferred, and caused to be transferred, Mail Fraud Scheme proceeds from Washakie's bank

accounts to third parties for the purposes of … ( 4) expanding and building out Washakie's

facilities in Plymouth, Utah."  *Id.* at 32.  Count 25 further alleged the defendants "transferred,

and caused to be transferred, Mail Fraud Scheme proceeds from Washakie's bank accounts to the

bank accounts of Order-related entities.  *Id.*

3.      The Second Superseding Indictment notified the defendants of the United States'

intent to seek forfeiture of "any property, real or personal, that constitutes or is derived from

proceeds traceable to the conspiracy" and "any property, real or personal" involved in money

laundering or traceable to such violations.  *Id.* at 56-58.

4.      The grand jury specifically found:

probable cause to believe that the listed defendants have committed the crimes
specified in the above forfeiture notice and that the above properties [including
the Subject Property"] listed for forfeiture are 1) constituted or derived from
proceeds traceable to the mail fraud conspiracy, or 2) connected to the money
laundering crimes as property involved in such crimes or property traceable to the
property involved in such crimes.

*Id*. at 60.

        B.      <u>Plea Agreements</u>

        10.      On July 19, 2019, defendants Jacob Kingston and Isaiah Kingston pleaded guilty to, among other charges, conspiracy to commit mail fraud that involved fraudulently obtaining over $500 million of fuel tax credits from the IRS and conspiracy to commit money laundering. Jacob Kingston Plea Agreement ("JK Plea"), ECF No. 439; Isaiah Kingston Plea Agreement ("IK Plea"), ECF No. 445.

        11.      As part of his plea agreement, Jacob Kingston admitted:

        At all times relevant to the charges in the Second Superseding Indictment, I was the owner and Chief Executive Officer ("CEO") of Washakie Renewable Energy ("WRE"). I was the CEO and functional owner of United Fuel Supply ("UFS"). I created Washakie Renewable Energy in 2006 to 2007 to produce biodiesel. While WRE was capable of producing some amounts of biodiesel, in no year did WRE ever produce more than 8.5 million gallons. Starting in 2010, I began filing false claims for renewable fuel tax credits as charged in the Second Superseding Indictment and to fraudulently claim renewable identification numbers ("RINs"). I did so in agreement with my co-defendants Isaiah Kingston, Rachel Kingston, and Sally Kingston, and later with co-defendant Lev Dermen, aka Levon Termendzhyan. I was primarily responsible for the preparation and filing of Forms 8849, Claims for Refund of Excise Taxes, in the name of WRE and UFS.

        [Count 1] [Counts 2 through 20] Starting in tax year 2010, I filed Forms 8849 claiming production and sale of renewable fuel, and I claimed RINS for fuel that I did not produce or sell for use as fuel. I agreed with the principals of Biofuels of Colorado, Montgomery Recycling, Aspen Biofuel, and Grease Depot to fraudulently file false claims for refundable fuel tax credits, by entering into toll processing agreements and creating backdated and false paperwork claiming that I produced fuel that I knew was not being produced. I also caused financial transactions to be created to reflect the false paperwork in order to further fraudulently claim that qualifying fuel was being produced and sold, when in fact I knew that qualifying fuel was not being produced or sold. I admit to preparing or causing to be prepared and filing or causing to be filed the nineteen false Forms 8849 charged in Counts 2 through 20 in the Second Superseding Indictment. Those Forms were false in that they falsely claimed that WRE had produced and or blended and sold for use as fuel qualifying renewable fuel that WRE had not in fact produced or blended and sold for use as fuel.

JK Plea at 7-8.

      12.     In his plea agreement, Isaiah Kingston admitted:

      Starting in 2010, I participated in a scheme to file false claims for renewable fuel tax credits on behalf of WRE and to fraudulently claim renewable identification numbers ("RINs"), as charged in the Second Superseding Indictment. I did so together with my co-defendants Jacob Kingston, Rachel Kingston, and Sally Kingston, and, starting no later than 2012, with co- defendant Lev Dermen, whom I knew as Levon Termendzhyan.

