IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| UNITED STATES OF AMERICA, | MEMORANDUM DECISION: FINDINGS RE SPECIFIC PROPERTY SUBJECT TO FORFEITURE |
|---|---|
| Plaintiff, | |
| v. | |
| JACOB KINGSTON, ISAIAH KINGSTON, LEV DERMEN, RACHEL KINGSTON, and SALLY KINGSTON, | Case No. 2:18-cr-00365-JNP |
| | District Judge Jill N. Parrish |
| Defendants. | |

Defendant Lev Dermen was convicted of ten counts of various offenses arising out of his participation in a conspiracy to defraud the United States government of renewable tax credits and launder the proceeds of the fraud. The government seeks forfeiture of a number of properties allegedly derived from payments fraudulently obtained from the United States. In order to determine whether these properties are subject to forfeiture, the court must decide whether the government has established the requisite nexus between each specific property and Dermen's convictions. Fed. R. Crim. P. 32.2(b)(1)(A). During the week of November 15-19, 2021, the government presented evidence to the court regarding the nexus to each specific property sought.

The court first addresses the applicable standard of proof for determining whether a nexus exists between each property and Dermen's criminal offenses. The court then turns to Dermen's objections to evidence submitted to the court by the government. Finally, the court makes findings of fact regarding the nexus issue.

## I.       STANDARD OF PROOF

The parties disagree as to the standard of proof that the court must apply in determining whether a nexus exists between Dermen's convictions and specific pieces of property that the government seeks to forfeit. Dermen argues that the court should apply a beyond-a-reasonable-doubt standard. The government contends that the court's nexus finding need only be supported by a preponderance of the evidence. The court concludes that the preponderance-of-the-evidence standard should be applied.

In *Libretti v. United States*, 516 U.S. 29, 49 (1995), the Supreme Court held that the Sixth Amendment does not apply to criminal forfeiture because it is an aspect of sentencing. Five years later, in *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), the Court held that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." In *Southern Union Co. v. United States*, 567 U.S. 343, 349 (2012), the Court clarified that the *Apprendi* rule also applied to criminal fines. Dermen argues that *Apprendi* and *Southern Union* overruled *Libretti* sub silentio. Thus, he contends that *Libretti*'s holding that the Sixth Amendment does not apply to forfeiture proceedings is no longer good law.

The court disagrees. Dermen has not cited any cases supporting his theory that the Supreme Court has overruled *Libretti*. Indeed, it appears that every circuit court that has examined this issue has held that *Libretti* remains binding precedent. *United States v. Keene*, 341 F.3d 78, 85–86 (1st Cir. 2003) (rejecting an argument that *Apprendi* requires proof beyond a reasonable doubt in forfeiture proceedings); *United States v. Fruchter*, 411 F.3d 377, 381 (2d Cir. 2005) ("*Libretti* remains the law until the Supreme Court expressly overturns it . . . ."); *United States v. Najjar*, 300 F.3d 466, 485–86 (4th Cir. 2002) ("[T]here was no fact passed on by the trial judge but not charged

2

in the indictment that would have increased the penalty the defendants faced beyond the statutory maximum penalty. Therefore, the district court did not err in applying a preponderance of the evidence standard."); *United States v. Gasanova*, 332 F.3d 297, 301 (5th Cir. 2003) ("We therefore join all other circuit courts of appeals to consider the question and conclude that statutorily-prescribed forfeiture is warranted upon a showing of a preponderance of the evidence."); *United States v. Corrado*, 227 F.3d 543, 550–51 (6th Cir. 2000) ("Accordingly, we reject the defendants' argument that . . . the district court, as the agreed trier of fact, must make fact determinations based on the 'beyond a reasonable doubt' standard."); *United States v. Vera*, 278 F.3d 672, 672 (7th Cir. 2002) ("Like the other circuits that have considered this question, we hold that *Apprendi* does not disturb the rule that forfeiture is constitutional when supported by the preponderance of the evidence."); *United States v. Sigillito*, 759 F.3d 913, 935–36 (8th Cir. 2014) (collecting cases and holding that "*Libretti* continues to control"); *United States v. Phillips*, 704 F.3d 754, 770 (9th Cir. 2012) ("[E]very Circuit to consider the question has found that *Apprendi* and its progeny did not alter the rule in *Libretti,* and *Southern Union* does not change that determination."); *United States v. Cabeza*, 258 F.3d 1256, 1257–58 (11th Cir. 2001) (per curiam) ("Because *Apprendi* does not apply to forfeiture proceedings, our earlier decisions on the burden of proof in such proceedings remain good law: the burden of proof on a forfeiture count is a preponderance of the evidence.").

It appears that the Tenth Circuit remains one of the few Circuits that has not expressly held that *Apprendi* and *Southern Union* did not overrule *Libretti*. But well after *Apprendi*, the Tenth Circuit held that the preponderance-of-the-evidence standard applies to forfeiture proceedings. *United States v. Bader*, 678 F.3d 858, 893 (10th Cir. 2012) ("A forfeiture judgment must be supported by a preponderance of the evidence."); *United States v. Gordon*, 710 F.3d 1124, 1165 (10th Cir. 2013) (same).

3

In short, the court concludes that both *Libretti* and Tenth Circuit authorities establish that the proper standard of proof in a forfeiture proceeding is by a preponderance of the evidence. Accordingly, the court applies this standard to determine whether the government has met its burden to establish a nexus between Dermen's convictions and the specific property it seeks to forfeit.

## II.    EVIDENTIARY OBJECTIONS

The parties agreed that Dermen could object to documentary evidence presented by the government after the conclusion of the forfeiture hearing. Pursuant to this agreement, Dermen raised a number of evidentiary objections to exhibits offered by the government.

### A.    Standard for Determining Admissibility

The court's first task is to determine the proper standard for evaluating the admissibility of evidence in forfeiture proceedings. As discussed above, the Supreme Court held in *Libretti v. United States* that "[f]orfeiture is an element of the sentence imposed *following* conviction." 516 U.S. 29, 38–39 (1995). Because forfeiture proceedings are a part of sentencing, the Federal Rules of Evidence do not apply: "These rules—except for those on privilege—do not apply to . . . sentencing." FED. R. EVID. 1101(d); *see also United States v. Smith*, 770 F.3d 628, 641 (7th Cir. 2014) (holding that, under Rule 1101(d), the Federal Rules of Evidence do not apply to forfeiture proceedings); *United States v. Capoccia*, 503 F.3d 103, 110 (2d Cir. 2007) (same). Instead, Rule 32.2(b)(1)(B) of the Federal Rules of Criminal Procedure provides the relevant standard for admitting evidence relevant to forfeiture. This rule states: "The court's [forfeiture] determination may be based on evidence already in the record, including any written plea agreement, and on any additional evidence or information submitted by the parties and accepted by the court as relevant and reliable." Under this rule, judges "are not bound by the stringent evidentiary standards

4

applicable at trial; rather, the evidence need only be reliable." *United States v. Ali*, 619 F.3d 713, 720 (7th Cir. 2010). Thus, hearsay evidence is admissible in a forfeiture proceeding so long as the court determines that it is relevant and reliable. *United States v. Capoccia*, 503 F.3d 103, 110 (2d Cir. 2007) (holding that hearsay evidence was admissible under Rule 32.2(b)(1)(B)); *United States v. Creighton*, 52 F. App'x 31, 36 (9th Cir. 2002) (unpublished) (hearsay evidence is admissible in a forfeiture proceeding if the court finds the evidence to be reliable); *United States v. Evanson*, No. 2:05CR00805 TC, 2008 WL 3107332, at *2 (D. Utah Aug. 4, 2008) ("Because criminal forfeiture is viewed as part of the sentencing process, hearsay is admissible." (citation omitted)).

Accordingly, in evaluating Dermen's objections to particular documents submitted by the government, the court is not bound by the Federal Rules of Evidence. Instead, the court need only determine whether the evidence or information is relevant and reliable.

### B.    Objection to Exhibit G2

Dermen first objects to exhibit G2, which is a document describing the operations of SBK A.S. Dermen argues that the document should be excluded because no party knowledgeable about its creation authenticated the document and because it is hearsay. But, as discussed above, objections based upon the Federal Rules of Evidence are not proper in a forfeiture proceeding. The relevant question is whether the document is reliable. The court finds that it is sufficiently reliable to warrant consideration. The document was retrieved from a computer seized from a Washakie Renewable Energy server well before charges were brought in this case. Thus, there is every indication that the document is a reliable insofar as it represents how the parties that controlled SBK A.S. wished to represent the operations of the company to potential business partners. Accordingly, the court declines to exclude it from evidence.

The court notes, however, that exhibit G2 is only minimally relevant to the issue before the court: whether funds transferred to SBK A.S. are traceable to the funds fraudulently obtained by the defendants. Accordingly, the admissibility of the document does not affect the court's ultimate conclusion that money transferred to SBK A.S. is forfeitable.[1]

C.       Objection to Exhibit G3

Dermen also objects to exhibit G3, which appears to be a press release issued by the Turkish government touting anticipated investments to be made by Washakie and Noil Energy Group. He objected to this document during the guilt phase of his criminal trial, and the court excluded the press release from evidence because it is hearsay. Dermen renews his hearsay objection in the forfeiture phase of his criminal proceedings. He also argues that the document should be excluded on foundation and authenticity grounds.

