```
 1              IN THE UNITED STATES DISTRICT COURT

 2                        DISTRICT OF UTAH

 3                        CENTRAL DIVISION

 4

 5   UNITED STATES OF AMERICA,    )

 6             Plaintiff,         )

 7       vs.                      )  Case No. 2:18-CR-365-JNP

 8   JACOB ORTELL KINGSTON,       )

 9             Defendant.         )

10   _____)

11

12           BEFORE THE HONORABLE JILL N. PARRISH

13       ----------------------------------------

14                       April 7, 2023

15                        Sentencing

16

17

18

19

20

21

22

23

24   REPORTED BY: Patti Walker, CSR, RPR, CP    385-215-5889

25   351 South West Temple, #8.431, Salt Lake City, Utah  84101
```

```
 1                          A P P E A R A N C E S

 2

 3   For Plaintiff:                John E. Sullivan
                                   Erika V. Suhr
 4                                 U.S. DEPARTMENT OF JUSTICE
                                   TAX DIVISION
 5                                 601 D St. NW
                                   Washington, DC  20004
 6
                                   Richard M. Rolwing
 7                                 U.S. DEPARTMENT OF JUSTICE
                                   TAX DIVISION
 8                                 303 Marconi Blvd., Suite 200
                                   Columbus, Ohio
 9
                                   Darrin McCullough
10                                 U.S. DEPARTMENT of JUSTICE
                                   CRIMINAL DIVISION FRAUD SECTION
11                                 1400 New York Avenue NW
                                   Washington, DC  20530
12

13   For Defendant:               Marc A. Agnifilo
                                   BRAFMAN & ASSOCIATES
14                                 256 Fifth Avenue, 2nd Floor
                                   New York, NY  10001
15
                                   Walter F. Bugden
16                                 BUGDEN & ISAACSON LLC
                                   445 East 200 South, Suite 150
17                                 Salt Lake City, Utah  84111

18

19

20

21

22

23

24

25
```

1       SALT LAKE CITY, UTAH; FRIDAY, APRIL 7, 2023; 9:00 A.M.

2                            PROCEEDINGS

3              THE COURT:  Good morning.  We are here in the

4   matter of the United States of America vs. Mr. Jacob

5   Kingston.  The case number is 2:18-CR-365.  This is the time

6   that we have set for sentencing in this case.

7              Let me ask counsel to enter their appearances,

8   please.

9              MR. ROLWING:  Good morning, Your Honor.  Rich

10  Rowling, John Sullivan, Erika Suhr, and Darrin McCullough,

11  from the United States Department of Justice.

12             THE COURT:  Thank you.

13             MR. AGNIFILO:  Good morning, Your Honor.  It's

14  very nice to see you again.  Marc Agnifilo and Wally Bugden,

15  with Jacob Kingston who's seated with us in court this

16  morning.  Good morning, Your Honor.

17             THE COURT:  Thank you.

18             Well, as I indicated, the reason that we are here

19  is to sentence you today, Mr. Kingston.

20             I should also note for the record that we have

21  present with us in the courtroom Mr. Glen Manross.  He's a

22  probation officer here in the District of Utah, and he

23  prepared the very extensive guideline presentence

24  investigation report in this case.  And we thank you,

25  Mr. Manross, for being here.

1              I also see Ms. Jennifer Gaston from the United

2    States Probation Office, who has also been instrumental in

3    preparing other presentence reports for some of the other

4    defendants in this case.

5              Before we begin, I want to make you all aware of

6    the matters that I have received and reviewed in preparation

7    for this sentencing hearing.  I want to ensure that I

8    haven't missed anything that might have been submitted for

9    my consideration.

10             And, of course, as a backdrop to all of that, as

11   you know, I've presided over this case since the beginning,

12   including detention hearings, pretrial motions.  I ended up

13   taking the guilty plea from you, Mr. Kingston.  I presided

14   over the trial of your co-defendant, Mr. Dermen.  I saw you

15   testify in the course of that trial.  So I have a

16   familiarity with the facts of the case.

17             But in addition to that, I have carefully reviewed

18   the guideline presentence investigation report that was

19   prepared by Mr. Manross.  And there's also an extensive

20   addendum to that report in which the government lays out

21   some requests for corrections.

22             And then, Mr. Agnifilo, the addendum indicates

23   that you also advised Mr. Manross of additions and

24   corrections to the report, and also requested arguments for

25   a departure and variance, and the addendum indicates what

1   Mr. Manross's response was to those requests.

2         In addition to the presentence report, I have also

3   reviewed an attachment to that report, which is the forensic

4   psychiatric evaluation of Mr. Kingston that was prepared by

5   Dr. David L. Moulton.

6         Then in addition, I have reviewed the government's

7   sentencing memorandum with respect to all four of the

8   Kingston defendants.  And I have reviewed a very extensive

9   sentencing memorandum that was filed on behalf of Jacob

10  Kingston.  Again, there are a number of attachments to this

11  memorandum, including, again, Dr. Moulton's report, as well

12  as a number of letters from Mr. Kingston's family and

13  others.  I have also reviewed all of those letters that have

14  been submitted on behalf of Mr. Kingston.

15        I should also indicate that in addition to what

16  I've already discussed, I presided over a forfeiture trial

17  in this matter as well, and there was much preliminary

18  briefing and post forfeiture trial briefing on those issues.

19  Pursuant to all of that, I entered a preliminary order of

20  forfeiture in this matter on March 24th of this year.

21        And I suppose I should ask you at this point,

22  Mr. Agnifilo, if you have any objection to the preliminary

23  order of forfeiture to any of the findings or conclusions

24  contained in that order.

25        MR. AGNIFILO:  I do not, Your Honor.

1           THE COURT:  All right, then.

2           Well, I will indicate now, then, that it will be

3    my intent to incorporate that preliminary order of

4    forfeiture into a final order of forfeiture in the judgment

5    and commitment order that I enter in regard to Mr. Kingston.

6           I believe that that is all that I have received

7    and reviewed in preparation for this hearing.  Have I missed

8    anything, counsel, that you may have submitted?

9           MR. ROLWING:  I don't believe so, Your Honor.

10          MR. AGNIFILO:  I don't believe so either,

11   Your Honor.

12          THE COURT:  All right, then.

13          Well.  What I would like to do, then, first is

14   take a look at the guideline calculation that is contained

15   in the presentence report.

16          Mr. Agnifilo, have you and/or Mr. Bugden carefully

17   reviewed that report with Mr. Kingston?

18          MR. AGNIFILO:  We both have, Your Honor.

19          THE COURT:  All right, then.

20          Well, let's turn to the guideline calculation that

21   is contained in that report.  And the guideline calculation

22   actually begins on page 73 of the report.

23          And I should note, Mr. Kingston, that I, of

24   course, am aware that you have entered your guilty plea in

25   this matter pursuant to an agreement with the United States

1    government under Rule 11(c)(1)(C) of the Federal Rules of

2    Criminal Procedure, and that the agreement you reached with

3    the government was for a sentencing cap in this case.

4           Regardless of the fact that there is a cap in

5    place, it's my obligation to review your agreement for that

6    cap and to determine if it's a reasonable agreement.  If I

7    conclude that it's reasonable, I will approve your plea

8    agreement with the government and then I'll sentence you

9    within that cap.  If I find that it's not reasonable, then

10   you, of course, would have the opportunity -- or the right

11   to withdraw your guilty plea.

12          Is that consistent with your understanding of how

13   this plea works?

14          MR. KINGSTON:  Yes.

15          THE COURT:  Okay.  So that's one aspect of it.

16          The other aspect is that I have to begin my

17   evaluation of a sentence in every case in which I sentence a

18   defendant with a correct calculation under the United States

19   Sentencing Guidelines, and those guidelines provide the

20   starting point for my consideration.  So even though there

21   may be a cap in place, I still have to have a correct

22   calculation under the Sentencing Guidelines.  They are not

23   the only thing that I can consider, but they are the

24   starting point for my consideration.

25          In the federal system, the Sentencing Guidelines

1    consist of two parts.  The first part is the offense level

2    computation, and that computation takes a look at, in your

3    case, the charges to which you pled guilty.  And then based

4    on their characteristics, they are assigned point totals.

5    In a fraud case like this, one of the biggest drivers of the

6    Sentencing Guidelines is the amount of the loss, as I'm sure

7    you've discussed with your attorneys.

8          And then the second part of the Sentencing

9    Guidelines looks at an individual's criminal history.  And

10   then those two numbers are put on a chart, and that gives us

11   a guideline sentence.

12         So the offense expenditure money laundering, which

13   was Count 33 to which you pled, is what is driving the

14   guidelines here, but all of the offenses are grouped

15   together for purposes of the guideline calculation.

16         So in your particular case, the base offense level

17   for expenditure money laundering is seven points.  Then

18   because the loss was more than $550 million, there is a

19   30-point increase to that base offense level.  There's

20   another two-point enhancement to the base offense level

21   because the offense involves sophisticated means.  There's

22   another two-point enhancement because you also pled guilty

23   to a charge under 18 United States Code Section 1956.

24         Then there is a four-point adjustment for your

25   role in the offense because you were an organizer or leader

1  of a criminal activity that involved five or more

2  participants and was otherwise extensive.  And then there's

3  a two-point enhancement for obstruction of justice.  That

4  gives us an adjusted offense level of 47 points.

5         You are then entitled to a total of three points

6  in reduction for accepting responsibility.  That would add

7  up to 44 points.  However, the guidelines only go up to 43.

8  So we take another point off, and you're at 43 points.

9         Is there any objection, counsel, to the guideline

10  calculation?

11         MR. AGNIFILO:  Your Honor, there's no objection

12  that's going to make a difference.  We raise an objection to

13  the four-level increase.

14         THE COURT:  Right.  And as I understand it, you

15  are arguing that only a three-point level increase for

16  organizer, leader would be appropriate.  I understand the

17  basis for that argument.  I suppose since that would still

18  get us to 43, it makes no substantive difference.

19         MR. AGNIFILO:  It makes no substantive difference.

20  So rather than having an argument on that, since it's a 43

21  and we have the cap anyway, we'll forgo that objection.

22         THE COURT:  All right.  And certainly you're free

23  to argue that as part of your 3553(a) factors.

24         MR. AGNIFILO:  Thank you, Judge.

25         THE COURT:  All right.  Any objection from the

1   government?

2          MR. ROLWING:  None, Your Honor.

3          THE COURT:  All right.

4          Well, let's turn to the criminal history part of

5   the computation.  That we can dispense of quickly because,

6   Mr. Kingston, you had no criminal history.  And so you have

7   a criminal history score of zero.  That places you in

8   criminal history category number I.

9          Is there any objection to the criminal history

10  computation or to any of the other material contained in the

11  presentence report?

12         MR. ROLWING:  Not on behalf of the government,

13  Your Honor.

14         MR. AGNIFILO:  None from us either, Your Honor.

15         THE COURT:  I find that the guideline range has

16  been correctly calculated and I will adopt the presentence

17  investigation report as it has been submitted.

18         Where that leaves us is with a total offense level

19  of 43 and a criminal history category of I.  The guideline

20  provisions for those numbers on the guideline chart would

21  yield a guideline provision of life in prison.  However, as

22  I indicated earlier, Mr. Kingston, you entered your guilty

23  plea pursuant to an agreement with the government for a cap

24  of 30 years.

25         And I can tell you, after reviewing everything

1   that I have reviewed, I'm inclined to accept your agreement

2   with the government for that 30-year cap, and I find it to

3   be reasonable.  And so I think where that leaves us is that

4   because the cap is below the guideline of life, the

5   guideline essentially functionally becomes the equivalent of

6   30 years.

7           Now as I indicated, that's just the starting point

8   for my consideration.  There are a number of other factors

9   that I may consider under controlling law.  And so what I

10  would like to do at this juncture is turn the time over to

11  the attorneys to make their arguments with respect to the

12  sentence in this matter.  We'll start with Mr. Rolwing.

13  Then we'll turn the time over to the defense team.  After

14  I've heard from the attorneys, Mr. Kingston, you will then

15  have an opportunity to address me if you wish to do so.

16          Mr. Rolwing.

17          MR. ROLWING:  Thank you, Your Honor.

18          I first would like to offer up -- and we've

19  covered this with counsel for Mr. Kingston and

20  Mr. Kingston -- Exhibits JOK 1, 2, and 3, which we

21  re-marked.  They are the exact same exhibits that were

22  stricken by the Court yesterday, but Mr. Kingston has no

23  objection to us offering them to the Court for the purposes

24  of providing the evidence necessary for Count 25, to which

25  he pled, which wasn't introduced at the trial, but is being

1   introduced and was introduced yesterday.

2           THE COURT:  All right.  And before you do that,

3   Mr. Agnifilo, would there be any objection to this material,

4   or have you seen it and do you believe it's appropriate for

5   argument?

6           MR. AGNIFILO:  I was given copies of it yesterday

7   afternoon.  I was obviously hit with the issue from

8   yesterday morning.  I have no objection to however

9   Mr. Rolwing wants to use these.

10          THE COURT:  Thank you.

11          You may proceed, Mr. Rolwing.

12          MR. ROLWING:  I don't intend to go over them

13  again, Your Honor.  The presentation of them yesterday was

14  to demonstrate and provide the Court some evidence that

15  brought to light what Jacob and Isaiah pled to in Count 25,

16  and to show Isaiah's role was more than just a key stroke.

17  He played a partner role with Jacob.

18          THE COURT:  But Isaiah has been sentenced.  So

19  what you had to say about them yesterday -- and I struck

20  them for purposes of that -- doesn't seem relevant to how

21  you're using them today.

22          MR. ROWLING:  It is relevant.  It is relevant, and

23  I will get to that, why it's relevant, because it shows that

24  John Daniel Kingston profited.  He had a $33 million debt to

25  The Order, which Jacob and Isaiah were aware of growing up.

1   And their efforts to defraud the United States and launder

2   money to and through The Order benefited their father to the

3   tune of $24 million, reducing the debt to The Order

4   $24 million.  That's what JOK No. 1 reveals was the internal

5   records maintained by The Order that were seized from

6   Washakie.  It's one of the reasons Jacob Kingston and Isaiah

7   were doing what they were doing.  That's why it's relevant

8   to Jacob Kingston's sentencing too, because as you've read

9   from Dr. Moulton's analysis of Jacob Kingston's childhood,

10  his childhood was less than ideal.  And his relationship

11  with his father is something that was also less than ideal.

12  I'm sure Mr. Agnifilo will address that.

13          It's not an excuse, but it does reveal that the

14  benefit, a humongous benefit, much more than Jacob Kingston

15  or Isaiah Kingston benefited personally, went to their

16  father, and The Order, and their extended family.  That's

17  why they were doing this.

18          Jacob Kingston, as the Court knows, was the leader

19  of this particular Kingston family business at Washakie.  He

20  led them astray down the path of bleeding the beast and

21  stealing from the government well before Levon Termendzhyan

22  ever entered the scene, and was the principal player who was

23  formulating the fraudulent agreements with the

24  co-conspirators around the country in the biodiesel industry

25  that were predisposed to also commit fraud and agreed to

 1   with Jacob.

 2          Isaiah, Rachel, and Sally then would execute the

 3   fraud that Jacob had engineered with these co-conspirators.

 4   And then he met Levon Termendzhyan, someone also predisposed

 5   to engage in fraud because they immediately started to do

 6   so.  But Jacob Kingston met his match in Levon Termendzhyan

 7   as someone who could con the conman.

 8          Unbeknownst to Jacob until much later, Levon

 9   Termendzhyan saw his mark, someone who was predisposed to

10   commit fraud, willing to do so on a grand scale, and who

11   would do it himself with his family without involving

12   putting Levon Termendzhyan's fingerprints on it.  And Levon

13   promised, falsely, the protection of his umbrella of corrupt

14   law enforcement.  Jacob needed to believe that he was going

15   to be protected, wanted to believe that he and his family

16   would be protected from all these massive frauds they were

17   committing and that he agreed to continue to commit and

18   escalate with Levon Termendzhyan.

19          Jacob Kingston was, in one sense, very gullible.

20   He believed Levon had this umbrella of corrupt law

21   enforcement.  Indeed he did.  As we all know, many law

22   enforcement agents have been prosecuted and are in prison

23   now that were in Levon Termendzhyan's world that Jacob

24   Kingston was exposed to.

25          But the promise of protection that Levon was

```
 1   assuring Jacob he had put he and his family under was false.
 2   Levon knew it was false, and that's why Levon -- and,
 3   remarkably, that's why Levon didn't put his fingerprints on
 4   a lot of this evidence, and left Jacob Kingston to execute
 5   the fraud with his family, and then transfer the proceeds at
 6   Levon's direction, and it was not an insignificant amount.
 7          Jacob Kingston started to believe Levon was
 8   leading him to the slaughter, because Jacob Kingston then
 9   got his own umbrella of protection through Commissioner
10   Gordon.  So he didn't believe Levon was going to completely
11   protect him, because Levon would use that umbrella as both a
12   sword and a shield, and the sword hurt and would put Jacob
13   Kingston and his family at risk.
14          Of course the Court remembers that text message
15   that was so incredibly revealing, the text message exchange
16   between Jacob and Levon in 2015.  My uncle is crazy.  What
17   does he want?  Millions.  You tell him, Levon says, he's got
18   his own matters, and if it wasn't for you, bye-bye.  If you
19   weren't stealing the money for me, my protection of your
20   uncle and The Order, who are being investigated, would lead
21   to them going to prison or worse.  And Jacob says I wonder
22   what the boys would do if they found out that he's
23   clamoring.  And Levon sends the emoji of someone with their
24   hand over their mouth.  Don't speak about the boys.  It's
25   the only text we have where they were talking about the
```

1    boys.  Levon says call me on the other, your burner phone.

2    We're going to talk about the boys.

3           Jacob believed it.  This was in 2015.  He was then

4    going to wire 75 percent -- 75 percent of the $164 million

5    they were just conspiring to steal from the government in

6    that period.

7           And it's so important to know that in March of

8    2015 -- on February 12th, when they filed that false claim

9    for 170 million, and Levon sent that text with the fist

10   thumbs-up, applause, we are the best, that they knew they

11   were under grand jury investigation.  Jacob Kingston had

12   been served with federal grand jury subpoenas in July of

13   2014.  He had copied them and given them to Levon

14   Termendzhyan in July and September of 2014.  They knew they

15   were under grand jury investigation.  The feds were coming

16   in.  And Levon got Jacob to apply for another 170 million,

17   based upon nothing, knowing that Jacob was going to be led

18   to the slaughter.  That's what Levon knew.

19          Jacob believed he was being protected by the boys,

20   as evidenced by the text message, and that his uncle and The

21   Order, who were also being investigated, were being

22   protected.  And it was all nonsense.  But he did wire

23   $98 million of the 164 to Turkey and to Levon, SBK USA, in

24   2015.  He gets 164, and he gives nearly 100 million of it to

25   Levon, at his direction.

1          He was willing to do anything and he certainly

2    did, because he then, even during the -- the investigation

3    is getting hotter and hotter, and they decide to apply for

4    even more, 322 million in January of '16 and 322 million

5    again, two weeks later, in the first week of February of

6    2016.  Ironically that request was received around the same

7    time period that the feds executed a search warrant on Jacob

8    Kingston's Washakie and UFS companies, and The Order.

9          So Jacob still believed in this protection despite

10   the search warrant.  But he has his own protection through

11   the so-called Commissioner Gordon that he was paying

12   millions to, and he was desperate.  And he then got conned

13   by Baran Korkmaz in 2018 into another protective scheme

14   regarding the grandpa, and he paid another $6 million in

15   2018 so that Baran's so-called grandpa could protect he and

16   his family from going down for what they have done.

17         Levon had separated himself, and Jacob was

18   desperate and was selling virtually every significant asset

19   that he had gotten from this scheme, the Lamborghini, the

20   Ferrari, his wife's jewelry, so he could pay Baran Korkmaz.

21   And he did, thinking that Baran's grandpa was the same and

22   connected to Levon's boys.  Even though Levon was stepping

23   back, he believed it was the same network of protection.

24         And then he got arrested.  When he was arrested,

25   he realized -- finally the truth started to bubble up that

```
 1   maybe I've been had.  All this crime I've been doing, and
 2   all this sharing of hundreds of millions to Levon, and all
 3   this sharing of hundreds of millions to others, paying
 4   expenses to keep the scheme alive, I'm going to be the one
 5   holding the bag.
 6        And then his wife and his mother were also
 7   included, rightfully, in this indictment, and he understood
 8   that everything he had done and his family had done they
 9   were going to be held accountable for.  So he made this bold
10   decision in 2019 to cooperate, to plead guilty, acknowledge
11   responsibility, admit to everything, and cooperate.
12        And I say bold because it involved Count 25, the
13   laundering of proceeds with his father's Order related
14   entities, Paul Kingston's Order entities, and others in The
15   Order, laundering the money through and to, sharing those
16   millions with The Order.  And he knew it was going to
17   involve them, and he committed to telling the truth and
18   cooperating.  And he did.
19        So he stands before you, I think -- he's laid it
20   on the line.  I think he was on the stand for six days in
21   this trial, and virtually every part of the scheme that
22   related to Levon Termendzhyan was revealed at this trial.
23   And the Court is well aware.  But I believe he did lay it on
24   the line.
25        And I'll never forget that when Mr. Geragos was
```

1    cross-examining him, trying to claim and allege that it

2    really was all about The Order and not Levon, that Jacob

3    Kingston said, in no uncertain terms, no, you're wrong.

4    This isn't about me and The Order.  This is about me and

5    Levon.  This is between me and Levon.

6          And that's really the truth of the bulk of this

7    400 million.  The first 70 million was about Jacob Kingston

8    and his family, even The Order, and he shared 30 or

9    40 million of the next 400 million with The Order.  But he

10   shared 200 million almost with Levon.  And he spent a great

11   deal of the remaining 200 million to keep the scheme alive.

12   And I'd say it with -- it's hard to say it, but he spent

13   very little on himself, comparatively.  But he did goat with

14   a $3 million house, and had the benefit of a Lambo.  And he

15   led a lifestyle -- Ferrari, Lambo, ridiculous house, and a

16   lifestyle that emulated Levon Termendzhyan.

17         Jacob, that's how he got involved with Levon in

18   the first place, was emulating him because of his persona,

19   and his authority, and his lifestyle, and he got sucked into

20   this, and he couldn't escape.  But none of that is an

21   excuse, and he never took it as an excuse.  He owned it, and

22   he said it, and he acknowledged it, and that's all to his

23   credit.

24         He is one of those rare guys, even though it took

25   him some time to disabuse himself of this delusional notion

1   that Levon was actually being protected and was going to

2   protect them, once he did and got to the realization that

3   I've been had, and there's no Commissioner Gordon, I'm going

4   to prison, and I'm the one holding the bag, and Levon's

5   fingerprints aren't on any of this, he made the right

6   decision, the brave decision to testify.

7          You know, at that time, in July of 2019, while

8   there was no doubt Levon Termendzhyan was a principal player

9   in this scheme, we didn't have an insider in the scheme.

10  Levon Termendzhyan, we were prepared to present to the

11  Court, had received $72 million in U.S. bank accounts from

12  this scheme.  He's purportedly buying product from Washakie,

13  biodiesel, yet they're paying $72 million in concealed ways

14  to the bank accounts in the United States associated with

15  Levon Termendzhyan and his family.  It didn't make any

16  sense, except criminal, and we've, of course, uncovered

17  witnesses who had interactions with Levon Termendzhyan and

18  Jacob Kingston that revealed that Levon was a principal

19  player and decision maker.

20         But when Jacob made the brave decision and

21  revealed the idea of the boys, and the umbrella, and that

22  I've shared all this grand jury information with Levon, and

23  he was protecting me, and he was the one directing me to

24  make even bigger and bigger claims, that was new

25  information, and it was crucial to explain Levon

1   Termendzhyan's role in this conspiracy.  He didn't just get

2   72 million, as we've shown.  He got 181 million sent from

3   Washakie's bank accounts for Levon Termendzhyan's benefit.

4        So he was an insider and he was a crucial insider

5   to reveal the truth of this massive fraud scheme, and

6   there's no other insider that could have done it.  Isaiah

7   wasn't close enough to have provided what Jacob did.  No

8   other insider but Jacob -- and it was a brave decision, and

9   he came through, under days of cross-examination with Mark

10  Geragos, and revealed, through the text messages, the

11  corroboration of the other witnesses, that Levon

12  Termendzhyan had played Jacob and was his partner in crime,

13  but also conning the conman himself.

14       So Jacob was facing life in prison as a result of

15  this massive fraud and his leadership role in the

16  laundering.  It was a life in prison sentence.  And we

17  offered him, in exchange for his overture to cooperate and

18  plea, this 30-year cap.  It wasn't much of an offer.

19  Essentially it was two points down from the highest

20  guideline range, which is life, down to 360 to life.  All

21  right.  We're going to cap you at 360.

22       We didn't offer him much, but he took it, because

23  we weren't quite sure whether he was going to cooperate all

24  the way and do what was necessary.  He did.  He did, and he

25  continues to every time we have reached out to him, which is

```
 1    over 25 times.  I think they've put it in their sentencing
 2    memo, we spent 25 days with Jacob Kingston debriefing him
 3    about the massive scheme that just involved his family, and
 4    then Levon, and many others, and for that reason, for his
 5    remarkable, and brave, and bold decision, and what he's
 6    committed to and that he performed in completing.
 7            And as I mentioned yesterday regarding Isaiah,
 8    there will be other opportunities in the future for Jacob
 9    Kingston to cooperate and continue to cooperate with
10    government ongoing investigations, and forfeiture matters,
11    in particular that relate to The Order related properties,
12    and others.
13            We know Baran Korkmaz is faced with an October
14    trial in this case, and that the charges against Baran
15    Korkmaz emanate from this fraud scheme.  Jacob Kingston will
16    be one of the principal witnesses at that trial, and in
17    particular that $6 million of fraud that Baran Korkmaz
18    perpetrated on Jacob in 2018 involving the grandpa, claiming
19    to be associated with the CIA, and purportedly protecting
20    Jacob and his family from lawsuits and from the criminal
21    investigation.  Jacob will be a witness then in October
22    should that case proceed to trial.
23            But today we've made the motion, based upon this
24    remarkable brave and bold decision of an insider, in the
25    face of a frightening circumstance, Levon Termendzhyan and
```

1     his associates, and his entourage, and his persona, and his

2     history -- the man traveled 24/7 with armed bodyguards.  As

3     Brendan Morrissey said, it was like a bad movie when I went

4     and met with Jacob and Levon Termendzhyan.  I wanted out of

5     there and I wanted out of there fast.  I didn't want to do

6     any business with him.

7            Jacob didn't have that initial reaction.  But to

8     his credit, in the face of that, he came forward and told

9     the truth and testified credibly, strongly, which assisted

10    the government substantially in convicting Levon

11    Termendzhyan for a crime that Levon was this close to

12    getting away with -- this close.

13           We arrested Levon and Jacob on August 23rd, 2018.

14    Jacob had flights to Turkey that day.  Levon had flights to

15    Turkey within days.  The yacht named Queen Anne had just

16    been launched in Istanbul on August 13th, Levon's birthday.

17    Levon had changed his name to Lev Dermen.  The millions were

18    in Turkey waiting for him.  He was this close to getting

19    away but for our arrest and this Court's detention of him,

20    and now Jacob Kingston's testimony that led to the

21    conviction where justice is served for this massive crime.

22           For that reason, we ask for the full 40 percent

23    reduction from the 30-year cap, taking him from instead of a

24    life in prison sentence to 18 years in prison.  He's already

25    served four and a half.  We think this is the right number

1    at this time.  And unless the Court has further questions,

2    we ask that you impose such a sentence.

3              THE COURT:  Thank you, Mr. Rolwing.

4              Mr. Agnifilo.

5              MR. AGNIFILO:  Thank you, Your Honor.

6              Thank you, Mr. Rolwing.

7              May it please the Court, despite how difficult and

8    heartbreaking this case is, really it's a pleasure to be

9    here and I'm really grateful that Your Honor has allowed me

10   to practice in front of you for these last four and a half

11   years.

12             It's a heartbreaking case, and I can tell you,

13   I've been sitting in the front row, kind of on the side

14   there, and the only thing that I can really see is Your

15   Honor's face listening to all the arguments, and I think I

16   get a sense of -- maybe I don't fully -- what the Court's

17   going through, because there's such overwhelmingly powerful

18   arguments on both sides.  And they're not just arguments.

19             There's something so deeply human about everything

20   that's going on here.  I mean the crime is so massive, it's

21   so just epic, and not only in size in terms of the dollar

22   amounts, but just the kind of commitment to the crime and

23   the different aspects to it.  It's not just the money.  It's

24   the massiveness in other ways of the crime.

25             And then on the other side you have this very

1   disarming sweetness of so many of these people.  And I've

2   gotten to know them.  They come to court, and they're

3   humble, and they're nice, and they love each other.  And I

4   don't know that I've seen a case in 33 years where you're

5   rifted -- everybody in the courtroom I think is rifting in

6   two directions at the same time.  And Your Honor has the

7   very, very difficult task of trying to harmonize all these

8   amazingly powerful sources, and be the Court, and come down

9   with a judgment that is fair and right given forces that are

10  almost impossible to wrap one's arms around.

11          I've written a very long sentencing memo to the

12  Court.

13          THE COURT:  I have to say it was very well done.

14  I actually commented to my staff this is something I would

15  have read even if I didn't have to read it because it was so

16  well done.