      Starting in tax year 2010, I know that WRE filed claims for renewable fuel tax credit, as well as RINs. I knew these claims were false because they falsely claimed that WRE had produced and/or blended qualifying renewable fuel and had sold it for use as fuel. With my co- defendants, Jacob Kingston, Rachel Kingston, and Sally Kingston, I agreed with the principals of Biofuels of Colorado, Montgomery Recycling, and Grease Depot to claim renewable fuel tax credits based on backdated documents and false invoices. I also engaged in financial transactions, the purpose of which was to give the false appearance that product was being bought and sold as described by the false invoices.

IK Plea at 9.

      13.     Both Jacob and Isaiah Kingston specifically admitted:

      From April 2013 through December 2015, I agreed with co-defendant Jacob [Isaiah] Kingston to both spend some of our portion of the fraud proceeds in building up and supporting WRE, and the Order, and in some instances, to do so in concealed manners. For instance, on more than one occasion, we agreed to cycle funds through Order-related entities. I knew these funds were received by WRE based on its false claims for renewable fuel credits and RINs knowing them to be criminally derived. Some of these payments to Order-related entities were supported by inflated invoices, and the monies returned to Washakie were falsely characterized as draws or loans. These transactions included funds cycled to and through various entities including A-Fab Engineering, Fidelity Funding, Alliance Investments, World Enterprises, AAA Security, American Digital Systems, Safeco Investments, Standard Restaurant Equipment, Attco Trucking, CCP Enterprise, and others as charged in Count 25 of the Second Superseding Indictment.

JK Plea at 10-11; IK Plea at 9.

      14.     In addition, the defendants admitted:

I admit that the majority of the transferred funds from Washakie or UFS to Order- related entities were not through bona fide purchases for value. Specifically, I do not contest that approximately $30 million in proceeds traceable to the mail fraud scheme or money laundering schemes to which I am pleading guilty were not bona fide purchases for value. I will not contest the United States' tracing of proceeds of the mail fraud scheme and/or proceeds involved in the money laundering schemes from Washakie and/or UFS to the properties listed in Exhibit A. In addition, I do not contest that Washakie and/or UFS used false and/or inflated invoices to give the false appearance that transfers of mail fraud scheme and/or proceeds involved in the money laundering schemes were bona fide purchases for value.

JK Plea at 15; IK Plea at 14.

      C.    <u>Trial Testimony</u>

On February 10, 2020, defendant Jacob Kingston testified at the trial of his co-defendant, Levon Termendzhyan, and admitted that he believed that during 2013 he and his brother Isaiah spent between $30 to $50 million upgrading the Washakie facilities at the plant site in Plymouth, Utah.  Trial Tr. at 995, ECF No. 1042.

On February 19, 2020, defendant Isaiah Kingston testified at the trial of his co-defendant, Levon Termendzhyan, and admitted that he believed that they used over $100 million in fraud proceeds to build out the Washakie facilities at the plant in Plymouth, Utah.  Trial Tr. at 2163, ECF No. 1048.

On November 16, 2021, defendant Isaiah Kingston again testified at the forfeiture hearing of Levon Termendzhyan, and admitted that Special Agent Washburn's summary (GX F1) showing that $64,985,551 of Washakie funds were used to build out the Washakie facilities at the plant in Plymouth, Utah, was accurate.  Forfeiture Tr. at 378, ECF No. 1316.  Special Agent Washburn testified that $62,015,111 of these funds represented fraud proceeds based on his tracing analysis.  *Id*. at 418.

At the closing arguments for the forfeiture proceeding, the United States explained that its forfeiture claim as to the Washakie physical facilities is for the entirety of the physical facility, which includes the land upon which the build-out facilities sit if the real property law of Utah treats the build out, i.e., the crush plant buildings, the railroad, the storage tanks, the biodiesel buildings, the warehouse, and the electric substation, as part of the land.[1]  Closing Argument Tr. at 21-23, ECF No. 1327.  If the prior owner of the land, NWR, an entity associated with the father of Jacob and Isaiah Kingston, and the husband of defendant Rachel Kingston, somehow claims it owns the Washakie physical plant as a result of the so-called lease and some settlement of litigation over so-called unpaid back rent, then the government will prepare to contest such a claim in the ancillary proceedings after the requested sale, and after the order of forfeiture is entered.