In this proceeding, the admissibility of the press release is not determined by the Federal Rules of Evidence. Instead, the question presented to the court is whether the evidence is reliable. The court determines that it is admissible as reliable hearsay. The government obtained the press release from the internet—apparently from an official Turkish government website. Because the document was publicly available from an official website operated by an arm of the Turkish government, the court finds it to be reliable hearsay, at least to the extent that the press release conveys representations made to Turkish officials about investments made, or about to be made, in the country.

---

[1] Dermen also objects to exhibit G2 because he argues that the document pushes "the categorically false narrative that Lev Dermen had an ownership interest or was a director [of] SBK A.S." ECF No. 1310 at 2. But as discussed below, for this phase of the forfeiture proceedings, it makes no difference who owned or controlled the entity. The only issue currently before the court is whether fraud proceeds can be traced to wire transfers made to the entity.

The admissibility of exhibit G3, however, does not affect the court's conclusions regarding the forfeitability of specific assets located in Turkey. The press release, on its own, is not particularly compelling evidence that particular assets were derived from the fraud proceeds at issue in this case. The court's rulings are instead based on bank records and other financial documents showing the flow of funds from the checks fraudulently obtained from the I.R.S. to Turkish entities.

### D.      Objection to Exhibit N

Dermen also objects to exhibit N, which is an internet news article about the launch of the Queen Anne yacht on grounds of relevance, foundation, hearsay, authenticity, and Rule 403. The government's  only response to these objections was that the news article was relevant because it was published on Dermen's birthday. The court finds that the relevance of the publication date to the issue of tracing fraud proceeds to the purchase of the Queen Anne yacht to be so tenuous that the court elects to disregard the news article.

### E.      Objection to Exhibits E, F7, and F9

Dermen also objects to flowcharts prepared by Agent Washburn depicting the flow of fraud funds to a joint bank account controlled by Dermen and Baran Korkmaz; a piece of property in Sherman Oaks, California; and a Lamborghini. He argues that the summaries should not be admitted because they are not supported by admissible evidence. *See United States v. Samaniego*, 187 F.3d 1222, 1223 (10th Cir. 1999) (holding that a summery must be based on admissible evidence).

First, Dermen argues that exhibit E should be excluded because this flowchart represents that a transfer was made on December 18, 2015 rather than December 28, 2015, the actual date of the transfer. But Agent Washburn acknowledged the error in the summary chart and corrected the

7

date of the transfer during his testimony to the court. Such a scrivener's error, after being corrected by the person who prepared the summary, is not a basis for excluding the corrected summary chart.

Second, Dermen argues that portions of exhibits E, F7, and F9 are based only on conjecture. Specifically, he argues that arrows depicting a transfer from a bank account controlled by SBK Holdings USA to DK Zvezda LLC on December 18, 2015, followed by transfer from DK Zvezda back to the SBK Holdings USA account on December 28, 2015 is unsupported. The court disagrees. The government attached bank records showing the transfer of $4 Million dollars from SBK USA to the bank account of DK Zvezda. The government also produced records showing a $14 Million transfer out of the DK Zvezda account back to the SBK USA account. Dermen's argument that the flow charts are based on speculation is simply wrong. Accordingly, the court overrules Dermen's objections to exhibits E, F7, and F9.

### F.    *Objection to Exhibit F38*

Finally, Dermen objects to exhibit F38, which depicts the flow of funds used to purchase the Mega yacht. In response to the objection, the government conceded that it no longer seeks forfeiture of the Mega yacht. Accordingly, this objection is moot.

## III.    FINDINGS OF FACT

During the week of November 15-19, 2021, as part of Dermen's sentencing, the government presented evidence to the court regarding the forfeiture of certain specific property. Pursuant to Rule 32.2(b)(1)(A) and (B) of the Federal Rules of Criminal Procedure, the court hereby makes its findings regarding the nexus of the properties noticed for forfeiture to the Dermen's convictions. The property was alleged to be subject to forfeiture in the Government's Seventh Bill of Particulars (ECF No. 1250), filed on June 17, 2021.

A. *General Findings of Fact*

    1)    Dermen's Objections to Proposed General Findings of Fact

The government proposed a number of general findings of fact based upon the exhibits and testimony presented to the court during both the guilt and forfeiture phases of Dermen's criminal trial. Dermen objects to these findings on several grounds.

First, Dermen repeatedly argues that the government has failed to prove that he owns several of the items of specific property that the government seeks to forfeit or that he was involved with certain business entities that received fraud proceeds. Dermen also objects that the government failed to prove that he directed the various transfers and purchases documented by the government. But in this phase of the forfeiture proceedings, it makes no difference who owns the property that the government seeks to forfeit or who directed the various transfers of funds. Rule 32.2(b)(2)(A) requires the court to enter a preliminary order of forfeiture "without regard to any third party's interest in the property. Determining whether a third party has such an interest must be deferred until any third party files a claim in an ancillary proceeding under Rule 32.2(c)." Under this rule:

> the court orders the forfeiture of the defendant's interest in the property—whatever that interest may be—in the criminal case. At that point, the court conducts a separate proceeding in which all potential third party claimants are given an opportunity to challenge the forfeiture by asserting a superior interest in the property.

FED. R. CRIM. P. 32.2, Advisory Committee Notes. "Accordingly, any objection [the defendant] may have on the basis that a third party holds an interest in forfeitable property is not his objection to make." *United States v. Rivers*, 60 F. Supp. 3d 1262, 1266 (M.D. Fla. 2014). Thus, the court's only task is to determine whether the government has proven that the specific properties that it seeks to forfeit` are traceable to Dermen's convictions. FED. R. CRIM. P. 32.2(b)(1)(A) ("If the

government seeks forfeiture of specific property, the court must determine whether the government has established the requisite nexus between the property and the offense.").

Second, Dermen takes issue with the accounting method that Agent Washburn used to trace the fraud proceeds. Washburn utilized the "bad-in-first-out" (BIFO) method of tracing funds. Under this method, if fraud proceeds are deposited in an account, the fist subsequent withdrawal or withdrawals of funds from the account are deemed to be the fraud proceeds. Dermen contends that Washburn admitted on cross-examination that if he had used a different accounting method, he might have come to different conclusions. But Dermen does not advocate for a competing tracing methodology, such as "bad in, last out." (BILO) Nor does Dermen state how the application of a competing methodology would affect the tracing for any of the specific pieces of property for which the government seeks forfeiture.

Depending on the facts of the case, courts may choose between a number of tracing methodologies, including BIFO and BILO. *See United States v. Banco Cafetero Panama*, 797 F.2d 1154, 1159–60 (2d Cir. 1986). In this case, the court finds that the BIFO methodology is particularly appropriate. In an attempt to lauder their ill-gotten funds, the defendants in this case transferred funds from one bank account to another in relatively short periods of time. Under these circumstances, the reality of the transactions is best reflected by the BIFO accounting method. *See United States v. Walsh*, 712 F.3d 119, 124 (2d Cir. 2013) (holding that a district court's application of the BIFO tracing methodology was proper). Accordingly, the court finds that Washburn's method of tracing funds in this case is proper. Indeed, Dermen does not argue for the application of any other competing methodology.

Third, Dermen objects to the forfeiture of the various properties located in Turkey because the government admits that it had very little insight into what happened to the fraud funds once

the money arrived in that country. But the government has produced evidence showing the transfer of funds from bank accounts located in the United States to various Turkish entities. These financial records are sufficient to prove a nexus to those entities. Moreover, Rule 32.2(b)(1)(C) permits the court to enter an order describing property in general terms if the government is unable to identify all of the specific property subject to forfeiture prior to sentencing. At minimum, a general order of forfeiture may serve as a placeholder until the government can prove the ultimate destination of the funds transferred to Turkey.

2)   Court's General Findings of Fact

Based on the evidence produced both in the trial and the forfeiture hearing in this case, the court finds by a preponderance of the evidence that the government's summary charts accurately depict the flow of funds relating to the fraud proceeds, including the source of the funds used to purchase/acquire the various properties the government seeks to forfeit based on the Defendant's convictions.   Trial Tr. at 3718-20, 3721-22, 3724, 3727-31, 3733-36, 3738-42, 3776-77, 3787, 3797, 3804-05, 3827, 3834, and 3842 (Washburn);[2] and Forfeiture Tr. at 199, 416-17, 428-29 (Washburn);[3]

The court further finds that a portion of the fraud proceeds obtained by Washakie Renewable Energy ("WRE") and the Kingston defendants pursuant to the mail fraud conspiracy charged in Count 1 were used to buy, in money laundering transactions that were part of the money laundering conspiracy, a luxury Bugatti vehicle for the Defendant, as well as a luxury personal

---

[2] "Trial Tr." are references to the transcript of the trial.

[3]  "Forfeiture Tr." are references to the transcript of the forfeiture bench trial.

residence for Jacob Kingston, GX 2-5; and GX 8-1,[4] rendering them both connected to the crimes of conviction.