17          MR. AGNIFILO:  That's very nice.  It's very nice

18  to say.  Maybe I should just sit down.

19          MR. BUGDEN:  It's a War and Peace novel all on its

20  own, Your Honor.

21          THE COURT:  It was well done.  I don't know if you

22  wrote it, or if Mr. Bugden wrote it, or some combination,

23  but in any event.

24          MR. AGNIFILO:  So the truth is, and I think it's

25  important to say, I literally wrote every single word.  I

1    really honestly did.  And I've been writing it over two and

2    a half years.  And I write it kind of when I have a thought

3    about the case.  I mean we had COVID for a lot of that time.

4    Your Honor had the trial with Mr. Dermen, and then the world

5    shut down pretty much the next day or week.

6              THE COURT:  Maybe that day.

7              MR. AGNIFILO:  And I had nothing to do other than

8    think about today, honestly, and really think how am I going

9    to try to bring all of these incredibly powerful human

10   aspects together for Your Honor so that at least Jacob's

11   position is heard.  And so really I'm touched that you read

12   it and that you thought it had value.  I appreciate that

13   very, very much.

14             So I'm not going to dwell on much of it.  There's

15   a few things that I do want to talk about because they

16   weren't as prominent in the trial evidence, and I think that

17   sometimes it's better to actually have a conversation about

18   certain topics rather than just put them in writing.

19             So one of the things I've been wrestling with

20   is -- you know, I'm from New York.  I'm not from here.  I'm

21   trying to figure out what this Order is and what it means.

22   So I asked people, even sometimes people on airplanes,

23   what's The Order, because I thought at one point we might

24   have to have a trial.  I don't know that we really came that

25   close to that, but it was a possibility.

1          THE COURT:  In terms of timing it was pretty

2     close.

3          MR. AGNIFILO:  It was.

4          THE COURT:  Well, I didn't learn about it until it

5     was very close.

6          MR. AGNIFILO:  Yes.  But I always knew there

7     was -- and I'm going to get to this part in my presentation

8     to Your Honor -- there were always these strange issues that

9     I had to grapple with, and let me just give Your Honor an

10    idea.

11         So I get into the case in I think September, or

12    so, of 2018 -- and I'm going to say all this because it's

13    been well briefed, but I think it's probably part of the

14    trial testimony, and now there's even an indictment of

15    another person based on some of these same facts -- and I'm

16    hearing tales of how some of this money is going to fund CIA

17    operations involving Kurdish groups.

18         So I come into this case.  It's a Utah case.  I

19    meet Mr. Kingston.  I meet the Kingstons.  And then the next

20    thing I hear is hundreds of millions of dollars are going to

21    Turkey.  And then I'm hearing that there's someone who's

22    affiliated with the U.S. Central Intelligence Agency that's

23    in the mix.

24         So I look this guy up on Google.  So this is all

25    public info.  And I want to make it clear so nothing bad

1    happens to me, this is all public information.  This is all

2    public information.  So I look up this guy's name, and he's

3    kind of like this mysterious character who seems to have

4    something to do with American intelligence, and he's

5    affiliated with people who are themselves members of these

6    Kurdish groups, some of which seem pretty controversial, at

7    least in Turkey, maybe also in the United States, and he's

8    involved in this, and money is going to business entities in

9    Turkey.

10          And I'm not giving anything away.  One of the

11   conversations I had with Jacob is he's trying to instill in

12   me that not all of it, but part of this is sanctioned by the

13   U.S. government, the CIA, at least.  And I'm telling him

14   that's crazy.  That's just not possible.  The CIA would

15   never make money through this tax fraud.  And I kind of

16   catch myself and I said, well, I think that's true.

17          So at some point -- and I think I even said this

18   to Your Honor close in time to when I did it -- I get on an

19   airplane all by myself and I fly to Istanbul to figure out

20   if Baran Korkmaz is in the CIA.  I don't know how I'm going

21   to go about doing this.  I'm just going to go there and see

22   him, and talk to him, and meet him.  And I do meet him, and

23   he's a man of some power and authority.  There's no

24   question.  I don't know who he is.  I don't really get a

25   satisfactory answer.

```
 1              But what ends up happening between, say, December
 2     and shortly before the time that Jacob Kingston pled, is I
 3     assured him that even if these things that he has been told
 4     are true, that's not going to be a viable defense, because
 5     certainly only a small part of the money -- I mean six, ten,
 6     whatever many millions of dollars would have gone there.  At
 7     the end of the day -- as we sit here today, and it doesn't
 8     matter, I don't really know the truth about that money.  I
 9     don't think it is what Jacob thought it was.
10              And so the process of bringing Jacob to a guilty
11     plea involved all of these hurdles that I have certainly
12     never had to jump over in my entire life.  And to come back
13     and say, Jacob, you know, this is a bottom-line thing.  You
14     know, if you're going to sit here and think that the CIA is
15     going to come save you -- and I feel like I can say this a
16     little more openly than maybe I was going to because
17     Mr. Rolwing referred to some of this in the 5K when Jacob
18     started to cooperate -- no one is coming to save you, and
19     there's no defense from this.  There's no legal defense, no
20     claim of right defense, no government authority defense that
21     you stole all these hundreds of millions of dollars and that
22     some of the money went to the CIA -- even if it did, which I
23     have every reason to believe it did not.
24              So there was so much about the dependency of this
25     case, which really had nothing to do with preparing for
```

```
 1    trial in any traditional sense.  It was layers and layers of

 2    undoing things that Jacob Kingston came to genuinely and

 3    utterly wrongfully believe.  And I started to think how is

 4    this possible?  And he's a very, very smart man.  He has a

 5    Ph.D. in engineering.  He's brilliant to talk to.  He really

 6    is.  Yet he's telling stories of money going to the CIA, and

 7    there being this Commissioner Gordon.  Brian Singleton was

 8    his name.  And I'm looking up Brian Singleton.  Is there

 9    even such a person?  And to go through the thickets of

10    misbelief took forever.

11         And so that's why I put in my sentencing

12    memorandum to Your Honor I didn't quite know how to

13    pigeonhole it or how to characterize it.  And so at first

14    blush it doesn't seem like this, but I think, in fact, it

15    really could be, that there is a downward departure.  And

16    let me just explain my theory of departures and 3553,

17    because departures now are like, you know, people's

18    appendix.  You don't really need them anymore, I don't

19    think.  You know, they're there.  They're holdovers from an

20    earlier age when we ate grass and when there was no Booker.

21         But I think they're useful analytically because

22    it's a way of really focusing on the issue that you want the

23    court to consider in two different veins, one as a

24    departure -- and they're still legitimate.  And then even if

25    it doesn't fit the departure criteria, which are often
```

```
 1   really demanding, then it kind of tumbles over into 3553(a)
 2   factors.  And there are a couple of Tenth Circuit cases that
 3   say that's perfectly fine.  There's nothing wrong with that.
 4   In fact, that's what we want our trial judges to do.
 5            So looking at what Jacob believed, he was willful.
 6   He engaged in all of this conduct knowing it was illegal.
 7   He engaged in all of this conduct not while sleepwalking.  I
 8   don't want to suggest -- you know, I don't want to go too
 9   far with this, but it caused me to start asking a lot more
10   questions about his childhood.  And what I've come to learn,
11   and it's a little bit of a twist on a theme that has been in
12   front of Your Honor in the last couple days, is there's this
13   strong patriarchy, from what I've come to learn, in this
14   group called The Order, the Davis County Cooperative.
15            Now you would think, well, that has to work well
16   for Jacob.  He's a man.  And not only is he a man, he's kind
17   of a capable man.  He's a -- I don't mean this in any
18   derogatory way, he's different even from Isaiah.  I mean
19   he's just kind of a strong, capable man.  But he wasn't
20   always a strong, capable man.  He was a boy, and he was a
21   nine-year-old boy.  And really I think what happened is he
22   saw what he was -- the word coming to mind, and I'm just
23   going to use the first word -- condemned to is he's just
24   going to work.  That's it.  There's no fun.  There's no
25   vacation.  There's no days off.  And he worked and he worked
```

1   and he worked because he was a capable boy.

2          And I have misgivings getting into all of this in

3   a public forum, but it's his sentencing and I'm going to,

4   and I've put it in the sentencing memo, he was pretty

5   severely physically punished.  He was hit.  He was -- a lot,

6   on a regular basis.  He was kicked out of the home.  He had

7   to fend for himself when he was insubordinate to his father.

8   Every child is obviously a product of their family.  So this

9   is really just a matter of degree.  There's nothing

10  unique -- not truly unique about Jacob Kingston's childhood

11  experience.  What makes it unique is the degree.

12         And I think also, unlike most children --

13  especially now with the Internet and there's all sorts of

14  problems with that too -- I don't think he saw life outside

15  of this realm.  And it wasn't as though he was being raised

16  to get good grades, go to school, and then go to graduate

17  school, get a job somewhere else, or marry a woman of your

18  own choosing, and do all that.  It wasn't that way.  So he

19  was predetermined and his life was going to be work.  And

20  that's really what it's been.

21         So he went to work at a young age, and he worked

22  hard.  And he's smart.  He went to school and got good

23  grades, and he got a Ph.D.  And he opened a biodiesel plant.

24  And as is certainly not disputed by us, he committed fraud.

25  This is before ever meeting Levon Termendzhyan.  Certainly

1    committed fraud on a very, very large scale.  Whether it be

2    40 million or 70 million, it was a lot of fraud having

3    nothing to do with Termendzhyan.  So what does it have to do

4    with?

5            And let me just say at this point, I am going to

6    ask Your Honor -- and I'm going to hope to back it up in the

7    next, you know, few minutes, or however much longer I speak,

8    I'm going to ask Your Honor for a 13-year sentence, and

9    that's what I'm asking for.  And that's not in any way

10   because I think the government is being stingy.  I don't.  I

11   think the government was fulsome and accurate in their 5K

12   letter and the facts, and I'm thankful for it.  And I've

13   told them that personally many times.  I'm thankful for

14   their letter.  But I'm going to take Your Honor through a

15   number of reasons why I think that could be the right

16   sentence.

17           And it occurs to me, I think that I've probably

18   asked for a double digit jail sentence a handful of times in

19   my life.  I tend to be more optimistic than that.  But I'm

20   mindful -- I want the Court to know I'm paying very close

21   attention to what I think Your Honor is looking to

22   accomplish, and I'm trying to be consistent with that.  And

23   I know that's a little -- that's probably not the number

24   Your Honor is thinking about at the moment, and I appreciate

25   that, but I'm going to try to get there and convince

1  Your Honor that's a reasonable and fair number given all the

2  circumstances.

3       So I say that now because all of my arguments are

4  in line of asking for a 13-year sentence, which I think

5  is -- it feels like not necessarily -- I don't mean this in

6  the context of the case, is a heavy sentence in and of

7  itself.  It's just a heavy sentence.  So all of my

8  justifications, all of my arguments really are to ask you

9  for a heavy sentence, just one a little bit lighter than the

10 government is talking about.

11       So in order to try to explain some of Jacob

12 Kingston's childhood to Your Honor in a way so that it

13 wasn't just coming from me, we got this David Moulton, who's

14 a psychiatrist, who did a forensic report, and Your Honor

15 noted that it's attached to the probation department's and

16 attached to our materials.  You know, he's been with the

17 U.S. military, Dr. Moulton, for 25 years.  He's been in two

18 different combat deployments providing psychiatric care to

19 our service people, and he's an expert in psychiatry and I'm

20 not.  And what he concluded was that due to

21 Mr. Kingston's childhood, he has something called complex

22 posttraumatic stress disorder, CPTSD.  Let me explain the

23 best I can what I gather this is and what I gather it isn't.

24       Obviously there's been a PTSD diagnosis around for

25 a very long time.  And PTSD I think is more derived from

1   singular, very, very traumatic experiences that cause

2   certain reactions, psychologically and even physically, in

3   people.  Complex PTSD is a little bit different.  And the

4   way that the doctor describes it in the report is that

5   rather than one or two traumatic events, it's really an

6   ongoing trauma, especially when it starts in childhood.

7          And the relevance of this is that it makes utterly

8   egregious criminal conduct slightly less egregious.  That's

9   all it does.  I mean it's not a pass.  It's not an insanity

10  defense.  It's nothing like that.  It's a way of

11  understanding the conduct not so that it's anything other

12  than very much criminal, but that it's looked at in a

13  different way.  And obviously this is something that the

14  guidelines contemplate and say, well, this is an appropriate

15  thing to look at even without 3553(a) factors.  So that's

16  why we get into Mr. Kingston's childhood.

17         And so what does this mean to the offense conduct?

18  How is this relevant to the offense conduct?  Mr. Kingston

19  made a choice to try to help his father with his debt.  He

20  made a choice to do that, but it's a choice made of, at this

21  point, an adult man who is that same person that he was when

22  he was nine years old, and when his realm of choices I think

23  was curtailed by physical and psychological -- and I'm going

24  to use the word -- abuse, because that's what it is to hit a

25  child a lot, and so the child has no choice, and to show the

 1    child all you're going to do is work and all you're going to
 2    do is work for me.  So that's really what it is, and I can't
 3    mince words at a time like this.
 4           And Dr. Moulton kind of explains in the report
 5    that there are effects of that.  These are not things that,
 6    you know, you walk off and you become an adult as though it
 7    didn't happen.  And so Jacob Kingston's adult criminal
 8    choice, which is what it was, to commit tax fraud to pay off
 9    his father's debt, I'm encouraging the Court to look at with
10    this in mind in terms of the degree of criminality, the
11    degree of badness, of punish worthiness.
12           THE COURT:  One thing that is curious to me, and
13    maybe you don't know the answer, is there's this debt to
14    this organization called The Order.  So what is the impact
15    of that debt?  Are there folks in The Order who are like
16    loan sharks who come and break your knuckles if you don't
17    pay it back or does it just sit on the books of The Order
18    and no one ever tries to collect it because it's a
19    collective, cooperative society.
20           MR. AGNIFILO:  It's a great question, and I think
21    we're going to have an answer.
22           So I'm told there's no violent component to this.
23    There's not going to be any knuckles broken, no one is going
24    to get hurt, but the debt never gets extinguished.  So if
25    the father doesn't pay it, A, I think that reflects badly on

1  that part of the family.  So that's to be avoided.  But

2  eventually someone is going to have to pay that debt.

3          THE COURT:  So when the father passes on, do the

4  children inherit the debt?

5          MR. AGNIFILO:  That's what I was just told.

6  Again, this is what I'm led to believe.  These are all

7  things I'm learning, to a certain extent, for the first

8  time.

9          But I think more in the immediate is that it's

10  just not -- it's frowned upon to have this unpaid debt.  And

11  so this is Jacob Kingston -- and I'm not suggesting somehow

12  that he didn't benefit in some reputational sense from this

13  because he's his father's son.  But at the end of the day,

14  the father made some bad business decisions to bring about

15  this debt.  And then I think when the father saw I have a

16  Ph.D. son, you know, and he could open a biodiesel business

17  and commit tax fraud, you know, that's kind of how this

18  started to happen.  It doesn't -- it's as criminal as the

19  day is long, but there's another aspect to the explanation.

20          So I know I go into this in great detail, but what

21  is the evidence that Jacob Kingston's actually laboring

22  under some impairment?  I mean because that's really how the

23  departure works.  It's not really -- it's not so much an

24  excuse for criminal conduct.  It has to be -- there has to

25  be some impairment.

1           And I think that's where we get to -- and
2    Mr. Rolwing addressed some of this in his presentation --
3    these layers of misunderstandings.  So there's two parts to
4    any fraud.  There's the lie and then there's the belief.
5    I'm going to talk about the belief part of all of these
6    frauds.
7           So in the course of -- so Termendzhyan certainly
8    plays on, I think, what is a certain vulnerability of
9    Kingston.  And it's easy for Termendzhyan to do it because
10   the truth is he and some of his allies, colleagues,
11   coworkers, whoever they are, actually have serious law
12   enforcement personnel on their payroll, lots of them.  I
13   mean a shocking amount, in fact.
14          There was a Department of Homeland Security
15   Special Agent Felix Cisneros who went to trial twice in the
16   Central District of California and got convicted twice.  Now
17   what did he do?  He helped Santiago Garcia -- he's the one
18   who came up with Commissioner Gordon -- get into the United
19   States from Mexico.  Santiago Garcia was somehow expelled
20   from the United States, wasn't allowed to come back to the
21   United States.  But we have a Department of Homeland
22   Security Special Agent in our pocket and he'll help him get
23   in, and he did help him get in.  So you have Felix Cisneros.
24          There's somebody named John Balian.  Now I don't
25   know that his name came up at the trial at all, but he was a

1   very important person, certainly in the discovery.  And he

2   was a local police detective in the Los Angeles area.  I

3   think he worked for the Glendale Police Department, and he

4   became friends with Termendzhyan.

5          And the relevance of Balian is it really was

6   Balian and Termendzhyan who went to Turkey to meet Baran

7   Korkmaz.  So to the extent that there's any suggestion in

8   the record anywhere that somehow Turkey was Kingston's idea,

9   Balian's important to put the falsehood to that because it

10  was Balian -- and I'm going to call him Dermen just for

11  consistency -- it was Balian and Dermen who went to Turkey

12  before Kingston was ever on the scene, before Kingston ever

13  met Dermen, and that's when they met Korkmaz.  So the

14  Balian, Dermen, Korkmaz connection clearly and provably

15  existed before Jacob Kingston was ever on the scene.

16         They had an FBI Special Agent Babek Broumand --

17  amazing.  He's a 20-year FBI agent and he's just flat-out on

18  the payroll -- not so much of Dermen directly, but of

19  someone named Edgar Sargsyan, who played a role at this

20  trial as well.

21         And just by way of a quick aside, Kingston did not

22  have meaningful dealings with Babek Broumand, but I had

23  conversations with the Assistant U.S. Attorney in the

24  Central District.  I gave her number to Mr. Rolwing.  I

25  think I gave them each of their numbers, and I think they

1    might have spoken.

2            So I told -- Ruth Pinkel -- was her name.  She was

3    deputy chief of the official corruption unit in the U.S.

4    Attorney's Office in the Central District, and I said Jacob

5    Kingston is willing to testify at your trial.  And she said

6    what's he going to say?  And I said, well, he's basically

7    going to say that, you know, Broumand was kind of on the

8    payroll of Dermen and Dermen's people.  Well, how does he

9    know that?  Because Dermen told him.  And she's like

10   honestly I have so much better evidence than that.  That's

11   great, and I think that's probably true, but the truth is I

12   have overwhelming evidence of Babek Broumand's bribery and

13   being involved in corruption.

14           So she seemed very appreciative.  At one point

15   we're talking about flying the agents from LA out to see

16   Mr. Kingston in jail -- I think at the time he was here in

17   Utah before he went to Nevada.  COVID kind of put that, you

18   know, on hold for a while.  And then AUSA Pinkel, who

19   believed she had enough evidence, was certainly corrupt,

20   because Babek Broumand went to trial and was convicted of

21   various corruption charges.

22           So there is a deeply truthful aspect to what Levon

23   was saying to Jacob, but there's also an exaggerated aspect.

24   And let me add one more thing to the mix.

25           One of the corrupt government officials was a

1   foreign minister from Belize named John Salvador.  And Jacob

2   Kingston testified about John Salvador on his third day of

3   testimony.  And I know that because I was able to look up

4   the Salt Lake City newspaper just this morning and they

5   wrote all about it, and they wrote about how Jacob Kingston

6   talked about how Levon Dermen was paying off this Belize

7   foreign minister.

8           At the end of the day, I don't know that this

9   foreign minister committed -- he didn't commit, for

10  instance, Foreign Corrupt Practices Act, because you have to

11  be an American to do that.  So I don't know that that -- I

12  don't know what happened to Salvador.  But what I do know is

13  that there's a state department notification that he's been

14  banned from the United States.

15          So that's something.  You know, and that's

16  important.  And it really was a by-product of his testimony.

17  And at the end of the day, cooperation is -- you know, there

18  should be like a valve.  You know, it's better and worse,

19  and all the things people say.  And he was going to tell the

20  government everything about everything, and he did.

21          One of the things he testified to was the

22  corruption of a foreign government official.  If that would

23  have been picked up by, you know, an interested United

24  States prosecutor -- I don't know that it falls within the

25  very broad purview of our fine prosecutors here today --

1  someone could have done something with it.  For all I know

2  something was done with it.  At a minimum, the state

3  department has banned him from the country.

4        So there's so much to what he has said -- Jacob

5  Kingston has said that has had real-world ramifications, not

6  just the six days of his trial testimony, but in all these

7  different areas.

8        But getting back to the core point.  So Dermen

9  does have these people at his disposal, but he weaponizes

10  that against Kingston in two ways.  One, you should feel

11  safe, Jacob, putting your name on all these egregiously

12  illegal tax filings.  You should feel safe, Jacob, sending

13  hundreds of millions of dollars in the name of your company

14  to Turkey.

15        I mean one of the things that was a head scratcher

16  for me -- and I was in the U.S. Attorney's Office once upon

17  a time and I've been my way around -- I don't know why they

18  didn't use shell companies.  I mean they are sending tax

19  fraud proceeds to Turkey from Washakie.  It's insane.  And

20  it's just a matter of time before this house of cards comes

21  crumbling down and everybody is looking at horrific prison

22  sentences and, lo and behold, that time came.

23        But as Mr. Rolwing referenced in his remarks,

24  Kingston felt safe, amazingly -- amazingly.  And that's kind

25  of really the evidence of the impairment.  He felt safe.  He

1    felt safe doing these clearly provably illegal things in his

2    name.  Sending money to Turkey in the name of his company

3    because of what?  Because he was protected.  What would form

4    that view?  And the answer, I think, is what would form that

5    view is kind of where he came from.

6              I mean I don't know that anyone else would have

7    that view.  No right thinking -- I don't mean this in a bad

8    way -- no right thinking person would have that view.  But

9    it's not just a criminal view.  Criminals are really smart.

10   Criminals are cunning.  Criminals are strategic.

11             And I'm not saying -- I wish I could say it -- I'm

12   not saying he's not a criminal.  He is, unfortunately.  God

13   forbid, he is.  But he's certainly not acting with any

14   cunning or strategy.  So how does this happen?  What forms

15   this mind-set?

16             And I think that is what the Moulton report is

17   valuable in explaining.  And all of this argument that I'm

18   making now is just evidence of the mind-set.  It's not that

19   he didn't commit a crime.  None of that.  It's evidence of

20   the mind-set.

21             But it goes further than that, because then he

22   meets Santiago Garcia, and Santiago Garcia takes this to

23   just a ridiculous level, because he creates a cast of

24   characters, Brian Singleton, a high-ranking DOJ official who

25   doesn't exist under the name Brian Singleton.  Kingston

1   believes that.

2           There is an Assistant U.S. Attorney from Texas who

3   goes by the nickname Cousin.  There was a judge from Texas

4   named Sondock.  There's a cast of characters seven or eight

5   members long.  And what Garcia would do on the phone --

6   because what he kept doing is I need more money.  You know,

7   you paid Singleton.  And Kingston is handling this like he's

8   ordering dim sum, you know.  Okay.  So you have a

9   high-ranking DOJ official, but you need a judge.

10          THE COURT:  Well, what made him think that the

11  judge they had would be the judge that had anything

12  whatsoever to do with his case or the DOJ official?

13          MR. AGNIFILO:  They were going to move the case.

14  They were going to move the case from here to Texas and then

15  Judge Sondock -- I don't even know that there is a Judge

16  Sondock -- was going to take the case after it was moved.

17          THE COURT:  But who had the ability to move it?

18          MR. AGNIFILO:  Brian Singleton.  Right.  Exactly,

19  Judge.  You're with me.  Brian Singleton was going to move

20  it.  So he was going to move the case because he was a

21  high-level DOJ official, who doesn't live under his actual

22  name.  He was going to move the case to Texas where cuz, the

23  Assistant U.S. Attorney, was going to do a bad job

24  prosecuting it and Judge Sondock was going to take a dive.

25          And Garcia would have conference calls where

1    Garcia would use different voices on the phone.  He would be
2    Singleton and Sondock, and Kingston would speak, and Garcia
3    would be like, yes, I'm a high-level DOJ official.  I'm a
4    judge.  And this worked.  This worked.  It worked.
5           For the life of me, I'm trying to go how did this
6    work?  Because it's so preposterous, it's so impossible.
7    And he believed it.  And so I can't think of another
8    explanation and relevance of this under the guidelines other
9    than to say there's something diminished in his ability to
10   appreciate reality.  Because that's exactly what it is.
11          And Garcia is just going and going and going.  He
12   would take pictures of boxes and then write the word
13   evidence on it and send it to Jacob and say, look, they're
14   going to get rid of all the evidence in your case.  And you
15   know they're going to do that because the box says evidence.
16   And he believes that.
17          And he had ninjas, Judge.  Ninjas.  And the ninjas
18   were the ones that were going to go through the files and
19   steal all the files.  And this is just okay.  This is
20   reality.
21          So reality -- reality for Jacob Kingston was that
22   Brian Singleton was going to move the case to a judge in
23   Texas.  Meanwhile ninjas were going to steal evidence, as
24   evidenced by the box of evidence that the ninjas assembled,
25   and he's paying millions of dollars to Santiago Garcia and

1    believing this every step of the way.

2            Your Honor has been a lawyer, a judge in different

3    forums, and here for a long time.  I have not seen this.  I

4    just haven't.  And hook, line, and sinker.

5            And then we have Baran Korkmaz.  Let's go for

6    broke, CIA.  The CIA, yep.  All this money is going to the

7    CIA -- not all of it, but some of it.  Millions and millions

8    of dollars are going to the CIA to go to Kurdish interests

9    that are in the interest of the CIA.  He believes that too.

10           At the end of the day, so much of the time period

11   between his arrest and the date of his plea -- and what I

12   ended up telling him at the end of the day, I said, you know

13   what, tell them.  Tell them.  Tell them about Brian

14   Singleton.  Tell them about the CIA.

15           And I remember this.  I took them aside one day

16   and I said I don't know if this is CIA or not CIA, but I

17   don't want us to all get in trouble.  So do you guys have to

18   do something?  Do you guys have to check this out in some

19   way?  Because it was unraveling this onion of just false

20   belief after false belief.

21           Now none of this makes it any less criminal.  And

22   a lot of very, very bad crimes were committed in this false

23   belief.  I mean there's obstruction of justice.

24           You know one of the things that I should mention

25   just in the fullness of the record is at one point -- and I

1    know this came up at the bail hearing quite a bit and

2    Your Honor will probably remember it -- Santiago Garcia said

3    there's a guy named Beto, and Beto was like a tough guy, and

4    Beto was going to make the bird not go to the grand jury.

5    Terrible.  Really, really terrible.  But you also see the

6    manipulation in that, and you see the manipulation because

7    Santiago Garcia says if you do nothing, Sally is going to

8    get arrested.  Sally is going to get arrested.

9           And let me just say something, and this has come

10    up.  You know, one of the things that -- you know, this case

11    is tragic in many, many ways.  But I wonder if Jacob

12    Kingston wasn't in his situation -- he loves Sally.  It's

13    really, really remarkable actually.  He loves Sally, like in

14    a way that if he could run away from all of it and just be

15    with Sally -- and honestly I think a lot of his agreement to

16    cooperate was that.  This has ruined the thing I care about,

17    and he cares about Sally.  And I'm not saying -- I know he's

18    in a complex situation, you know, but that's what I see.

19           THE COURT:  How do you explain the not letting her

20    have a child in the hospital in the same month when he

21    profited $11 million from the fraud scheme?

22           MR. AGNIFILO:  It's a great question, and it's

23    because it's not ultimately his money.  He can't speak for

24    this money, you know.  He's a flow-through vehicle.  He's an

25    instrumentality of people that are more influential in this

```
 1   world than is he.
 2            I heard that too.  I thought Mr. Washburn -- I
 3   thought that was a very, very powerful presentation.
 4            THE COURT:  What was the hospital bill, a thousand
 5   bucks versus 11 million?
 6            MR. AGNIFILO:  Yeah, no.  There's no -- there's no
 7   earthly reason for that.  And I think the answer is that
 8   it's just not Jacob Kingston's money to spend.  And I think
 9   that's probably evidence of that.  This is Jacob's child and
10   Jacob's wife.  And so I think if anything, it's really,
11   really overwhelming proof of whose money this isn't at the
12   end of the day.  That vignette I think is proof of that.
13            So there's so much complexity and so much
14   backstory.  And I tried to capture it in the sentencing
15   memo, so I'm not going to go through it all again.
16            So the pre-Dermen phase is substantial, and we
17   admit to that readily.  And he can't blame Dermen for that
18   because he hadn't met him yet.  What does happen, and I
19   think Mr. Rolwing alluded to this, is by the time Jacob
20   Kingston meets Dermen, though, Jacob Kingston is just
21   immensely useful to Dermen.  A, he's already started
22   committing crimes.  He has a biodiesel plant and he knows
23   how to do it.  And there are some remarkable aspects about
24   Dermen that really make this situation work for Dermen.
25            One of the things, and we allude to it in our
```

1  papers, is Dermen was physical with Jacob too.  Not as much

2  as his father was.  I mean Jacob is a grown man now.  I

3  don't know that a lot of people would choose to pick a fight

4  with Jacob Kingston, but Dermen is one of those people.