> D.   Delinquent Taxes

On February 15, 2022, Box Elder County sent notice to NWR of its intent to sell the $64 Million Biodiesel Plant at a public auction on May 19, 2022 for five years of delinquent taxes. See copy of Notice of Final Sale attached as Exhibit B.[2]

As a result of NWR's tax appeal for the tax years of 2017, 2018, 2019 and 2020, Box Elder County conducted an audit and reclassified what it considered real property and personal

---

[1] Utah Code Ann. § 57-1-1 defines Real property" or "real estate" means any right, title, estate, or interest in land, including all nonextracted minerals located in, on, or under the land, all buildings, fixtures and improvements on the land, and all water rights, rights-of-way, easements, rents, issues, profits, income, tenements, hereditaments, possessory rights, claims, including mining claims, privileges, and appurtenances belonging to, used, or enjoyed with the land or any part of the land.

[2] The amount of $912,447.02 reflected in the notice is the amount of taxes NWR owes for the real property as of February 15, 2022.

property related to the $64 Million Biodiesel Plant for tax purposes.[3]  Based upon this audit, the

taxes NWR now owes for the real property for 2017, 2018, 2019, 2020 and 2021 $1,062,035.21.

See copy of Invoice from Box Elder County attached as Exhibit C.[4]  The taxes it now owes for

personal property for 2017, 2018, 2019, 2020 and 2021 is $1,404,661.82 for a combined total of

$2,466,697.03 as of March 10, 2022.[5]  *Id.*

Rodney Bennett, the Box Elder County Recorder, has informed the United States that the

county intends to send NWR an amended final notice of tax sale to include both the amount of

$1,062,035.21 owed for the real property and $1,404,661.82 owed for the personal property for a

total of $2,466,697.03.

E.    Purchase Proposal for the $64 Million Biodiesel Plant

On November 11, 2021, Lean Manufacturing Design Consultants ("Lean

Manufacturing"), on behalf of a group of investors, made a Purchase Proposal for biodiesel plant

and the $64 Million Biodiesel Plant to the United States and NWR for approximately $20

million.  Lean Manufacturing's latest offer is to purchase the biodiesel plant and the 349.51-acre

parcel upon which it is located for $4 million, pay the outstanding real and personal taxes of

$2,466,697.03, plus interest and penalties, for the tax years from 2016 to 2021 and invest $14.3

---

[3] Steve Hadfield, Box Elder County Attorney, has informed the United States that NWR's tax appeal has been resolved as a result of the county's agreement to provide a separate tax assessment for the real property and a tax assessment for the personal property.

[4] Mr. Hadfield has also informed the United States that NWR failed to timely file an appeal on the tax assessment amounts reflected in the Invoice.

[5] Until paid, this amount will continue to increase because of accruing interest and penalties.

million in the biodiesel plant to make it operational again.  See copy Purchase Proposal and Dec. 5, 2021 email attached as Exhibit D.[6]

As an operational plant, Lean Manufacturing projects it will employ forty-six full-time employees, twelve managers and thirty-four employees to operate the plant.  It also anticipates the need for thirty full-time construction positions and eleven full-time design positions for six months.

F.      NWR's Plant and Land Values

NWR obtained an appraisal of the Plymouth Plant Property in 2017, valuing the land at $220,000, and the improvements at $780,000, for a total value of $1,000,000 as of January 1, 2017.  April 16, 2021 Hearing Transcript ("Hearing I Tr.") at 4; Exh. 22 at 50, ECF No. 1231. The appraiser did not include any of the bulk storage tanks in his appraisal because he was of the opinion that the storage tanks were personal property and should be valued pursuant to State Tax Commission Rule R884-24P-33(6)(o)(i)(F).  *Id.*, Exh. 22 at 3, 43.