The court further finds that $11.2 million of fraud proceeds were used to make a loan to Zubair Kazi, an associate of the Defendant, and that both the Defendant and Kazi signed a promissory note indicating that the loan would be paid back to SBK Holdings USA, Inc., an entity owned by the Defendant, GX 3-1; and GX 3-23, rendering the loan connected to the crimes of conviction.

The court further finds that the fraud proceeds Washakie sent to Belize in a money laundering transaction were used to buy a piece of real property that was titled in the name of GT Energy, an entity associated with the Defendant's family and associates.  GX F39; GX W.  Thus, this property is also connected to the crimes of conviction.

The court further finds that $21,550,00 of Count 1 fraud proceeds (net) were transferred from WRE to SBK Holdings USA, Inc. in California as part of the money laundering conspiracy charged in Count 2.  GX 2-2; and Count 2 (ECF 135, at 27-28 (¶34(a)).  Further, the court finds that those proceeds were used to buy various pieces of real property, which renders all of those properties and the entity itself connected to the Defendant's crimes of convictions for Counts 1 and 2.  GX F3; GX F4; GX F6: GX F7; GX F9; GX F12; GX F14; and GX F15.

The court further finds that a significant portion of the fraud proceeds obtained by WRE and the Kingston defendants were also transferred in money laundering transactions to Turkey and Luxembourg.  GX 2-3; GX A; and GX B.  The court finds that a significant portion of the proceeds that were transferred to Turkey and Luxembourg were transferred to and through a variety of

---

[4] "GX" stands for Government Exhibit.

international bank accounts in Turkey (including the accounts of Komak, Biofarma, Alptekin Yilmaz, SBK Holding AS, Sezgin Baran Korkmaz) and transferred back to the United States into and through accounts associated with the Defendant and his family and associates (Speedy Lion Renewable Fuel, GT Energy, SBK Holdings USA, Inc., Century Energy, Noil Energy Group, Inc., DK Zvezda, Pillar Law Group, and the Korkmaz/Dermen joint personal account).  GX A; GX B; GX C; GX D; and GX E.  The court finds that these properties are connected to the crimes of conviction.

The court further finds that a significant portion of the fraud proceeds sent back from Turkey into and through these domestic accounts was withdrawn in cashier's checks, redeposited, and also transferred back to Turkey and then back to the United States in a series of wire transfers as part of the money laundering conspiracy charged in Count 2.  GX B; and Count 2 (ECF 135, at 27-29 (¶34(c)-(d)-(e)).

The court further finds that the following fraud proceeds transferred to Luxembourg and Turkey remained overseas with companies (Komak, SBK Holding AS, Mega Varlik, Biofarma, Isanne, Setap/Blane) and individuals (Alptekin Yilmaz) associated with the Defendant, Jacob Kingston, and their mutual associate Sezgin Baran Korkmaz:

(i)      GX 2-3 (showing $4 million remained with Komak, and $10 million was sent to SBK Holding AS);

(ii)     GX F35 (showing $10 million was sent for Mega Varlik);

(iii)    GX A (showing over $1 million remained with Isanne, $1.5 million remained with Biofarma,[5] and/or $10 million remained with Yilmaz);

(iv)    GX B (showing over $1 million remained with Speedy Lion); and

(v)    GX C (showing $1 million remained with GT Energy).

The court further finds that after the search warrant was executed on WRE and the Kingston defendants, the Defendant caused the transfer of millions of dollars of fraud proceeds back to SBK Holding AS and Komak in Turkey.  GX C; and GX E.  The court finds that general orders of forfeiture are appropriate for all of these entities and individuals as connected to the crimes of conviction.

The court further finds that the Defendant caused $15 million of fraud proceeds to be sent to SBK Holding AS in Turkey on November 8, 2016, just two days before SBK Holding AS wired €3,000,000 for the purchase of the *Soraya* yacht.  Based on the testimony of Andy Madadian, Ray Williams, Dana Timmer, and Nazmi Topcuoglu, and GX H, GX I, GX J, GX L, and GX X, and the testimony of Agent Washburn, and GX F37 and GX N, the court finds that the *Soraya* yacht, which was subsequently named the *Ani*, and then named the *Queen Anne*, is connected to the Defendant's crimes of conviction for Counts 1 and 2 and is subject to forfeiture.

The court further finds that many of the remaining properties the government seeks to forfeit were purchased with fraud proceeds that were transferred back in money laundering transactions to the United States into and through accounts associated with the Defendant and his

---

[5] According to the MASAK report, over $8.5 million of the $10 million that was sent from Korkmaz's personal account in Turkey to the joint personal account the Defendant shared with Korkmaz in California, *see* GX E, came from the $10 million that remained in the Biofarma account after $30 million was transferred to Alptekin Yilmaz, *see* GX A.  Defense Ex. W, at 48-49 (MASAK report).

family and associates (Speedy Lion, GT Energy, Pillar Law Group, Century Energy), rendering them all connected to the crimes of conviction.  GX F5; GX F10; GX F11; GX F13; GX F17-19; GX F20; and GX F21-25.

Finally, the court finds that the Defendant and his family and associates commingled funds from unknown sources with a significant portion of the fraud proceeds from Count 1, *see* GX B and GX D, and then engaged in significant money laundering transactions with these commingled funds and proceeds that were part of the money laundering conspiracy, rendering these funds from unknown sources property involved in money laundering transactions ("PIML").  Thus, these funds and the properties traceable to these funds are connected to the Defendant's convictions for Counts 1 or 2 and subject to forfeiture.  Furthermore, the court finds that the fraud proceeds and the PIML were transferred to business accounts associated with the Defendant, his co-defendants, the Kingstons, their mutual associate Korkmaz and his associates (SBK Holdings USA, Inc., Biopharma, Isanne, Mega Varlik, Setap/Blane, Alptekin Yilmaz, and SBK Holdings AS), or the Defendant's family and associates (GT Energy, Century Energy, DK Zvezda, and Speedy Lion, Pillar Law Group).  Because the government continues to seek to locate properties/assets traceable to these fraud proceeds and money laundering transactions, the court finds that general orders of forfeiture are appropriate with respect to these entities.  GX A; GX B; GX C; GX D; GX E; GX F16; GX F32; GX F33; GX F34; GX F35; and GX F36.

B.   *Specific Findings of Fact*

The court finds by a preponderance of the evidence that the following properties have the requisite nexus to the referenced counts of conviction and are, therefore, subject to forfeiture:

1) The Washakie Plant

The court finds that Washakie Renewable Energy (WRE) began producing biodiesel in late 2011 at a plant located in Plymouth, Utah, Trial Tr. at 1962, 1971 (I. Kingston); that WRE also had an office at that location in a trailer building, *Id*. at 1969 (I. Kingston); and that WRE received tens of millions of dollars of fraud proceeds in 2011, and hundreds of millions of dollars of fraud proceeds in 2013, much of which was used to build out WRE's biodiesel plant. *Id*. at 2035-36 (I. Kingston); GX 1-2.

The plant is situated on a 349.51-acre site in Box Elder Country, Utah, that used to be a farmstead. GX 23, at 2.[6]  The build out of WRE's plant facilities was completed in 2015 and includes a 40,000 square foot crush plant, six 625,000-gallon fuel storage tanks, two 1,000,000-gallon fuel storage tanks,[7] a fuel distribution facility, a rail spur, and miscellaneous other buildings and equipment related to the production of biofuel, including a warehouse building, a power station, a process building, a boiler building, an office/shop building, a production building, a Quonset building, a tower building, a bleaching building, and a pump house. *Id*. at 2 and 40.  The site also contains farmstead improvements built in the 1950s that are in poor condition. *Id*. at 2.

Government Exhibit F1 includes a list of expenditures made between 2011 and 2015 from the following three bank accounts:

(1)   Bank of Utah account #4874 in the name of Washakie Renewable Energy;

---

[6]  GX 23 is an appraisal report that was received in evidence at the evidentiary hearing held on April 16, 2021, in connection with New Washakie Ranch LLP's motion for equitable distribution on lease payments (Doc. 1200).  *See* attached GX 23.

[7]  While GX 23 describes eight 625,000-gallon tanks, GX 20 (Appraisal of Box Elder County Assessor) describes two of those tanks as 1,000,000-gallon tanks.  *See* attached GX 20.

(2)   Bank of Utah account #0596 in the name of WRE Production; and

(3)   Bank of Utah account #6754 in the name of WRE Construction.

GX F1, at 2-35; and GX 1-11.  At some point in 2013, WRE set up a separate construction account, Bank of Utah account #6754, to pay for the various construction projects undertaken to build out the plant.  Forfeiture Tr. at 377 (I. Kingston).  Agent Washburn met with Isaiah Kingston, WRE's chief financial officer, on a couple of occasions to determine which of the expenditures in these three accounts related to the build-out of the plant.  Forfeiture Tr. at 417 (Washburn).  Pages 3 through 35 of GX F1 list expenditures made with funds from WRE's construction account.  *Id*. at 377-78 (I. Kingston).  All of the expenditures listed in GX F1 were used to build out WRE's plant in Plymouth.  *Id*. at 378 (I. Kingston).  The expenditures listed in GX F1 total $64,985,551 over a five-year period, 2011 through 2015.  GX F1.