5  And, you know, it was physical.  I mean he hit him, and put

6  him in his place, and made him feel scared, you know,

7  physically, made him afraid that if he didn't do what Dermen

8  wanted, you know, he would be out of this little, you know,

9  law enforcement umbrella that protects us so much.  And

10 that's a heck of a belief for someone who comes from a

11 closed society already.  So I think what Dermen was very

12 successful in doing is replicating the forces that were on

13 young Jacob Kingston, but in an adult version because he had

14 law enforcement.  Dermen was the only moral authority.

15 Jacob could not safely leave Dermen's, you know, group.  And

16 it ended up being a very effective way of keeping him in

17 check.

18          Now let's go to the other side too.  Jacob

19 Kingston is getting a lot out of this too.  I mean maybe not

20 as much directly, but there was a certain amount of money

21 that went to The Order after the Dermen time period.  I

22 think Mr. Rolwing puts that at about 30 million and I have

23 no reason to quarrel with that figure.  That sounds about

24 right.

25          But it's also true -- and I'm going to qualify

1    this -- that I don't know that Jacob Kingston himself really

2    enjoyed the money.  And the emphasis is on enjoy, okay.  He

3    lived in a very nice house.  I think it was a $3 million

4    house.  If I remember the trial testimony correctly on this

5    issue, he and Dermen were riding in a car near that house

6    and Dermen said something like the house you're living in is

7    not our kind of house.  That's our kind of house.

8         Now, you know, Jacob had the house.  And I'm not

9    going to say he didn't live in the house.  He bought the

10   house.  He lived in the house.  He lived in a nice house.

11   He drove fancy cars.  My impression of all of this is this

12   is all lost on him.  I don't know that he enjoys any of

13   this.  I don't know he's one of these people who, hey, look

14   at me, I have a big house.  I've met enough of those people

15   certainly as a criminal defense lawyer from New York, but I

16   don't think he's one of them.  And the cars, this was so all

17   keeping up appearances so they could be the high-flying, you

18   know, moneymaking, international jet-setting, you know, kind

19   of criminal group that they had become.

20        But I don't know that even here this is something

21   that, you know, Jacob Kingston is of the view now that I'm

22   making all this money, you know, I'm going to really recline

23   and enjoy, and sit on the porch of my beautiful house.  He

24   bought it.  He bought it.  He lived there, no question.  But

25   there's something about Kingston that is -- and Dr. Moulton

```
 1   says it comes from his childhood.  He just wants to be worth
 2   the effort of the authority figure in his life, you know.
 3   He sees an authority figure in his life.  I want to be
 4   worthy of being in your employ, in your presence, whatever
 5   it is.  First it was his father.  Then it was Dermen.  I
 6   know I go through this quite a bit in my sentencing memo.
 7   So this is all by way of an explanation in terms of
 8   background.
 9            So I'm going to move on to another topic.  He's
10   been -- and, Your Honor, tell me if -- I know I've going for
11   a while.  If Your Honor wants to take a break at any point,
12   just let me know.
13            THE COURT:  I'm fine.
14            But, Ms. Walker, you tell us if you need a break.
15            MR. AGNIFILO:  Mr. Kingston has been in pretrial
16   detention four and a half years.  That's difficult under all
17   circumstances.  You don't have the programs.  I think
18   there's been no church since COVID.  There's really not a
19   lot to do for the inmates.  It's not a place that someone is
20   supposed to be for four and a half years.
21            What makes it worse is COVID.  He had COVID twice
22   alone, you know, in a place where there's no loved one to
23   take care of you.  He was away from his family during the
24   COVID pandemic, which was scary and people had it, and
25   that's kind of terrifying.
```

```
 1              The other thing that I think -- you know, I want
 2    to salute Ms. Tangaro, who I hope is still here -- there she
 3    is -- who said something yesterday.  She said two things --
 4    she said a lot of things yesterday.  She said two that I
 5    thought were especially beautiful.  One was that her client
 6    would be a mom to, you know, younger women in jail.  I
 7    thought that was -- that just touched me.
 8              The other is -- and it was curious.  I was
 9    thinking as a lawyer, wow, she really brought that up, that
10    she lost her singing voice.  And I was like, man, that's
11    kind of risky.  I mean this is a case with, you know,
12    $500 million.  But the one thing that criminal defense
13    lawyers see that not everyone sees the same way is these
14    people lose their humanity, and that really does happen.
15    That's a real thing.
16              When I meet people, I don't meet the version of
17    them -- I mean I sometimes will listen to wiretaps, and
18    whatnot, and say, wow, listen to you.  You're not like that
19    at all anymore.  And there's just this massive stripping of
20    all the things that make you human.  And I thought
21    Ms. Tangaro really seized on that just by that little
22    remark, you know, that this thing that makes her more
23    beautiful and brings beauty into the world has left her.
24    And that's what happens with everybody.
25              And part of what happens in a traditional prison,
```

1   not these holding facilities, is you start to restore that

2   maybe.  They do things.  There's programming.  You know, you

3   can work on your mental health.  You can get a job.  You

4   can, you know, read more books.  You can do these things and

5   start to just become a better person.

6          But in these kind of in-between facilities, it's

7   just one dehumanizing aspect after the next, and you lose

8   your humanity.  And to be in a place like this for four and

9   a half years is just difficult under any circumstances.

10  It's more difficult for Mr. Kingston, because since March of

11  2020 he's been in there as a cooperator in a very, very

12  public case.  That isn't easy.

13         You know, he's had people have all sorts of

14  thoughts about that, and approach him having all sorts of

15  thoughts about you're a rat, you know.  There's a code in

16  prisons where that's just not favored, and there's certain

17  groups of people in prisons, you know, gangs, things like

18  that, that kind of handle that kind of situation.

19         So this has been a very difficult time for

20  Mr. Kingston, and it's not like four and a half years, you

21  know, someplace else.  So that's, I think, a very important

22  part of calculating the overall sentence, just taking that

23  into account.

24         I'm going to speak very briefly about sentencing

25  parity, and then I'm going to talk and end with cooperation.

```
 1              Okay.  So the outstanding -- truly outstanding
 2    work done by the probation department in this case -- and I
 3    think they're both still here -- maybe not -- there we go --
 4    you know, I mean just tremendous work.  And honestly, if
 5    they didn't do such great PSI reports, my sentencing memo
 6    could have been over 100 pages.  So it was merciful that
 7    it's not that long.  But one of the things they do that's
 8    helpful, they talked about related cases on page three and
 9    they talk about unindicted co-conspirators on page ten.  So
10    who are some of those people?
11              And I'm going to bring this up and then I'm going
12    to say that I agree with what the government did, and the
13    first person I'm going to bring up is Deryl Leon.  Deryl
14    Leon was involved in hundreds of millions of dollars of
15    fraud with the Kingstons, led by the Kingstons, but
16    certainly and actively participated in by Deryl Leon.  Deryl
17    Leon got no jail.  He got a non-jail sentence.  I think he
18    was in jail for a period of time.  And then he was sentenced
19    ultimately, I think, to time served.
20              And Mr. Rolwing explained yesterday why, and I
21    think his answer is a very good answer.  His answer was he
22    was an extraordinary cooperator, and he cooperated
23    immediately, and he cooperated, you know, throughout the
24    investigation, and so his cooperation justifies that
25    sentence.  And I think that's fair.  And I think, as we've
```

```
 1    seen in this case, cooperation is sometimes the key.  I mean
 2    the government has lots of different avenues at its disposal
 3    to investigate complicated cases, but cooperation is
 4    certainly one of them.  And like I said, I'm going to end my
 5    remarks with that.
 6            So we have the Deryl Leon sentence.  So what does
 7    Your Honor do with that?  It's there.  It's there in the PSI
 8    report that he's a co-conspirator, and he got no jail.  And
 9    I understand the differences, I do.  But that's one of the
10    cases that we have to be consistent with under 3553(a)(6).
11            Then we have Andre Bernard.  He got 33 months.
12    There are a few different times that his sentence was
13    reduced from an originally higher sentence to a lower
14    sentence, but he got 33 months.  And he's one of the
15    mainstay guys in the Kingston fraud, sort of pre-Dermen.
16    You know, you have Andre Bernard, you have Tom Davanzo.
17    Davanzo got 57 months.  You have Robert Fedyna, who got 63
18    months.  You have Josh Wallace who got 70 months.  So you
19    start to see this, you know, kind of critical mass of kind
20    of what the sentences are.
21            And granted -- granted, the conduct here was --
22    there's a lot more fraud in this case than those cases.
23    There's no question.  But at times we've kind of made a
24    little bit of a dichotomy between the pre-Dermen numbers and
25    the post-Dermen numbers.  So in these pre-Dermen numbers,
```

1    these are some of the going rates.  You know, we're seeing

2    that.  Frank Dibenedetto got probation.  Michelle Helms got

3    probation.  Again, listed in the presentence report as

4    co-conspirators.  You know, certainly related cases, like

5    cases.  So I just say that to Your Honor.

6          THE COURT:  Well, and it's hard because I don't

7    know all of the facts of all of those cases.  I don't know

8    what's driven by recommendations versus what is dependent on

9    the predilection of the judge who happens to draw the case.

10   And I guess the other question is just because that judge

11   sentenced those folks first, does that then bind me to some

12   kind of a benchmark?

13         MR. AGNIFILO:  No.  No, I don't think it does.  I

14   don't think it's a benchmark by any means.  I think what the

15   3553 factors say is that sentencing parity is something that

16   we're trying to avoid.

17         THE COURT:  Avoid unwarranted disparity I suppose

18   is the language.

19         MR. AGNIFILO:  Exactly right.

20         So no, it's not a benchmark.  Especially

21   cooperation situations, each one is different.

22         I mean one of the things that I encourage every

23   judge to try to do -- so I would be a hypocrite if I said

24   not to do it here -- is to look at the individual

25   characteristics in each case.  So it's only so helpful.  But

 1   because it was in the PSI, I thought it made sense to

 2   mention it to Your Honor.

 3          The last thing I want to talk about is

 4   cooperation, and I would like to do it from a perspective --

 5   that's my perspective, and I just want to share it with

 6   Your Honor.  I don't know if it's going to be valuable or

 7   not valuable, but it's -- so for three minutes I just want

 8   to talk about one perspective on cooperation.

 9          I had the great, good fortunate to start at the

10   Manhattan District Attorney's Office on August 20th, 1990.

11   And in 1990, we had 2600 murders in New York City, and we

12   had over 600 murders in Manhattan when I was an assistant

13   DA.  And what I saw, as a young, impressionable prosecutor,

14   is the older prosecutors were starting to make these big

15   group cases.  They were doing mob cases, Italian organized

16   crime.  They were doing Chinese gang cases, drug crew cases.

17   And the way they did it is they focused on the group.  And

18   the way they focused on the group is they used cooperators,

19   and it was just cooperators, cooperators, cooperators.  And

20   Manhattan went from 600 murders in 1990 to 39 murders five

21   years ago.  That's fascinating and important.  Now there's

22   lots of reasons.  There's lots of reasons.

23          New York City has a wonderful police department.

24   There are a lot of things that they have going for it.  But

25   the one thing that I've seen in New York is the critical,

1    central nature of cooperation.  I mean cooperation is why

2    there's no more meaningful Italian organized crime, really

3    anywhere in this country.  It's why these drug gangs decided

4    they're just going to stop being violent.  And the way --

5    this is just me -- the way that we kind of learned to do it

6    is you really have to reward them.  I mean you have to

7    incentivize them to cooperate in a really deep and

8    meaningful sense.

9         Now Your Honor will know better than me.  There's

10   a crime in New York that's kind of unique.  You know, no one

11   else really has meaningful Italian organized crime the way

12   we did, and this is really where these cooperation kind of

13   guideposts really came from.  So I think everyplace really

14   is different.  And Utah does the right thing for Utah.  And

15   I'm not law enforcement and I'm not from Utah.  So I'm maybe

16   the last person to ask about this.  But from what I've seen,

17   there's an incentivization aspect to cooperation and

18   furthering law enforcement that at the end of the day it is

19   the courts to do.

20        I know we had a little, you know, issue yesterday,

21   which I totally get, and the only reason I'm bringing it up

22   is because I'm going to tell you how I understand it,

23   because the Court is the one sentencing everybody.  And so

24   there ends up being this -- partnership is not the right

25   word, so I'm not even going to use that word.  There's an

1    interrelationship between the Court and how the Court

2    handles cooperators and the executive branch's ability to do

3    its job.

4           Now it's plain for everyone to see the executive

5    branch here is not done with this investigation.  You know,

6    it seems like it.  I mean we have Baran Korkmaz at a

7    minimum.  But they seem to be of the view that there are

8    worthwhile aspects to this investigation that have not yet

9    been fully pursued.

10          And I totally understand how the Court fits into

11   that, because it's always fit into that in that same way.

12   But my request for today is that the Jacob Kingstons of the

13   world, wherever they may be and whatever they may be doing,

14   can be incentivized or dis-incentivized to come do the right

15   thing.  And what he did here is mighty and historic.

16          From what I'm gathering in terms of what the

17   government seems to think about this group of people that he

18   was born into, one of the things I told him this morning

19   that he didn't know and really was deeply affected by --

20   because I just found out from Mr. Rolwing in the last couple

21   of days -- is apparently Jacob Kingston's father wrote a

22   sentencing letter for Isaiah.

23          THE COURT:  One for his wife as well.

24          MR. AGNIFILO:  He didn't write one for Jacob.  He

25   didn't write one for Jacob.

 1          If you needed to bring all of this to a

 2     crystalized point, that might actually be it.  He lost his

 3     father.  He lost his father.  His son is here, about to get

 4     sentenced for paying off his debt, and he doesn't write

 5     Your Honor a letter.

 6          So when I say incentive, I'm not trying to be

 7     transactional.  I know it seems at first blush that it's not

 8     a transaction.  It's not.  He has changed his life in the

 9     most fundamental of ways, never to go back.  His father

10     didn't write him a letter on the day of sentencing -- his

11     father.  That will be this way for the rest of time.  He

12     will remember that on his deathbed, my father didn't write

13     me a letter on the day I'm looking at 30 years in front of a

14     judge for paying off your debt.

15          So this case has so many powerful elements to it,

16     but I think that might be one of the most powerful.  And the

17     work that Jacob has done to get to this point, the

18     cooperation -- with your permission I'm going to ask --

19     because I would fly in every once in a while -- will

20     Your Honor permit Mr. Bugden to talk a little bit about the

21     cooperation, because it was extraordinary.  I mean I started

22     to see, you know, Rich and John as -- not my brothers, my

23     first cousins.  We just spent a lot of time together, but

24     Wally was here every day.  So I'm just going to have him

25     just address this very quickly, and I'd appreciate it.

```
 1                THE COURT:  Thank you.

 2                Mr. Bugden.

 3                MR. BUGDEN:  Maybe not so quickly.

 4                THE COURT:  Well, depending on --

 5                MR. BUGDEN:  I will be quick.

 6                THE COURT:  We can take a morning break right now,

 7   but we can let you proceed.

 8                MR. BUGDEN:  I'm not going to be that long.  I

 9   just was paring with Mr. Agnifilo.  But he did use the word

10   that I want to use too.  Jacob's cooperation was

11   extraordinary.

12                And, you know, you've received the 5K, Judge.  And

13   I do appreciate the government's comments in their 5K, and

14   Mr. Rolwing's demeanor and his tone in discussing the

15   courage that Jacob displayed in this matter.  But I want to

16   put a little meat on the bones here when we talk about

17   cooperation, because the government has been very generous

18   and I think factual in describing that he did put forth

19   extraordinary effort.  But I just want you to understand we

20   met with the government, Jacob and I, 30 times, not just 25.

21   200 hours -- 200 hours with Rich.  Now that's a lot, Judge.

22                THE COURT:  Was it the nice Rich or the --

23                MR. BUGDEN:  No.  That's the point.  It was not

24   always the nice Rich.  It was no party, Judge.  It was no

25   party, although he did most of the time --
```

```
 1            THE COURT:  Just a minute.  Mr. Sullivan just
 2   stood up.
 3            MR. SULLIVAN:  I object a little bit on that one.
 4   I was there too for some of these.
 5            THE COURT:  But you're suggesting it was partly
 6   nice and partly not nice?
 7            MR. SULLIVAN:  I'm going to take the Fifth,
 8   Your Honor.
 9            MR. AGNIFILO:  My client has nothing to say.
10            MR. BUGDEN:  Well, I was there.  I was an
11   eyewitness.
12            Now he did, on many of these occasions, get an
13   escape from jail food.  So there was that benefit as well.
14   But we met 30 times.  And, you know, we're covering
15   basically a decade.  He was asked to recall, you know,
16   minute details.
17            And Mr. Rolwing has -- he really does actually
18   have a photographic memory.  It's an amazing memory.  But as
19   Jacob would be debriefed and prepared to testify, he'd be
20   shown documents.  He would be given documents.  We had the
21   computer that we're allowed to have -- the small computer
22   that he's allowed to take back to the jail.  He did
23   homework, Your Honor.  I mean he was all in.  Once he
24   decided that he was going to cooperate, he was all in.  And
25   he did homework.  He worked hard to understand the details
```

1    so that his testimony could be corroborated by exhibits, or

2    by different things.

3           And as we talked about and as I put in the letter

4    for Sally Kingston, oftentimes the government would ask for

5    a document, or a photograph, or do you have something like

6    this, Jacob.  And of course he's in jail.  He couldn't

7    access any of these things other than to rely on Sally.  I

8    could call Sally and Sally would respond almost immediately.

9    I'm talking about within an hour.  If the government thought

10   that we might have a photograph or thought we might have a

11   document, we could produce that.  That was all an extension

12   of Jacob's cooperation, although Sally, of course, was

13   cooperating as well.

14          But it really was a Herculean task and not always

15   a pleasant thing.  I mean I don't think it's been entirely

16   pleasant for Jacob to hear about his own life and his own

17   feelings today.  And I can tell you that oftentimes it was a

18   very unpleasant experience with Mr. Rolwing, but Jacob never

19   quit.  He did his homework, and he testified for six days.

20   So not only was he subjected to Mr. Rolwing's not nice side

21   from time to time, but also Mr. Geragos.  He came into

22   court.  He told the truth.

23          The government has made -- we, again, appreciate

24   the 5K, but I don't know why you need to be tied -- and

25   you've given great deference to the government saying that

1   this is how much it should be worth, 40 percent.  I would

2   just ask you to consider that you as the judge can decide

3   that all that Mr. Kingston did should be rewarded with more

4   than a 40 percent reduction.  He hit it out of the ballpark.

5            THE COURT:  Thank you, Mr. Bugden.

6            Mr. Agnifilo.

7            MR. AGNIFILO:  I'm almost done, Judge.

8            So I think the Court is in a position that I hope

9   the Court sees as somewhat advantageous to the principles of

10  sentencing.  I'm asking for a 13-year sentence.  It's a

11  heavy sentence.  I think it reflects all of the 3553(a)

12  factors that apply, and I've gone into all of those in my

13  sentencing memo.

14           THE COURT:  How does it tie into the sentence that

15  I gave Isaiah yesterday?

16           MR. AGNIFILO:  I knew you were going to ask me

17  that, Judge.

18           THE COURT:  Because Isaiah also cooperated and he

19  got just one year less than what you're asking for.

20           MR. AGNIFILO:  Your Honor, you're right.  It's two

21  things.  I can say this because I'm neither the Court nor

22  the government.  I think that the investigation is going to

23  continue.  I think there may be -- and I know I'm speaking

24  out of both sides when I say, Judge, don't consider it,

25  don't consider it -- there may be Rule 35 possibilities, but

1     that's not my real reason for bringing that up.

2              I think ultimately Jacob Kingston was the person

3     they needed, and Mr. Rolwing said that today.  I'm not

4     besmirching Isaiah's cooperation or the impact on that.  I

5     know you're trying to be consistent between the two.  I

6     think 13 years, A, is higher.  It might not be enough

7     higher, in Your Honor's estimation, to be justified.  And

8     this is why I think the Court is in somewhat of an

9     advantageous position, because a 13-year sentence would seem

10    like a great sentence, it would.

11             I mean that's what the last two days have shown

12    us, that a 13-year sentence would send the message to the

13    world.  Jacob Kingston cooperated, committed, going the

14    whole way, no topic is off limits.  If the government wants

15    to ask about The Order, he's going to talk about The Order.

16             And, you know, just to connect the dots, that's

17    why his father is not here.  I mean that's why his father

18    did not write a letter.  That's why.  Because everybody

19    knows what's going on.  And that is different.  That

20    actually is -- I guess I would say that is substantively

21    different.  Because that, at the end of the day, is what you

22    sign up for.  If you're going to do this, you do it, and you

23    do it to the bitter end.

24             And something that Scott Williams said yesterday,

25    also I think is important, when he said he wasn't thinking

1    about the cap.  I was thinking about just talking to

2    Your Honor.  It's a commitment that goes in two directions.

3    And I think the commitment that Scott Williams was talking

4    about is I'm committed to telling the Court the truth about

5    everything and I'm committed to accepting the result.  And

6    that's a massive -- leaps of faith.  That's a massive

7    commitment.

8          And that's a commitment that the lawyers make and

9    that's a commitment that every defense lawyer makes to every

10   defendant, your job is to tell them the truth about

11   everything.  If they ask you about your father, you talk

12   about your father.  If they ask you about your mother, you

13   talk about your mother.  If they ask about your kid, you

14   talk about your kid.  That's always the toughest one.  You

15   do it, you do it all, and then you leave it to me to talk to

16   the judge and try to make this as fair as we can.

17         And so what I'm hearing from the government, and I

18   think what justifies Your Honor's very well placed question

19   is that Jacob Kingston has no boundary.  It's complete.

20   It's full.  It's a hundred percent.  And because he was more

21   involved -- and I know that kind of cuts both ways, and

22   that's what's giving Your Honor I think some pause -- he was

23   able to be helpful in other areas.  And the John Salvador

24   thing is one example.  The Babek Broumand is another

25   example.  He was just at that level.

```
 1              So my urging -- and now I really am almost done --
 2    is that Your Honor can give a weighty, weighty sentence -- I
 3    mean a substantial prison sentence and yet send the word
 4    out.  And one of the things about big cases that's different
 5    than just cases is big cases are important for general
 6    deterrence, you know, messages, all those things.  And
 7    certainly I think the Court has very firmly established that
 8    the Court is aware of general deterrence.  I think each one
 9    of Your Honor's sentences are very much in line with what
10    3553 says Your Honor has to consider about general
11    deterrence.
12              But with the world of cooperators, I think it's
13    also useful to send the word out that you will get
14    comparatively -- you'll get comparatively a good sentence.
15    So that's really my basis to say you can give Jacob Kingston
16    a little bit more than Isaiah Kingston and have it be
17    overall consistent, consistent with 3553, consistent with
18    5K1.1.  And now I really am done unless the Court has any
19    questions.
20              THE COURT:  I don't.  Thank you.
21              MR. AGNIFILO:  Thank you, Judge.
22              MR. BUGDEN:  Judge, may I be heard for just a
23    minute?
24              THE COURT:  You may.
25              MR. BUGDEN:  With respect to the Isaiah --
```

```
 1              THE COURT:  Come to the podium.  I want to make
 2    sure that we can all hear you, and you're a long ways away
 3    from Ms. Walker.
 4              MR. BUGDEN:  With respect to the Isaiah question
 5    and how do you justify this one-year difference, that you're
 6    asking for 12 and 13, and Isaiah's level of cooperation, but
 7    Isaiah's level of cooperation really -- I mean he's
 8    absolutely helped the government, but the cooperation from
 9    Jacob, it certainly had to be -- I don't know what number
10    you put on it, but ten times is not a wrong estimation on my
11    part.  I mean we met for 200 hours.
12              I heard Scott Williams say they met five times.
13    We met 30 times.  These were sometimes, not always,
14    eight-hour sessions, five-hour sessions.  So there's an
15    extraordinary amount of work.  That's one difference.
16              The other difference, Judge, is the level of -- or
17    the extent to which Jacob has been cast out of the Davis
18    County Cooperative.  He's an outcast.  Isaiah is not an
19    outcast.  Isaiah's father wrote a letter for him.  No letter
20    for Jacob.
21              On the eve of sentencing -- Sally's sentencing --
22    I think I've got this right -- Joseph, who's in the court,
23    one of the sons, asked about prayers, and learned that a lot
24    of people were going to pray on behalf of Rachel and Isaiah.
25    And then Joseph had to say, well, is anyone going to pray
```

1   for my dad?  He had to remind people that maybe someone

2   should be praying for Jacob and for Sally.  He's an outcast.

3   He put a lot on the line.  There is a different level of

4   risk and consequences from his level of participation.

5            THE COURT:  So is his current relationship with

6   The Order one that's of his choosing?  In other words, has

7   he made a decision to leave The Order or has The Order made

8   the decision to leave him?

9            MR. BUGDEN:  I think he'll have to answer that.  I

10   don't want to answer for him.  But I think it's more one

11   dimensional with he now having this.  I asked, well, are

12   you -- from another case I was involved in and that you were

13   involved in as a Supreme Court Judge -- I said were you an

14   apostate?  Are you considered an apostate now?  He said,

15   well, I don't know that, but I'm an outcast.

16            And Sally, with her five children, while he's

17   been -- five minor children living in their circumstances,

18   has not received help from the Davis County Cooperative.

19   She's been on her own.

20            So there's a different level of consequence for

21   Jacob for his level of participation.  And when I say he's

22   all in, he has been all in.

23            And much to Mr. Rolwing and Mr. Sullivan's credit,

24   they acknowledge that.  They say that this guy did hit it

25   out of the ballpark.  He absolutely hit the home run, but

```
 1   they're saying a home run is only 40 percent.  I'm saying
 2   there's no reason that you need to be stuck on 40 percent,
 3   Judge.
 4              THE COURT:  Mr. Rolwing, where did the 40 percent
 5   come from?  Is that just a number that represented your best
 6   judgment?
 7              MR. ROLWING:  It exceeds the standard in the Utah
 8   U.S. Attorney's Office for someone who cooperates and
 9   testifies at a trial and assists the government.
10              THE COURT:  One thing I've never been able to get
11   a handle on is what is the standard in the U.S. Attorney's
12   Office in the District of Utah.  I can't necessarily figure
13   it out or see any consistency.
14              MR. ROLWING:  Well, I can't speak for the U.S.
15   Attorney's Office and their standard, but I believe it's
16   around 33 percent if you hit a grand slam.  And we, from the
17   Department of Justice, at the tax division, and in
18   conjunction with the U.S. Attorney's Office in our
19   consultation with them believed this case was significant,
20   and his cooperation was significant, and they gave me
21   permission to request the 40 percent, which we believe is an
22   extraordinary departure.
23              In Jacob's case it's from life in prison down to
24   18 years.  He's not just -- from the 30-year cap down to 18
25   years is 12 years we're asking to be reduced from his
```

```
 1   exposure.

 2           As Mr. Agnifilo, Jacob Kingston, Wally Bugden, as

 3   I told them yesterday, this was not going to be a dispute.

 4   I didn't intend to get up and bicker over things.  I was

 5   going to make my recommendation.  But there's a few things I

 6   have to respond to Mr. Agnifilo's that I think are

 7   important.  And what's important and it really comes down to

 8   why Jacob Kingston deserves more than Isaiah Kingston and

 9   the others.

10           I mean you talk about the related cases that are

11   mentioned in the PSI, and you look through those sentences,

12   the end sentences for some of those players, all of those

13   players got reductions for helping us convict him.

14           We had to go and work with all of those people in

15   this PSI all over the country to get them to do what they

16   describe as the bad Rolwing.  It's me having people eat

17   their words, acknowledge what they did, who they were, and

18   swallow it, digest it, so they can live it, and they can own

19   it, and they can be better, and they can then start being

20   better people, because they're getting out of the state of

21   denial that they lose themselves in when they are committing

22   these horrible crimes.

23           They lose their humanity because they lie to

24   themselves all the time.  And I had to go in there and say

25   it's about the truth.  Here's what I'm going to do.  It's
```

1   going to be painful.  It's not going to taste good.  You're

2   going to eat the truth.  I had to go do that all over the

3   country to all the people so they could come here and

4   testify against Kingston, until Jacob Kingston finally said

5   I plead guilty.  That's why they got those reduced

6   sentences.  But they didn't do what Jacob Kingston did and

7   steal a half billion dollars and try to steal a billion

8   dollars -- 1.1 billion.

9          And I agree with virtually everything Mark

10  Agnifilo and Wally Bugden said, virtually everything.

11  There's a couple of things I'll just point out, though, even

12  to Jacob Kingston's credit, I don't think they -- Mark

13  described, for instance, the effect he had on John Salvador

14  in Belize as well as it could have been.

15         I mean Salvador was the defense minister in

16  Belize, forced to resign the day after Jacob Kingston's

17  testimony.  He was the candidate to be the prime minister of

18  Belize.  He had just been nominated by the party three days

19  before Jacob Kingston's testimony.  No longer the candidate

20  now after it was described as barred by the state

21  department.  That's because we introduced, through Jacob

22  Kingston's testimony, the reality of his involvement with

23  Levon Termendzhyan and Jacob Kingston.

24         But I will quibble a bit with -- because I deal in

25  the truth -- Jacob Kingston's living in this big house and

1   did he really enjoy this house.  And one of his most

2   disgusting moments, in my view, was his birthday party in

3   April of 2014 when he put the Lambo and the Ferrari out

4   front with the doors propped open, face to face -- you've

5   seen the picture, it's been all over the news -- in front of

6   his house, welcoming all these people to his birthday party.