The 2017 appraisal states in the reconciliation section, "we estimate a market value for the subject property as improved of a million dollars.  In our opinion, the improvements contribute significantly to the value of the site."  *Id.* at 31.

NWR obtained a second appraisal on October 30, 2019, valuing the land at $210,000 and the improvements at $1,861,507 for a total value of $2,150,000.  *Id*. at 42; Exh. 23 at 3, 55, 70. Likewise, the appraiser did not include in his appraisal the value of any of the storage tanks

---

[6] Since learning recently that the taxes owed on Parcel #08-046-0002 is now $2,466,697.03, Lean Manufacturing is willing to pay this amount, plus accruing interest and penalties as part of its purchase offer.

because of his position that the storage tanks were personal property and must be valued pursuant to State Tax Commission Rule R884-24P-33(6)(o)(i)(F). *Id.*, Exh. 23 at 56.

Rachel Young testified the appraisals were obtained to appeal Box Elder County's tax assessments of the Plymouth Plant Property. *Id.* at 71: 16-17. She is of the opinion that the biodiesel plant has only salvage value based upon the appraisals and her inability to find tenants for the property. *Id.* at 24-28; 69, 81. Salvage value is the lowest value obtainable for a property, April 22, 2021 Hearing Transcript ("Hearing II Tr.") at 163: 1-3, ECF No. 1232, and usually involves dismantling the property. *Id.* at 163: 9-10. It was her understanding the appraisals contained a valuation of the storage tanks because she considers them to be part of the property. Hearing I Tr. at 71:16-17; 72: 15-17.

## ARGUMENT

**Preserving The $64 Million Biodiesel Plant and Other Good Cause Exists to Grant the Motion of the United States.**

Under 21 U.S.C. § 853(e),[7] "upon application of the United States, the court may . . . take any other action to preserve the availability of property" subject to forfeiture. *See United States v. Gianelli*, 594 F. Supp. 2d 148, 150 (D. Mass. 2009) (Section 853(e) authorizes the court to "take any . . . action to preserve the availability of property" subject to forfeiture; interlocutory sale necessary to preserve equity in property for forfeiture).

Additionally, Fed. R. Crim. P. 32.2(b)(7) provides that "At any time before entry of a final forfeiture order, the court, in accordance with Supplemental Rule G(7) of the Federal Rules of Civil Procedure, may order the interlocutory sale of property alleged to be forfeitable."

---

[7] This statute, which sets procedures in criminal forfeiture proceedings involving drug crimes, applies to the criminal charges in this matter by 28 U.S.C. § 2461(c) and 18 U.S.C. § 982(b).

Supplemental Rule G of the Federal Rules of Civil Procedure governs forfeiture actions *in rem* arising under federal law and authorizes a court to order the interlocutory sale of all or part of the property subject to a pending asset forfeiture action if certain conditions are met. Specifically, Rule G(7) provides:

> (a) *Preserving and Preventing Criminal Use of Property.* When the government does not have actual possession of the defendant property the court, on motion or on its own, may enter any order necessary to preserve the property, to prevent its removal or encumbrance, or to prevent its use in a criminal offense.

> (b) *Interlocutory Sale or Delivery.*

> (i) Order to Sell. On motion by a party or a person having custody of the property, the court may order all or part of the property sold if:

> (A) the property is perishable or at risk of deterioration, decay, or injury by being detained in custody pending the action;

> (B) the expense of keeping the property is excessive or is disproportionate to its fair market value;

> (C) the property is subject to a mortgage or to taxes on which the owner is in default; or

> (D) the court finds other good cause.

Fed. R. Civ. P. G(7).