Government Exhibit F1 is a true and accurate summary of the expenditures listed on pages 2 through 35 of GX F1.  Forfeiture Tr. at 417 (Washburn).  Agent Washburn conducted an analysis of WRE bank records to determine which portion of these expenditures represent fraud proceeds. *Id*. (Washburn).  Agent Washburn used the "bad-in-first-out" methodology to conduct his analysis. *Id*.  Based on his analysis, Agent Washburn determined that $62,015,111 of the $64,985,551 of expenditures summarized in GX F1 represent illicit fraud proceeds that were used to build out WRE's biodiesel plant.  *Id*. at 418 (Washburn).  This $62,015,111 of fraud proceeds constitutes 95.43% of the total expenditures listed in GX F1.  *See* GX F1.

Based on Agent Washburn's detailed report tracing fraud funds, the court finds by a preponderance of the evidence that the following items are subject to forfeiture:

(1) The biodiesel production plant and all equipment contained or affixed therein;

(2) The crush plant, the warehouse, and all equipment contained or affixed therein;

17

(3) The liquid storage tank farm; and

(4) The rail line.

The government also seeks forfeiture of a number of other structures and equipment located at the Washakie plant. The only evidence cited in support of the additional equipment was an appraisal report written in 2019. But the appraisal only briefly noted that the "biodiesel plant improvements were completed [in] 2015." The appraisal did not trace the source of any funds used to pay for any particular structure or equipment. Indeed, the purpose of the appraisal was to evaluate the value of all of the structures and equipment at the Washakie plant in 2019, not to trace fraud proceeds to the purchase or installation of specific equipment. Accordingly, the government has not proven that any other structures or equipment found on the Washakie property were acquired with fraud proceeds. The court also notes that it is undisputed that the 349.51-acre plot of land, upon which the Washakie plant is situated, was not purchased with fraud proceeds.

Dermen states that he has no interest in the Washakie plant and that there is no nexus between his convictions and the plant equipment for which the government seeks forfeiture. But, as noted above, the government need not prove that Dermen owned or controlled specific property in order to show that it is subject to forfeiture. Moreover, Dermen chose to include the Washakie plant equipment in this proceeding. Finally, the court finds that there is a nexus between Dermen's convictions and the specific structures and equipment listed above. The jury found Dermen guilty of Count 1, which charged Dermen with conspiring with the Kingston defendants to fraudulently obtain renewable fuel tax credits and RINs from the United Sates. The government has proven that the funds fraudulently obtained through this conspiracy were used to purchase the four categories of improvements to the Washakie plant listed above.

2)   Proceeds from the Sale of the 2072 East Creek Road Property

The court finds by a preponderance of the evidence that the property identified as 2072 East Creek Road, Sandy, Utah was acquired with $3 million of fraud proceeds (93.10% of purchase price), and $160,000 of property involved in money laundering ("PIML"), as shown in GX 8-1 and GX 8-1.3, and by the testimony of Agent Washburn, and is thus connected to the convictions for Counts 1, 2, and 8 of the Indictment.  Furthermore, the court finds that GX 8-1 was admitted into evidence at the Defendant's trial, that the jury convicted the Defendant of Counts 2 and 8 for engaging in a money laundering transaction with respect to the purchase of the property, and that the funds used to purchase the property represented illicit fraud proceeds traceable to the mail fraud conspiracy charged in Count 1.  Forfeiture Tr. at 418-20 (Washburn).

Dermen argues that none of the funds used to purchase the home were fraud proceeds because of the manner in which he and Jacob Kingston structured the transaction. On June 5, 2013, Jacob borrowed $3 million and transferred it to Noil Energy Group, which was controlled by Dermen. On July 3, 2013, Jacob paid the loan in full with $3 million in fraud proceeds. Then on August 5, 2013, Noil Energy transferred $3.16 million to a title company to purchase the 2072 East Creek Road property. Dermen, relying on Agent Washburn's testimony that the $3 million loan was not fraud proceeds at the time that the funds were transferred to Noil, contends that no fraud proceeds flowed though Noil to purchase the property. The court disagrees. Jacob could not successfully launder his ill-gotten gains simply by taking out a short-term loan and then repaying the loan with fraud proceeds 28 days later. Taken in context, the $3 million loan constituted fraud proceeds traceable to a large portion of the purchase price of the property.

Moreover, even if the $3 million loan were not traceable to the Count 1 mail fraud conspiracy, it is undoubtably tied to the Count 8 money laundering charge. Count 8 charged

Dermen with transferring $3.16 million to the title company to fund the purchase of the 2072 East Creek Road property in order to conceal the proceeds of the Count 1 mail fraud conspiracy. Because the jury found Dermen to be guilty of the Count 8 money laundering charge, the property is also forfeitable because there is a nexus to this count.

3)      The 16572 Somerset Lane Property

The court finds by a preponderance of the evidence that the 16572 Somerset Lane, Huntington Beach, California property was acquired with $3,500,000 in fraud proceeds (98.03% of purchase price) as shown on GX 10-1, and by the testimony of Agent Washburn, and is connected to the convictions for Counts 1, 2, and 10 of the Indictment.  Furthermore, the court finds that GX 10-1 was admitted into evidence at the Defendant's trial, that the jury convicted the Defendant of Counts 2 and 10 for engaging in a money laundering transaction with respect to the purchase of the property, and that the funds used to purchase the property are traceable to two U.S. Treasury checks totaling $164 million (claim #37 on GX 1-2) that were obtained pursuant to the mail fraud scheme charged in Count 1.  Forfeiture Tr. at 420-21 (Washburn).

Dermen faults the government for failing to adequately investigate the title officer, the escrow agent, or the third party that purchased the 16572 Somerset Lane property. But the government is only required to prove that the money used to purchase the property can be traced to the Count 1 or Count 10 charge. The government has done so. Any evidence that the government could gather from individuals involved in the process would be only minimally relevant to the flow of funds proven through financial records.

4)      The 1605 Cactus Road Property

The court finds by a preponderance of the evidence that the 1605 Cactus Road, San Diego, California property was acquired with $3,132,000 of fraud proceeds (100% of purchase price) as

shown on GX F4 and F6, and by the testimony of Agent Washburn, and is connected to the convictions for Counts 1 and 2 of the Indictment.  Furthermore, the court finds that the Cactus Road property (Property No. 4) and the Camino Maquiladora property (Property No. 6) were purchased in the same transaction; that they are two separate properties, a gas station and a Mexican restaurant; and that the funds used to purchase these properties are traceable to two U.S. Treasury checks totaling $164 million (claim #37 on GX 1-2) that were obtained pursuant to the mail fraud scheme charged in Count 1 and that the funds were moved through international bank accounts as part of the money laundering conspiracy charged in Count 2.  Forfeiture Tr. at 421-22 (Washburn).  The court further finds that the funds used to purchase the property were moved from WRE to SBK Holdings USA, Inc. as part of the money laundering conspiracy charged in Count 2 and are subject to forfeiture on that basis as well.  GX F4 and F6; and Count 2 (ECF 135, at 27-28 (¶34(a)).

Dermen objects to this conclusion because SBK Holdings, USA—the entity that received the fraud funds and subsequently purchased the 1605 Cactus Road property—also received funds that were not connected to the fraud proceeds. But Dermen does not argue that Agent Washburn incorrectly applied the bad-in-first-out methodology to trace the fraud funds from the SBK USA account to the purchase of the property. And, as noted above, Dermen has not shown that the bad-in-first-out methodology is inappropriate here. Accordingly, the fact that fraud funds may have been comingled with clean funds does not alter the court's conclusion that the government successfully traced the fraud funds to the purchase of the property.

Dermen also objects on the grounds that the government failed to adequately investigate Edgar Sargsyan, who controlled one of the entities through which the fraud funds were traced. But the bank records produced by the government showing the movement of the fraud funds are

sufficient to prove the nexus between the fraud conspiracy and the funds used to purchase the property. Any information that the government could glean from interviewing Sargsyan would be superfluous.

           5)      The 13720 Vanowen Street Property

The court finds by a preponderance of the evidence that the property located at 13720 Vanowen Street, Van Nuys, California was acquired with $1,003,638.32 of fraud proceeds (100%) as shown on GX F5, and by the testimony of Agent Washburn, and is connected to the convictions for Counts 1 and 2 of the Indictment.  Furthermore, the court finds that the funds used to purchase the property are traceable to a U.S. Treasury check in the amount of $33,578,660 (claim #35 on GX 1-2) that was obtained pursuant to the mail fraud scheme charged in Count 1.  Forfeiture Tr. at 422-23 (Washburn).  The court further finds that the funds used to purchase the property were moved through international bank accounts as part of the money laundering conspiracy charged in Count 2 and are subject to forfeiture on that basis as well.  GX F5; and Count 2 (ECF 135, at 27-28 (¶34(c)-(d)-(e)).

Dermen asserted the same objections that he raised in relation to the 1605 Cactus Road Property. The court overrules these objections for the same reasons articulated above.