7   It was ostentatious and gross.  He did enjoy that house and

8   the benefits of his crime in many ways, in addition to

9   paying off the debt of his father.

10          He put a big gym -- he paid $20,000 to put a gym

11  in his basement so he could work out, using the fraud

12  proceeds to do it.  He paid for a personal trainer.

13          He did a bunch of things that you would expect

14  people committing crimes like he was doing to benefit

15  themselves.  The other Kingstons were doing it to benefit

16  The Order and the family.

17          Jacob also wanted to be like Levon.  He has said

18  that.  He acknowledged it.  He's been made to eat it and

19  he's admitted it.  He knows he was different and he

20  shouldn't have done it, and he's recognized it, but it makes

21  him different than the other Kingstons, who did not benefit

22  in the ways Jacob Kingston did.

23          And this has also got to be said, and this is why

24  we think the 18-year sentence, a sentence higher than

25  Isaiah's, is an extraordinary departure from what Jacob

1   Kingston was looking at, and was looking at worthy of his

2   criminal conduct.

3           He was cunning and he was strategic.  He is very

4   bright.  The cunning strategy, unfortunately for Jacob

5   Kingston, that he employed for years was how to protect,

6   obstruct justice, pay off people to protect he and his

7   family from prosecution for crimes he continued to commit in

8   the face of this.  That was the kind of strategy that he

9   chose to employ his wits towards, and he drug his mother and

10  brother into that obstruction.  On many levels, that's what

11  makes Jacob Kingston different than the other Kingstons.

12          It also made him much more worthy to be a witness

13  and an insider, and to reveal the full truth, and that's why

14  he's getting this 12-year departure request from the

15  government.  And he was undoubtedly, between the Kingstons,

16  the most capable of going through the process I've just

17  described.

18          And like Wally Bugden said, when he says

19  homework -- I have to mention this because I'm sure

20  Mr. Geragos will try and make hay of Wally's use of that

21  word -- I didn't give him assignments to go learn things.  I

22  gave him assignments to refresh his memory of the truth of

23  his past, which he could not remember because he lived a

24  worldwind life, jet-setting around the world with Levon

25  Termendzhyan, from Belize, to Turkey, and all over, doing no

1   good.  And he couldn't remember one trip from the next and

2   put it in place.

3          And it's my job, as a prosecutor, to take the

4   evidence, put it in a time line, and ask him to try and

5   figure out is this time line accurate, because we've got to

6   present the truth?  And that's what he did so well once we

7   were able to figure out what would help him remember the

8   past.

9          If you recall, he sat up there and he had, at this

10  trial, his travel itinerary that we had built from his

11  credit card, from his passport of his travels all over the

12  world, and how they intercepted with Levon, and which ones

13  were Levon related.  And that was the way we were finally

14  able to unlock his memory so that he could digest the truth

15  and be able to articulate it back to a jury and to this

16  Judge so that the truth could be out and the culpable party

17  could be convicted of the crime and the crimes that he

18  perpetrated with and on Jacob Kingston.

19         And I'm just going to correct the record that when

20  Mr. Agnifilo said Edgar Sargsyan played a role in this

21  trial, he did not testify at this trial, if you recall.  The

22  only role he played might have been in the defense's

23  imagination and theory, but it was not a role in this trial.

24         But John Balian, who you may not have heard about,

25  what he said about John Balian was definitely true.  Balian

1   and Termendzhyan went to Turkey before they ever met Jacob

2   Kingston, met Korkmaz, and began a relationship with

3   Korkmaz.

4          Balian was also someone you have not heard

5   evidence from, but I will proffer to you that when we

6   interviewed John Balian, convicted Glendale police detective

7   for his involvement in Levon Termendzhyan's world and others

8   associated with that whole entourage in LA, he admitted he

9   was there with Levon Termendzhyan and Jacob Kingston when

10  Jacob Kingston was trying to explain the RIN program to

11  Levon Termendzhyan, and he said Levon Termendzhyan said this

12  is a license to steal.  And, in fact, it was.  Levon even

13  engineered a plan to do so.

14         The other thing that makes Jacob Kingston

15  different than the other Kingstons, to his great regret,

16  this is one of the most difficult things Jacob Kingston had

17  trouble digesting and articulating back, but he did, and it

18  hurt -- I remember it and I'll always remember it -- is he

19  paid Garcia to pay off Beto to hurt Deryl Leon and others.

20  That's shameful, criminal, and nearly unforgivable.  He had

21  such a hard time admitting it.  It was in black-and-white

22  decor.  He had to and he did, and he stood up and has

23  recognized the person I was back then, was flying 100 miles

24  an hour, desperate and panicking that my family was going

25  down because Levon was putting pressure on me, Garcia was

1    putting pressure on me, and he folded to that.

2            And Garcia was the one who led him into that, no

3    doubt, promoted the opportunity, offered him the

4    opportunity, led him into it, enticed him into it, and he

5    bit.  But that makes him different than the other Kingstons.

6            So because I deal in the truth, and I'm trying to

7    give you the full picture, I know you don't know all of

8    these other related cases, I will also say -- you know,

9    again, like I said yesterday, Deryl Leon's cooperation was

10   so much different than anyone else's in the sense of when

11   they raided the Kingstons in Utah, that Deryl, in Miami,

12   Florida, decided I want to cooperate.  Nobody came and

13   talked to him.  No law enforcement had shown up at his door,

14   nothing.  But in his mind he said I've committed a lot of

15   crimes.  I'm going to go help.

16           And his help in '16 and '17 was while -- his help

17   in 2016 and '17, before we indicted and arrested Jacob

18   Kingston in 2018, was during the time period where we didn't

19   have the search warrant records.  We had possession of them.

20   They were behind a filtered wall because of the

21   attorney-client privilege.

22           So the prosecution team is operating, waiting on

23   the filter team to get the records to the investigation team

24   to try and figure out what happened.  How can we prove all

25   this?  Well, we had an insider, Deryl Leon.  We spent days

1    with him going through his emails to try and recreate what

2    happened.

3            That is why he stands starkly different than any

4    other cooperator.  It was on own volition, without law

5    enforcement prompting, and he hit the true grand slam.

6    Jacob hit one after he was charged, arrested, and finally

7    disabused of all the delusions that he had been suffering

8    from, and that all those around him were using him for, that

9    Mark Agnifilo, and Wally Bugden, and this prosecution team

10   got him to come to reality -- into the world of reality, it

11   took a lot of effort.  But he did, and he did it

12   successfully, and that's why we are asking for such an

13   extraordinary departure here, 40 percent.

14           And I have every -- well, what Mark said about the

15   ongoing nature of this investigation of the prosecution

16   remains true.  As I said yesterday and today, I don't think

17   this is the last time you will hear from Jacob Kingston.

18   And it's not my intent -- I certainly expect to work with

19   Jacob Kingston in the future because I'm so impressed with

20   his ability that I've described.  It's rare for a defendant

21   to be able to do what he did, when he was so far gone, to

22   come back as far as he's come and then move forward in the

23   other direction.  It's a huge turnabout, and he did that, to

24   his credit.  I hope he continues down that road going this

25   way.

1              Thank you, Your Honor.

2              THE COURT:  Thank you.

3              MR. AGNIFILO:  I just want to answer Your Honor's

4    question as best I can.

5              I don't know that there's been anything formal

6    that has happened where Jacob Kingston has been expelled

7    from The Order.  I don't know that that has happened.

8              What seems pretty clear is just the events that

9    we've discussed today and the consequence of that.  I mean

10   his father is a fairly significant person in that group.

11   And his father, it seems pretty clear, he's no longer

12   supporting Jacob in any way, shape, or form.  I think that's

13   the best that we can say.

14             At the end of the day, what I had told Jacob, and

15   I think he's followed this direction, is you can't worry

16   about any consequences.  You just have to go and tell Rich

17   and John the truth about everything.  And, you know, there

18   will be consequences.  And there will be consequences even

19   from today I expect.  But the truth is the truth is the

20   truth.  And I don't know that either side here has a

21   monopoly on the truth.  I don't know that our friends with

22   the government are any more or less truthful than we are.

23             I think there's a difference of opinion about what

24   a reasonable sentence is given all of this.  At the end of

25   the day, the government's recommendation carries weight, and

1   it has to carry weight.  It says specifically in 5K1.1 it's

2   something that the Court has to consider.  But 5K1.1 is also

3   very clear that it's the Court's consideration based on what

4   the Court knows.

5           And I'm not looking to -- there's no facts worth

6   bringing up at this point to frame a dispute.  I think

7   Your Honor probably knows everything from the lawyers that

8   you could probably know at this point.  And Your Honor will

9   do the right thing, I know that -- I know that.  I mean I've

10  seen the Court for the last two days.  I see what Your Honor

11  is going through.  And whatever you say will be the right

12  answer.  I mean at some point, you know, there's a ball.

13          THE COURT:  You're assuming there is a right

14  answer, and I'm not sure that that's actually the case.  I

15  think there's a range of acceptable answers and that's what

16  makes this so difficult.

17          MR. AGNIFILO:  I know that, Judge.  And I want to

18  say I can see what the Court goes through, and I notice and

19  I appreciate it.  Thank you.

20          THE COURT:  Thank you.

21          Mr. Kingston, at this point it's your opportunity

22  to address me if you wish to do so.

23          MR. AGNIFILO:  Just before he does, I spoke to our

24  friends from the marshal service who asked if it was okay

25  with Your Honor if he remains seated.

1          THE COURT:  That would be just fine.  Just pull

2   that microphone close so we can all hear you.

3          MR. KINGSTON:  Can you hear me?

4          THE COURT:  Yes.

5          MR. KINGSTON:  Anyway, I appreciate the time I

6   have here.  And I want to express my appreciation to my

7   legal team, Marc and Walter, and also to Rich and John.  It

8   wasn't that bad.  There were moments, but I appreciate them

9   helping me to become a better person and to get to where I'm

10  at today.  But I wanted to sincerely apologize for the

11  things that I have done, and I allowed something or someone

12  to come between me and what I know was right, and also

13  between me and my family.  I want to apologize sincerely to

14  my family for the hurt that I've caused.

15         I even used my religion to justify doing the

16  things that are just not right, and part of that is

17  committing fraud.  And the last several years I've struggled

18  and been very angry with myself for the things that

19  happened, but I've realized it is time to move forward, and

20  I look forward to the time where I can move forward and be

21  with my family.  And with the mercy of the Court, I hope

22  that process is quicker.  And I hope I can make things right

23  with the people that I've hurt, my family, my God, and this

24  Court.

25         And with that, I appreciate your time.

1          THE COURT:  All right.  Thank you, Mr. Kingston.

2          We've been going about two and a half hours, and I

3     have some things to think about.  So let's take a 20-minute

4     break, and come back at about ten minutes to the hour.

5          (Recess)

6          THE COURT:  I think many of you have maybe heard a

7     version of what I'm about to say, over the past few days.

8     But I know, Mr. Kingston, that you were not here, so I'm

9     going to explain again the factors that I'm considering that

10    are important to me in determining an appropriate sentence

11    in this particular case.

12         And I should start by just indicating that I'm

13    formally approving the plea agreement that you've entered

14    into with the government at the time you pled guilty under

15    Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure,

16    in which you and the government agreed on a cap of 30 years.

17         So given that the guideline provisions were life

18    and that the cap was lower than that, I think, just from a

19    practical standpoint, we are looking at a starting point of

20    30 years.  But then, as you know, there are a number of

21    other factors that the statute tells me may be considered in

22    determining what is an appropriate sentence in a criminal

23    case.

24         The law requires me to impose a sentence

25    sufficient but not greater than necessary to comply with a

1    number of purposes of sentencing.  Those include the nature

2    and circumstances of the offense, the history and

3    characteristics of the defendant, the need for the sentence

4    to reflect the seriousness of the offense, to promote

5    respect for the law and provide just punishment, and to also

6    afford adequate deterrence to criminal conduct.

7            And then there's some other factors that can be

8    considered, the need to protect the public from further

9    crimes of the defendant, as well as the need to avoid

10   unwarranted sentencing disparities among defendants with

11   similar records who have been found guilty of similar

12   conduct, and then the need to provide restitution.

13           As I've noted with respect to the three other

14   defendants that I have sentenced this week, I think some of

15   those factors just really don't carry much weight here.  For

16   example, based on your extraordinary cooperation and your

17   owning what happened, I don't believe that we have a need to

18   protect the public from any further crimes that you may

19   commit.  I think you've learned your lesson.

20           I also don't think that given the extraordinary

21   amount of restitution that's owed in this case, that the

22   length of the sentence will really make much of a difference

23   to what percent of that restitution judgment you are able to

24   pay off.

25           But there are some factors that I think are

1    important in this particular case.  And as I have indicated

2    before, the nature and circumstances of this offense are

3    extraordinary.  I think everyone here has acknowledged that

4    it's really hard to even comprehend the amount of the fraud.

5    At some point I suppose it just became a number on a paper,

6    or play money.  But the reality is that you were actually

7    successful in getting real money, not just a request but

8    actually getting over half a billion dollars from the United

9    States Treasury.

10            I also think it's easy to say, well, it's just a

11   faceless victim.  But as I have articulated, again, several

12   times this week, I don't believe it's a faceless victim.

13   The victim is every single individual in the country who is

14   a taxpaying citizen, and it's the voluntary nature of our

15   tax system that funds the government.  It provides for our

16   defense.  We have roads that are built.  It pays for the

17   justice system.  It pays for law enforcement.

18            And then importantly, when folks are struggling,

19   it provides a safety net for those people.  And I think one

20   of the ironies is that your family may find itself in a

21   situation as a result of your incarceration and your wife's

22   incarceration to take advantage of that safety net.  And

23   that's why the tax laws are so important.

24            The fact that they're voluntary makes it

25   particularly important for everyone who pays taxes to know

1   that people who don't pay taxes will be punished.  And so

2   when we have a fraud against the IRS of this magnitude, I

3   think it really is important to make it clear to anybody who

4   thinks about doing this that there are consequences, and

5   especially to the folks in the biofuel industry where fraud

6   was running rampant.  This whole thing just became

7   completely out of control.  Again, to the point where it was

8   almost like you were playing with Monopoly money.

9        So I think it's important to send the message that

10  we absolutely cannot tolerate this kind of conduct, and that

11  the need for general deterrence is especially acute when

12  we're talking about crimes against the taxpayers.  So that's

13  the first thing to consider.  Again, the nature and

14  circumstances of the offense, and the seriousness of the

15  offense, and to promote respect for the law and just

16  punishment.

17       The other thing that I think plays in here

18  very well -- or important is the history and characteristics

19  of the defendant.  That's you.  I have great compassion for

20  what you suffered in your youth and for the pressures that

21  were put upon you given the family into which you were born.

22  It clearly presented some real challenges.  And I think it

23  also created this kind of naivety that allowed you to be the

24  victim, to some degree, of Mr. Dermen's manipulation.

25       My last law clerk was from Manhattan and he always

1    kind of talked about how naive we were here.  And I think we

2    can magnify that 100X to the society in which you were born,

3    and the naivety then becomes, I guess, partly explainable.

4            I credit what Mr. Agnifilo has said about the

5    complex PTSD.  I think those kinds of things are real.

6            At the same time I would note that most of the

7    folks that come before me have not had an easy life.  And it

8    doesn't matter -- I mean you had this challenge and your

9    crime turned out to be tax fraud.  Most of the defendants

10   who come in front of me for conspiracy to distribute illegal

11   substances ended up growing up in a home where their parents

12   were drug users, or where they were so high that they didn't

13   bother to parent the defendant, or where the defendant then

14   turned to a gang at age 13 and started using drugs because

15   there wasn't appropriate parental supervision.

16           So I think the bottom line is that most folks who

17   end up in the criminal justice system have a story, and that

18   story is important to understand how you got to where you

19   are, but I don't think it can necessarily be a driver of the

20   sentence to the ultimate degree, because if that were the

21   case, everyone's story would mean that we couldn't mete out

22   just punishment.

23           The other thing that I think is clear in your case

24   is that you have a lot of children, you have family that

25   depend on you, and it's clear that you are a caring father,

1   and that you will be severely missed by your family,

2   particularly those closest to you and your children.

3          But, again, the reality is that most white-collar

4   defendants have loving families and people who care about

5   them and people about whom they care.  So do those who are

6   dealing drugs and engaging in other kinds of criminal

7   activity.  So, again, I don't know that that entitles you

8   necessarily to a substantially lower sentence.

9          I will say what I agree with Mr. Agnifilo about is

10  that this case has been tearing me all week in two

11  completely different directions, and it's really hard to

12  tease out where all of that makes me land.  Again, the

13  nature of the crime is so horrific.  And the length of the

14  crime, and the obstruction of justice element of the crime,

15  those are significant.

16         But I've been faced every single sentencing this

17  week with an individual human being, like you, like Sally,

18  like Isaiah, like Rachel, who are caring people, who have

19  caring family, and who have tough stories to tell.  So the

20  thought of sending you away is not one that I relish at all,

21  and it really has been tearing me apart, but I don't think

22  that that means I don't have to do what the law requires me

23  to do.

24         The other factors that Mr. Agnifilo mentioned in

25  his presentation were the fact that you spent some hard time

1   in the county jail during COVID, and I don't mean to

2   minimize that.  On the other hand, that time is behind you

3   and you get credit for it.

4           And I actually found myself yesterday, when family

5   members were thanking me for letting Isaiah out after the

6   trial, I'm not so sure I wouldn't have wanted to get the

7   time under my belt rather than go out and come back in and

8   have it hanging over your head while you're out.

9           And then the sentencing disparity issue is a real

10  tough one, and that's because I'm very familiar with these

11  defendants and the facts of this case.  I simply am not

12  familiar with all of the facts and considerations that went

13  into those sentences that were imposed by other judges.  And

14  I can't just say, well, whoever meted out the first

15  sentence, that I've got to avoid unwarranted sentencing

16  disparities so I don't have to think about this.  I can't do

17  that.

18          So all I can do is try and provide a sentence that

19  I think avoids unwarranted sentencing disparities among the

20  defendants in this case where I have a bigger base of

21  knowledge.

22          And, again, as I think everyone has acknowledged,

23  when we get to cooperation, because I don't have all of the

24  facts, I do get to take into account cooperation, and it's

25  still my decision.  But the commentary to Section 5K1.1 does

1   indicate that substantial weight should be given to the

2   government's evaluation of the extent of the defendant's

3   assistance, particularly where the extent and value of the

4   assistance are difficult to ascertain.

5          And here, again, I think your assistance was

6   incredibly valuable, but how to compare that assistance to

7   assistance that others gave in other cases presents a much

8   more difficult task for me.  So I do have to give weight to

9   the government's recommendation with respect to cooperation.

10         In that regard, I want to commend you for your

11  willingness to cooperate.  I had never really thought about

12  it in the way that Mr. Agnifilo presented with respect to

13  the murder rate in Manhattan.  But I think that just like a

14  sentence can provide an incentive for deterrence -- a heavy

15  sentence can provide an incentive for deterrence, I think it

16  is equally important that those who cooperate receive a

17  reward, because we want to incentivize people to obey the

18  law in the first place.  But if that doesn't work, we need

19  to incentivize people who made a mistake to come clean and

20  move forward, and help clean up the system.  And

21  particularly, for example, in this Biofuel industry, it's

22  important that we have people who are willing to come

23  forward and clean up the mess.

24         So I credit very much the cooperation that you

25  have given and the service that you have provided to the

1    justice system, and, frankly, contributing to a law-abiding

2    society where people are incentivized to pay their taxes,

3    and to acknowledge responsibility when they make mistakes.

4         So at the end of the day, none of this is

5    scientific.  I don't think that necessarily any of the facts

6    that I've just talked about merit a formal departure under

7    the Sentencing Guidelines, but they are all things that I

8    have considered and that I've tried to appropriately weigh

9    in coming up with the sentence.

10        And yesterday I sentenced Isaiah Kingston to 12

11   years.  And keeping in mind the need for a sentence that

12   reflects the seriousness of the offense and the different

13   role that you and Isaiah played in the whole scheme, I do

14   think it's appropriate that you receive a sentence that is

15   substantially higher than Isaiah received, because at the

16   end of the day, it was my sense, and I don't think there's

17   any dispute about the fact that Sally, and Isaiah, and

18   Rachel would not have engaged in this fraud if you wouldn't

19   have led the way.  And I'm sure that that's part of what

20   torments you when you think about your past behavior, and

21   I'm sorry about that.

22        But I think that the reality is before Lev Dermen

23   entered the picture, and independent of any of your

24   co-conspirators, you were the one who began the fraud, and

25   it grew exponentially.  But you were the one who first made

```
 1    that decision to start the fraud, and then it just
 2    continued, and it continued for a very long period of time
 3    and culminated in obstruction of justice.  So that is
 4    serious.
 5            So for that reason I'm going to -- and I should
 6    say in this regard, I think that the government was more
 7    than generous in its recommendation, because absent that
 8    recommendation, I would be imposing a more severe sentence
 9    than the government has recommended.  But taking into
10    account the substantial weight that I need to accord the
11    government's recommendation, given the extraordinary extent
12    of your cooperation, I'm going to follow the government's
13    recommendation and impose a sentence of 216 months.
14            So before I pronounce sentence, I don't know,
15    Mr. Agnifilo, if you have a recommendation with respect to
16    placement.
17            MR. AGNIFILO:  One second, Your Honor.
18            So, Your Honor, Mr. Kingston points out, I think
19    he has a hernia that hasn't been treated.  So I think he
20    would like a facility that could treat that medical
21    condition.
22            THE COURT:  Okay.
23            MR. AGNIFILO:  Which I think has been an ongoing
24    situation.
25            THE COURT:  All right.  So I will include that.
```

1    And should that just be the primary driver?

2         I suppose I could indicate that he needs that

3    procedure, and that he would then desire a facility as close

4    to Utah and his family as possible.

5         MR. AGNIFILO:  So when is Your Honor going to have

6    the judgment done, if I may ask?

7         THE COURT:  I should have them out, I would think,

8    in the next week.

9         Can we do the J&Cs that fast, Ms. Hola?

10        MR. AGNIFILO:  If we sent Your Honor a letter

11   Monday or so -- but I don't want to hold Your Honor up --

12   that would be okay?

13        THE COURT:  Oh, yeah, absolutely.  It's Friday.  I

14   mean I'm --

15        MR. AGNIFILO:  Okay.  We'll send you a letter on

16   Monday.

17        THE COURT:  That's fine.  I'm happy to incorporate

18   any recommendation that you would like to provide.

19        It is the judgment of the Court that the

20   defendant, Jacob O. Kingston, be placed in the custody of

21   the Federal Bureau of Prisons for a period of 216 months.

22        Upon release from confinement, the defendant shall

23   be placed on supervised release for a term of three years.

24   Within 72 hours of release from custody of the Federal

25   Bureau of Prisons, the defendant shall report in person to

1    the probation office in the district to which the defendant

2    is released.

3              In accordance with the Violent Crime Control and

4    Law Enforcement Act of 1994, I find, Mr. Kingston, that you

5    pose a low risk of future substance abuse, so I'm suspending

6    the requirement that you submit to mandatory drug testing.

7    But you will be required to submit to the collection of a

8    DNA sample at the direction of the Federal Bureau of Prisons

9    or U.S. Probation Office.

10             I will note that I signed a preliminary order of

11   forfeiture in this matter on March 24th of 2023, and I am

12   going to incorporate that preliminary order of forfeiture

13   into the judgment and commitment order in this case

14   rendering it the final order of forfeiture as it relates to

15   you, Mr. Kingston.

16             You shall not commit any federal, state, or local

17   crime.  As a convicted felon, you're prohibited from

18   possessing a firearm or ammunition.  In addition, you shall

19   not illegally possess a controlled substance.  And you shall

20   comply with the standard conditions of supervision as

21   adopted by this Court.

22             I'm also imposing the following special

23   conditions.  There are 11 of them.  All 11 of them are

24   intended to ensure that you do what you can to contribute to

25   the massive restitution amount that you will owe.  So we

1     need to allow the probation office to monitor your finances

2     and make sure that anything that is available is going

3     towards that restitution.

4            So the first condition is that you must inform any

5     employer or prospective employer of your current conviction

6     and supervision status.

7            Two, you must not enter into any self-employment

8     while under supervision without prior approval of the U.S.

9     Probation Office.

10           Three, you must refrain from incurring new credit

11    charges or opening additional lines of credit unless in

12    compliance with any established payment schedule and unless

13    you obtain the approval of the U.S. Probation Office.

14           Four, you must provide the U.S. Probation Office

15    complete access on all business and personal financial

16    information.

17           Five, you must not be involved in any fiduciary

18    capacity or any position allowing access to credit or

19    personal information of others, unless a third party is

20    fully aware of the offense of your conviction and the U.S.

21    Probation Office approves.

22           Six, you must not maintain more than one personal

23    and/or business checking or savings account and you shall

24    not open, maintain, be a signatory on, or otherwise use any

25    financial institution account without the prior approval of

1    the U.S. Probation Office.

2          Number seven, you must not transfer, sell, give

3    away, or otherwise convey any asset with the value of $500

4    or more without the approval of the U.S. Probation Office.

5          Number eight, you must not be employed by,

6    affiliated with, own or control, or otherwise participate

7    directly or indirectly in the business of biodiesel, and/or

8    fuel manufacturing or blending.  You may not market

9    biodiesel or fuel products.

10         Nine, you must apply all monies received from

11   income tax refunds, lottery winnings, judgments, and/or

12   anticipated or unexpected financial gains to your

13   outstanding Court ordered financial obligations, and you

14   must immediately notify the probation office of the receipt

15   of any indicated monies.

16         Ten, you must be placed on the State Finder and

17   Treasury Offset programs requiring any state and federal tax

18   refunds be intercepted for purposes of Court ordered

19   financial obligations.

20         Eleven, you must notify the U.S. Probation Office

21   and the Office of the U.S. Attorney of any material change

22   in your economic circumstances that might affect your

23   ability to pay Court ordered financial obligations.  You

24   must also notify the U.S. Probation Office and the Office of

25   the U.S. Attorney of any loss of employment or increase or

1   decrease in income.

2          I've considered your financial resources and

3   assets, projected earnings and other income, and your

4   financial obligations in considering whether to impose a

5   fine and the schedule for restitution payments.  I find that

6   you don't have the ability to pay the fine, so I'm waiving

7   the fine.

8          You will be required to pay restitution, pursuant

9   to 18 United States Code Section 3663A, in the amount of

10  $511,842,773 is payable jointly and severally with your

11  co-defendants, to the IRS-RACS, attention Mail Stop 6261,

12  Restitution 333 West Pershing Avenue, Kansas City, Missouri,

13  64108.

14         You need to pay the greater of $25 per quarter or

15  50 percent of your income while incarcerated.  If you

16  receive more than $200 from any outside source in any given

17  month during the period of incarceration, all funds received

18  in access of $200 that month shall be paid toward

19  restitution.

20         The defendant shall pay restitution at a minimum

21  rate of 600 per month upon release from incarceration.  I'm

22  waiving the accrual of interest.

23         You'll also be required to pay a special

24  assessment fee in the amount of $4,100.  That represents a

25  $100 assessment for each count to which you pled guilty.

```
 1    That's mandatory in the federal system, and it's due
 2    immediately.  But you will have the opportunity while you're
 3    serving your sentence to work and make payments towards that
 4    restitution amount.
 5            Counsel, are there corrections or additions that I
 6    need to make to the sentence?
 7            MR. ROLWING:  There is the issue of the money
 8    judgment.
 9            THE COURT:  Oh, you're right.  And is that -- I'm
10    trying to think.  I know I indicated a willingness to issue
11    that substitute money judgment.  Is that in the -- it's in
12    the forfeiture order.
13            MR. ROLWING:  Is it in the forfeiture order?
14            THE COURT:  I believe it's in the forfeiture
15    order.  I've got the forfeiture order right here, so let's
16    make sure that it is.
17            MR. ROLWING:  It's in document 1396.
18            THE COURT:  Okay.  What is the amount of that
19    substitute money judgment?
20            MR. ROLWING:  $338,606,523.
21            THE COURT:  338 million -- one more time.
22            MR. ROWLING:  $606,523.
23            THE COURT:  Okay.  All right.
24            I am going to enter a substitute money judgment as
25    part of the forfeiture proceedings in the amount of
```

1    $338,606,523, and I'm assuming that's in favor of the

2    Internal Revenue Service or the United States government.

3    How does that work?

4              MR. ROLWING:  Payable to the United States

5    Treasury.

6              THE COURT:  Okay.  Payable to the United States

7    Treasury.

8              And I'm assuming that that will be presented to me

9    in the form of a separate order, or will that just be part

10   of the judgment and commitment order, counsel?

11             MR. McCULLOUGH:  That should be in the J&C,

12   Your Honor.  Your Honor already entered the order on

13   March 24th, and it should be in the J&C, if that would be

14   possible.

15             THE COURT:  Well, I believe it is here.  It is

16   incorporated in the preliminary order of forfeiture that I

17   entered on March 24th.  It's paragraph --

18             MR. McCULLOUGH:  It's paragraph 12, Your Honor.

19             THE COURT:  It's paragraphs 12, 13, 14.  Fourteen

20   is the one that refers to Mr. Jacob Kingston.  And so I

21   suppose by incorporating this order into the J&C, it will

22   include that, but I appreciate you pointing that out so that

23   I can make sure that it's there.

24             MR. McCULLOUGH:  Thank you, Your Honor.

25             THE COURT:  Are there any other corrections, or

1    additions, or mistakes that I need to correct?