As the Court is well aware, the property is expensive to maintain, continues to deteriorate, and is subject to taxes which are in default. The sale may be ordered if it necessary to preserve the property, prevent its encumbrance, risk of injury or if the court "finds other good cause." Supplemental Rule G(7) gives a court broad discretion to order the interlocutory sale of property subject to forfeiture for "good cause." *See, e.g.*, *United States v. One Parcel of Real Property*, 128 F.3d 1386, 1389-90 (10th Cir. 1997) (noting that the district court ordered an interlocutory sale of real property based on the government's assertion that, absent "great expense," the property was subject to deterioration, decay, or injury during the pendency of the

action); *United States v. Hailey*, No. 11-CR-0540-WDQ, 2011 WL 6202787, 1 (D. Md. Dec. 8, 2011) (explaining "that the Government's desire to avoid storage costs (particularly with respect to the twenty-two automobiles and the tractor trailers) and the risk of depreciation in value (particularly of the computers and other electronic items) constitute 'good cause' for the interlocutory sale of the personal property").

    A.    <u>Delinquent Taxes</u>

There is no dispute now that NWR is in default of its real and personal property taxes and owes $2,466,697.03 in taxes to Box Elder County.  It has not paid one penny toward its property taxes for more than six years.  No doubt, NWR will blame the United States for its failure to pay its 2016 taxes. NWR will argue the money the Court awarded to the United States from the 2020 lease agreement between US Tank and Rail and Big West Oil had been intended to pay the 2016 taxes. Hearing I Tr. at 117, Exh. 56 and 57.  However, this does not explain why it didn't pay its 2016 taxes in 2017, 2018 or 2019; nor does it explain why it hasn't paid any of its 2017, 2018, 2019, 2020 or 2021 taxes since its tax appeal was resolved.  The simple answer is that NWR does not have the financial ability to pay these taxes – and it never has.  *Id.* at 129, Exh. 24; Hearing II Tr. at 248, Exh. 43. The testimony of Rachel Young and exhibits offered at the April 16, 2021 hearing show that NWR, US Tank and Rail and American Chemical have operated at a loss for years.  Hearing I Tr. at 129, Exh. 24; Hearing II Tr. at 248, Exh. 43.

    B.    <u>Purchase Proposal</u>

The purchase offer from Lean Manufacturing represents a substantial increase – $18 to $19 million more than NWR's salvage value claim of $1 to $2 million for the $64 Million Biodiesel Plant.  It means full-time jobs for forty-six employees.  It means bringing in those with the expertise to operate the plant.  It means establishing a more meaningful tax base for at least

ten acres upon which the plant is located for Box Elder County, the timely payment of future property taxes, the payment of NWR's outstanding property taxes of $2,466,697.03 and the payment of $4 million into escrow to address the claims of parties to the biodiesel plant in an ancillary proceeding.  There is also a possibility that an auction of the plant, as discussed below, will bring an amount for the purchase of the plant greater than what Lean Manufacturing has offered.  Should NWR or any other party succeed on their third-party claim to the $4 million or more, it will represent an amount far more than they could have ever hoped to receive from a plant destined to remain forever idle.

In addition, Lean Manufacturing proposes to invest some $14.3 million to return the plant to full operation after six years of neglect.  Lean Manufacturing's $20 million proposal is a substantial offer and the only offer NWR and the United States has received to purchase and operate the biodiesel plant.  We know from Rachel Young that she hasn't found any interested parties in operating the biodiesel plant.

> We have found that we have not been able to find a tenant that would lease the biodiesel plant, that the value is – there is no tenant that will come in to support the value that's there, and we haven't been able to do anything with it.
>
> . . . .
>
> We have actually gotten ahold of one of the large international industrial real estate agencies that would like to lease it.  We have contacted some of the other parties that we thought might be interested in doing something with the biodiesel, and nobody is interested in doing it.

Hearing I Tr. 24: 11-15, 20-25.

The United States has traced more than $62 million of illegal proceeds to the construction of the biodiesel plant.  The plant has remained idle since NWR took over the plant in 2016.  The shocking diminution in value of the biodiesel plant from its $64 million construction cost to NWR's salvage-claimed value lies directly at the feet of NWR.  The evidence NWR offered at

the April 16 and 22, 2021 hearings showed that it has never had the financial resources to make the plant operational, let alone maintain it.  Hearing I Tr. at 129, Exh. 24; Hearing II Tr. at 248, Exh. 43. The Purchase Proposal will exponentially enhance the value of the biodiesel plant and satisfies the "other good cause" requirement justifying an interlocutory sale under Rule G(7).