           6)      The 7004 Camino Maquiladora Property

The court finds by a preponderance of the evidence that the 7004 Camino Maquiladora, San Diego, California property was acquired with $3,132,000 of fraud proceeds (100% of purchase price) as shown on GX F4 and F6, and by the testimony of Agent Washburn, and is connected to the convictions for Counts 1 and 2 of the Indictment.  Furthermore, the court finds that the Cactus Road property (Property No. 4) and the Camino Maquiladora property (Property No. 6) were purchased in the same transaction; that they are two separate properties, a gas station and a

Mexican restaurant; and that the funds used to purchase these properties are traceable to two U.S. Treasury checks totaling $164 million (claim #37 on GX 1-2) that were obtained pursuant to the mail fraud scheme charged in Count 1, and that the funds were moved through international bank accounts as part of the money laundering conspiracy charged in Count 2. Forfeiture Tr. at 421-22 (Washburn). The court further finds that the funds used to purchase the property were moved from WRE to SBK Holdings USA, Inc. as part of the money laundering conspiracy charged in Count 2 and are subject to forfeiture on that basis as well. GX F4 and F6; and Count 2 (ECF 135, at 27-28 (¶34(a)).

Dermen asserted the same objections that he raised in relation to the 1605 Cactus Road Property. The court overrules these objections for the same reasons articulated above.

7)     The 14021 Margate Street Property

The court finds by a preponderance of the evidence that the 14021 Margate Street, Sherman Oaks, California property was acquired with $1,175,000 of fraud proceeds (97.92% of purchase price) as shown on GX F7, and by the testimony of Agent Washburn, and is connected to the convictions for Counts 1 and 2 of the Indictment. Furthermore, the court finds that the funds used to purchase the property are traceable to two U.S. Treasury checks totaling $164 million (claim #37 on GX 1-2) that were obtained pursuant to the mail fraud scheme charged in Count 1 and that the funds were moved through international bank accounts as part of the money laundering conspiracy charged in Count 2 and are subject to forfeiture on that basis as well. GX F7. Forfeiture Tr. at 424-26 (Washburn); and Count 2 (ECF 135, at 27-28 (¶34(c)-(d)-(e)).

Dermen asserted the same objections that he raised in relation to the 1605 Cactus Road Property. The court overrules these objections for the same reasons articulated above.

8)    The Bugatti Veyron

The court finds by a preponderance of the evidence that the Bugatti Veyron VIN: VF9SC2C23AM795205 was acquired with $1,820,000 of fraud proceeds (100% of purchase price) as shown on GX 2-5, and by the testimony of Agent Washburn, and is connected to the convictions for Counts 1 and 2 of the Indictment.  Furthermore, the court finds that the funds used to purchase the Bugatti are traceable to three U.S. Treasury check totaling $33.5 million that represent fraud proceeds, and that Defendant's convictions on the mail fraud and money laundering conspiracies charged in Counts 1 and 2 are also a basis for forfeiture of the Bugatti.  Forfeiture Tr. at 426-27 (Washburn).

Dermen requests that the court reserve its ruling on the forfeitability of the Bugatti because he asserts that he has discovered new evidence related to the credibility of Zubair Kazi. But the credibility of Kazi's trial testimony is not relevant to the forfeiture issue before the court. The financial records produced by the government are sufficient to show that funds used to purchase the Bugatti were derived from the fraud proceeds.

9)    The Lamborghini Aventador

The court finds by a preponderance of the evidence that the Lamborghini Aventador, VIN: ZHWUR1ZD2FLA03759 was acquired with $462,000 of fraud proceeds (100% of purchase price) as shown on GX F9, and by the testimony of Agent Washburn, and is connected to the convictions for Counts 1 and 2 of the Indictment.  Furthermore, the court finds that the funds used to purchase the Lamborghini are traceable to two U.S. Treasury checks totaling $164 million (claim #37 on GX 1-2) that were obtained pursuant to the mail fraud scheme charged in Count 1 and that the funds were moved through international bank accounts as part of the money laundering conspiracy

24

charged in Count 2 and are subject to forfeiture on that basis as well.  Forfeiture Tr. at 427-28 (Washburn).

Dermen argues in passing that the government failed to adequately trace the fraud proceeds and failed to establish a nexus between the Lamborghini and his convictions. The court disagrees. The government provided financial records tracing the fraud proceeds from Dermen's Count 1 conspiracy conviction to the vehicle.

10)   Proceeds from the Sale of the 1901–1903 W. Magnolia Blvd. Property

The court finds by a preponderance of the evidence that the 1901–1903 W. Magnolia Blvd., Burbank, California property was acquired with $548,000 of fraud proceeds (20.4% of purchase price), as shown on Government Exhibit F10, and by the testimony of Agent Washburn, and is connected to the convictions for Counts 1 and 2 of the Indictment.  Furthermore, the court finds that the funds used to purchase the property are traceable to two U.S. Treasury checks totaling $164 million (claim #37 on GX 1-2) that were obtained pursuant to the mail fraud scheme charged in Count 1.  GX F10; and Forfeiture Tr. at 431 (Washburn).  The court further finds that the funds used to purchase the property were moved through international bank accounts as part of the money laundering conspiracy charged in Count 2 and are subject to forfeiture on that basis as well. GX F10; and Count 2 (ECF 135, at 27-28 (¶34(c)-(d)-(e)).

Dermen argues that there is no nexus between the fraudulently obtained funds and this property because his former business associate, Edgar Sargsyan, embezzled approximately $20 million from his company, SBK Holdings, USA, while Sargsyan served as president of that company. But the money used to purchase the 1901–1903 W. Magnolia Blvd. property never flowed through SBK USA. The funds were transferred through another company controlled by Dermen, Speedy Lion Renewable Fuel Investments. Dermen has failed to explain how the alleged

embezzlement from SBK USA would be relevant to the tracing of funds to the purchase of this property. Moreover, even if the purchase of the 1901–1903 W. Magnolia Blvd. property had been traced to the allegedly embezzled funds, Dermen cites no authority suggesting that the theft somehow sanitized the funds and insulated the proceeds of the stolen money from forfeiture.

11)     Proceeds from the Sale of the 5761 S. Anderson Street Property

The court finds by a preponderance of the evidence that the 5761 S. Anderson St., Vernon, California property was acquired with $460,841.39 of fraud proceeds (30.16% of purchase price), as shown on Government Exhibit F11, and by the testimony of Agent Washburn, and is connected to the convictions for Counts 1 and 2 of the Indictment.  Furthermore, the court finds that the funds used to purchase the property are traceable to two U.S. Treasury checks totaling $164 million (claim #37 on GX 1-2) that were obtained pursuant to the mail fraud scheme charged in Count 1. GX F11; and Forfeiture Tr. at 431 (Washburn).  The court further finds that the funds used to purchase the property were moved through international bank accounts as part of the money laundering conspiracy charged in Count 2 and are subject to forfeiture on that basis as well.  GX F11; and Count 2 (ECF 135, at 27-28 (¶34(c)-(d)-(e)).

Dermen asserted the same objections that he raised in relation to the 1901–1903 W. Magnolia Blvd. property. The court overrules these objections for the same reasons articulated above.

12)     Proceeds from the Sale of the 6507 Teesdale Ave. Property

The court finds by a preponderance of the evidence that the 6507 Teesdale Ave., Valley Glen, California property was acquired with $640,000 of fraud proceeds (100% of purchase price) as shown on Government Exhibit F12, and by the testimony of Agent Washburn, and is connected to the convictions for Counts 1 and 2 of the Indictment.  Furthermore, the court finds that the funds

used to purchase the property are traceable to two U.S. Treasury checks totaling $164 million (claim #37 on GX 1-2) that were obtained pursuant to the mail fraud scheme charged in Count 1. GX F12; and Forfeiture Tr. at 431 (Washburn).  The court further finds that the funds used to purchase the property were moved from WRE to SBK Holdings USA, Inc. as part of the money laundering conspiracy charged in Count 2 and are subject to forfeiture on that basis as well.  GX F12; and Count 2 (ECF 135, at 27-28 (¶34(a)).

Dermen asserted the same objections that he raised in relation to the 1901–1903 W. Magnolia Blvd. property. Unlike the W. Magnolia Blvd. property, the 6507 Teesdale Ave. property was purchased with funds that flowed through SBK Holdings, USA. Thus, there is a possibility that the 6507 Teesdale Ave. property is tied to the allegedly embezzled funds. Nonetheless, Dermen cites no authority suggesting that the theft somehow sanitized the funds, insulating the proceeds of the stolen money from forfeiture.

13)     Proceeds from the Sale of the 160 E. Alondra Blvd. Property

The court finds by a preponderance of the evidence that the 160 E. Alondra Blvd., Carson, California property was acquired with $200,000 of fraud proceeds (21.05% of purchase price) as shown on Government Exhibit F13, and by the testimony of Agent Washburn, and is connected to the convictions for Counts 1 and 2 of the Indictment.  Furthermore, the court finds that the funds used to purchase the property are traceable to two U.S. Treasury checks totaling $164 million (claim #37 on GX 1-2) that were obtained pursuant to the mail fraud scheme charged in Count 1. GX F13; and Forfeiture Tr. at 431 (Washburn).  The court further finds that the funds used to purchase the property were moved through international bank accounts as part of the money laundering conspiracy charged in Count 2 and are subject to forfeiture on that basis as well.  GX F13; and Count 2 (ECF 135, at 27-28 (¶34(c)-(d)-(e)).