2             MR. AGNIFILO:  No mistakes, but I have one quick

3    question.

4             THE COURT:  Okay.

5             MR. AGNIFILO:  Your Honor, to the extent that

6    there are other counts of the second superseding indictment

7    that were not the subject of the plea, we ask those be

8    dismissed.

9             THE COURT:  That motion is granted.  And I don't

10   see in my materials that there are, but it's better safe

11   than sorry on that point.

12            The last thing I need to do, unless I'm missing

13   something else, is notify you, Mr. Kingston, with respect to

14   your appellate rights.

15            As we've discussed and as you clearly know, you

16   pled pursuant to a plea agreement with the government under

17   Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure.

18   Under the terms of that agreement, you expressly waived your

19   right to appeal your conviction.  But if you believe your

20   guilty plea was somehow unlawful or involuntary, or if there

21   is some other fundamental defect in the proceedings that was

22   not waived by your guilty plea, you can appeal your

23   conviction.

24            Under the terms of that plea agreement, you agreed

25   to a sentencing cap.  I've accepted and approved the terms

1    of that agreement, and the sentence that I have imposed is

2    below that cap to which you agreed.

3            As part of your plea agreement, you agreed to

4    waive your right to appeal that sentence.  Those waivers are

5    generally enforceable, but if you believe the waiver is not

6    valid, you can present that theory to the court of appeals.

7            Any notice of appeal needs to be filed within 14

8    days of the entry of judgment.  If you request, the clerk

9    will prepare and file a notice of appeal on your behalf.

10           If you can't afford to pay the cost of an appeal

11   or for a lawyer to handle the appeal, you can apply for

12   assistance.  You can ask that the Court waive the filing

13   fee.  And you may also apply for court appointed counsel.

14           Do you have any questions about your right to

15   appeal, Mr. Kingston?

16           MR. KINGSTON:  No.

17           THE COURT:  So before we adjourn, Mr. Kingston, I

18   do want to say that I wish you the best.  Again, I

19   appreciated the insight that your defense team has given me

20   into how and maybe why -- or at least some explanation as to

21   how you find yourself sitting where you are today.  But at

22   the end of the day, we all make mistakes.  And your mistakes

23   may be of a larger magnitude than the mistakes, at least

24   monetarily, that most of us make in our lives.  But

25   everything doesn't come down to monetary mistakes.  There

1    are a lot of other values that are important in life.

2            And it's clear to me that you're a family man.

3    And the fact that you made this mistake doesn't devalue your

4    worth as a human being, and it doesn't make you a bad

5    person.  It means you made a really bad mistake.  But I

6    don't think our character is defined by a single decision or

7    set of decisions that we make.  It's defined by what happens

8    when we make mistakes and the decisions that we make in

9    moving forward, and changing, and learning from mistakes.

10   And hard circumstances often yield really positive results

11   in terms of our character.

12           It strikes me that you've gone through a lot these

13   past few years, and that you've done as much as you can in

14   working with the government to try and make amends and to

15   rehabilitate yourself.  And so don't let this moment define

16   your future.  I mean the time will pass, and you'll have a

17   clean slate.  And what really matters is the direction that

18   you're traveling, not necessarily where you are at any given

19   point in time.  And I think right now you're headed in a

20   positive direction.

21           So I commend you for the insight that you've

22   gained and the work that you've put in, and I truly wish you

23   and your family the best.

24           MR. KINGSTON:  Thank you.

25           THE COURT:  We're adjourned.

1          MR. AGNIFILO:  Thank you, Your Honor.

2          THE COURT:  Let's talk about what time we're going

3    to reconvene.  It is 12:30.  We're reset to reconvene at

4    1:00 -- oh, at noon.  Okay.  So let's reconvene at 1:30.

5          MR. GERAGOS:  Thank you, Your Honor.

6          (Whereupon, the proceeding was concluded at 12:30

7    p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          SALT LAKE CITY, UTAH; FRIDAY, APRIL 7, 2023; 1:45 P.M.
2                            PROCEEDINGS
3          THE COURT:  Good afternoon.  We are here in the
4    matter of the United States of America vs. Mr. Lev Dermen.
5    The case number is 2:18-CR-365.  This is the time that we
6    have set for sentencing in this matter.
7          Let's begin by asking counsel to enter their
8    appearances.
9          MR. ROLWING:  Rich Rolwing, John Sullivan, Erika
10   Suhr, and Darrin McCullough from the United States
11   Department of Justice on behalf of the government,
12   Your Honor.
13         THE COURT:  Thank you.
14         MR. GERAGOS:  Good afternoon, Your Honor.  Mark
15   Geragos, G-e-r-a-g-o-s, with Setara Qassim.  And Mr. Dermen
16   is present.  And I believe I saw Jon Williams behind me.
17         THE COURT:  Oh, there he is.  Welcome,
18   Mr. Williams.
19         MR. GERAGOS:  With a fresh haircut.
20         THE COURT:  Well, as I indicated, we're here today
21   for purposes of sentencing, but I do want to acknowledge
22   that I received this morning a document number 1425 on the
23   docket, which is Mr. Dermen's motion to continue the
24   sentencing hearing, and a motion to compel discovery.  I
25   believe I should allow counsel to address this motion so

1    that I can rule on it at the outset the hearing.

2          And I also neglected to indicate, after counsel

3    made their introductions, that we have present in the

4    courtroom two of our United States probation officers who

5    have worked very hard on the presentence investigation

6    reports in this case, Mr. Glen Manross -- and I'm not sure

7    who prepared the presentence report in this case,

8    Ms. Jennifer Gaston or Glen Manross -- and it appears that

9    Mr. Manross is the one that prepared the report with respect

10   to Mr. Dermen.

11         So with that being said, Mr. Geragos, I'm happy to

12   hear you out on your motion.

13         MR. GERAGOS:  Thank you, Your Honor.

14         We've put in there what -- and obviously the Court

15   remembers -- what happened yesterday.  And I often invoke my

16   father who says that the law does not require futile acts,

17   but I put it in.  I can't help but think that Your Honor has

18   a necessarily human nature inspired inclination to say,

19   Mr. Geragos, really, it's Good Friday before Easter and

20   we're at the finish line.  If you think I'm going to

21   continue this sentence for you to get further discovery at

22   this point, the mother of the judge hasn't been born yet.

23         However, I think that given what was said

24   yesterday, you might have noticed that I kind of perked up,

25   maybe not in my seat -- and Mr. Rolwing provided the MOIs --

1    I just looked at them -- that were provided back in 2019,

2    that I believe he thinks informs this.

3            However, I think there's a more fundamental

4    problem.  The idea of -- and I went back and I looked at the

5    transcript, this Court was meticulously taking notes.

6    Leslie Goemaat, as you might remember, the erstwhile member

7    of the prosecution team, was the lawyer who was dealing with

8    Isaiah in real time.  Ms. Goemaat was objecting, and the

9    Court overruled a couple of times her objections to text

10   messages that had been redacted under the rule of

11   completeness.

12           There was also, I think, a real problem, and the

13   real problem is, as this Court undoubtedly remembered, I got

14   up in opening statement and I said this was a prosecution by

15   proxy of The Order.  However, for some reason The Order was

16   not sitting at the table.  I did a lengthy cross-examination

17   of Isaiah.  And contrary also to what Mr. Williams said

18   yesterday in his comments about not landing any glove on

19   him, I think one of the few things that maybe you and I can

20   agree on about that trial is that Isaiah did not fess up on

21   direct.  And basically what was presented to this Court on

22   direct, and what was presented, more importantly, to the

23   jury, since they were the finders of fact, was a very

24   incomplete picture of what was actually going on.

25           Slowly, during cross-examination, Isaiah came

1    around.  And it became apparent, at least to me and I think

2    to the Court -- and I say that because in your order

3    releasing Isaiah almost three years ago you quoted -- or you

4    suggested that even the defense in closing -- and I take

5    that as me -- acknowledged what his role was.  And I always

6    thought he was the kind of challenged little brother who was

7    put in a very difficult situation and was believing what his

8    older brother was telling him, which was core to this

9    defense.

10          And the fact that the government at his sentencing

11   would now get up and represent to the Court and on the

12   record that they knew -- or that he was uncooperative from

13   the get-go -- and why do I say get-go?  Because the MOIs

14   they just turned over predate the trial by a substantial

15   amount.  I just took a look at what was in the MOIs, and you

16   really have to have a lot of background information to take

17   from that that the government thought he was protecting The

18   Order and that he was perfectly willing to lay everything

19   off on Levon.

20          I would suggest that the government -- and part of

21   the reason I bring this up now, I make the motion to

22   continue, I'm going to do it again, if you don't, or

23   whenever we do sentencing, part of the problem with this

24   case is -- and I think I might have a disagreement on the

25   defense team, but I don't attribute bad motives to the

1    prosecution.  I think the prosecution does not understand

2    their function.

3              I do not think that they understand Brady.  I

4    don't think they understand Giglio.  I do not think that

5    they understand that you cannot represent to the finder of

6    fact that this person is telling the truth and not disclose

7    to them that you think that that person from the witness

8    stand is protecting The Order, especially -- especially and

9    most importantly when the defense has basically grounded and

10   anchored their defense precisely in what they're saying

11   yesterday is what we believed, that Jacob and Isaiah were

12   basically using Levon as a proxy for The Order because they

13   didn't want to lay out The Order.

14             Now I also -- and I apologize because I'm

15   anticipating kind of where I'm going to go also -- you say

16   to yourself I want to -- I mean it's human nature again -- I

17   want to be done with this.  There's a large portion of me

18   that says I want to get to the Tenth Circuit.  I just want

19   to get there.  I want to say, you know, 25 years ago you

20   ruled on what Brady obligations of the prosecution was, and

21   when somebody makes a specific request and identifies the

22   Brady material, that heightens the prosecution's duty, and

23   that was not complied with here.

24             And so you might say, well, then just bring it up.

25   You've got the record.  You've made the record.  I think

1   what the problem is and what has happened here during the
2   entire course of this case is -- and I don't want to -- I'm
3   not saying this in a way that we prophesy, because to me it
4   was obvious what was happening.  This whole case was set up,
5   and this false wall between the Central District of
6   California, and the district here in Utah, and this idea,
7   which they have argued to you repeatedly, that the Central
8   District case has no connection to the District of Utah
9   case, this or that, that has been -- and I've said to you
10  from day one, that that was really disingenuous, and it has
11  been proven at every single point.

12          And I'll get into this when we do sentencing,
13  whether it's now or sometime shortly in the future, what the
14  problem is here is that what's going to happen.  We're going
15  to have a direct appeal.  Then in conjunction with that
16  direct appeal -- because I guarantee you, I'm going to make
17  the bold prediction right now -- the evidence that we have
18  or we suspect the government has that they have not turned
19  over, whether it's raw notes, whether it's the other things
20  that pertain to the Korkmaz resolution, or potential
21  resolution, or trial, that what's going to happen is there's
22  going to be a 2255, and we're going to be back here, and
23  we're going to be asking for the exact same thing -- the
24  appellate lawyer is going to be asking for the exact same
25  thing, and we're going to be litigating that one more time

1    before we go to the court of appeals -- or while the court

2    of appeals decides what they're going to do with it.

3           And I think that it makes most sense -- and that's

4    why I filed this morning the attachment that was on the PSR

5    as its own separate document, 14, whatever that was -- 16 or

6    14, whatever --

7           THE COURT:  I have it here, but I had previously

8    reviewed it.

9           MR. GERAGOS:  Right, as an attachment to the PSR.

10   And I just want to get the universe of documents in the

11   record so that we do not -- this isn't like a typical case.

12   I'm going to venture another guess, that we're going to be

13   back, either by Zoom or in person, on much litigation in

14   connection with the forfeiture.  And so we will be back

15   here.  And so I don't think that it's too much to ask to

16   have an order that they comply with the discovery so that we

17   have a complete record, so that when we go to the Tenth

18   Circuit, we're not filing a 2255 to expand the record based

19   on things that we think they have, number one, and number

20   two, based on things that are going to come out inevitably

21   when Korkmaz sees the light of day.

22          And why do I say that?  You'll remember during

23   this trial three years ago we kept asking for Edgar

24   Sargsyan's plea agreement.  And, Your Honor, I went and

25   looked.  You said it was a close call.  I will tell you what

1    has happened since we've asked for Edgar Sargsyan's plea

2    agreement.

3            Since then it has been revealed that Mr. Sargsyan,

4    in his testimony in the Broumand trial, which you heard

5    about with Jacob, not only the day before that trial

6    started, the federal district court judge in the central

7    district, Judge Klausner, was forced to grant a continuance.

8    And why?  Because the day before trial started, Mr. Sargsyan

9    finally admitted that contrary to what he told the grand

10   jury here in Utah under questioning from Mr. Rolwing, he

11   presented himself as a lawyer.  He presented himself as

12   having a law practice.

13           The day before he would go to trial on the matter

14   there, the lawyer for Mr. Broumand got a declaration from a

15   guy by the name of Hendrik Mosesi.

16           THE COURT:  Is this the guy that took the bar for

17   him?

18           MR. GERAGOS:  The guy who took the bar for him.

19   Who, by the way, if you check is the state bar in

20   California, is still a practicing lawyer with no

21   investigation against him.

22           So we have a situation where we keep saying the

23   central district is separate and Edgar Sargsyan is

24   irrelevant.

25           THE COURT:  Mr. Geragos, I think what I've

1    struggled with from the outset is I have zero doubt that

2    there are many shady characters who have had, what, dealings

3    with the defendants in this trial.  I mean the whole

4    industry was rampant with fraud and there were all kinds of

5    unsavory characters committing all kinds of illegal acts.

6    But at the end of the day, I don't know that that changes

7    the fundamental evidence with respect to what happened to

8    the money, and I don't think it changes the core evidence on

9    which this jury convicted your client.

10          So I worry that we just run down a million

11   different rabbit trails, and I've never really understood

12   how these issues undermine confidence in the verdict.

13          MR. GERAGOS:  Could I respond to that --

14          THE COURT:  Yes.

15          MR. GERAGOS:  -- because I think it's very clear?

16          First of all, as you will remember better than

17   anybody, on March -- I believe it was the 12th, three years

18   ago, we finished up evidence and we went to the closings.

19   On that day there was a national emergency that was

20   declared.  Over the weekend it became spreaded -- I don't

21   want to say like a virus, but let's call it for what it was,

22   it was a different time in real time.  We filed right then,

23   because the jury was still out, a motion for a mistrial.

24   They came back the following day.

25          People may forget, there were people, leading up

```
 1   to the declaration of a national emergency -- people meaning
 2   jurors, who were sitting in that jury box wearing masks,
 3   people who were sick, people who now are hearing about the
 4   NBA suspending their season, and the local team suspending
 5   what was going on in Utah, it was wall to wall.  And if the
 6   confidence in a verdict against somebody, who for the last
 7   two days I've heard there are no fingerprints, there's no
 8   evidence against Mr. Dermen other than the words of the
 9   brothers Kingston, that's where I have real trouble with
10   that.
11        How do we reconcile the fact that we were in the
12   middle of a full-blown panic -- a COVID panic, that the jury
13   was brought in to deliberate, coming on the heels of some of
14   the most -- I don't want to call it crazy, but I don't think
15   you or I have ever had a jury deliberating who had a
16   magazine cover about a defendant in a seat that had blown up
17   in flames during the taking of evidence, and then jurors,
18   that you and I both, I think, also agreed on, were actually
19   lying to us on the stand, or at least not coming clean?
20        So this was not the cleanest version of jury
21   deliberations.  And to hear repeatedly over two days, when
22   sentences are meted out -- and I share your being torn in so
23   many directions, because it's a thankless job you have in
24   terms of trying to navigate this, but the fact remains that
25   Mr. Dermen, in my belief, did not get a fair trial.
```

1           Mr. Dermen, because of what happened with this

2   jury, with the deliberations, with the COVID declaration,

3   the closing of the courthouse I believe took place that same

4   week, there is no way that I think that we can say we've got

5   complete confidence in that verdict.

6           One of the reasons I want to make as fulsome a

7   record as I can, because you've hit the nail on the head.

8   When we get to the Tenth Circuit, they're going to say was

9   it overwhelming or not overwhelming, was this a problem,

10  kind of what the Court did.  And when you say how does that

11  affect it, this is how it affects it.

12          We said since day one this was Edgar Sargsyan

13  inspired.  We said since day one Edgar Sargsyan was meeting

14  with this team and that there was something else going on.

15          One of the other things that happened on March

16  13th, right after the evidence was closed in this case, is

17  their chief witness Kazi, who was their foundation for many

18  of the counts, he ended up filing a lawsuit alleging that

19  the government and the IRS was giving him a deal, so that he

20  would not reveal certain things, and the deal was he would

21  get to buy seized assets from the government at a discount.

22          Once again, they have led you to believe that

23  there's no connection to the central district.  There's only

24  one problem.  The OIG, the office of independent -- whatever

25  you want to call it -- internal whatever they call

1  themselves -- did an investigation and they found text
2  messages with the head of LA Best, which is the ground zero
3  for the central district, choreographing what Kazi was
4  supposed to tell to the grand jury here in Utah.

5          So we have what I would humbly submit to the
6  Court, we have a case -- and I hate to use virus language --
7  infected by everything that was going on in the central
8  district.  And this artificial wall that has been set up by
9  the government here in Utah with the central district, I
10  think, number one, violates Brady, Giglio, number two, has
11  undercut any -- any chance for a fair trial that he got,
12  because everything is always, well, that's not our case.
13  It's got no overlap with us.  Oh, if it's got an overlap it
14  really doesn't matter.  These cases are intertwined.

15          By the way, when we get to sentencing I will
16  remind the Court that the central district, both state and
17  federal, back in 2017, executed the warrant and the
18  affidavit, that Mr. Rolwing and his compatriots wanted
19  unsealed without telling us, that central district of the
20  state court ordered the money, the Bugattis, everything back
21  to Mr. Termendzhyan.  And why?  Because the presiding judge
22  in that case, Judge Ferrari, now retired, gave the DA's
23  office and the feds not one, not two, three different
24  chances, month after month after month, to bring a case
25  against him.  You want to take his money, you want to take

1    his Bugatti, you want to take his 20 trucks, bring a

2    criminal case.  You've got no basis to do this.

3            So another judicial officer had already given the

4    government their best shot.  And what ends up happening?

5    They don't bring the case.  Instead, he gets plucked out of

6    the IRS office in the central district and planted here for

7    three years in what can best -- as you've described earlier,

8    best be described in violation of most of the CC&Rs of the

9    Bureau of Prisons here in Salt Lake City, because he is a

10   preconviction prisoner.  That I think speaks volumes to what

11   was going on here.

12           I heard a lot of talk about Jacob Kingston coming

13   to this.  Jacob Kingston.  Once again, I'll invoke my

14   father.  The guilty don't flee where no man pursueth.  Jacob

15   Kingston was leaving behind two of his wives, his other kids

16   as he was caught at the airport.

17           My client was in the IRS office in LA.  My client,

18   who doesn't have a wife because, unfortunately, she took her

19   life, my client who didn't have two other wives sitting in

20   the courtroom as he was being sentenced today, my client who

21   couldn't attend -- you know, his father could not write a

22   letter either because his father died, and he wasn't allowed

23   to go to the funeral.

24           So there is another side to what is happening

25   here.  And this caricature that has been kind of laid out by

1    the government as to my client, I think we need to get a

2    fulsome record so that I can go to the court of appeals and

3    we can decide what are the prosecutors' obligations here,

4    how extensive does the law still in the Tenth Circuit mean,

5    what I at least interpret it as.

6              THE COURT:  All right.  Thank you.

7         You may respond, Mr. Rolwing.

8              MR. ROLWING:  Well, I will respond only briefly,

9    Your Honor.

10        The motion to continue is moot.  The motion to

11   compel discovery is moot if it's based upon what was said

12   yesterday, and it appears it was.  All the rest of whatever

13   Mr. Geragos argued he's argued before, before this Court.

14   It's been decided.  He can go to the Tenth Circuit on

15   appeal, but it's already been resolved.

16             THE COURT:  Well, when you say it's been resolved,

17   I mean I think that I indicated that, for purposes of the

18   sentencing yesterday, I wasn't going to consider certain

19   things, but I don't know that that necessarily moots what

20   Mr. Geragos just argued.  So you need to explain that to me.

21             MR. ROLWING:  The explanation is you asked me

22   whether there was going to be potential Rule 35s or

23   additional proceedings for Isaiah, that I might be back

24   here.  I said I hope so.  It's up to him.  I hope he

25   cooperates in the forfeiture proceedings against The Order,

1    but that's up to him.  And now that he's been back within

2    The Order for the last few years because you let him out,

3    nah?

4            He gave answers that were unsatisfactory when he

5    was asked back in the day, and that got interpreted, as

6    Mr. Geragos now interpreted this, as Scott Williams did,

7    that I was saying he was not truthful.  That's not what I

8    said at all.  They were unsatisfactory.  And there's no

9    additional memos that were ever taken because there were no

10   additional meetings that have not been provided to

11   Mr. Geragos of our meetings with Isaiah Kingston.  Instead,

12   I've given him this old MOI from July of '19 with the

13   paragraph to which I was referring, calling what I

14   considered Isaiah's few answers about John Daniel and Paul

15   unsatisfactory.

16           THE COURT:  But you've now given him everything

17   that you have with respect to --

18           MR. ROLWING:  This was provided in discovery

19   production 15 back in 2019 or '20.  I'm just now putting it

20   all out there for him.  His misguided notion that there were

21   additional meetings where Isaiah recently said I'm not going

22   to cooperate against The Order, that's not what happened.

23           Instead, back in 2019, when I asked him about Paul

24   Kingston, he said, as it was quoted in the MOI, Isaiah won't

25   say that Paul Kingston orchestrated all of this.  Well, that

1  wasn't the question, but that was his answer, indicating he

2  was sort of hostile, but for -- it was just unsatisfactory

3  in my opinion.

4          THE COURT:  So let me just make sure I understand.

5  What you're saying is it was never your belief that Isaiah

6  Kingston was untruthful about anything.  It was rather your

7  belief that he did not want to extend cooperation to certain

8  topics.  Is that --

9          MR. ROLWING:  Well, in response to my questions on

10 that day he gave what I considered unsatisfactory answers.

11 They weren't -- that's what I said yesterday.

12         THE COURT:  Unsatisfactory because they were

13 untruthful, or unresponsive, or some combination?

14         MR. ROLWING:  They weren't untruthful as far as I

15 know.  When he says Isaiah won't say that Paul Kingston

16 orchestrated it, I won't say that.  That's not untruthful.

17 He's telling us what he won't say.  I don't know if it's

18 true or not that Paul Kingston orchestrated all of this, but

19 Isaiah made it clear he wasn't going to say that, and that's

20 what was put in the memo back in 2019.

21         And John Daniel Kingston would ask us how things

22 are going.  Okay.  That could be true, but it wasn't really

23 responsive.  They were unsatisfactory answers.  I didn't

24 have the time nor the need to follow up at that time with

25 Isaiah on those answers.  I believe we will in the future.

1    I believe we will give him the opportunity in the future

2    when he has to answer questions about John Daniel and Paul

3    regarding these transactions when we confront the forfeiture

4    proceedings.  Maybe not.

5            Maybe The Order won't be in here filing petitions

6    and fighting the forfeiture, and we won't need to ask Isaiah

7    to come in and tell the truth about John Daniel, and Paul,

8    and Ruth, and how all this money flowed to The Order,

9    consistent with what you said.  But maybe we will and he'll

10   get that opportunity.  So that's how that came up.

11           It's not about things that haven't been produced.

12   All the MOIs of our meetings with Isaiah have been produced.

13   And it's gotten misunderstood by Scott Williams,

14   misunderstood -- Mr. Geragos argues in his motion that I

15   introduced this evidence to undermine Isaiah's credibility

16   at the sentencing.  That's not at all what I did.

17           I was introducing this evidence to give the Court

18   the underlying evidence of the guilty plea to Count 25, that

19   Jacob and Isaiah pled guilty to, that wasn't a part of his

20   trial.  It wasn't necessary because it didn't involve

21   Mr. Dermen.  It involved Jacob and Isaiah, and The Order,

22   Count 25.  They were the two charged, and I was giving the

23   Court the evidence to show the Court Isaiah's role in that

24   particular offense conduct, not to undermine his

25   credibility, because he admitted it all in this memo back in

1   July of '19, in his plea agreement.

2        And Scott Williams got it all mixed up.  Like I

3   just don't understand what Scott Williams was doing on that,

4   but it got trickled down to Mr. Geragos now, also

5   misunderstanding it all.

6        THE COURT:  Is it accurate to say that you have

7   provided all posttrial statements by Isaiah Kingston to the

8   government?

9        MR. ROLWING:  We believe so, yes.

10       THE COURT:  Okay.

11       MR. GERAGOS:  I loathe to interfere, but this is

12   one of the reasons we wanted -- and I want the record to be

13   clear -- the raw notes, because what the sentence actually

14   says is John Daniel Kingston would ask how things are going.

15   Isaiah won't say that Paul Kingston orchestrated all of

16   this.  Now that's a very unique way to capture something.

17       If the notes say that Isaiah refused and that

18   didn't make it into the report, if the notes say Isaiah

19   doesn't want to talk about it and that doesn't make it in

20   the report, I would venture to say I'm just a little bit

21   confused as to how you can argue that it doesn't undermine

22   his cooperation, yet you wanted the Court to know that that

23   was their evaluation.  To me, those are irreconcilable.

24       THE COURT:  Do you have raw notes from this

25   interview?

1          MR. ROLWING:  I certainly do not.  Sometimes the

2     agents make up the memo as they're typing.  I don't know.  I

3     can check.

4          THE COURT:  Will you ascertain if there are raw

5     notes?  And if there are raw notes, will you provide them to

6     Mr. Geragos?

7          MR. ROLWING:  I will, your Honor.

8          THE COURT:  All right.

9          Well, at this juncture, Mr. Geragos, we have a

10    commitment that you'll be provided any raw notes.  I think

11    that many of the issues that you have raised have been

12    raised before.  You've preserved them again.  I understand

13    your desire to get to the Tenth Circuit, and I don't think

14    that this particular issue regarding Isaiah Kingston is one

15    that makes sense to litigate now presentence.  I think

16    you'll get that information.  You'll get raw notes if there

17    are any.

18         I'm sure you'll be hitting me with some motions,

19    I'm sure you'll be taking material to the Tenth Circuit, but

20    I think we need to proceed today with the sentencing.

21    Because of COVID and everything that's happened, I think

22    that, frankly, Mr. Kingston and Mr. Dermen have not enjoyed

23    being housed in county jail facilities.  We need to get this

24    done and we need to get to the Tenth Circuit.  And I think

25    those issues that you've raised can most effectively be

1    raised in that context.

2         MR. GERAGOS:  I understand, and we made it a dual

3    request.  So if the Court would just expand that order to

4    all notes with Isaiah -- raw notes, that's fine, and let's

5    proceed.

6         MR. ROLWING:  No, Your Honor.  Again, Mr. Geragos

7    wants to take these two sentences that I characterized as

8    unsatisfactory into reopening discovery into something that

9    this Court has already denied over and over again.  To go

10   back at this stage in sentencing, to go back and review all

11   these raw notes when we've --

12        THE COURT:  Get the raw notes to that MOI.  If

13   they're there, provide them to Mr. Geragos.  If Mr. Geragos

14   thinks that there's a basis to get anything more, he can try

15   and convince me of that at that juncture.

16        MR. ROLWING:  Thank you, Your Honor.

17        THE COURT:  All right.

18        MR. GERAGOS:  Thank you, Your Honor.

19        THE COURT:  Let's proceed with the sentencing,

20   then.  And I just want to indicate for all of you the

21   materials that I have received and reviewed.  I do that

22   because I want to make sure that I haven't missed anything

23   that has been submitted for my consideration.

24        As you know, I presided over the trial that

25   resulted in the conviction in this case, so I'm familiar

1  with the charges.  I'm familiar with the evidence.  And I

2  also presided over the forfeiture proceedings that arose

3  from this case.  So I have that background going in.

4          In terms of the new material that I have received

5  and reviewed, of course, I carefully reviewed the guideline

6  presentence investigation report that was prepared by

7  Mr. Manross on March 7th.  That report was revised on

8  March 29th.  There's also an addendum to that report in

9  which Mr. Manross carefully goes through all of the

10 objections that were made to the report, and then he details

11 his response.

12         There are also a number of attachments to the

13 report, one of which was the document that Mr. Geragos

14 refiled on the docket and provided to me just earlier.  I've

15 carefully reviewed that document as well.

16         In addition, I have reviewed Mr. Dermen's

17 sentencing memorandum.  That's number 1412 on the docket.

18 Attached to that memorandum are a number of letters from

19 Mr. Dermen's family, business associates, religious leaders,

20 and community members attesting to Mr. Dermen's

21 philanthropic activities, his dedication to the community,

22 and his family associations, and how he cares for his

23 children.

24         I have also reviewed the government's position on

25 sentencing.  That's document number 1410 in the docket.