As long as the interlocutory sale does not diminish the value of the property, it may be sold for any of the reasons set forth in Supplemental Rule G(7)(b). S*ee United States v. Real Property and Residence*, 699 F.3d 956, 961-62 (6th Cir. 2012) (affirming an interlocutory sale of a yacht where the owner of the yacht was in default on a loan secured by the yacht and the "value of the underlying property is not at risk from an interlocutory sale, because the yacht will be sold in a commercially reasonable manner taking into account the characteristics of the yacht.") (internal quotation marks and citation omitted).

An interlocutory sale is necessary to preserve the value the Purchase Proposal brings to the $64 Million Biodiesel Plant and prevent any further loss in the value of the forfeiture.  The loss is ever greater now that Box Elder County plans to sell the parcel at a tax sale on May 19, 2022, threatening the claim of the United States.

If a court orders an interlocutory sale of properties over the objection of any interested party, the sale must comply with the provisions of 28 U.S.C. §§ 2001 (sale procedures) and 2002 (notice requirements).  These statutes provide procedural safeguards to ensure that court-ordered sales are made on terms that best preserve the parties' interests.  Section 2001(a) authorizes public sales of property and sales by court-appointed receivers.  Section 2001(b) permits private sales of property for cash or other consideration after a hearing of which notice to all interested parties shall be given by publication, or as otherwise directed by the court, and after the court finds that the best interests of the estate will be conserved thereby.

Upon information and belief of the United States, there are five potential interested parties who might oppose this Motion for Interlocutory Sale:

1).  Box Elder County Assessor's Office is represented by counsel, Steven Hadfield, the Box Elder County Attorney, at 81 North Main Street, Suite 102, Brigham City, Utah 84302, shadfield@boxeldercounty.org.

2)      NWR Limited Partnership who is represented by counsel, Jim Bradshaw, Brown, Bradshaw & Moffat, 422 North 300 West, Salt Lake City, Utah 84103, jim@brownbradshae.com.

3)      Lev Dermen, a/k/a Levon Termendzhyan, who is represented by counsel, Mark J. Geragos, Esq., Geragos & Geragos APC, 644 S Figueroa St., Los Angeles, CA 90017, (213) 625-3900, mark@geragos.com.

4)      ICPE Construction Management Services, LLC at 3212 South State Street, SLC, Utah  84115.

5)      Lifetree Trading PTE, Ltd who is represented by counsel, Adam Affleck, Richards Brandt, 111 East Broadway, Suite 400, SLC, Utah 84111, adam-affleck@rbmn.com.

Notice will be given to the above-referenced counsel of the intent of the United States to sell the $64 Million Biodiesel Plant and retain the proceeds pending forfeiture as a substitute *res*. A proposed Order to that effect is also filed herewith.

The sale of the property will be turned over to the Treasury Executive Office for Asset Forfeiture ("TEOAF") and TEOAF, including any contractor retained by TEOAF, may auction the $64 Million Biodiesel Plant according to its policies, practices, and procedures. The Proposed Purchase will serve as an auction bid for the purchase of the $64 Million Biodiesel Plant.  The

TEOAF has sole discretion to decide the logistics of the auction, including but not limited to, the timing of such auction; and the auction process itself.

The proceeds from the sale shall be disbursed in the following priority and order:

      a.      First, all costs of acquisition, maintenance, and sale of the $64 Million Biodiesel Plant;

      b.      Second, all costs not previously paid that were incurred by the United States, its agencies, or contractors in connection with the storage, maintenance, repair, marketing, and sale of the $64 Million Biodiesel Plant; and

      c.      Finally, all remaining proceeds shall be held by the United States Marshal Service in a seized asset account pending the entry of this court's forfeiture order and directions in that order how the Marshals may dispose of the proceeds.