Dermen asserted the same objections that he raised in relation to the 1901–1903 W. Magnolia Blvd. property. The court overrules these objections for the same reasons articulated above.

14)      Proceeds from the Sale of the 12026 Hoffman St. Property

The court finds by a preponderance of the evidence that the 12026 Hoffman St., #302, Los Angeles, California property was acquired with $255,727 of fraud proceeds (33.64% of purchase price) as shown on Government Exhibit F14, and by the testimony of Agent Washburn, and is connected to the convictions for Counts 1 and 2 of the Indictment.  Furthermore, the court finds that the funds used to purchase the property are traceable to two U.S. Treasury checks totaling $164 million (claim #37 on GX 1-2) that were obtained pursuant to the mail fraud scheme charged in Count 1.  GX F14; and Forfeiture Tr. at 431 (Washburn).  The court further finds that the funds used to purchase the property were moved from WRE to SBK Holdings USA, Inc. as part of the money laundering conspiracy charged in Count 2 and are subject to forfeiture on that basis as well. GX F12; and Count 2 (ECF 135, at 27-28 (¶34(a)).

Dermen asserted the same objections that he raised in relation to the 1901–1903 W. Magnolia Blvd. property. Unlike the W. Magnolia Blvd. property, the 12026 Hoffman St. property was purchased with funds that flowed through SBK Holdings, USA. Thus, there is a possibility that the 12026 Hoffman St. property is tied to the allegedly embezzled funds. Nonetheless, Dermen cites no authority suggesting that the theft somehow sanitized the funds, insulating the proceeds of the stolen money from forfeiture.

15) "Kazi loan receivable" identified as the outstanding amount of principal and interest due on the June 21, 2013, loan to Zubair Kazi in the amount of $11,226,211.21

The court finds by a preponderance of the evidence that a loan was made to Zubair Kazi with $11,226,211.21 of fraud proceeds as shown on Government Exhibit 3-1, and by the testimony of Agent Washburn (Forfeiture Tr. at 432-33; and Trial Tr. at 3776-86), Jacob Kingston (Trial Tr. at 881-86) and Isaiah Kingston (Trial Tr. at 2021-26), and is connected to the convictions for Counts 1 and 2. Furthermore, the court finds that the funds used to make the loan are traceable to two U.S. Treasury checks totaling $23.1 million (claims #27 and #28 on GX 1-2) that were obtained pursuant to the mail fraud scheme charged in Count 1. GX 3-1; and Forfeiture Tr. at 432-33 (Washburn). The court further finds that the funds used to make the loan were moved from WRE to a third party as part of the money laundering conspiracy charged in Count 2 and are subject to forfeiture on that basis as well. GX F3-1; and Count 2 (ECF 135, at 30 (¶34(h)). The court further finds that that the $12 million promissory note payable to SBK Holdings USA, Inc., GX 3-23, is connected to the Defendant's convictions for Counts 1-7, and is subject to forfeiture.

Dermen requests that the court reserve its ruling on the forfeitability of the Kazi loan because he asserts that he has discovered new evidence related to the credibility of Zubair Kazi. But the credibility of Kazi's trial testimony is not relevant to the forfeiture issue before the court. The financial records produced by the government are sufficient to show that the money loaned to Kazi was derived from the fraud proceeds.

16) SBK Holdings USA, Inc.

The court finds that the defendants transferred proceeds from WRE to SBK Holdings USA, Inc. as part of the money laundering conspiracy charged in Count 2. GX 2-2; and Count 2 (ECF 135, at 27-28 (¶34(a)). Furthermore, the court finds that over $93 million in fraud proceeds were

29

sent as part of the money laundering conspiracy charged in Count 2 to SBK Holdings USA, Inc., or are connected to SBK Holdings USA, Inc. by virtue of the promissory note payable signed by Zubair Kazi.  GX 2-2 ($35.5 million), GX A ($15 million), GX C ($23 million), GX E ($8.5 million), and GX F3-1, GX 3-23 ($11.2 million loan to Kazi).

The court further finds that the assets of SBK Holdings USA, Inc., and any investments held or made by SBK Holdings, USA, Inc., which have value, are connected to the Defendant's convictions for Counts 1-7, and that the United States is entitled to a general order of forfeiture pursuant to Federal Rule of Criminal Procedure 32.2(b)(2)(C) for any and all property that constitutes or is derived from proceeds of mail fraud, or that constitutes property involved in money laundering, or property traceable to such property.

17)   Parcel APN: 427-111-11 Mojave, California, in the name of Desert Properties, Holding, LLC

The court finds by a preponderance of the evidence that this property was acquired with $90,789 of fraud proceeds (100% of purchase price) as shown on GX F17 and by the testimony of Agent Washburn and is connected to the Defendant's convictions for Counts 1 and 2 of the Indictment.  Furthermore, the court finds that the funds used to purchase the property are traceable to a U.S. Treasury check in the amount of $33,578,660 (claim #35 on GX 1-2) that was obtained pursuant to the mail fraud scheme charged in Count 1.  Forfeiture Tr. at 435-36 (Washburn).  The court further finds that the funds used to purchase the property were moved through international bank accounts as part of the money laundering conspiracy charged in Count 2 and are subject to forfeiture on that basis as well.  GX F17; and Count 2 (ECF 135, at 27-28 (¶34(c)-(d)-(e)).

18)    Parcel APN: 427-111-08 Mojave, California, in the name of Desert Properties Holding, LLC

The court finds by a preponderance of the evidence that this property was acquired with $65,703 of fraud proceeds (100% of purchase price) as shown on GX F18 and is connected to the Defendant's convictions for Counts 1 and 2 of the Indictment.  Furthermore, the court finds that the funds used to purchase the property are traceable to a U.S. Treasury check in the amount of $33,578,660 (claim #35 on GX 1-2) that was obtained pursuant to the mail fraud scheme charged in Count 1.  Forfeiture Tr. at 435-36 (Washburn).  The court further finds that the funds used to purchase the property were moved through international bank accounts as part of the money laundering conspiracy charged in Count 2 and are subject to forfeiture on that basis as well.  GX F18; and Count 2 (ECF 135, at 27-28 (¶34(c)-(d)-(e)).

19)    Parcel APN: 427-111-10 Mojave, California, in the name of Desert Properties Holding, LLC

The court finds by a preponderance of the evidence that this property was acquired with $331,946 of fraud proceeds (100% of purchase price) as shown on GX F19, and by the testimony of Agent Washburn, and is connected to the Defendant's convictions for Counts 1 and 2 of the Indictment.  Furthermore, the court finds that the funds used to purchase the property are traceable to a U.S. Treasury check in the amount of $33,578,660 (claim #35 on GX 1-2) that was obtained pursuant to the mail fraud scheme charged in Count 1.  Forfeiture Tr. at 437-38 (Washburn).  The court further finds that the funds used to purchase the property were moved through international bank accounts as part of the money laundering conspiracy charged in Count 2 and are subject to forfeiture on that basis as well.  GX F19; and Count 2 (ECF 135, at 27-28 (¶34(c)-(d)-(e)).

20)     Willowcrest Apartments, 5217 Willowcrest Avenue, Los Angeles,
        California

The court finds by a preponderance of the evidence that this property was acquired with

$791,525 of fraud proceeds (99% of purchase price including prepaid rents) as shown on GX F20,

and by the testimony of Agent Washburn, and is connected to the Defendant's convictions for

Counts 1 and 2 of the Indictment.  Furthermore, the court finds that the funds used to purchase the

property are traceable to U.S. Treasury checks that were obtained pursuant to the mail fraud

scheme charged in Count 1.  Forfeiture Tr. at 438-39 (Washburn).  The court further finds that the

funds used to purchase the property were moved through international bank accounts as part of the

money laundering conspiracy charged in Count 2 and are subject to forfeiture on that basis as well.

GX F20; and Count 2 (ECF 135, at 27-28 (¶34(c)-(d)-(e)).

21)     Solar turbines and related equipment paid for by the $3,900,000 wire
        transfer to Hendrix Henergy

The court finds by a preponderance of the evidence that this property was acquired with

fraud proceeds (100% of purchase price) as shown on GX F21 and GX S, at p. 62, and by the

testimony of Agent Washburn, and is connected to the Defendant's convictions for Counts 1 and

2 of the Indictment.  Furthermore, the court finds that the funds used to purchase the property are

traceable to U.S. Treasury checks that were obtained pursuant to the mail fraud scheme charged in

Count 1.  Forfeiture Tr. at 440-41 (Washburn).  The court further finds that the funds used to

purchase the property were moved through international bank accounts as part of the money

laundering conspiracy charged in Count 2 and are subject to forfeiture on that basis as well.  GX

A; GX B; GX D; GX F21; and Count 2 (ECF 135, at 27-28 (¶34(c)-(d)-(e)).