1           Then there was a late filed character letter that

2     I received just this morning from Mr. Dermen's son George.

3     I've also reviewed that.

4           And then finally, earlier, on March 24th of this

5     year, after many pretrial proceedings, I issued a

6     preliminary order of forfeiture in this matter.

7           And I suppose one thing we'll need to discuss is

8     how to handle any objections, Mr. Geragos, that you may have

9     to that order, but I suppose we can address that now or in

10    your presentation.

11          MR. GERAGOS:  In the presentation is fine.  I can

12    do it all at the same time.

13          THE COURT:  Okay.

14          All right.  Have I missed anything that has been

15    submitted for my consideration?

16          MR. GERAGOS:  No, you have not, and I appreciate

17    the laundry list.

18          MR. ROLWING:  Not from the government.

19          THE COURT:  All right.

20          Mr. Geragos, have you and Mr. Dermen reviewed the

21    guideline presentence investigation report in this case?

22          MR. GERAGOS:  Yeah.  And I should tell the Court

23    that much of it -- and this is not a criticism, just an

24    observation -- is a cut and paste from previous government

25    filings that I've gone over extensively with Mr. Dermen.  So

1    yes.

2              THE COURT:  Okay.

3              Well, what I would like to do, then, is to turn

4    our attention to the guideline calculation that's contained

5    in the report.  As we all know, in the federal system my

6    analysis of a sentence has to begin with an accurate

7    calculation of the Federal Sentencing Guidelines.  Then once

8    I have that, there are a number of other factors to be

9    considered under Section 3553.  But I need to begin with the

10   guideline range.

11             So the guidelines consist of two parts.  The first

12   part is the offense level computation, which takes a look at

13   the charges that the jury convicted Mr. Dermen of, and then

14   those are assigned point totals based on the

15   characteristics.  And then the second part of the sentencing

16   guideline looks at a defendant's criminal history, and point

17   totals are assigned to prior convictions.  Then the

18   combination of the criminal history score and the offense

19   level yield us a guideline range.

20             So there were ten counts that were at issue at

21   trial in this case.  Counts 1 through 10 were money

22   laundering and fraud counts.  The jury returned a conviction

23   on all ten counts.  They're grouped for purposes of the

24   guideline calculation.  The base offense level for the

25   charges is seven points.

1          Then because the loss at issue was more than

2     $550 million, there's a 30-point enhancement.  There's also

3     a two-point enhancement because the offense involved

4     sophisticated means.  There's another two-point enhancement

5     because one of the counts to which Mr. Dermen was convicted

6     was under 18 United States Code Section 1956.

7          There's then a four-point adjustment for the fact

8     that Mr. Dermen was considered to be an organizer and leader

9     of a criminal activity that involved five or more

10    participants.  That gives us an adjusted offense level of 45

11    points.  And because the guideline range goes only to 43

12    points, two of those points are removed, and we're left with

13    a total offense level of 43 points.

14          Are there any objections to that calculation?

15          MR. GERAGOS:  Yes, there is.

16          THE COURT:  Okay.

17          MR. GERAGOS:  Briefly.  I think there's a

18    controversy right now, as the Court is well aware, about the

19    points under the Sentencing Guidelines based on the amount

20    of money.  I know that the Sentencing Commission is looking

21    at that.  I know that that is the subject -- or it has been

22    the subject of several judicial conferences, and in Congress

23    as well as to whether or not it's completely overstated.

24          I would argue here, and I want to make the

25    objection that it is completely overstated.  The idea of

1    adding -- whatever it is -- 30 points based on

2    500 million -- which is not attributable -- and I'll invoke

3    Mr. Rolwing's term, no fingerprints of Mr. Dermen at any

4    point -- that that unduly speaks to the calculation and the

5    information that the Court considers.

6            You know Mr. Agnifilo had mentioned earlier that

7    we're in a pre-Booker era back when people used to eat

8    grass.  Actually that quote is from his senior partner, who

9    I've heard utter it.  So I want to give attribution to Ben

10   Brafman, but my belief is that the calculations, when they

11   are overstated like this and to this degree, make no sense

12   whatsoever.

13           I would just cite to the fact that I think the

14   worst sentence that has happened during the insurrection in

15   Washington, D.C., I think the worst sentence that's been

16   imposed is seven years.  And now we're talking about a

17   nonviolent crime -- white-collar crime, and we're starting

18   at an offense level of 43 or 45, only because the 43 is

19   where you max out.  That points out exactly -- and I want

20   the record to be clear.  That points out exactly what the

21   people who are saying that the Sentencing Guidelines are

22   wrong have been arguing and would be the subject of, I

23   think, potentially, future motions if, in fact, what happens

24   is that there's either a safety valve that gets enacted or

25   they say that you've got to recalculate.

1         THE COURT:  So, Mr. Geragos, I guess that raises

2    the question -- you've indicated a general dissatisfaction

3    with the way the guidelines are currently set up and with

4    the 30-point enhancement, but my question to you was more

5    narrow.  It wasn't do you disagree with the guidelines

6    themselves.  It was is this calculation correct under the

7    guidelines that are currently in effect.

8         MR. GERAGOS:  No, because I think it overstates --

9    I think giving him the 500, which is attributable to Jacob,

10   is, I think, an overstatement as a matter both factually and

11   legally.  I don't think that you can do that, I don't think

12   you should be able to do it, and that's my objection.

13        THE COURT:  Just so I'm clear on your objection,

14   your objection is that it would only be appropriate to

15   figure out -- to not take the total loss occasioned by the

16   conspiracy, but to only look at the loss that can be

17   directly traced to Mr. Dermen?

18        MR. GERAGOS:  Correct.  Notwithstanding whether or

19   not we believe there was intent or anything else, the jury

20   made that finding.  I'm saying that if you can't attribute

21   it to the defendant, you can't just bury the defendant under

22   the guidelines.

23        THE COURT:  Okay.

24        Any response, Mr. Rolwing?

25        MR. ROLWING:  We believe the guidelines are

```
 1   correct.  And it sounds to me like that's another appellate
 2   argument he wants to bring.  We believe they accurately
 3   represent the financial crime and the loss associated with
 4   his conduct, and are correctly computed.
 5            THE COURT:  All right.
 6            I'm going to overrule the objection.  I think the
 7   guidelines are what they are today and I'm not in a position
 8   to prognosticate what might happen to them in the future or
 9   to come up with my own set of guidelines that would be more
10   fair.  I think I'm bound to follow the guidelines that are
11   duly promulgated and that are now in effect.
12            Any other objections to the guideline calculation?
13            MR. GERAGOS:  Just one moment.
14            No.  The only other one was that -- you know,
15   along those lines, under Apprendi, without the jury making a
16   finding as to the loss, that that is an impermissible
17   imposition of the guidelines.  So I want to make sure the
18   record reflects that.
19            There was, as I remember -- I was just asking
20   Ms. Qassim, but I don't believe the jury was asked to make a
21   factual determination as to the amount of the loss.  Absent
22   that, I don't think that, under Apprendi, we can impose an
23   off the charts guideline.
24            THE COURT:  Okay.  Well, that objection is
25   preserved, but also overruled as well.
```

1            So let's turn to the criminal history part of the

2    guideline calculation.  Mr. Dermen has criminal convictions

3    that result in a subtotal criminal history score of two.

4    That places him in criminal history category II.

5            I know you've made some argument that the criminal

6    history score overstates his criminal history.  I don't know

7    if that's more appropriately something you would argue as a

8    3553 factor or whether that suggests that the calculation

9    itself is incorrect.

10            MR. GERAGOS:  I think both actually.  I actually

11    have handled the matters that ended in a hung jury and a

12    dismissal in one case and an acquittal in another case.  And

13    I handled the court trial in the one matter that is cited,

14    that is a misdemeanor, and it does not, I believe, for

15    purposes of the guidelines, does not affect the criminal

16    history.

17            So I think, number one, it overstates.  And his

18    only conviction that I'm aware of, and I've been handling

19    these things for decades, is a one misdemeanor count with no

20    jail time, and what was called summary probation.  I don't

21    think that that pushes him into any criminal history

22    category.  There's no upward movement under that.

23            THE COURT:  I mean there are two convictions on

24    the report that have a point total associated with them.

25    There's a reckless driving charge from 2003.  And then

1  there's a misdemeanor battery charge out of the Superior

2  Court of Los Angeles in 2012.

3          MR. GERAGOS:  Right.  The reckless driving, as I

4  remember -- I don't have the report in front of me -- is

5  that listed as a 23103?

6          THE COURT:  Let's see.  Reckless driving, Superior

7  Court of Los Angeles, Metro.  It just says ten days jail or

8  fine, a 36-month term of probation.

9          MR. GERAGOS:  Correct.  And I believe that that is

10  not a DUI, that that is a -- and the ten days, what happens

11  in California is the minimum fine is $360.  You get $30 for

12  each day in custody.  So you can either pay the 360 or do

13  ten days in custody.  That's the only significance of that

14  order.  It is a driving offense, and I don't believe it

15  qualifies as a conviction for purposes of the guidelines.

16          The other one, the battery, is the one I was

17  referring to, which I do believe should be -- they can take

18  a look at it, but the battery also, I think, produced only a

19  summary probation and is not something that should enhance

20  under the guidelines for purposes of criminal history.

21          THE COURT:  Mr. Rolwing.

22          MR. ROLWING:  I believe the presentence report

23  also reflected that there were counts charged for driving

24  under the influence that were dismissed as a result of a

25  plea to reckless.  So it was a DUI related offense.

1          It doesn't matter at the end of the day, given

2     that he's looking -- he's in the level 43, and it moves him

3     from life to life, category I, category II, but we believe

4     the criminal history category is accurately computed.

5          THE COURT:  Do we agree that he's in the same

6     guideline range regardless of which criminal history

7     category he's in?

8          MR. GERAGOS:  Yes, Your Honor.

9          THE COURT:  Okay.  Then I believe, under the

10    rules, that I'm not required to rule on that objection

11    because it makes no difference.

12         MR. GERAGOS:  I agree.  And I believe under IAC

13    I'm compelled to make the argument.

14         THE COURT:  All right.  Well, your argument is

15    noted, the objection is noted, but I find that it's not

16    something that I need to rule on because it's immaterial to

17    the ultimate guideline calculation.  So whether Mr. Dermen

18    is in a criminal history category of II or I, we're looking

19    at guideline provisions of life.

20         Let me ask you, before I turn the time over to you

21    to make arguments, if there's any objection to anything else

22    contained in the presentence report?

23         MR. ROLWING:  Not from the government, Your Honor.

24         MR. GERAGOS:  To the extent that we've already

25    made, numerous times, arguments that he was not a member or

1    a leader of this, I would incorporate all of those

2    arguments.  I obviously am -- nothing that the government is

3    going to say or that the Court's going to rule is going to

4    change our opinion that he was not a leader.  He wasn't

5    participating to that extent, and I'll get into it.  But

6    there is a formal objection.

7           THE COURT:  All right.  Again, that objection is

8    noted for the record.  But I'm going to adopt the guideline

9    presentence investigation report as submitted, and I'm going

10   to enter a finding that the guideline range in this case is

11   one that yields a life guideline.

12          So with that being said, what I would like to do

13   is turn the time over to counsel to make their arguments.

14   And then after I've heard from counsel, Mr. Dermen, you'll

15   have a chance to address me if you wish to do so.

16          Mr. Rolwing.

17          MR. ROLWING:  Thank you, Your Honor.

18          I will note that paragraph 117 of the presentence

19   report, my co-counsel and I just recognized probably a typo

20   or a mistake.  Paragraph 117, where they're comparing the

21   counts from the second superseding indictment to the counts

22   in the renumbered indictment, Counts 9 and 10 of the

23   renumbered indictment were actually Counts 42 and 43, not 44

24   and 45.

25          THE COURT:  All right.  Well, then I will -- and

1   that's page 37 of the report on the table, correct?

2              MR. ROLWING:  Correct.

3              THE COURT:  I will note that correction on the

4   J&C.

5              MR. ROLWING:  Well, we are here to finally argue

6   for a sentence that should be imposed on Mr. Dermen who, by

7   all accounts, in many ways is a charming individual,

8   intelligent, loving family man, involved in his community

9   benevolent, some of the letters have referenced, mentioned.

10  But as the evidence showed in this case, has another side.

11  And he stands before you convicted on all counts of the

12  second superseding indictment, the renumbered indictment,

13  one through ten.

14         The evidence at this trial the Court is well aware

15  of.  And, you know, the Court has heard my recitation of

16  this now in four sentencings that have taken place over the

17  last two days -- two or three days.  And why has the Court

18  heard the recitation of Mr. Dermen's criminal conduct in

19  those sentencings is because Mr. Dermen preyed on the

20  Kingstons.  He saw his mark.  He preyed on the Kingstons.

21         He used them to build an enormous amount of wealth

22  that was stolen from the United States Treasury.  He did so

23  in a tremendous amount of concealed ways, in surreptitious

24  ways, burner phones, and using all sorts of individuals, and

25  he had the money stashed, for the most part, over in Turkey

1   where we all know he was planning to flee and live out his

2   days with the millions -- hundreds of millions that he had

3   amassed in this scheme.  He changed his name legally in 2017

4   for that purpose, in the midst of the investigation.

5          He was aware, if you recall, of the grand jury

6   investigation into the Kingstons as early as 2014.  He

7   confronted Deryl Leon in March of 2014.  Someone's talking,

8   he's going to talk, he's going to roll, are you prepared to

9   leave the country if they come at us, because they had just

10   stolen 300 million.  Then he confronted Deryl again in April

11   of '17.  Someone's talking.  Is it your wife?  He knows that

12   there's an investigation going on.

13          And then there's grand jury subpoenas issued in

14   July of '14, and he's made aware of those.  And in the face

15   of that, he gets the Kingstons to apply for $170 million

16   more.  It was a license to steal and he did steal the money.

17          He wanted -- if you recall from the trial

18   evidence, Jacob's testimony in that document, he wanted

19   $250 million in 2015.  He wanted them to apply for

20   250 million.  The largest one they applied for before that

21   was around 30 some million dollars.  They were doing that

22   every few weeks in 2013.  But this was in 2015 for the whole

23   2014 year, he wanted $250 million, and Jacob and he settled

24   on 170 million with the breakdown, if you'll remember, in

25   Jacob's handwriting of how much would go to the boys, how

1    much would go to Levon.  And they applied for that

2    170 million, and they got 164 million, all while there was a

3    grand jury investigation going on.

4           He knew the Kingstons were going to get arrested,

5    he knew the Kingstons were going to go to jail, and he

6    wanted to steal the money before they did and go to Turkey.

7           THE COURT:  The Kingstons were boarding a plane on

8    the date of the arrest.  Why was Mr. Dermen still in LA?

9           MR. ROLWING:  The Kingstons were going for a

10   vacation planned by Baran Korkmaz for them in Turkey, as far

11   as the evidence shows.  Mr. Dermen, when the search warrant

12   was executed on the day of his arrest, August 23rd, the

13   agent saw tickets to Turkey in his home.  So

14   Mr. Termendzhyan was on his way to Turkey as well.

15          We don't know when he was going to finally make

16   the move final, but he was there in 2017, if you recall,

17   after the first search warrant from the state that was

18   executed in California, and tried to avoid giving a

19   deposition in that civil lawsuit by claiming he resided in

20   Turkey, and all his businesses were there, and he was taking

21   care of all these businesses in Turkey.

22          So that was the plan he was in the process of

23   fulfilling.  Some witnesses told us he was going to wait

24   until the wedding of his daughter, which happened in the

25   summer of 2018.  We had every expectation that he was going

1    to leave after that event.  He was indicted in August of

2    '18, in part because of that, under seal, and arrested when

3    one of them booked a ticket to Turkey.  It happened to be

4    Jacob at that time.

5            So he almost got away with it.  He really did.  It

6    was an ingenious crime, and I tip my hat to him, because it

7    was an ingenious crime.  It was so sophisticated.  I mean I

8    reflect on it all the time how terrifically it was thought

9    out and executed with the Kingstons and their particular

10   personalities.  And he had them by his pinkie, afraid that

11   they were going to be either arrested or afraid that they

12   would be harmed by he and his cohorts, if he didn't do it

13   himself, and also seducing Jacob more and more into his

14   lifestyle to try and keep Jacob involved in the crime and

15   benefiting from it.

16           And when you say there were no fingerprints, he

17   tried to keep his fingerprints off of the crime.  He did a

18   really terrific job of doing so.  But we had the financial

19   fingerprints.  There is no explanation.  This Court has

20   never heard one to date.  And there will never be any

21   legitimate explanation for why, first, the $72 million of

22   these fraudulent proceeds were paid to him in the United

23   States bank accounts and in the United States on his behalf.

24           But at the trial we also showed that there was

25   another hundred million dollars that went over to Turkey at

1    his instruction to his associate Baran Korkmaz.  And in the

2    end, it was all his, as Jacob testified to.  So he had --

3    our money judgment reflects $181 million of these fraud

4    proceeds were sent out at his direction, and these are

5    financial fingerprints that cannot be denied.

6            We uncovered his actual finger workings of text

7    messages.  We didn't need fingerprints.  We had his text

8    messages to Jacob Kingston on the phone that revealed a

9    great deal.  And as I reflected earlier today in Jacob

10   Kingston's testimony -- in his sentencing, I'm sorry, the

11   exhibit that was so revealing of the text exchange in 2015

12   where they admit to the boys, they admit to the protection

13   regarding Paul Kingston.  There are threats in it.  There

14   was an applause and thumbs-up, and fist pump for filing.

15   There's a reference to burner phones.  It's a synopsis --

16   and thank God we got it -- that showed what was really going

17   on between Mr. Termendzhyan and Mr. Kingston, and it

18   corroborated Jacob Kingston's inside story.

19           So the Kingstons may have been the cause of the

20   arrest on August 23rd, but had they not booked a trip to

21   Turkey, there would have been an arrest of Levon

22   Termendzhyan in the near future.

23           Well, you know, I reviewed Mr. Geragos's

24   sentencing memorandum.  And I don't intend to try and

25   relitigate the trial.  He apparently intends to do so.

1    That's the way I read his sentencing memorandum.  But the

2    most important thing is that Mr. Termendzhyan stands before

3    you today, unlike the prior four defendants who all pled

4    guilty, acknowledged responsibility, even apologized to the

5    Court, asked for mercy, recognized the harm they caused to

6    their families, to the community, to the country, and all

7    regretted it.  That is a stark contrast to where we are

8    right now.

9              When Mr. Geragos, on behalf of his client, says he

10   maintains his innocence and he blames everybody else.  It's

11   essentially what he's doing and he continues to do.  He

12   blames Edgar Sargsyan, Zubair Kazi, Santiago Garcia, Jacob

13   Kingston, The Order, everybody.  He hasn't acknowledged any

14   responsibility.

15             So I don't think it's a very difficult call for

16   this Court to determine that he should be sentenced to the

17   most significant sentence.  That's not a difficult call.

18             Now we've asked for life in prison.  And he's not

19   convicted of an offense that has life as a statutory max.

20             THE COURT:  And that was my question.  So if the

21   statutory max is 20 years, what is your recommendation with

22   respect to how this breaks out?

23             MR. ROLWING:  Well, he's been convicted of, I

24   believe, eight 20-year offenses and two ten-year offenses.

25   And I submit to you that a 20-year sentence concurrent is

1   not sufficient to reach the goals of 3553(a).  It is not.

2             THE COURT:  Well, given his age, 40 years is a

3   life sentence, is it not?

4             MR. ROLWING:  Yes.  So I believe the Court should

5   impose a sentence of 40 or 50 years, consecutive sentences

6   for Counts 1 and 2.  And you could choose one of the 1957

7   counts, Count 10, the Huntington Beach house, as another

8   ten-year offense to reach 50, instead of 180, which is also

9   within the realm of possibilities.

10            I looked at -- I went back and tried to review

11  other big cases, financial white-collar cases --

12            THE COURT:  Has there ever been a life sentence

13  imposed in such a case?

14            MR. ROLWING:  Bernie Madoff got 150 years.

15            Shalom Weiss, who was associated with a

16  $450 million collapse of National Heritage Life Insurance,

17  got 845 years.

18            Frederick Brandau, who was convicted for a

19  $117 million Ponzi scheme, got 55 years.

20            Charles Lewis, 73 years old, got a 30-year

21  sentence for a 40 million Ponzi scheme.

22            The queen of mortgage fraud, Chalana McFarland,

23  who was 41, she got a 30-year sentence for $20 million of

24  defaulted loans.

25            Kyle Kimoto, here in Utah, he made over 12 million

1   phone calls to consumers with weak credit histories,

2   attempted to sign them up for a credit MasterCard, which

3   turned out to be far less than what he promised.  An

4   Illinois federal judge sent him to prison for 29 years and

5   two months and ordered to him to pay 35 million for a

6   $35 million crime.

7            I can go on.  There's many more.

8            Lou Pearlman, for a $300 million Ponzi and bank

9   fraud scheme, 25 years in prison, at age 54.

10           Randall Treadwell, at age 51, for a $50 million

11  fraud, sentenced to 25 years.

12           Garland Hogan, who was the lawyer for Frederick

13  Brandau in that $117 million Ponzi scheme, got 28 years at

14  age 53, while Brandau got 55 years.

15           Bernard Ebbers, age 67, got a 25-year sentence for

16  WorldCom.

17           Jeffrey Skilling, for Enron, at age 55, got a

18  24-year sentence.

19           Steven Warshaw, back in Ohio, at age 43, got 25

20  years for a $959 million scheme.

21           So yes, there have been sentences that have been

22  imposed in this manner, life sentences on criminal

23  defendants who have committed massive frauds and are at the

24  age that Mr. Termendzhyan is today.

25           He stands before you with no remorse, still

1    fighting, contesting, and blaming others, with all of the

2    wrongs that he did for so long and on such a grand scale,

3    knowing that the lives he was involving in his scheme were

4    going to be decimated.

5         Now they were predisposed, and willing, and went

6    along with it, but he knew they weren't being protected, and

7    they were going to go down, and he hoped they would go down,

8    and not he, as he sat on his yacht in Istanbul.  That was

9    his dream and his goal.

10        So, fortunately, he was arrested and detained by

11   this Court, faced trial, and got a fair trial, and was

12   convicted by the jury here.  The evidence is, and was, and

13   will always be overwhelming for Mr. Termendzhyan, even

14   though he tried.

15        The prosecution and the witnesses provided

16   overwhelming evidence of his leadership in this scheme,

17   whether it was from Joshua Wallace, Branden Morrissey, Kat

18   Pattison, Jacob and Isaiah Kingston, even his own people,

19   Dan McDyre, who didn't want to testify against -- or in the

20   trial against Levon Termendzhyan.  Porter from California,

21   who didn't want to testify in the trial against Levon

22   Termendzhyan.  They provided evidence which was highly

23   incriminating of Mr. Termendzhyan, and without a doubt

24   proved his involvement in this grand fraud and money

25   laundering scheme to Turkey.

1          If you recall McDyre's preparation of the resume

2     in 2013 and in 2017, in his consultation with just Levon

3     preparing it, where Levon was claiming he owned all that was

4     sent to Turkey, and of course that was true.  And he still

5     sits here and does not admit it, denies it, and claims that

6     for some reason when he was buying biodiesel from the

7     Kingstons, who made poor biodiesel, he was just the

8     recipient of $180 million.  Even though he should have paid

9     for the biodiesel, they paid him $181 million.  No

10    explanation will ever be able to be given for that.

11         So we ask at the end of the day, despite all of

12    his terrific qualifications and characteristics as a human

13    being on the one side, that the other side of him was

14    revealed in this courtroom.  He should be held accountable

15    for it.  We ask that a sentence be crafted in a consecutive

16    manner for Counts 1 and 2, and another of the 1957 counts,

17    whether it be the $483,000 he texted to Jacob, send it to my

18    Guaranti bank account in Turkey and make sure you write

19    waterside mansion -- the VAT for the waterside mansion,

20    that's Count 9, or Count 42 in the original indictment, or

21    the $3.5 million wire transfer for the purchase of the

22    Huntington Beach residence.

23         And if you recall the evidence, Jacob Kingston and

24    Levon filed this claim for 170 million on February 12th,

25    2015.  Levon sends the we are the best text message.  The

1    money comes in in March, and Jacob immediately texts Isaiah

2    I'm going to go to LA and talk with Levon about the plan.

3            When he goes to LA, the next text message Jacob

4    sends Isaiah is wire 8.5 million to SBK Holdings U.S. in Los

5    Angeles.  That gets wired the next day to Los Angeles, and

6    within three days Mr. Termendzhyan wires 3.5 million of that

7    money to buy the Huntington Beach mansion, and he puts it in

8    the name of Gilbert Island, a trust that he and his brother

9    Grigor share, and then they secure it by a so-called

10   mortgage from SBK Holdings U.S. so it looks like it's been

11   the subject of some loan.

12           So it's that offense that could be another ten

13   years if you wanted to go to 50 years.  But we believe that

14   a 40- or 50-year crafted sentence is the right result for

15   Mr. Termendzhyan.

16           Does the Court have any other questions?

17           THE COURT:  I suppose, based on your

18   recommendation -- I was a little confused by your sentencing

19   recommendation when you requested -- let me make sure that

20   I've -- here it is -- you requested a term of life

21   imprisonment and 36 months of supervised release.

22           MR. ROLWING:  Is that right?

23           THE COURT:  You did.

24           MR. ROLWING:  Well, that was oversight.

25           THE COURT:  It's internally inconsistent.

1              MR. ROLWING:  I apologize for that, Your Honor.
2       That was an oversight.
3              So I do not -- quite frankly, this is the first
4       time I've ever recommended a sentence of this magnitude.  I
5       don't know if 36 months of supervised release is
6       automatically part of any sentence -- federal sentence, even
7       if it is life.  I don't know.  But with the First Step Act,
8       and if it is 40 or 50 years and Mr. Termendzhyan lives a
9       long life and outlives the sentence, I would suggest that 36
10      months of supervised release would be appropriate, since
11      he's not been convicted of an offense that has life as a
12      statutory max.
13             So whether that is an oversight or not, I don't
14      know the answer whether it legally applies, but it would be
15      the safer course in the event that Mr. Termendzhyan outlives
16      such a sentence.
17             THE COURT:  I suppose I could ask probation, since
18      you're making the argument.  Is the 36 months of supervised
19      release mandatory?
20             MR. MANROSS:  Your Honor, it's not mandatory.  But
21      I think, as the government has suggested, if he is to
22      receive a compassionate release at some point, it may be
23      helpful.
24             MR. ROLWING:  If there are any other particular
25      questions regarding Mr. Geragos's arguments about the

1    evidence and the trial, I'm happy to address them, but I

2    believe that to be not the reason why we're here.

3                THE COURT:  Thank you, Mr. Rolwing.

4                Mr. Geragos.

5                MR. GERAGOS:  Thank you, Your Honor.

6                The idea that somehow we can't go to life, but we

7    want 50 years for a man who's -- what are you now, 57 -- is

8    57 years old, as somebody who's a couple years ahead of

9    that, it's almost farcical.

10               Let me correct a couple of things, which we've

11   never -- we've never gotten an answer to.  As I sit here,

12   it's amazing to me that -- you know, I heard Mr. Agnifilo

13   talk about the fancifulness of the CIA.  I heard Mr. Rolwing

14   talking about the fact that somehow my client was the person

15   who was -- in response to your question -- that Mr. Kingston

16   was just taking a family vacation.  I've never -- I don't

17   know about you, but I've never booked a family vacation

18   where we buy a one-way ticket.

19               I've also, by the way, never gone on a family

20   vacation where I have my wife get in a separate TSA line so

21   that the two of us are separate, and I've never -- not

22   having three wives -- I've never left two of my wives behind

23   after I just sold $6 million of my assets to get to Turkey.

24               And, by the way, one thing that has been

25   conspicuously absent is my client -- I'll repeat again -- he

1    went voluntarily to the office of the IRS.  That's where

2    they arrested him.

3            THE COURT:  So, Mr. Geragos, I acknowledge that

4    your client, for example, went voluntarily to the IRS

5    office.  What I'm struggling with is I'm here for

6    sentencing.  We had a trial and the jury entered a

7    conviction.  And it sounds like you're essentially saying

8    the jury got this wrong and my client is innocent.

9            MR. GERAGOS:  I understand in the post eating

10   grass, the post Booker era, that you're supposed to stand up

11   here and say woe is me, I want my three levels for

12   acceptance.  We don't.  And I don't say this begrudgingly,

13   and I'm not trying to be flippant.  No.  I will go to my

14   grave saying they didn't prove it, that that jury got it

15   wrong, and I don't blame them because they were in the midst

16   of a panic, and I understand that.