The proceeds shall be a substitute *res* for the $64 Million Biodiesel Plant, and the criminal forfeiture of net proceeds shall be treated as if they were The $64 Million Biodiesel Plant. Any claim of third parties to the $64 Million Biodiesel Plant must be made in the context of an ancillary proceeding pursuant to 21 U.S.C. § 853(n) following the entry of the forfeiture order which follows a finding of guilt of the defendant and the finding of the nexus by the Court.[8]

---

[8] 21 U.S.C. § 853(n) provides, in part:

(n)  Third Party Interests

    (1)  Following the entry of an order of forfeiture under this section, the United States shall publish notice of the order and of its intent to dispose of the property in such manner as the Attorney General may direct. The Government may also, to the extent practicable, provide direct written notice to any person known to have alleged an interest in the property that is the subject of the order of forfeiture as a substitute for published notice as to those persons so notified.

**CONCLUSION**

The United States requests this Court grant its motion for an interlocutory sale of the $64 Million Biodiesel Plant for cause pursuant to Rule 32.2(b)(7) and 21 U.S.C. § 853(e).

Without interlocutory sale relief, the $64 Million Biodiesel Plant's value will continue to significantly diminish and jeopardize the ability of the United States to return some value through forfeiture of the more than the $500,000,000 the United States Treasury lost as a result of the criminal schemes of Jacob Kingston and Isaiah Kingston.  An interlocutory sale will substantially enhance the value of the biodiesel plant with the payment of the delinquent real and personal property taxes of $2,466,697.03, the investment of more than $14 million into the plant and a cash payment of $4 million.  Conversion of the $64 Million Biodiesel Plant to cash through a sale will preserve the value of the property for the benefit of the United States and interested parties as well.

Dated this 21st day of March, 2022.

> ANDREA T. MARTINEZ
> United States Attorney
>
> */s/ Cy H. Castle*
> Cy H. Castle
> Assistant United States Attorney

---

(2)  Any person, other than the defendant, asserting a legal interest in property which has been ordered forfeited to the United States pursuant to this section may, within thirty days of the final publication of notice or his receipt of notice under paragraph (1), whichever is earlier, petition the court for a hearing to adjudicate the validity of his alleged interest in the property. The hearing shall be held before the court alone, without a jury.

**Exhibit A**

The property is described as follows:

The physical plant once known as Washakie Renewable Energy, LLC with an address of 8100 West 24000 North, Portage, Box Elder County, Utah and a Parcel Number of 08-046-0002, and all the equipment installed therein, and affixed thereto, including the Biodiesel Production Plant, the Crush Plant and Warehouse, the Liquid Storage Tank Farm(s), the Rail Line, and the Electric Substation.

<u>Certificate of Service</u>

I certify that on the 21st day of March 2022, I caused a copy of the foregoing to be emailed to counsel below and mailed to ICPE Construction Management Services, LLC:

Box Elder County Assessor's Office is represented by counsel, Steven Hadfield, Box Elder County Attorney, at 81 North Main Street, Suite 102, Brigham City, Utah 84302, shadfield@boxeldercounty.org.

NWR Limited Partnership who is represented by counsel, Jim Bradshaw, Brown, Bradshaw & Moffat, 422 North 300 West, Salt Lake City, Utah 84103, jim@brownbradshae.com.

Lev Dermen, a/k/a Levon Termendzhyan, who is represented by counsel, Mark J. Geragos, Esq., Geragos & Geragos APC, 644 S Figueroa St., Los Angeles, CA 90017, (213) 625-3900, mark@geragos.com.

ICPE Construction Management Services, LLC at 3212 South State Street, SLC, Utah 84115.

Lifetree Trading PTE, Ltd who is represented by counsel, Adam Affleck, Richards Brandt, 111 East Broadway, Suite 400, SLC, Utah 84111, adam-affleck@rbmn.com.

*/s/ Cy H. Castle*
CY H. CASTLE
Assistant United States Attorney