22)   Compressors

The court finds by a preponderance of the evidence that this property was acquired with fraud proceeds (100% of purchase price) as shown on GX F22, and by the testimony of Agent Washburn, and is connected to the Defendant's convictions for Counts 1 and 2 of the Indictment. Furthermore, the court finds that the funds used to purchase the property are traceable to U.S. Treasury checks that were obtained pursuant to the mail fraud scheme charged in Count 1. Forfeiture Tr. at 441-42 (Washburn).  The court further finds that the funds used to purchase the property were moved through international bank accounts as part of the money laundering conspiracy charged in Count 2 and are subject to forfeiture on that basis as well.  GX A; GX B; GX D; GX F22; and Count 2 (ECF 135, at 27-28 (¶34(c)-(d)-(e)).

23)   Industrial equipment, and/or storage tank

The court finds by a preponderance of the evidence that the property was acquired with fraud proceeds (100% of purchase price) as shown on GX F23, and by the testimony of Agent Washburn, and is connected to the Defendant's convictions for Counts 1 and 2 of the Indictment. Furthermore, the court finds that the funds used to purchase the property are traceable to U.S. Treasury checks that were obtained pursuant to the mail fraud scheme charged in Count 1. Forfeiture Tr. at 442-43 (Washburn).  The court further finds that the funds used to purchase the property were moved through international bank accounts as part of the money laundering conspiracy charged in Count 2 and are subject to forfeiture on that basis as well.  GX A; GX B; GX D; GX F23; and Count 2 (ECF 135, at 27-28 (¶34(c)-(d)-(e)).

24)   9153 Stellar Court, Corona, California

The court finds by a preponderance of the evidence that this property was acquired with both fraud proceeds and property involved in money laundering (100% of purchase price) as

33

shown on GX F24, and by the testimony of Agent Washburn, and is connected to the Defendant's convictions for Counts 1 and 2 of the Indictment.  Furthermore, the court finds that, of the $2 million in funds used to purchase the property, $1,052,884.56 (52.64% of purchase price) represents fraud proceeds traceable to U.S. Treasury checks that were obtained pursuant to the mail fraud scheme charged in Count 1, and the remaining $947,115.44 represents property involved in money laundering not traceable to the fraud scheme.  Forfeiture Tr. at 443-44 (Washburn).[8]  The court further finds that the entire $2 million used to purchase the property represents funds involved in money laundering transactions, including $1,052,884.56 of funds that were moved through international bank accounts as part of the money laundering conspiracy charged in Count 2, and the property is subject to forfeiture on that basis as well.  *Id*. at 444 (Washburn); GX A; GX B; GX D; GX F24; and Count 2 (ECF 135, at 27-28 (¶34(c)-(d)-(e)).

> 25)  Any asset purchased or traced to the $275,000 transfer on 11/20/19 to Century Energy account #9961 ("welding machines, skid manufacturing, and a 5-ton crane")

The court finds by a preponderance of the evidence that the property was acquired with $250,000 of funds involved in money laundering, as shown on GX F25, and by the testimony of Agent Washburn.  The court further finds that the property was purchased with funds that were commingled by Dermen's relatives with fraud proceeds that were moved through international bank accounts as part of the money laundering conspiracy charged in Count 2 and, thus, is connected to the Defendant's conviction for Count 2 of the Indictment and is subject to forfeiture.

---

[8] While Agent Washburn testified at the forfeiture hearing that the fraud proceeds involved in the purchase that were from the specified unlawful activity of mail fraud exceeded $1.1 million, the government submitted a more specific figure of $1,052,884.56 of fraud proceeds after the hearing. *See* ECF 1308, at 10 (Property #24).

Forfeiture Tr. at 444-45 (Washburn); GX A; GX B; GX D; GX F25; and Count 2 (ECF 135, at 27-28 (¶34(c)-(d)-(e)).

26)    A general order of forfeiture against Century Energy

The court finds by a preponderance of the evidence that the United States is entitled to a general order of forfeiture against Century Energy for up to $15 million (less the value of the other Century Energy property that is forfeited) pursuant to Rule 32.2(b)(2)(C) for any and all property that constitutes or is derived from proceeds of mail fraud, or that constitutes property involved in money laundering, or property traceable to such property.  Furthermore, the court finds that $38 million in funds representing 100% fraud proceeds were commingled in the Speedy Lion account with $5.6 million of funds from an unknown source to became property involved in money laundering.  Forfeiture Tr. at 208-10 (Washburn); and GX B.  The court further finds that the $15 million used by Century Energy to purchase a certificate of deposit on December 21, 2018, represents funds involved in money laundering transactions, including a portion of which was moved through international bank accounts as part of the money laundering conspiracy charged in Count 2 of the Indictment, and are subject to forfeiture on that basis.  Forfeiture Tr. at 208-10; and 407-11 (Washburn); GX B; GX D; GX F21-25; and Count 2 (ECF 135, at 27-28 (¶34(c)-(d)-(e)).

27)    The $4 million that remained at Komak Isi Yalitim Sistamleri Sanayi (Turkey) after being transferred to Komak on 12/31/13, and the $3,810,000 transferred to Komak Isi Yalitim Sistamleri Sanayi (Turkey) by Noil Energy on 03/22/16

The court finds by a preponderance of the evidence that the United States is entitled to a general order of forfeiture against Komak for $7,810,000 pursuant to Rule 32.2(b)(2)(C) for any and all property that constitutes or is derived from proceeds of mail fraud, or that constitutes property involved in money laundering, or property traceable to such property, as shown on GX E

and GX 2-3, and by the testimony of Agent Washburn, and is connected to the convictions for Counts 1 and 2 of the Indictment. Furthermore, the court finds that the $13,000,000 of funds transferred by Washakie on December 31, 2013, were fraud proceeds directly traceable to claim 33 of the mail fraud conspiracy. Forfeiture Tr. at 435-36; 445-48 (Washburn). Further, the court finds that the $3.81 million in funds that were transferred from the Noil Energy account in March 2016 to Komak in Turkey represents 100% proceeds from the mail fraud conspiracy and were moved through international bank accounts as part of the money laundering conspiracy charged in Count 2 and are subject to forfeiture on that basis as well. GX E; and Count 2 (ECF 135, at 27-28 (¶34(c)-(d)-(e)).

28) SBK Holding, AS - The assets of SBK Holding, AS, and any investments of SBK Holding, AS, which have value

The court finds by a preponderance of the evidence that the United States is entitled to a general order of forfeiture against SBK Holding AS in Turkey pursuant to Rule 32.2(b)(2)(C) for any and all property that constitutes or is derived from proceeds of mail fraud, or that constitutes property involved in money laundering, or property traceable to such property, as shown on GX 2-3, GX C, GX E, and GX F38, and by the testimony of Agent Washburn, and as charged in Counts 1 and 2 of the Indictment. Furthermore, the court finds that $10,000,000 of fraud proceeds were transferred from Washakie to SBK Holding, AS in Turkey on November 13, 2013. GX 2-3. The court further finds that additional fraud proceeds in the amounts of $3,778,509 and $458,000 were transferred from Noil Energy Group and SBK Holdings USA on February 17, 2016, and March 25, 2016, respectively. GX E. The court further finds that $21,265,000 of fraud proceeds connected to the convictions for Counts 1 and 2 of the Indictment were transferred from SBK Holdings USA to SBK Holding, AS in Turkey between October 21, 2016 and November 8, 2016.

GX C; Forfeiture Tr. at 451-52 (Washburn).  Based on the foregoing, the court finds that these funds represent proceeds of the mail fraud conspiracy charged in Count 1, and property involved in money laundering as charged in Count 2, and that the United States is entitled to a general order of forfeiture against SBK Holding, AS in the amount of $35,501,509 pursuant to Rule 32.2(b)(2)(C).

> 29) The assets of Biofarma, Ilac, AS (Turkey) purchased or traced to fraud proceeds transferred thereto, which have value

The court finds by a preponderance of the evidence that the United States is entitled to a general order of forfeiture against Biofarma in Turkey pursuant to Rule 32.2(b)(2)(C) for any and all property that constitutes or is derived from proceeds of mail fraud, or that constitutes property involved in money laundering, or property traceable to such property, as shown on GX A, and by the testimony of Agent Washburn, and as charged in Counts 1 and 2 of the Indictment. Furthermore, the court finds that the $40,000,000 of fraud proceeds transferred to Biofarma relate to claim 37 of the mail fraud conspiracy.  The court further finds that, of this amount, $30,000,000 was transferred to an account in the name of Alptekin Yilmaz, and that $8.5 million more was transferred to the joint personal account of the Defendant and Korkmaz.  Forfeiture Tr. at 452-54 (Washburn); and Defense Ex. W, at 48-49 (MASAK report).  Based on the foregoing, the court finds that these funds represent proceeds of the mail fraud conspiracy charged in Count 1, and property involved in money laundering as charged in Count 2, and that the United States is entitled to a general order of forfeiture against Biofarma, Ilac, AS in the amount of $1.5 million pursuant to Rule 32.2(b)(2)(C).