17           I mean they were sick sitting in the jury room.

18   They had already been interrogated by us, at my behest,

19   because they had a flaming defendant's chair pasted to their

20   jury deliberation room.  He was plucked out of Los Angeles

21   at the IRS office as a brown Armenian guy and brought to

22   Utah where he had been, I think, three times before in his

23   life.  He's been characterized in ways that bear little or

24   no resemblance to who he is and who he's been for 50 some

25   odd years.

```
 1              He's got kids.  He's got grandkids.  He sat in
 2    custody in a paleaceous place for close to, what, three
 3    or -- five years I guess -- coming on the five-year
 4    anniversary.  He's missed his father's funeral.  He's missed
 5    the birth of two grandchildren.  And he's maintained his
 6    innocence all along.
 7              And, by the way, I don't want to be one of those
 8    guys who's vouching, but the trial itself was anything but
 9    overwhelming.
10              And, by the way, whatever happened to the --
11    there's been at least four agents who have been --
12    government federal agents who have been convicted out of
13    this, every single one of them connected to Edgar Sargsyan.
14    This guy sued Edgar Sargsyan.  We know that because he was
15    in a trial.  They've put in the videotape.  They now have
16    tried to turn themselves in knots to get around that.  A guy
17    who they -- as I indicated before in the motion for
18    continuance, Mr. Rolwing had testify in front of the grand
19    jury here in Salt Lake.  And the infomercial about Sargsyan
20    as tell me about your law practice, blah, blah, blah.  The
21    guy wasn't even a lawyer.  He paid somebody to take his
22    exam.
23              And then the one overreaching thing, do you think
24    that Jacob Kingston was tipped off?  Is that incredible?  Do
25    we think it's incredible that Jacob Kingston was tipped off
```

1    that they had an indictment?

2            Well, I'll tell you one compelling thing that has

3    been noticeably absent.  We've never gotten to the bottom,

4    have we, of who tipped off Jacob Kingston a week in advance

5    of the search warrant being executed at Washakie, and tipped

6    them off so that they knew that Rachel, Ma Barker, Kingston,

7    and -- what's her name -- Sally could destroy documents, and

8    then come in here and filter documents to the government at

9    the same time.  How in the world -- there's only two places

10   that could have leaked that search warrant.

11           Did they get to a federal judge or magistrate?  I

12   doubt it.  I think that's way too fanciful.  I share your

13   disbelief about that.  So I don't think the clerk of that

14   federal magistrate who signed the search warrant for

15   Washakie picked up the phone and called.  I think it was

16   somebody in the IRS.  And why do I say that?  Because the

17   call came from Ogden, Utah.

18           And, by the way, in all of their MOIs, where is

19   the -- where's the question and the answer to Jacob, or

20   Isaiah, or Sally, or Rachel, who tipped you off that the

21   search warrant was coming in weeks and you could deep-six

22   all the stuff?  I thought you said that it was Levon who was

23   the umbrella protection.  Well, if he was the umbrella

24   protection, why was he sitting in an IRS office when, in

25   fact, these guys were at the airport.

1              THE COURT:  And, Mr. Geragos, those are all

2    interesting questions.  What I come back to is you follow

3    the money and it leads to your client.  The text messages,

4    the other documentary evidence at trial I believe supports

5    the jury's verdict.  So I'm struggling to know what to do.

6    I mean this is a sentencing.  It's not a motion for a new

7    trial or --

8              MR. GERAGOS:  The reason I struggle -- and I get

9    it -- is because he didn't do it.  And I'm not going to sit

10   up here and be inauthentic with you and say, okay, woe is

11   me.  He apologizes.

12             What is characterized as the documentary evidence

13   is just as easily interpreted as somebody who's investing

14   money in Turkey because he's planning -- you know, they keep

15   talking -- another thing that we keep talking about, this

16   thing all exponentially exploded once he met Mr. Dermen.

17             Well, we have the uncontroverted, unrebutted

18   evidence during the trial that Kingston was operating a

19   number of other conspiracies that had nothing to do with

20   this guy.  And we have the uncontroverted, unrebutted

21   evidence that it was Paul Kingston feeding his fat face --

22   speaking of text messages, you remember that -- with Jacob's

23   silver spoon.  That's what happened here.

24             I mean they can talk about he met Levon, and maybe

25   Levon's lifestyle -- which, by the way, 20 years before

1    predating and ever meeting Jacob, he had the same lifestyle.

2    This guy has been a flashy LA guy for as long as I've known

3    him, for 25 years.  He's always had nice cars.

4         By the way, the Bugatti they keep talking about

5    the government had in 2017.  It was returned by the

6    government to Mr. Dermen in 2018.  The judge had that.  The

7    car was in federal custody.

8         So this idea that somehow this was all

9    orchestrated by Levon is belied by the facts.  The facts are

10   Jacob Kingston wanted to get out from under The Order.

11   That's what his brother says.  His brother -- and, by the

12   way, on cross-examination, I had to pull teeth, and he

13   finally came through that he was getting this from Jacob,

14   all of the text messages.

15        Did the money go to things that they now claim

16   were Levon controlled?  Well, I'll tell you what happened

17   during this trial.  Remember what happened?  Sally Kingston

18   was calling up the people in Turkey, and texting them, send

19   me my money.  I need the money.  Jacob is in custody.  We

20   need the money.  Well, was Sally in cahoots with Levon?  No.

21   So I don't know.  I'm with you, I struggle.

22        I get up here and I say they want 50 years.  Okay,

23   I get it.

24        By the way, a number of those cases they mentioned

25   to you were reversed, most notably the Enron case, rather

1    famously, by the United States Supreme Court.  So they can

2    cite you cases all they want, but I would just tell you that

3    you already articulated today that you don't know the

4    circumstances of a bunch of cases that had no relationship

5    to this case.  You do know what the sentences were in every

6    case that was related to this case, and nobody got 50 years.

7          Jacob Kingston, who clearly by any stretch of the

8    imagination was a fraudster before, during, and after

9    meeting Levon.  You know, they talk about, well, Lev pulled

10   out of it at a certain point.  No.  Jacob had his mind made

11   up.  Jacob was the mastermind, and now he's had his come to

12   Jesus moment.  And I get it.  He's not the first.  He's

13   certainly not going to be the last person who is in custody.

14         But there's a lot going on when you've got the

15   government putting pressure on you.  A friend of mine used

16   to say the only difference between the government and the

17   Mafia is that even the Mafia spares the women and children.

18   That wasn't the case here.  The government took Kingston's

19   wife, they took Kingston's brother, who's -- I think I share

20   your read of Isaiah -- and they took his mother, who's 67

21   and got seven years yesterday, which is a substantial

22   sentence.

23         But, remember, Rachel Kingston was a -- if there

24   was anybody who left her fingerprints everywhere on this, it

25   was Rachel Kingston.  Rachel Kingston, if you read our

1    report, our PSI report, which obviously you have, was here.

2    She was in the middle of it.  As you pointed out, her

3    husband, I guess, did not write -- I don't have access to

4    her PSR, but I listened to you and you said her own husband

5    didn't write a letter.  That ought to speak volumes --

6            THE COURT:  He did write a letter for her.

7            MR. GERAGOS:  Did he write a letter for her?

8            THE COURT:  He wrote one for her and Isaiah, not

9    for Jacob.

10            MR. GERAGOS:  Not for Jacob.

11            So I don't know what the dynamic of that is.  I

12    can only guess.  But I will tell you the idea of my client,

13    at age 57, with the cardiac trouble and everything else, and

14    all the milestones in his life that he's missed, and the

15    fairly unblemished record, contrary to what everything was

16    portrayed to you, 50 years is just incredulous.

17            And I mentioned before, you can go and break into

18    the capital and commit an insurrection, and the worst thing

19    that's happened is seven years.  Do I compare this to that?

20    Yeah, I do actually.  I mean we can talk about what happened

21    here.  But has anybody ever asked the question how does a

22    one-page form out of the IRS, where somebody just signs

23    it -- which is actually a lot easier to do than the one-page

24    form when you're filing a 1040 -- how do you just write

25    checks for $100 million if the IRS -- unless something else

1    was going on?

2            And I would submit to you we don't have an answer

3    to who tipped them off.  We know, I would submit, that the

4    evidence is clear they knew that they were going to get

5    arrested, which is why they fled.  And clearly he didn't

6    know because if you know that you're going to get arrested,

7    where's the last place on earth you're going to be?  The IRS

8    office in Los Angeles, California.  And that was where he

9    got arrested.

10           So I understand the government's position.  It's

11   embarrassing because the OIG is investigated, the DOJ, the

12   convicted Homeland Security agents.  They convicted a San

13   Francisco FBI agent, by the way, Broumand.  Back when we had

14   a joint defense agreement, Jacob -- this kind of fanciful

15   belief that Mr. Agnifilo characterized -- well, we were told

16   that Jacob knew that there was a corrupt San Francisco agent

17   before there was ever any public disclosure of that.  We

18   knew that.

19           In fact, when Broumand got arrested, the first

20   question I asked Ms. Qassim was don't tell me this guy was

21   in San Francisco, because then maybe Jacob is not as crazy

22   as he sounds.  Maybe he's crazy like a fox.  Maybe there's

23   something else going on here.

24           And you'll remember during the forfeiture

25   proceeding, the government came in on day five and basically

1    shut us down when I started talking about the CIA.  And, you

2    know, it's ironic because I went back and I found a

3    picture -- and maybe I'll mark it here -- but I've got

4    Korkmaz and the ex-CIA director with a giant check.  And

5    I've got Levon with his arms around the ex-CIA director,

6    Mr. Woolsey.  I'll mark those as Defense A and B, and submit

7    this to the Court.  But there's obviously more going on

8    here.

9            I don't mean to be like one of those -- you know,

10   we have a term in California which mirrors the code section

11   for somebody who's a danger to themselves or others, which

12   is called 5150 -- and I've seen my share in 40 years of a

13   lot of 5150s -- but the depth and breadth of the corruption

14   that was going on.  Down to the day after this trial, the

15   key witness, Kazi, filed a lawsuit saying the government had

16   betrayed his deal that he had.  And the text messages, which

17   I supplied to your Court, with Wally McMahon from LA Best

18   saying we got all of Levon's money, and all of that.

19   There's just a lot more going on here.

20           What's a good sentence?  What's the appropriate

21   sentence?  I don't know.  I leave that up to you.  Does he

22   deserve more than Jacob Kingston?  Why?  Because Jacob got

23   up here and basically used Levon as a proxy for what The

24   Order was doing for him?  I mean every single thing that

25   Jacob Kingston testified to -- Levon searched me.  Well, it

1    turns out we asked another witness, Jacob searched him.

2    Levon did this and promised me an umbrella.  Oh, wait a

3    second.  The other witnesses said Jacob had an umbrella.

4    Commissioner Gordon, that had nothing to do with Levon.  And

5    yet Commissioner Gordon -- and at the same time that

6    somebody is tipping him off from Ogden, Utah.

7            So I understand it.  I get it.  We're not

8    accepting responsibility because he didn't do it.  If I had

9    a nickel for every innocence project case or parole hearing

10   that I've done where somebody refused to acknowledge and

11   later turned out they were innocent, whether through DNA or

12   something else, I wouldn't be standing here.  But there are

13   times where there is a built-in tension under the sentencing

14   in the federal system.  I mean in the federal system it is

15   geared towards you just singing the script and the tune that

16   the government wants you to.

17           I know that Mr. Rolwing predicted that I would

18   talk about the homework he gave Mr. Kingston, whether it was

19   bad Rich or good Rich.  Yeah, but the reason for that is

20   because there were times -- and we even had a witness on the

21   stand, you might remember -- I forget the gentleman, but one

22   of the cooperators who said Mr. Rolwing was yelling at him

23   because he didn't get what he wanted.

24           Jacob Kingston is smart enough -- he's a Ph.D.,

25   unlike my guy who I don't even think graduated from high

1    school.  Jacob Kingston is smart enough after 20 meetings
2    with the government to tell them what they want to hear.
3    He's smart enough to know that at a certain point, in order
4    to save his mom and his wife, he's going to have to give the
5    government what they want.  He's smart enough to say, okay,
6    I give up uncle.  And he's smart enough to know at a certain
7    point blame Levon, blame Levon for everything and that will
8    set you free.

9         Your Honor did not exactly set him free.  You gave
10   him what the government requested.  I would ask you not to
11   give Mr. Dermen what the government requested.  I think that
12   would be an ultimate injustice.  He is not a man who
13   deserves it.  He's been a character at some times in this
14   courtroom.  I hear things and it just doesn't jibe with who
15   I know and who I've known for 20 years, and who has gone
16   through and been falsely accused in the past, and been
17   vindicated, frankly.

18        I get it.  He's been convicted.  I'm the last guy
19   who's going to throw bric-a-brac at the criminal justice
20   system.  That's my religion is the justice system.  That's
21   my altar as I stand here on Good Friday and talk to you.
22   I'm the biggest proponent of the system, but sometimes the
23   system doesn't get it right.  And that's not a reason to
24   impose or to ignore what are the most fundamental human
25   characteristics of him.  And a 50-year sentence, which is

1    equivalent to life, on a nonviolent case, where, mind you,

2    the evidence -- you can talk about the documentary evidence,

3    but I think that they speak to two different

4    interpretations.

5            And I get where you are in terms of sentencing,

6    but I would implore you, give him a sentence that he can

7    live out, and in the interim, I'll make my way to the Tenth

8    Circuit.

9            THE COURT:  To the Tenth Circuit.

10           MR. GERAGOS:  Exactly right.  Nothing would make

11   me happier --

12           THE COURT:  I would expect nothing less from you,

13   Mr. Geragos.

14           MR. GERAGOS:  I understand, Your Honor.  And I

15   don't mean this personally, but I look forward to coming

16   back here with a positive result from the Tenth.

17           And on a personal note, I want to thank you,

18   because I have enjoyed my time here, and I have enjoyed --

19   even in spite of the fact of the result -- your

20   thoughtfulness and your ability to hold both sides to

21   account.  And I think your genuine humanity is not something

22   I find a whole lot in this day and age, and I appreciate

23   that.  I mean that.

24           THE COURT:  Thank you.

25           Mr. Rolwing.

1              MR. ROLWING:  Just a few things, Your Honor.

2              Mr. Geragos just mentioned the documentary

3    evidence, and he also mentioned that Jacob Kingston was

4    smart, a Ph.D., and Mr. Termendzhyan just a high school

5    graduate.  But let me remind the Court of this piece of

6    evidence, which I think is so striking and is so telling of

7    who's the smart one and who's responsible.

8              Government Exhibit 6-79 is a series of invoices

9    Levon Termendzhyan sent to Jacob Kingston for Viscon of $625

10   a gallon, in October of 2015.  $625 a gallon.  390,000

11   gallons were delivered under this and invoiced at $625 a

12   gallon, in October of '15.

13             When Dan McDyre, if you recall his testimony about

14   this, took the stand and he said that's crazy.  $625 is not

15   what Viscon sells for.  Mr. Termendzhyan asked me to go

16   collect this and I reduced it all the way down.  And we saw

17   the exhibit, Government Exhibit 19-6.  In April of '16,

18   Mr. McDyre has reduced it to $62 a gallon, much more in line

19   with the going rate of this Viscon at that time.

20             But if you go back to see what Mr. Termendzhyan

21   was up to and how smart he was, what he was doing in October

22   of '15 by getting Jacob Kingston to agree to buy this Viscon

23   fuel additive at $625 a gallon, 390,000 gallons, if you

24   multiply that -- and I have my calculator here, 625 times

25   390,000 gallons, $243,750,000.

1          If you recall, at trial we had this little easel

2    up here, and Dan McDyre wrote that up here -- or Arthur or I

3    did -- it was written on the easel, $243,750,000 in October

4    of '15.  Who was the smart one who figured this out?

5    Mr. Termendzhyan was charging this ridiculous -- ridiculous

6    fee on Viscon to get this 243 million paid by Jacob Kingston

7    because he knew he was going to have Jacob Kingston file a

8    tax return, a claim for refund in the next year, which he

9    did, in January of '16, for 322 million.

10         What is $243,750,000?  About 75 percent of -- it's

11   actually 75 percent of $325 million, and Jacob Kingston and

12   Levon Termendzhyan filed a claim for 322 million in January

13   of '16.  It was all -- this is genius level stuff, designed

14   by Mr. Termendzhyan.  Jacob Kingston did not try and somehow

15   frame Mr. Termendzhyan by giving him 100 million of the 164

16   and then agree to give him 243 of the $322 million claim.

17   That would be just the most ironic framing in history.  No,

18   just give me all this money.

19         Mr. Termendzhyan planned it all, schemed it all,

20   designed it all, and he did so in this sophisticated way

21   with these agreements, invoices, to hide it and shelter it

22   so that it would never be found and he would have a

23   legitimate basis to claim why these payments were being

24   made.

25         And then we saw the settlement agreement that Dan

1  McDyre didn't even know about in April of '18 that

2  Mr. Termendzhyan had Jacob Kingston agree to, that he was

3  going to pay any IRS settlement that ever got paid -- or any

4  IRS claims that got paid, pursuant to the $644 million of

5  claims that weren't, that Jacob Kingston agreed to pay to

6  Mr. Termendzhyan.  Who was in charge and who's leading this

7  billion dollar fraud scam?  This gentleman right here.

8  That's why -- that's why he was convicted.

9        The evidence was undeniable, the financial

10 fingerprints, the documentary evidence, all the witness

11 testimony, even from in his own camp.  That's why he should

12 be sentenced at a level commensurate with his crimes in the

13 grand scheme of things, and the grand scheme of things

14 demands a sentence far in excess of what the cooperating

15 Jacob Kingston got, and that's why we recommend the sentence

16 we did.

17        My colleague, John Sullivan, has a few comments he

18 would like to make.

19        MR. SULLIVAN:  Your Honor, it's been a long

20 journey, and I just want to reiterate what we said at the

21 very end of our sentencing memorandum, which I drafted.

22 Mr. Rolwing took control of the document and he added to it,

23 then I added to it, and he added to it.  We wanted to get it

24 right.  And when we landed the plane, we landed with the

25 sentence that said it is imperative in this case for the

```
 1    court to impose a life sentence.  And the reason we said

 2    that was for what you've been saying throughout all these

 3    sentencing hearings.  We need to defer other would-be

 4    fraudsters from attempting to steal millions if not a

 5    billion dollars from the U.S. Treasury.  We need that type

 6    of sentence in this case for general deterrence.  Thank you.

 7              THE COURT:  Anything further, Mr. Geragos, before

 8    we turn the time over to Mr. Dermen?

 9              MR. GERAGOS:  I can't resist.

10              Mr. Sullivan, my father, when he was a prosecutor,

11    used to have a famous line, if you want to send a message

12    use Western Union.  And I've always wanted to use that in a

13    courtroom and I will for Mr. Sullivan.

14              No.  I would just ask you to do what you think is

15    right, which I know you will anyway.  Thank you.

16              THE COURT:  All right.

17              Mr. Dermen, would you like to address me?

18              MR. DERMEN:  Yes.

19              THE COURT:  It's fine to sit down.  Pull the

20    microphone -- speak with a loud voice so the microphone

21    picks up.

22              MR. DERMEN:  Okay.  Thank you.  Thank you,

23    Your Honor.

24              I want to appreciate you and all this time that I

25    was here, five years.  I might have some stuff that I could
```

1    say.  I already know your five years, and I know that you're

2    the one who can make decisions.  You're supposed to make

3    decisions.  That's your job and I respect that.

4          Just a couple things.  It looks like all this time

5    I'm here, maybe my English is not well, but I know you are

6    missing stuff.  You're missing a lot of puzzles from all

7    these things.  I really don't care today what I'm going to

8    get sentenced with life sentence.  It's okay.  That's fine.

9    There's always law out there that will bring the truth out

10   one day.

11         Saying this, I'm going to go back to exactly what

12   Mr. Rolwing said a minute ago about $600 a gallon of

13   scenario picture -- the Picasso picture he's painting.  $600

14   a gallon is only 18 cents treated gallons.  Eighteen cents,

15   very small amount.  Eighteen cents.  When you treat it, it

16   comes out to 18 cents.  Sometimes when you mix the blend

17   higher on Viscon, you can bring it down to six cents a

18   gallon.  It is not a big amount.  I give them that because

19   he offered me to get three countries, Indonesia, Malaysia,

20   and Singapore, which have very tithing government there.  He

21   never told you that.  That's not going to happen.

22         You know what's going to happen is what to convict

23   me, to paint the picture so I can be the one.  But again,

24   the decision is yours.

25         Now going back to that, it was $50 million each

1    location, each country.  There was going to be exclusivity.

2    I have a contract with them.  He signed a contract.  He

3    breached my contract.  When he breached my contract, I had a

4    lien on his refinery, and his house.  And he said to me, you

5    know, I'm guaranteeing.  All you got, just give.

6         Now we have to buy feedstock, feedstock meaning

7    the raw product that we can make Viscon out of it.  So now I

8    spend money to buy and prepare it for his takeoff.  Then he

9    breached the contract.  He calls back, he says I talked to a

10   couple of ministers in the country -- whoever he's talking

11   to -- who actually had a business problem in Indonesia and

12   Malaysia.  He does have actually a company going down for

13   years.  And I say, okay.  Then I have to blend that

14   $150 million into your per gallon.  He asked me to do that,

15   to blend it into -- into -- at the price of the product.  So

16   when you blend it to price of the product, it becomes to be

17   $680, $700 a gallon, whatever the number was.  Obviously,

18   yeah, it is outrageous.  I'm even telling you that.  Even

19   Dan McDyre said -- I said, listen.  This is the way he

20   wants.  He's the one who's buying it.

21        And I sold not only 600, I sold Viscon for $1,200

22   a gallon.  $1,200 a gallon in India, in Pakistan.  So it is

23   not an outrageous number.  And we did sold -- actually I

24   sell to -- in Texas it's mandatory.  I do sell it in Texas

25   for $84 a gallon, in the United States.  I'm not going to

1   charge -- overcharge the United States.  It's our patent.  I

2   can charge whatever I want to charge.  But it kind of fit in

3   perfectly.  It sounds good in front of the jury.

4           Now you've got 12 people sitting out there, who's

5   depending my life on.  And obviously when you bring a guy

6   who produces it, oh, is this outrageous prices, $600?  Yes,

7   it is.  Of course it is.  I know it is.  Knowingly I've done

8   it.  But it was supposed to be blended into the price.  I

9   did blend it in the price.  He breached the contract.

10          I delivered him 390,000 gallons into Plymouth,

11  Utah.  I don't come to Utah too much.  First time I came in,

12  I had a blood pressure -- high blood pressure.  That's why I

13  could not stay here.  I went back right away.  It was his

14  birthday.  I came in two times -- two or three times max

15  I've been here in Utah.  I couldn't stay any more because my

16  blood pressure is high.

17          Anyway, coming back to this $600 a point.  No, he

18  can only speak what they tell him to speak.  He can only

19  picture the Picasso picture because they tell him put a red

20  color, and white color, and blue color.  He's the painter.

21  He's painting it.  The people are listening.

22          The day we went -- the day he went to his own

23  country, Ireland, with his wife, to talk to Brandon

24  Morrissey, that day he was on the video.  We were here.  It

25  was a magistrate judge, I believe.

1           We went back -- they took us back.  They put us
2   together.  He looked at me kind of weird.  He said you know
3   what?  I've had enough of this BS.  I'm sorry for my
4   language.  And he says to me I don't even want to talk to
5   you.  What's wrong with you, man?  We were just in there.
6   What's wrong with you?  I don't want to talk to you.

7           And about ten minutes later they move me to a
8   different cell -- the next cell, right here in this court.
9   He told his brother, listen to me.  We might not have a
10  chance face-to-face again.  Anything I say, you say, yeah,
11  Levon did it, Levon did it, Levon did it, Levon did it,
12  Levon knew it, Levon knew it, Levon knew it, Levon did it.
13  That's it.  We might never have a chance again.  I heard
14  this.  They both was in custody.  I was in custody as well.

15          So he was training his brother what to say.  And
16  exactly from there on, I called Setara, I says how you guys
17  doing -- flying back.  She says, by the way, he announced
18  that he's going to testify against you.  I said I don't
19  care.  Let him testify against me.  I got nothing to worry
20  about.  Let him testify against me.

21          So I guess that part of $600 was that, and I
22  reduced it.  He came and re-signed the contract with me in
23  August.  Yeah, August, August 13th, 14, on my birthday.  And
24  then about a week later, we got indicted.  And he breached
25  the contract, because January 1st, I was supposed to send

1    ISO tanks.  ISO tanks is the 6,000 gallon of Viscon product,

2    which can blend up to 20 million gallons -- 20 million U.S.

3    gallons, which is 80 million of liters -- European

4    standards.  It was going to go to Malaysia.

5           He had the contract.  Everything was fine.  No

6    problem.  And he had problems.  I said, hey, finish your

7    problems.  I don't want to have anything to do with your

8    problems.  I know they raided you guys, blah, blah, blah.  I

9    want to do nothing with this.  Don't bring me no problems.

10          And now I'm going to go back to tell you exactly

11   what you need to know to figure this out.  And whatever you

12   want to sentence me, you can sentence me.  That's fine.  I

13   have no problem with that.  But whatever is negative in your

14   mind, Your Honor, you need to tell me just straight out.  I

15   can answer all your questions, and you make the decision at

16   the end.  It's your decision.  At the end it's all in front

17   of you.  You are the law today.  You're supposed to do the

18   law -- you're supposed to do the right thing.  Not me, not

19   the DAs like this who represent our country, who represent

20   Washington, D.C.  He should be wearing this, (indicating his

21   jumpsuit), because it will come to that.  He should be

22   wearing this, not me.

23          So I would like to understand what is it you're

24   missing from the get-go so I can open a little bit, just

25   give you a formula, whatever happened.  Imagine I'm sitting

1    on the stand and talking right now.  I don't want you to

2    believe me, anything that I'm saying.  But just you're the

3    law, you have to make the decision, and I respect that.

4           What part are you missing?  I know you're missing

5    some.  As much as I watched you for five years, I know

6    you're missing, sometimes I can see.  I mean maybe I'm

7    gifted, or maybe I'm wrong, but please tell me what are you

8    missing so I can give you exactly what happened so you

9    understand where we at.

10          THE COURT:  Unfortunately, the case was not tried

11   to me.  The case was tried to a jury.  And so to the extent

12   that you believe the jury got it wrong, then Mr. Geragos

13   needs to file a motion asking to set aside the jury verdict,

14   and that's the appropriate forum to consider that.  So the

15   reason we're here today is not to retry the case, but to

16   have you say anything you want that might impact my

17   sentencing decisions.

18          And as I've told Mr. Geragos, I'm kind of in a box

19   today where my job is to sentence you based on the jury

20   verdict.  And to the extent that you think the jury got it

21   wrong, then there needs to be briefing on that.  I'll need

22   to decide that.  And then if you still disagree, you need to

23   visit the court of appeals.

24          MR. DERMEN:  Okay.  Okay.  So can I speak now and

25   tell you what happened exactly so I can finish my sentence?

1          So the only reason I'm telling you these things,

2     Your Honor, I don't deserve that.  I don't deserve it at

3     all.  In 2012, my wife passed away.  Twenty of them came in

4     from Utah, from Kingston family.  In my culture, yeah, I

5     respect that.  So I kind of got in with them, you know.

6     They're just like -- I respected them.  I barely know them.

7     He started selling me -- I mean he started selling me

8     product, to which I had maybe 20, 30 people who can sell me

9     product like him.  It was not really important to me.

10          And all my life I made money.  I had the proper

11    licenses.  I could have done it myself.  If I would have

12    done any fraud through the United States, I would have done

13    it myself.  I don't need to.  I do have existing licenses

14    right now as we speak.  From the IRS, I still have an active

15    license.  I can bill it tomorrow and I still can get the tax

16    credit tomorrow.  But if I don't have no fuel to blame on, I

17    cannot get no tax credit.  I'm not going to fake.  I never

18    faked.  I was a young kid.  I grew up hustling.  I grew up

19    working hard.  I made a successful life.  All my successful

20    life was my -- I lost my wife, I lost my father because of

21    him.  He made me come over here.

22          In 2012, a federal agent came to me.  I was

23    sitting in a restaurant.  How you doing?  I'm like, good

24    looking women, two of them.  Okay.  Can I sit with you?

25    Like you're sitting right next to me.  I mean why would you

1    want to sit with me?  Well, I like to sit with you.  I said,

2    okay, come sit.  Let's see what you want to say.  She said

3    to me, oh, how's Utah.  I'm like what?  Utah?  What are you

4    talking about?  You got something to say, say it to me

5    straight up.  What do you mean Utah?  Yeah, you know what?

6    You're the black sheep in that family.  We want to catch

7    that family since '60s.  Why don't you work for us and let's

8    catch them, because you're the one inside of their family.

9         I said, listen, I don't have a badge.  I can't

10   work for you.  I'm not going to do your job.  You go do your

11   job.  I don't know what you want.  He says, listen to me, I

12   know what he's doing and I know you're involved in this too,

13   and I'm going to set you up if you don't.  I said good luck

14   with that.  I left.  It was a federal agent from the

15   agricultural department -- fraud department.

16        As the time passed by, he came back to me, sold me

17   a batch for about 400,000 gallons, messed up all any

18   locations.  He didn't even finish the product.  He sent it

19   to me raw, later I find out.  And the railcars coming to

20   California.  When it snows here, it's hot in California.

21   It's okay to use in California.  We blend it in.  And one

22   morning I got 20 phone calls, all the truck stops were down.

23   Six, 700 trucks were in the streets.  He says, I'm sorry.

24   How can I make this up for you?  This is Jacob.  I'm like

25   what do you mean, man?  This is grandfather locations.  I

1    can't have this mess.

2           Now I'm paying for tow trucks.  Now I'm pumping

3    the fuels out, giving them new fuels.  I lost 63 percent of

4    the volume of all the locations because of him.  He says

5    I'll make you up with it.  How is he going to make me up

6    with it?  How is he going to help me?  I'll pay for

7    everything, and he paid.  He paid $620,000, I believe.