30)    The assets of Isanne SARL (Luxembourg) purchased or traced to fraud
proceeds transferred thereto, which have value

The court finds by a preponderance of the evidence that the United States is entitled to a

general order of forfeiture against Isanne SARL in the amount of $1.3 million pursuant to Rule

32.2(b)(2)(C) for any and all property that constitutes or is derived from proceeds of mail fraud,

or that constitutes property involved in money laundering, or property traceable to such property,

as shown on GX A, and by the testimony of Agent Washburn, and as charged in Counts 1 and 2

of the Indictment.   Furthermore, the court finds that the entity of Isanne SARL received

$56,300,000 of fraud proceeds traced to claim 37 of the mail fraud conspiracy in May 2015 and

that $55,000,000 of these funds were transferred to Biofarma and SBK Holdings USA in June and

July 2015.  GX A; and Forfeiture Tr. at 454-56 (Washburn).  Based on the foregoing, the court

finds that these funds represent proceeds of the mail fraud conspiracy charged in Count 1 and

property involved in money laundering as charged in Count 2 and that the United States is entitled

to a general order of forfeiture against Isanne SARL in the amount of $1.3 million pursuant to Rule

32.2(b)(2)(C).

31)    Mega Varlik - The assets of Mega Varlik Yonetim (Turkey) purchased or
traced to fraud proceeds transferred thereto, which have value

The court finds by a preponderance of the evidence that the United States is entitled to a

general order of forfeiture against Mega Varlik in Turkey pursuant to Rule 32.2(b)(2)(C) for any

and all property that constitutes or is derived from proceeds of mail fraud, or that constitutes

property involved in money laundering, or property traceable to such property, as shown on GX

F35, and by the testimony of Agent Washburn, and as charged in Counts 1 and 2 of the Indictment.

Furthermore, the court finds that on March 12, 2014, $7,887,055 of fraud proceeds traceable to

claims 35 and 36 of the mail fraud conspiracy were transferred to Turkey in a $10,000,000 wire

with the note "Shareholder's equity for establishment of a bank and asset management company in turkey."  GX F35; Forfeiture Tr. at 456-57 (Washburn).  Based on the foregoing, the court finds that these funds represent proceeds of the mail fraud conspiracy charged in Count 1, and property involved in money laundering as charged in Count 2, and that the United States is entitled to a general order of forfeiture against Mega Varlik in the amount of $7,887,055 million pursuant to Rule 32.2(b)(2)(C).  The court notes that other funds controlled by Mega Varlik may be subject to forfeiture based on the tens of millions of dollars of additional funds that were transferred to Mega Varlik as loans, shareholder contributions, and transfers from Blane, SBK Holding, AS, and Jacob Kingston's account in Turkey.  Defense Ex. W, at 5, 38, 39, 40, 43, 53, 56, 57, 58, 60, 63, 77, 78, and 90 (MASAK report).  The government may, pursuant to Rule 32.2(e), file a motion to amend this general order of forfeiture to the extent the government subsequently locates or identifies additional property that is subject to forfeiture.

32)    The assets of Setap Teknoloji (Turkey), and Blane Teknoloji, AS (Turkey), which have value

The court finds by a preponderance of the evidence that the United States is entitled to a general order of forfeiture against Blane pursuant to Rule 32.2(b)(2)(C) for any and all property that constitutes or is derived from proceeds of mail fraud, or that constitutes property involved in money laundering, or property traceable to such property, as shown on GX 2-3, GX F36, and GX F38, and by the testimony of Agent Washburn, and as charged in Counts 1 and 2 of the Indictment. Furthermore, the court finds that $11,055,700 of fraud proceeds were transferred to Setap in March and May of 2014.  GX 2-3.  The court further finds that Setap received $15,000,000 in fraud proceeds directly from Washakie in April of 2015.  Trial tr. at 1158-67 (J. Kingston); and Forfeiture Tr. at 457-58, 551-52, and 558-59 (Washburn).  Based on the foregoing, the court finds

that these funds represent proceeds of the mail fraud conspiracy charged in Count 1 and property involved in money laundering as charged in Count 2 and that the United States is entitled to a general order of forfeiture against Blane in the amount of $26,055,700 pursuant to Rule 32.2(b)(2)(C).

> 33)     Motor Yacht   *Queen Anne,* registered in the Cook Islands, No. 2732, IMO #9704958, Call Sign E5U3623, or funds from the interlocutory sale thereof

On November 8, 2016, SBK Holding USA, Inc transferred $15,000,000 in fraud proceeds to SBK Holding, A.S. in Turkey.[9] GX C. Two days later, on November 10, 2016, SBK Holding, A.S. transferred €3,000,000 to purchase the *Queen Anne* yacht (then known as the *Soraya*) .  GX F37; Forfeiture Tr. at 554-56 (Washburn).  The court finds by a preponderance of the evidence that the *Queen Anne*[10] was acquired with €3,000,000 in fraud proceeds as shown on GX F37 and is connected to the convictions for Counts 1 and 2 of the Indictment. The court further finds that the funds used to purchase the *Queen Anne* were moved through international bank accounts as part of the money laundering conspiracy charged in Count 2 and are subject to forfeiture on that basis as well.  GX B; GX C; GX F37; and Count 2 (ECF 135, at 27-28 (¶34(c)-(d)-(e)).

Dermen asserts that the government failed to prove that the *Queen Anne* was purchased with fraud funds. He argues that the forfeiture hearing testimony of Dana Timmer, Nazmi Topcuoglu, Ray Williams, and Andy Madadian was either not credible or irrelevant. But Dermen failed to address the most persuasive evidence of a nexus between Dermen's convictions and the

---

[9] The court takes judicial notice of the fact that 1 dollar equaled approximately .91 euros on November 8, 2016.

[10] The court entered an order authorizing the interlocutory sale of the *Queen Anne* on October 22, 2021 in *United States v. Sezgin Baran Korkmaz*, Case No. 2:21-cr-00140-JNP (ECF 19).

funds used to purchase the yacht: financial records showing the transfer of $15,000,000 in fraud proceeds to SBK A.S., followed by the transfer of €3,000,000 from SBK A.S. to the seller of the *Queen Anne* just two days later. Additionally, Topcuoglu credibly testified that Baran Korkmaz, the individual who negotiated the purchase on behalf of SBK A.S., stated that he was waiting for money from the United States before he could transfer the funds to the seller of the yacht. Forfeiture Tr. at 482-85. This evidence is sufficient to establish by a preponderance of the evidence that the *Queen Anne* was purchased with the proceeds of the Count 1 mail fraud conspiracy.

34) Belize real property - A parcel in the Banque Free Zone, Belize, described as Parcel 3628, Block 23, most recently valued at $700,000 and titled in the name of G.T. Energy, LLC

The court finds by a preponderance of the evidence that the property was acquired with $742,500 of fraud proceeds (100% of purchase price) as shown on GX F39, and by the testimony of Agent Washburn, and is connected to the convictions for Counts 1 and 2 of the Indictment. Furthermore, the court finds that the funds used to purchase the property are traceable to a U.S. Treasury check in the amount of $11,400,000 (claim #28 on GX 1-2) that was obtained pursuant to the mail fraud scheme charged in Count 1, and therefore the property is subject to forfeiture. GX F39; and Forfeiture Tr. at 567-68 (Washburn).

35) Funds Transferred to G.T. Energy LLC and a $1 Million Certificate of Deposit

The court finds by a preponderance of the evidence that a total of $28,993,450 in fraud proceeds were transferred to GT Energy LLC as reflected in GX B. Accordingly, the court finds that the United States is entitled to a general order of forfeiture against GT Energy LLC pursuant to Rule 32.2(b)(2)(C) for any and all property that constitutes or is derived from proceeds of mail

fraud, or that constitutes property involved in money laundering, or property traceable to such property.

Additionally, the court finds by a preponderance of the evidence that $1 million in fraud proceeds were used by GT Energy to purchase a certificate of deposit on June 2, 2016, as reflected in GX C. Thus, the United States is also entitled to a general order for the $1 million certificate of deposit pursuant to Rule 32.2(b)(2)(C).

Dermen objects to a declaration signed by Agent Washburn on February 10, 2022, regarding his continued investigation of the ultimate destination of the $1 million certificate of deposit. The government submitted this declaration in support of its proposed forfeiture findings. Dermen argues that because the declaration was submitted after the November 2021 evidentiary hearing, he should have an opportunity to cross-examine Washburn regarding the contents of the declaration. The court concludes that Dermen's objection is moot. During the evidentiary hearing, the government presented financial records tracing the fraud funds to the purchase of the certificate of deposit. This evidence is sufficient to prove that the government is entitled to a general order of forfeiture for the certificate of deposit. Because the court does not rely on Washburn's February 10, 2022 declaration in deciding this issue, the court denies Dermen's request for further proceedings related to the declaration at this time.

## CONCLUSION AND ORDER

Based on the evidence presented during the guilt and the forfeiture phases of Dermen's criminal trial, the court finds that the government has proven the requisite nexus between his convictions and the specific pieces of property listed above. The United States is directed to promptly file its Motion for Preliminary Order of Forfeiture pursuant to Rule 32.2(b)(2)(A), (B), and (C).

DATED November 15, 2022.

BY THE COURT

_____
Jill N. Parrish
United States District Court Judge