8           And then I did have a refinery that I didn't

9    finish.  He had the same machine running in Utah.  I had the

10   same one, which at this time I didn't even know him.  He

11   purchased that machine too so he can double his production

12   here.  That was my deal.  And $1.2 million in the beginning

13   that they said came to me.  It was charged to me for that.

14   It was clearly -- clearly refinery product that I sold him.

15   It's BlueTEC technology.  It is a refinery.

16          As the time went on -- me and Baran are close, you

17   know.  I even furnished it to them.  He wanted to do

18   business.  He wanted to do business separate from their

19   family.  He brought his uncle to me -- what was his name --

20   Paul, whatever his name was.  He came to my office to check

21   me out.  I don't even know why, but he came in to check me

22   out.  He told him, yeah, he's a good guy.  After I asked

23   him, he says, yeah, he's a good guy.  I won't mess with him.

24   That's the exact Kingston words to me.

25          Then he said to me, you know what?  I want to do a

1    separate business that my family do not want to know.   I
2    have some money.   I'm keeping it aside.   I want to do
3    business with you.   I want you to know too, I want you to
4    know the truth today, because I'm going to prove everything
5    I say today on record.   That's why I want it on record,
6    Your Honor.
7             So I introduce him together.   At this time, Baran
8    Korkmaz had a company, which was then buying dead companies.
9    I'm not into that.   I like fuel.   That's what I'm good at
10   and that's what I'm going to stick on.   I don't believe in
11   other businesses I don't know how to operate.   I'm not going
12   to get into it.   Did I introduce to each other?   Yes, I did.
13   I said you be careful with him.   Whatever you do, I'm not in
14   this.   You understand?   But if you guys make good money,
15   listen, don't forget me.   There was nothing wrong with that.
16            And I introduced him to him.   They started
17   working.   They made a decision to open up an office in
18   California called SBK Holdings U.S.   So they opened the
19   corporation.   He said you know what?   I don't trust him.
20   Baran says to me I don't trust him.   I said, well, you know,
21   you don't trust him, what can I say?   He says you take care
22   of the funding.   I said how am I going to take care of
23   family?   There is a law firm for that.   Give it to the law
24   firm.   Let the law firm release the money to the client --
25   or get the money back from the client, goes to a trust

1   account.  I can't touch it.  I don't want to touch it.

2   You'll get a report.  I'll introduce you to the lawyers

3   today.  He said but no, I want the company to -- I want your

4   name in there too.  This is what Mr. Korkmaz told me.

5          I put 50 percent my name and 50 percent of

6   Kingston's name.  We started it.  And eventually, months

7   later on, IRS, of course, federal agents, of course,

8   corrupt, one to another.  Corrupt is not even -- is not even

9   the word to say.  But who's going to stop these people?

10  Somebody is going to stop these people.  I am going to stop

11  these people.  It doesn't matter if I give my life to.

12  That's how life rolls.  Maybe this was meant to be to my

13  life.  Maybe that was the -- maybe that's my destiny, but

14  that's what it is.

15         I am going to put him down.  I am going to have

16  him arrested and he's going to put these clothes on, because

17  he's setting me up.  Everyone is setting me up.  Everybody

18  sits out there.  Every agency lied.  Every federal agency

19  made -- they offered -- they put a gunpoint on me for

20  $3 million, a federal agent.

21         Now why you talking about a gun, a badge?  Of

22  course.  Who's going to go against that?  Yeah.  That was LA

23  Best.  They went and got search warrants.  They came.  They

24  seized everything, my tankers.  Sucked the fuel out of the

25  ground.  Shut everything down.  Take the computers that

```
 1   people cannot even operate.  Oh, it's a biodiesel blending.
 2   It's a biodiesel blend.  If you have little bit ratio
 3   problems, if you blend it higher problems, only a violation.
 4   That's the law.  I know the law.  I've been doing this since
 5   I was a kid.  I have 40 years into this.  He's not going to
 6   take it away from me.  No way.  I'm not going to give the
 7   leverage to him.
 8           So he comes in now.  He hits all my locations.  He
 9   takes the computers.  He's not even selling diesel.  He's
10   selling gasoline.  He even takes those computers.  Shuts
11   everything down.  Takes my cars.  Takes my tankers.  Takes
12   everything.  Takes all the money.  And guess what?  Why?
13   Because I didn't do what they wanted me to do.  I didn't
14   work for them.  He said we're going to set you up.  We are
15   going to set you up.  You're not going to go anywhere.
16   You're not going to run.  We're going to get you, and here
17   am I.
18           They brought me to Utah.  He came and he said
19   stories to you.  Several occasions my lawyer tried to get me
20   out.  He couldn't get me out.  He knew that.  He told
21   Sargsyan -- he told Sargsyan he's not getting out.  Don't
22   worry about it.  He's not getting out.  He was right, yeah.
23   He gave them immunity to steal $23 million from U.S.
24   government that you're asking me now.  He stole that money.
25   You know I don't have that money.  You have not even $1 you
```

```
 1   can track me to that.
 2             Verbally you can bring witnesses there who was
 3   getting 20 years.  Now like Kingston, you give him ten
 4   years.  Of course he will say what color paint you want,
 5   white, blue, red, because you're the painter.  You're the
 6   Picasso painter the jury is listening to.  They don't know
 7   what the law is.  They don't know what the biodiesel is.  He
 8   stole $23 million because you give him the license to steal.
 9   He give them immunity, Your Honor.  Now you are sentencing
10   me for the $23 million I don't have.  I'm sorry for my words
11   today.
12             Now coming back to -- this is the interesting
13   part.  2019, I was -- we had a hearing, the magistrate judge
14   hearing, August 13th.  I can never forget that day.  It's my
15   birthday.  I'm a leo.
16             By the way, coming back to my name and last name,
17   I didn't change my last name.  My name is Levon
18   Termendzhyan.  My original last name is Termendzhyan.  So
19   what I did -- not many Americans can pronounce Termendzhyan.
20   It's very hard.  So what I did, I shortened it up,
21   L-e-v-o-n, Lev.  That is a lion also in Russian.  So I
22   start -- they called me out and so I said, you know what?
23   We talked about it.  I'll put my last name in there too.  No
24   problem, because I wanted to shorten it.  I'm not changing
25   my name.  I always use my name also.  I'm going to use both
```

1    names.  There's nothing wrong with that.  I'm not doing

2    anything illegal.  But I've never changed my name,

3    Your Honor.  I never changed it.

4         So August 13th, we come to court.  He's pissed

5    that day.  I don't know for what reason.

6         THE COURT:  When you say he, who?

7         MR. DERMEN:  Uh, uh --

8         THE COURT:  Mr. Rolwing?

9         MR. DERMEN:  Mr. Rolwing, yes.  Mr. Rolwing was

10   very pissed that day.  I don't know.  You know I can see

11   when he turns red, I know something is bothering him.  I had

12   five years, I can -- it's okay.

13        So we come to it -- it was a hearing.  Mr. Geragos

14   is arguing with the magistrate judge and saying you know

15   what, Your Honor, this is not the way it's supposed to be,

16   blah, blah, blah.  You know, they cannot do this to him.

17   And he says you know what, Mr. Geragos, if you really want

18   to get your client out, bring Baran Korkmaz and he'll be

19   out.  Tell him to tell the truth.

20        So I'm sitting there.  Leslie Goemaat was sitting

21   right next to us.  I'm watching them, right?  I'm reading

22   them, what they're going to do.  She had paperwork like

23   this.

24        When Your Honor said, Mr. Geragos, you need to

25   bring Baran Korkmaz into the court, then everything will be

1    proved, that he has the money, or whatever.  The money went

2    to Turkey.  He has control of it.  Because he keeps arguing

3    he does not have the money.  He does not have the money.  He

4    does not have the money.

5         And then Mrs. Goemaat is right on the side, she's

6    covered up, good luck with that.  What do you mean good luck

7    with that?  Can you explain to me what good luck with that

8    means?  They knew he was not going to come.  They did it

9    purposefully to not have him come, because this is the only

10   witness I need.  He would come, he will tell the truth, then

11   you get your money back, if you think I took that money.  I

12   don't need that money.  I never needed the money.  I have

13   money.  I don't need no money.

14        As on the record, you can see, go back, check,

15   before they even shut me down in 2017, when I was running

16   away from government, oh, I flew out Jacob Kingston.

17        No, I did not.  I did not.  I went -- I had a

18   business meeting.  I went.  Simple as that.

19        At that time, Your Honor, on the record, I was

20   making 1.5 to $2 million a month.  You can check my records.

21   But that doesn't fit in.  He does not want to listen to

22   that.  He does not want to listen to that.

23        I bring product from Indonesia, I bring product

24   from Italy, I bring product from all over.  I was buying

25   dollar, 1.50 gallon cheaper than whatever the cost was.  So

```
 1   I was making a lot of money.  Why would I take money?  Why
 2   would I steal money?  Why didn't he bring that up in the
 3   trial by bringing me texts, papers saying, oh, look how much
 4   money you make, but he bumped it up after he took the tax
 5   credit?  No, no, no, no.  What about that two, three years
 6   that I was making million, two million a month?  How come
 7   the jury didn't see that?
 8           This is the problem we have, Your Honor.  The jury
 9   never heard these kinds of things.  They only heard the
10   Picasso pictures, what they wanted to hear.  I never had a
11   chance to talk.  I never had -- I never had the chance to
12   talk.  I was going to get up to testify.  He didn't
13   recommend me.  But today I know it's my life in front of
14   you, and I'm telling you what happened.  They stopped him.
15           As he was walking back after court, Mr. Rolwing,
16   he kind of kicked in the door -- because Setara came back to
17   me and said, hey, you know, Mr. Dermen, we might have a
18   contact with Mr. Baran -- because he stopped contacting with
19   us.
20           THE COURT:  With mister who?
21           MR. DERMEN:  Mr. Baran, Baran Korkmaz.  He stopped
22   contacting me, period.  I mean drop dead.  He was in
23   Washington, D.C. with him.  I would like to check his phone
24   records now.  Maybe he told him to not show up?  I don't
25   know.  The Tenth Circuit will find that out.
```

```
 1              And then he was walking out, he kicked the door,
 2    like, oh, he got fooled.  Just like somebody fooled him.  I
 3    caught Baran in his lies.  It's okay.  I let it pass.  This
 4    is in 2019 -- 2019.  I never knew it would come to this far.
 5    I'm not here to change anything.  All I'm telling you, the
 6    truth what happened.  This is the dead truth what happened.
 7              He wanted to keep away from his family.  He played
 8    the game right.  Maybe I was the fool.  Just like
 9    Mr. Geragos said, maybe I was the good one in the middle to
10    play with.  Because obviously if you look at it, yeah, I was
11    a good one.
12              Now I'm thinking about it.  Now I'm seeing
13    everything coming out.  I don't understand how he keeps a
14    man like this, 20 years of experience.  He should be in
15    jail, or he should do the job properly.  Because I know you
16    are, Your Honor.  I know you are.  I know you are.  Whatever
17    you do, I'm okay with it.  It's this moment in time.  I'm
18    angry.  I'm letting it out now.  You make your decision.  If
19    your decision is 50 years, I'm going to live with that.  I'm
20    going to respect that.  I'm going to respect your court.
21    I'm going to respect everybody here and everybody sitting
22    over here, including my family.  Because at this moment -- I
23    lost my father too -- I got nothing to lose.
24              I want him to feel.  How does it feel?  He's
25    cuffing his hands and your father is in the grave, and I
```

1    cannot go why?  A man gets caught with $8 billion in New

2    York.  They pick him up from Mexico, bring him down.  He

3    gets $250 million bail in New York.  He lives in California.

4    He goes to New York court.  And I can't get a bail.  What

5    was the problem, Your Honor?  What was the problem,

6    Your Honor?  What is the problem, Your Honor?  I lost my

7    father, Your Honor.  But that's okay.

8            Again, I've got to live with this.  And I'm going

9    to put cuffs on somebody's hands.  A lot of federal agents

10   are going to go down.  I know they are corrupt.  I know who

11   they are.  They can't change what it is.  They can't change

12   what it says, the text message.  Did you see how I set him

13   up?  I got him arrested.  I did it for you.

14           Now you got a testimony to do in Utah.  The guy

15   comes, sits down here, who cries for me to help, and I told

16   Kingston to help him, Mr. Kazi.  He helped him.  I end up

17   getting whacked for it, because he didn't -- he promised

18   that he's going to pay in four months.  He didn't pay.  So I

19   went at him.  I say, hey, you need to pay the guy.  The guy

20   helped you.  You need to pay him back.  He didn't ask no

21   interest.  He gave him $12 million with no interest.  Then

22   they put the interest on.  It was $12 million, okay.

23           And Kingston switched the case against me.  And

24   obviously, guess what?  Bravo.  In the jury's eyes, I own

25   SBK, so the money is mine.  Your Honor, the money is mine?

1   No, no, no, no.  This guy is a good actor.  Mr. Rolwing is a

2   good actor.

3        So as far as that goes, Mr. Korkmaz was in

4   Washington, D.C. offering him information.  He does not want

5   to hear.  And all of a sudden he disappeared.  I had no one

6   to testify.  No one.  No one.  Absolutely no one.  No one.

7   No one could get up in there and tell the truth because no

8   one knew.  No one.  If you logically look at it, no one knew

9   about it.

10       He put his people in there.  All of them was

11  convicted persons.  They got ten years, five years by

12  telling them all, you got a statement to make in Utah.  What

13  are you talking about?  What statement?  What is he talking

14  about?  A $100 million of product, they told him that he

15  will get it for $3 million.  Kazi paid $3 million to federal

16  agent's account.  Money going to federal marshal's account.

17  Okay.  So he's going to get it from there.  I'm going to get

18  locked up.  He's not going to get locked up.  $12 million

19  he's not going to pay.  $100 million he's going to get.

20  What?  Whoops.  Was all lie.

21       They set it up, they made it happen, good.  That's

22  why I didn't plea or nothing.  I'm not guilty, Your Honor.

23  And everything -- it's everything in your hands now.  I'm

24  not guilty.  He deserves to get fired from his job, and I

25  make sure I'm going to work that as long as I'm living.

1    Thank you, Your Honor.

2              THE COURT:  Thank you, Mr. Dermen.

3              I would like to take a brief recess and reflect on

4    what I'm going to do.

5              It's four o'clock.  Let's be back at 4:15.

6              (Recess)

7              THE COURT:  Let me begin by saying that sentencing

8    is the hardest thing I'm ever asked to do, and it's made

9    much more difficult in a situation like this, following a

10   jury trial where the defendant disagrees with the jury

11   verdict, because then I'm in the position of having to

12   impose a sentence and I have to base my sentence on the

13   verdict the jury returned.

14             And so, Mr. Dermen, I appreciated hearing from you

15   today.  I can imagine that you've felt a sense of

16   frustration over the last five years sitting quietly and

17   hearing lawyers and others talk and not telling your side of

18   the story.  I can see why you would find that frustrating.

19   But, unfortunately, a sentencing hearing is not the proper

20   procedural forum for me to just say I'm throwing the jury

21   verdict out the window.  So I hope you understand that.

22             I think Mr. Geragos understands that there is a

23   procedural mechanism for raising the issue that you've

24   raised today.  So I'm sure that he'll be filing a motion.

25   And then certainly you can raise those issues with the court

1    of appeals.

2            And I remember very well something that a friend

3    of mine, who had been a trial judge for a long time, told

4    me, which was -- I remember asking him how he felt when he

5    got reversed, if it made him angry, and he said no.  I'm

6    really glad there's a court of appeals because I don't want

7    to function without a backstop.  I don't want to walk on the

8    tightrope without a net.  So the Tenth Circuit is there so

9    that when mistakes are made, they're there to fix it.  And I

10   actually take a lot of comfort in knowing that.

11           So as I said, I appreciate hearing from you after

12   all these years.  Right now is not the time for me to throw

13   out the jury verdict.  So I hope you understand that.  I'm

14   in the position of sentencing you based on the jury verdict.

15   And I just have to trust that your very competent lawyers

16   will work through these issues, and that at the end of the

17   day justice will be served.

18           So with that being said, I then have to decide

19   what sentence to impose.  And, again, recognizing that if

20   you're vindicated at the end of the day, what I sentence you

21   to won't really matter, but I'm sentencing you based on the

22   facts as the jury found them.

23           And as I indicated at the outset, under the law I

24   am bound to begin my assessment of a sentence in every

25   federal criminal case with a correct calculation under the

1    Sentencing Guidelines.  And in this particular case, because

2    of the amount of loss, the guideline provisions are life in

3    prison, but there are other factors that I can consider.

4           And I think it is interesting to note that the

5    maximum sentence for a lot of the crimes that the jury

6    brought a guilt verdict back on, they were 20-year maximums,

7    and then two of them were ten-year maximums.

8           Given the other factors that I need to consider,

9    let me just tell you how I'm weighing things.  And, again,

10   this is based on the jury's finding of guilt, and that's

11   what I have to base it on at this point.

12          I'm required under the law to consider the nature

13   and circumstances of the offense, your history and

14   characteristics.  And I'm also required to discuss the issue

15   of just punishment, and deterrence, and to promote respect

16   for the law, and reflect the seriousness of the offense.

17          And in this particular case, as it has been with

18   the defendants all week, Mr. Dermen, I'm torn because by all

19   accounts, and I have no reason to doubt those accounts,

20   you're a man who has a record of philanthropy.  You're a

21   great father.  You were a good husband.  And there were so

22   many letters from folks who really, really value their

23   association with you and what they've seen of you.

24          On the other hand, I've got this jury verdict that

25   finds that there was a massive fraud committed with respect

1    to the tax credits for biofuel, and the amount at issue is

2    absolutely staggering.  It's over half a billion dollars.

3    It's certainly the biggest case that I've ever been involved

4    in.

5            And as I have said all week, as I've sentenced

6    people, deterrence is a really important consideration in

7    fraud cases, and particularly in fraud cases involving the

8    Internal Revenue Service and our tax system because

9    voluntary compliance with our tax system is critical to the

10   functioning of our government.  And so those who pay their

11   taxes need to know that those who don't pay taxes will be

12   punished.  And we clearly want to send a signal that

13   submitting false claims for over a billion dollars will not

14   be tolerated.  And so that weighs very, very heavy in my

15   assessment of what to do here.

16           The other thing that I would say -- and I

17   understand you may disagree with the premise of this, but

18   under the Sentencing Guidelines there is credit given for

19   accepting responsibility.  I understand that you have

20   asserted your innocence, you've maintained your innocence,

21   and that that doesn't allow you to take advantage of credit

22   for accepting responsibility.  And, again, that's something

23   that has to be worked out in a hearing other than this one,

24   because at this point I'm not in a position to give you

25   credit under the guidelines for that.

1        So at the end of the day, we're looking at a

2   guideline provision of life.  And as I go through all of the

3   aggravating factors and mitigating factors, despite your

4   personal characteristics, the magnitude of what happened

5   here, and the length of time over which it occurred doesn't

6   give me much of a reason to vary downward significantly.

7        So what I have determined I am going to do is

8   sentence you to the statutory max on Counts 1 and 2, and

9   have that run consecutively.  And then with respect to

10  Counts 3 through 10, I'm going to sentence you to ten years

11  on each of those counts to run concurrently with the other

12  two.  So at the end of the day it comes up with a total

13  effective sentence of 40 years.

14       I will note that you'll be entitled to credit for

15  the time that you've already served, and you'll be able to

16  earn good time off of that as well.

17       So that's where I've landed.  I don't know that it

18  makes any sense to pile stuff on and come up with some

19  astronomical figure just to make press headlines.  So I'm

20  not going to do that.

21       So with all of that being said, it is the judgment

22  of the Court that the defendant, Lev Aslan Dermen, be placed

23  in the custody of the Federal Bureau of Prisons on Count 1

24  for a period of 20 years, on Count 2 for a period of 20

25  years.  Those two sentences to be served consecutively.  And

it's my further ruling that I will impose a ten-year
sentence on each of Counts 3 through 10, to run concurrently
with the two consecutive sentences on Counts 1 and 2, for a
total period of 480 months.  I also am going to impose a
term of supervised release of three years.

Within 72 hours of your release from custody, you
need to report in person to the probation office in the
district to which you are released.

I find that you don't pose a risk of future
substance abuse, so I'm suspending the requirement that you
submit to mandatory drug testing.  But you will be required
to submit to the collection of a DNA sample at the direction
of the Federal Bureau of Prisons or U.S. Probation Office.

I'll note that I entered a preliminary order of
forfeiture on March 24th, 2023.  I'm going to incorporate
that into the judgment and commitment order with respect to
the property to be forfeited as well as with respect to the
money judgments that are addressed in paragraphs 16 and 17
of that order.

You shall not commit any federal, state, or local
crime.  As a convicted felon, you're prohibited from
possessing a firearm or ammunition.  In addition, you shall
not illegally possess a controlled substance, and you shall
comply with the standard conditions of supervision as
adopted by this Court.

1          I am going to order that you work with the

2     probation office in making them aware of your assets that

3     might be used to satisfy the restitution that I'm going to

4     order in this case, and that would include that you must

5     provide the U.S. Probation Office complete access to all

6     business and personal financial information.  Secondly, you

7     must not transfer, sell, give away, or otherwise convey any

8     asset with a value of $500 or more without the approval of

9     the U.S. Probation Office.

10         MR. GERAGOS:  Can I ask for a clarification of

11    that?  There is litigation.  Does that include anything that

12    he controls or has indirect control of?

13         THE COURT:  And that's interesting, and I suppose

14    we can hear from the government on this.  I suppose to the

15    extent he owns an asset and is subject to a restitution

16    order, then there needs to be some accountability for making

17    restitution payments.  And I don't know what your suggestion

18    is on that.

19         Clearly there's going to be an amount of

20    restitution that is paid.  And, frankly, the payment

21    schedule that I was going to propose was the greater of $25

22    per quarter or 50 percent of his income while incarcerated.

23    And that if he receives more than $200 in any month during

24    his confinement, then anything in excess of the $200 would

25    be applied towards restitution.  And then I was going to

1    order that he pay restitution at a minimum rate of 600 per

2    month upon release from incarceration.

3              MR. GERAGOS:  Okay.  I just want to make sure that

4    if he has an interest in some asset, just hypothetically, he

5    is capped at -- what did you say -- anything over $500?

6              THE COURT:  He shouldn't give it away --

7              MR. GERAGOS:  Got it.

8              THE COURT:  -- without approval of the probation

9    office.

10             MR. GERAGOS:  Got it.  Thank you.

11             THE COURT:  I'm also going to impose a condition

12   that you must apply all monies received from income tax

13   refunds, lottery winnings, judgments, or anticipated or

14   unexpected financial gains to your outstanding Court ordered

15   financial obligations.  You must notify the probation

16   officer of the receipt of any indicated money.

17             And, number four, you must be placed on the State

18   Finder and Treasury Offset programs, requiring any state and

19   federal tax refunds to be intercepted for purposes of Court

20   ordered financial obligations.

21             And then, finally, you must notify the U.S.

22   Probation Office in the Office of the United States Attorney

23   of any material change in your economic circumstances that

24   might affect your ability to pay Court ordered financial

25   obligations.  And, again, that's just to facilitate the

1   probation office in helping to collect the restitution

2   amounts.

3           I have considered your financial resources, and

4   given the magnitude of the restitution amount, I'm not going

5   to order a fine.  I'm going to waive the fine.  But I am

6   going to order restitution, pursuant to 18 United States

7   Code Section 3663A, in the amount of $511,842,773, payable

8   to the IRS, attention Mail Stop 6261, Restitution 333 West

9   Pershing Avenue, Kansas City, Missouri, 64108.

10          I will note that that restitution amount is

11  entered jointly and severally with all of the co-defendants

12  in this case.  And then I'll order that it be paid based

13  upon the payment schedule that I articulated a moment ago.

14          Finally, you need to pay a special assessment fee

15  in the amount of $1,000.  That will be due immediately, but

16  you'll be able to work and pay that off during the period of

17  your incarceration.

18          I don't know if you have a recommendation,

19  Mr. Geragos, as to where Mr. Dermen would like to be

20  assigned.  I know he's anxious to get out of the jail where

21  he's been held.

22          MR. GERAGOS:  Yes.  If we could ask for an

23  expedited transfer to Lompoc in California.

24          THE COURT:  Okay.  I will make that, and hopefully

25  they can get you out of the Salt Lake County Jail quickly.

 1                   MR. DERMEN:  Thank you.

 2                   THE COURT:  You don't like the altitude here

 3     anyway, right?

 4                   MR. DERMEN:  Yeah, it's hard for me.  And now,

 5     during this hour, it gets high.  Now it started.

 6                   THE COURT:  All right.

 7                   MR. DERMEN:  Lompoc is close to water.

 8                   THE COURT:  Mr. Dermen, everything in California

 9     is close to water right now.

10                   MR. GERAGOS:  Yes, right.  Now everything is.

11                   THE COURT:  Are you under water down there?

12                   MR. GERAGOS:  Yes.  We have lakes reappearing that

13     have been disappeared for 40 years.  It's the most

14     incredible thing you'd ever want to see.  I live next to a

15     dam, within walking distance, that has been barren for 30

16     years and now the water has reappeared, lakes have

17     reappeared.  It's wild.

18                   MR. DERMEN:  It's ocean next to me.  I get some

19     suntanning stuff.  I've got 40 years to go.

20                   THE COURT:  Well, and you want to be close to your

21     family, right, have better visitation, all that stuff, while

22     this gets worked out in front of the Tenth Circuit.

23                   MR. DERMEN:  Thank you.

24                   THE COURT:  All right.

25                   Is there any other correction or addition that I

 1   need to make to the sentence?

 2          MR. GERAGOS:  There's two things.  For credits,

 3   it's always been my interpretation, I assume the Court would

 4   agree with me, that the sentencing court defers to the

 5   Bureau of Prisons for that calculation of the credits,

 6   number one.  Number two, I believe that we were just having

 7   a discussion under the rules that now the J&C will be issued

 8   and that will be a final order on the preliminary order of

 9   forfeiture, which, my quick reading here, I'm allowed to ask

10   to be stayed once the appeal is filed -- or the notice is

11   filed.  So I will do that.

12          THE COURT:  Okay.

13          MR. McCULLOUGH:  That's correct, Your Honor.

14          The final order actually has been accomplished by

15   your pronouncing it orally at sentencing.  So it's final now

16   as to the defendant.  And once you incorporate it in the

17   J&C, then they can move to whatever -- they can move to stay

18   if they wish.

19          THE COURT:  Okay.  And my understanding is also

20   that anybody else who may have an interest in any of the

21   property will proceed through ancillary proceedings at that

22   point.

23          MR. McCULLOUGH:  That's correct.  So we'll go

24   through the ancillary, which we are already commencing

25   notice for to see who comes in and files claims, and

1    obviously we will be filing those with Your Honor.  I expect

2    there will be a number of them and that will probably take

3    some time.

4            THE COURT:  Everything about this case has taken

5    time.

6            MR. McCULLOUGH:  I hesitate to say perhaps a long

7    time, but it may take a long time.

8            MR. GERAGOS:  The number of lawyers who have had

9    kids is also amazing, including Ms. Qassim.

10           THE COURT:  Ms. Qassim, congratulations.

11           MR. GERAGOS:  And then Teny Geragos, the associate

12   of Mr. Agnifilo.

13           THE COURT:  All right.  Well, we also have a

14   defendant who's had a couple of children during this case.

15   I think Mr. Kingston falls in that category.

16           All right.  Well, if there are no other

17   corrections, requests, or additions to the judgment that I

18   have just pronounced, the last thing I need to do,

19   Mr. Dermen, is notify you with respect to your appellate

20   rights.  And based on what you've articulated today, I'm

21   sure you want to exercise those.  So listen carefully,

22   although I know Mr. Geragos will take good care of you in

23   that regard.

24           But you, unlike the other defendants in this case,

25   did not plead guilty.  So you still have the full panoply of

1    appellate rights that are available to you.  You haven't

2    waived any of those.  If you choose to appeal, you must do

3    that within 14 days of the entry of judgment.  If you

4    request, the clerk of the court will prepare and file a

5    notice of appeal on your behalf.

6            If you can't afford to pay the cost of an appeal,

7    or you can't afford to pay a lawyer to handle the appeal,

8    then you can ask that the filing fee be waived, and you may

9    apply for a lawyer to handle the appeal at government

10   expense.

11           Do you have any questions about that?

12           MR. DERMEN:  No, Your Honor.  I don't have any

13   questions.

14           THE COURT:  All right.  Is there anything else

15   that we need to address?

16           MR. GERAGOS:  No.  Thank you, Your Honor.

17           MR. ROLWING:  Not from the government.

18           THE COURT:  Thank you.

19           Mr. Dermen, I wish you the best.  I know it's been

20   a difficult five years living through COVID while you're

21   incarcerated, and hopefully getting back to that California

22   sunshine and ocean will make things a bit better.

23           MR. DERMEN:  Thank you, Your Honor.

24           THE COURT:  Thank you.

25           (Whereupon, the proceeding was concluded.)

1                 C E R T I F I C A T E

2

3

4                                                                I

5   hereby certify that the foregoing matter is transcribed from

6   the stenographic notes taken by me and is a true and

7   accurate transcription of the same.

8

9

10

11

12

13

14

15

16

17   PATTI WALKER, CSR-RPR-CP      DATED: 4-24-2023
     Official Court Reporter
18   351 South West Temple, #8.431
     Salt Lake City, Utah  84101
19   385-215-5889

20

21

22

23

24

25